DAVIS WRIGHT TREMAINE LLP
    James H. Moon (SBN 268215)
    jamesmoon@dwt.com
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071
Telephone: (213) 633-6800
Fax: (213) 633-6899

LATHROP GPM LLP
    Patrick N. Fanning (*pro hac vice* forthcoming)
    Emma C. Halling (*pro hac vice* forthcoming)
2345 Grand Blvd., Suite 2200
Kansas City, MO 64108
Telephone: (816) 292-2000
Fax: (816) 292-2001

*Attorneys for Defendant*
*Crayola LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE WEDGE, SHAWN WAGNER, and ROBERT MASON, | Case No. 3:26-cv-397 |
|         Plaintiffs, | **NOTICE OF REMOVAL** |
|       v. | |
| CRAYOLA LLC, and DOES 1 to 50, | |
|         Defendant. | |

-1-

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Crayola LLC removes the above-entitled action from the Superior Court of California in the County of Alameda, to the United States District Court for Northern District of California on the grounds of diversity of citizenship. In support of its Notice of Removal, and in accordance with 28 U.S.C. § 1446, Defendant Crayola states as follows:

### THE STATE COURT ACTION

1.    Plaintiffs Stephanie Wedge, Shawn Wagner and Robert Mason filed the Complaint in the Superior Court of the State of California for the County of Alameda on December 5, 2025, captioned *Wedge, et al. v. Crayola LLC, et al.,* Case No. 25CV157969 ("State Court Action").

2.    On December 15, 2025, process of this lawsuit was served on Crayola's registered agent. This process included a summons and the Complaint.

3.    Crayola has not filed a responsive pleading in the State Court Action.

4.    Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the Complaint is attached as Exhibit A.  True and correct copies of all other process, pleadings, and orders served upon Crayola are attached as Exhibit B.

5.    Plaintiffs Stephanie Wedge, Shawn Wagner, and Robert Mason allege they purchased thirteen different Crayola products "which are all art products that uniformly claim to be non-toxic." (Compl. ¶ 1).

6.    Plaintiffs allege Crayola's use of the word "non-toxic" on its product labels "violate[s] numerous laws, including the Federal Trade Commission Act ('FTC Act,' 15 U.S.C. § 45) the Federal Trade Commission's ('FTC') Green Guides for Environmental Marketing Claims ('Green Guides,' 16 C.F.R. § 260.10 et seq.), and California's Environmental Marketing Claims Act ('EMCA,' Bus. & Prof. Code, § 17580 et seq.)." (*Id.* ¶ 6).

7.    Plaintiffs further plead that Crayola's use of the word "non-toxic" on its product labels "constitutes unfair, fraudulent, and unlawful conduct that violates California's Unfair Competition Law ('UCL,' Bus. & Prof. Code, § 17200 et seq.), violates California's Consumers Legal Remedies Act ('CLRA,' Civ. Code § 1750 et seq.), and constitutes false advertising in violation of California's False Advertising Law ('FAL,' Bus. & Prof. Code, § 17500, et seq.)."

1  (*Id.*).

2       8.    Plaintiffs seek "relief from Crayola as provided for in Civil Code section 1780," a

3  statute that provides for actual damages, injunctive relief, restitution, punitive damages, a

4  mandatory award of attorneys' fees and court costs for prevailing plaintiffs, and attorneys' fees for

5  prevailing defendants upon a finding of lack of good faith. (*Id.* ¶ 348). Plaintiffs also request

6  "injunctive relief under Business and Professions Code sections 17203 and 17535" and "restitution

7  under Business and Professions Code section 17203 and 17535.' (*Id.* ¶ 7). Plaintiffs also seek

8  "such other and further relief as the Court may deem just and proper." (*Id.* p. 85).

9  <div align="center">**NOTICE & NON-WAIVER**</div>

10       9.    In accordance with 28 U.S.C. § 1446(d), promptly after filing this Notice of

11  Removal, Crayola will file a Notice to the Clerk of Removal with the Clerk of the Superior Court

12  of California in the County of Alameda and will attach a copy of this Notice of Removal. A copy

13  of the Notice to Clerk of Removal is attached as Exhibit C.

14       10.    Further, Crayola will serve a copy of the Notice of Removal upon counsel for

15  Plaintiffs.

16       11.    Crayola has good and sufficient defenses to this action, and does not waive any

17  defenses, jurisdictional or otherwise, by the filing its Notice of Removal. *See* Wright & Arthur R.

18  Miller, *Federal Practice and Procedure* § 1395 (3d ed. 2004) (*quoting Greenberg v.*

19  *Giannini,* 140 F.2d 550, 553 (2d Cir. 1944)) ("When a defendant removes an action from a state

20  court in which he has been sued, he consents to nothing and 'waives' nothing; he is exercising a

21  privilege unconditionally conferred by statute, and, since the district court to which he must

22  remove it is fixed by law, he has no choice, without which there can be no 'waiver.'").

23       12.    Consent of the Doe Defendants is unnecessary because they have been sued under

24  fictitious names and have not been properly joined or served.

25  <div align="center">**REMOVAL IS TIMELY AND VENUE IS PROPER**</div>

26       13.    Removal of the State Court Action is timely because Defendant Crayola has filed

27  its Notice of Removal within 30 days after the December 15, 2025, date of service of the summons

28  and Complaint. 28 U.S.C. §§ 1446(b)(1); Fed. R. Civ. P. 6(a).

NOTICE OF REMOVAL
Case No. 3:26-cv-397

14. Venue lies in this Court because the State Court Action was originally filed in Alameda County, California, which is within the geographic boundaries of the United States District Court for the Northern District of California. 28 U.S.C. § 105; 28 U.S.C. § 1441(a).

**THIS COURT HAS ORIGINAL JURISDICTION OVER THIS ACTION**

15. This Court has original jurisdiction over Plaintiffs' lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiffs and Crayola are "citizens of different states" (*See supra*, ¶¶ 12-15) and the matter in controversy exceeds the sum or value of $75,000.

**A. Citizenship of the parties**

16. Plaintiffs Stephanie Wedge, Shawn Wagner and Robert Mason are domiciled in the State of California and thus are citizens of California for diversity purposes. (Compl. ¶¶ 9-11.)

17. Defendant Crayola LLC has a single member: H.A., LLC.

18. H.A., LLC, also has a single member: Hallmark Cards, Incorporated.

19. Hallmark Cards, Incorporated is a Missouri corporation that maintains its principal place of business and corporate headquarters in Kansas City, Missouri.

20. Defendant Crayola LLC is therefore a citizen of Missouri.

**B. The amount in controversy exceeds $75,000.**

21. Plaintiffs allege they "suffered injury in fact and lost money or property as a result of purchasing" Crayola's products. (Compl. ¶ 336, 360).

22. Plaintiffs' requested relief includes actual damages, restitution, and punitive damages under California Civil Code Section 1780. (Compl. ¶ 348; Prayer for Relief, p. 85) ("Plaintiffs request relief from Crayola is provided for in Civil Code section 1780," which provides for actual and punitive damages, as well as "such other and further relief as the Court may deem just and proper.").

23. Plaintiffs also request, pursuant to Business and Professions Code sections 17203 and 17535, that this Court make any "order or judgment" it "deems appropriate as may be necessary to prevent" the conduct alleged by Plaintiffs in their complaint. (Compl. p. 85.)

24. Plaintiffs repeatedly request orders of restitution. (Compl. ¶¶ 7, 338, 348, 361, p. 85). This includes "restitution in such amount that Plaintiffs paid to purchase Crayola's Products

-4-

1  or paid as a premium over alternatives, or restitutionary disgorgement of the profits Crayola

2  obtained from those transactions." (Compl. p. 85).

3      25.    Plaintiffs' complaint does not assert an explicit monetary amount Plaintiffs seek to

4  recover, nor provide a valuation of the non-monetary relief sought by Plaintiffs.

5      26.    The Ninth Circuit defines "the amount in controversy as the 'amount at stake in the

6  underlying litigation … this includes any result of the litigation, excluding interests and costs, that

7  'entails a payment] by the defendant …. This amount includes, *inter alia*, damages (compensatory,

8  punitive, or otherwise) and the cost of complying with an injunction, as well as attorneys' fees

9  awarded under fee shifting statutes." *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644,

10  648 (9th Cir. 2016) (citations omitted).) "'Amount at stake' does not mean likely or probable

11  liability; rather, it refers to possible liability." *Greene v. Harley-Davidson, Inc.*, 965 F.3d 767, 772

12  (9th Cir. 2020); accord *Chavez v. JPMorgan Chase & Co.*, 888 F.3d 413, 417 (9th Cir. 2018). This

13  includes future attorneys' fees, not just those accrued at the time of removal. *Fritsch v. Swift*

14  *Transportation Co. of Arizona, LLC*, 899 F.3d 785, 795 (9th Cir. 2018).

15      27.    In their Complaint, Plaintiffs seek "relief from Crayola as provided for in

16  [California] Civil Code section 1780," a statute that provides for actual damages, injunctive relief,

17  restitution, punitive damages, a mandatory award of attorneys' fees and court costs for prevailing

18  plaintiffs, and attorneys' fees for prevailing defendants upon a finding of lack of good faith. (*Id*. ¶

19  348). Plaintiffs further seek "injunctive relief under Business and Professions Code sections 17203

20  and 17535" and "restitution under Business and Professions Code section 17203 and 17535.' (*Id*.

21  ¶ 7). Plaintiffs also seek "such other and further relief as the Court may deem just and proper." (*Id*.

22  p. 85).

23      28.    Under California Civil Code section 1780(e), "[t]he court shall award court costs

24  and attorneys' fees to a prevailing plaintiff in litigation filed pursuant to this section." Because

25  there are multiple Plaintiffs in this action, "attorneys' fees awarded under § 1780 must be divided

26  among all members of the plaintiff class for purposes of amount in controversy." *Kanter v.*

27  *Warner-Lambert Co.*, 265 F.3d 853, 858 (9th Cir. 2001).

28      29.    The amount in controversy exceeds $75,000 on the basis of statutory attorney fee

-5-

claims alone, without even including the other categories of damages Plaintiffs seek in their Complaint.

30. To determine the amount of attorneys' fees for the purposes of the amount in controversy, the Notice of Removal looks to the identity and experience of Plaintiffs' counsel, the prevailing rates in the community in which the district court sits (*see Carr v. Tadin, Inc.*, 51 F. Supp. 3d 970, 978 (S.D. Cal. 2014), and a reasonable estimation of the attorneys' fees to be incurred in the litigation of this matter.

31. Plaintiffs are represented by Feinstein Doyle Payne & Kravec, LLC. (Complaint, p. 85). Attorneys Wyatt Lison and John Worgul signed the 85-page Complaint. (*Id.*). And named partner Joseph Kravec, along with Mr. Lison, submitted the 55-page pre-suit demand Plaintiffs sent to Crayola.

32. Mr. Kravec is a Partner with more than 30 years' experience as a class action litigator representing insureds, borrowers, consumers, investors, employees and retirees as lead or co-lead counsel in numerous nationwide, multi-state and statewide class actions in federal and state courts throughout the United States. He is a 1993 law school graduate and named partner with the firm.

33. Mr. Lison is a partner at the firm and is a complex, mass and class action litigator primarily practicing in the fields of consumer litigation, consumer fraud, securities, and antitrust law. Mr. Lison is a 2002 law school graduate.

34. Mr. Worgul is a 2008 law school graduate and member of the firm's class action litigation group.

35. The Wolters Kluwer Real Rate Report ("2024 Real Rate Report") provides an appropriate estimate for Plaintiffs' attorney fees. "The Real Rate Report is an annual publication by Wolters Kluwer that analyzes data derived from actual rates charged to (and paid by) clients on law firm invoices. It has been referenced in this circuit to assess reasonable historical rates." *Food & Water Watch, Inc., v. EPA*, No. 17-CV-02162-EMC, 2026 WL 26125, at *3 (N.D. Cal. Jan. 5, 2026).

36. The 2024 Real Rate Report identifies the "median" hourly rates for litigation in San

-6-

Francisco as $825/hour for partners and $614/hour for associates.

37.     Additionally, in *U.S. v. Academy Mortgage Corp.*, (Gwen Thrower, Relator), No. 3:16-cv-02120-EMC, Dkt. 500, pp. 2, 11, 14 (N.D. Cal. May 31, 2024), this Court approved the following rates for litigation counsel in a Northern District of California qui tam action:

>    a.  Partner J. Nelson Thomas, 1993 law graduate: $888/hour;
>
>    b.  Partner Michael Lingle, 2000 law graduate: $860/hour; and
>
>    c.  Partner Jessica Lukasiewicz, 2008 law graduate: $840/hour.

38.     Based on the 2024 Real Rate Report and the ruling in *Academy Mortgage*, Crayola provides the following estimates for the hourly rates of the Plaintiffs' attorneys identified to date in this lawsuit:

| Attorney | Years of Experience | 2024 Real Rate | *Academy Mortgage* Comparator Rate | Estimated rate: (Average of 2024 Real Rate and *Academy Mortgage* Comparator Rate) |
|---|---|---|---|---|
| Joseph Kravec | 33 | $825 (partner) | $888 | $856 |
| Wyatt Lison | 24 | $825 (partner) | $860 | $842 |
| John Worgul | 18 | $614 (associate*) | $840 | $727 |

*The 2024 Real Rates table did not include a category for counsel.

39.     The estimated rates are consistent with rates included for Plaintiffs' counsel's law firm in a 2020 fee motion in the Southern District of New York federal court. *See U.S. ex rel. Yasti v. Nagan Construction*, No. 1:17-CV-07163-AT, Dkt. 34, 2020 WL 9460441 (S.D.N.Y. April 1, 2020) (reporting Feinstein Doyle Payne Kravec charged rates of "$425 for associates, $750 for senior litigation counsel, and $850 for partners."). Indeed, Plaintiffs' counsel's rates now—6 years later—are almost certainly higher than those reported in 2020.

40.     The $856 estimated rate for Mr. Kravec is only $6 higher than the $850 partner rate Feinstein Doyle provided to the Southern District of New York federal court in 2020 (a 0.7% increase). The $842 estimated rate for Mr. Lison is $8 lower than the $850 partner rate Feinstein Doyle provided in 2020. And the $727 estimated rate for Mr. Worgul is $23 below the $750 rate Feinstein Doyle provided in 2020 for senior litigation counsel, a role which would be consistent with Mr. Worgul's experience and years of practice. The estimated rates for the Feinstein Doyle

-7-

team are therefore conservative based on rates previously submitted by the firm in the Southern District of New York federal court.

41.    Blending the estimated hourly rates for the three Plaintiffs' attorneys (($856+$842+$727) ÷ 3 attorneys) reveals an estimated blended hourly rate of $808.33.

42.    Applying the blended estimated hourly rate, Plaintiffs have already incurred significant attorney fees in the lawsuit. Plaintiffs' counsel sent Plaintiffs' 55-page single-spaced demand letter on April 2, 2025, 8 months before filing the 85-page Complaint. Plaintiffs have therefore provided 140 pages of submissions to date, which explicitly reference the "investigation of their counsel," (See Compl., p. 1.) Plaintiffs' counsel also includes 113 footnotes in their Complaint, with most of their footnotes referencing cases, studies, websites, and alleged survey results. Conservatively estimating that an exceedingly efficient attorney may be able to read and research background information and generate a single page of a demand letter or pleading (annotated with researched footnotes) in 25 minutes, Plaintiffs' attorneys' generation of 140 pages thus far would confirm that Plaintiffs have already spent at least 3,500 minutes (roughly 58 hours) preparing just their preliminary demand and pleading. At Plaintiffs' attorneys' blended rate of $808.33 per hour—and assuming counsel read all the materials cited in the Complaint—Plaintiffs have already incurred estimated fees of approximately $46,883.00 simply to get their case to the initial pleading stage.

43.    Plaintiffs also plead 280 separate "Factual Allegations" against Crayola, with at least 28 paragraphs (or 10%) pleaded based "on information and belief." (*See* Compl., ¶¶ 59-339.) Even if Plaintiffs' counsel are able to develop each and every one of their 280 separate factual allegations after spending an average of one hour of discovery and review for each allegation (including those that are currently premised on nothing more than information and belief), Plaintiffs would still incur $226,332 in additional attorney fees (1 hour *x* 280 fact paragraphs *x* $808.33 blended rate) simply developing the facts to support their 280 factual allegations.

44.    Plaintiffs ask for a legal determination that thirteen separate Crayola products have been "unqualifiedly, unfairly, and unlawfully" "labeled as being NON-TOXIC." (Compl. ¶ 1.) Plaintiffs specifically plead the NON-TOXIC label on the thirteen separate products "violate

-8-

numerous laws" including: (1) the Federal Trade Commission Act, 15 U.S.C. § 45; (2) the Federal Trade Commission's Green Guides for Environmental Marketing Claims, 16 C.F.R. § 260.10 *et seq.*; (3) California's Environmental Marketing Claims Act, Bus. & Prof. Code, § 17580 *et seq.* Plaintiffs wish to obtain a determination that the thirteen separate products' "false and misleading NON-TOXIC labeling also constitutes unfair, fraudulent, and unlawful conduct" that violates: (1) California's Unfair Competition Law, Bus. & Prof. Code, § 17200 *et seq.*; (2) California's Consumers Legal Remedies Act, Civ. Code § 1750 *et seq.*; and (3) California's False Advertising Law, Bus. & Prof. Code, § 17500 *et seq.* (Compl. ¶ 6.)

45.     In other words, Plaintiffs have outlined in their pleading a requirement that they develop sufficient evidence to develop and prove that each of the thirteen separate Crayola products violates six separate—sophisticated and complex—federal and state statutory schemes. Simple math confirms Plaintiffs have outlined a requirement to establish 78 separate alleged statutory violations based on their subjective arguments that each of Crayola's NON-TOXIC product labels are the product of unfairness, unlawfulness, and fraud (13 separate Crayola products multiplied by 6 statutory schemes). Even if Plaintiffs' attorneys could develop the necessary legal arguments applicable to each product and statute at a rate of four hours per product, they would still need to invest an additional estimated 312 hours preparing the legal arguments to establish their theories. At their estimated blended attorney rate of $808.33, Plaintiffs would incur an estimated $252,199.00 in additional attorney fees developing their legal arguments.

46.     Accordingly, and without accounting for Crayola's defenses and contrary arguments (which will be significant and substantial), Plaintiffs will incur estimated attorney fees of approximately $525,414.00 ($46,883.00+$226,332.00+$252,199.00) simply working to establish their factual allegations and legal conclusions.

47.     Crayola vehemently disagrees with the factual allegations and legal conclusions Plaintiffs have offered in their Complaint. Crayola will contest each of Plaintiffs' asserted theories and arguments (as well as several of Plaintiffs' pleaded facts). Indeed, Crayola will defend its labeling for each and every one of the thirteen products Plaintiffs have identified in their Complaint. And Crayola will fundamentally dispute any allegation or theory that its NON-TOXIC

NOTICE OF REMOVAL
Case No. 3:26-cv-397

label violates any one of the six separate federal or state statutory schemes Plaintiffs have listed. Accordingly, Plaintiffs' attorneys will not be able to develop their factual allegations or legal arguments without significant disagreement and substantial counter-discovery from Crayola, which will likely include substantial dispositive motion practice. Plaintiffs will therefore incur significant additional attorney fees addressing Crayola's defenses, discovery, and disagreement with the factual and legal premises Plaintiffs have advanced.

48.   No matter how the Court evaluates Plaintiffs' statutory attorney fees theories, Plaintiffs' claim satisfies the $75,000.00 amount in controversy requirement based on statutory attorney fee claims alone.

49.   Removal to this Court is therefore proper due to diversity of citizenship under 28 U.S.C. § 1332.

Dated:  January 14, 2026                    DAVIS, WRIGHT, TREMAINE LLP

                                            /s/ James H. Moon
                                    By:     James H. Moon

                                            Attorneys for Defendant CRAYOLA LLC

-10-

# EXHIBIT A

1  Wyatt A. Lison (SBN – 316775)
   John P. Worgul (SBN – 259150)
2  **FEINSTEIN DOYLE PAYNE**
     **& KRAVEC, LLC**
3  429 Fourth Avenue
   Law & Finance Building, Suite 1300
4  Pittsburgh, PA 15219
   Tel.: 412-281-8400
5  Fax: 412-281-1007
   Email: wlison@fdpklaw.com
6  Email: jworgul@fdpklaw.com

7  *Attorneys for Plaintiffs*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**12/05/2025 at 01:14:20 PM**
By: Andrel Gospel,
Deputy Clerk

8  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
   **FOR THE COUNTY OF ALAMEDA**
9

10  **STEPHANIE WEDGE, SHAWN WAGNER**      Case No.: 25CV157969
    **AND ROBERT MASON,**
11                                          **COMPLAINT:**

12                              **Plaintiffs,**     **(1) "Unlawful" and "Unfair" Business
                                                    Practices in Violation of The Unfair**
13              **v.**                              **Competition Law ("UCL"), Bus. & Prof.
                                                    Code §§ 17200, et seq.**
14  **CRAYOLA LLC, and DOES 1 to 50**
                                                    **(2) Violation of the Consumers Legal
15                                                  Remedies Act ("CLRA"), California Civil
                                                    Code §§ 1750, et seq.**
16
    **Defendants.**                                 **(3) Violation of California's False
17                                                  Advertising Law, Cal. Bus. Prof. Code §§
                                                    17500, et seq.**
18

19

20

21

22

23

24

25

26

27

28

1    Plaintiffs Stephanie Wedge, Shawn Wagner and Robert Mason ("Plaintiffs"), by and through

2    their attorneys, bring this action against Defendant Crayola LLC ("Crayola") and DOES 1-50 and

3    allege the following based upon their personal experience, based upon the investigation of their

4    counsel, and based on information and belief as to all other matters:

<div align="center">

**NATURE OF THE CASE**

</div>

6    1.    This is an action seeking relief that is statutory and equitable in nature, including

7    enjoining Crayola LLC from selling its art Products (the "Products") unqualifiedly, unfairly, and

8    unlawfully, labeled as being NON-TOXIC. The Products include Crayola Classic Markers (Exhibit

9    1), Crayola Color Change Dual-Ended Markers (Exhibit 4), Crayola Washable Markers (Exhibit 7),

10   Crayola Color Wonder Mess Free Coloring Pages and Markers (Exhibit 9), Crayola Glitter Glue

11   (Exhibit 12), Crayola Washable Glue Sticks (Exhibit 14), Crayola School Glue (Exhibit 16), Crayola

12   Paint Sticks (Exhibit 18), Crayola Washable Paints (Exhibit 20), Crayola Anti-Dust Chalk (Exhibit

13   22), Crayola Sidewalk Chalk (Exhibit 23), Crayola Washable Dry Erase Markers (Exhibit 25), and

14   Crayola Silly Scents Scented Washable Makers (Exhibit 27), which come in various packaging,

15   quantities, colors, and versions, but which are all art products that uniformly claim to be NON-TOXIC.

16   2.    Crayola prominently labels the Products as NON-TOXIC on their front labels. There

17   is no clear, prominent, and understandable qualification to Crayola's NON-TOXIC claims made on

18   the labeling of the Products. Crayola's NON-TOXIC claims about the Products are unqualified

19   environmental marketing claims.

20   3.    Crayola's marketing of the Products, including through its product labeling and

21   advertising, emphasizes the safety of the Products to people, animals (including pets), and the

22   environment. This is done to capitalize on consumer demand for "eco-friendly" and "toxin-free"

23   products, including those that will primarily be used by or with children, near or around pets and

24   animals, and the remainder of the environment at large.

25   4.    Crayola's promotions of the Products as being NON-TOXIC, safe, and eco-friendly

26   tells consumers that the Products will not harm people, pets, or the environment.

27   5.    Despite the Products' environmental marketing claims that the products will not cause

28   harm to people, pets, or the environment, the Products are capable of causing harm to people, pets,

1    and the environment.

2        6.      Crayola's false and misleading NON-TOXIC claims on the Products' labels violate

3    numerous laws, including the Federal Trade Commission Act ("FTC Act," 15 U.S.C. § 45) the Federal

4    Trade Commission's ("FTC") Green Guides for Environmental Marketing Claims ("Green Guides,"

5    16 C.F.R. § 260.10 et seq.), and California's Environmental Marketing Claims Act ("EMCA," Bus. &

6    Prof. Code, § 17580 et seq.).   The Products' false and misleading NON-TOXIC labeling also

7    constitutes unfair, fraudulent, and unlawful conduct that violates California's Unfair Competition Law

8    ("UCL," Bus. & Prof. Code, § 17200 et seq.), violates California's Consumers Legal Remedies Act

9    ("CLRA," Civ. Code § 1750 et seq.), and constitutes false advertising in violation of California's False

10   Advertising Law ("FAL," Bus. & Prof. Code, § 17500, et seq.).

11       7.      To stop the unfair marketing of the Products as being NON-TOXIC when the Products

12   actually can cause harm to people, pets, and the environment, Plaintiffs bring this action seeking

13   injunctive relief under Business and Professions Code sections 17203 and 17535, and Civil Code

14   section 1780 subdivision (a)(2).  Plaintiffs also seek restitution under Business and Professions Code

15   section 17203 and 17535, and Civil Code section 1780 subdivision (a)(3).

16                              **JURISDICTION AND VENUE**

17       8.      This Court has jurisdiction over the claims raised in this Complaint and venue is

18   appropriate pursuant to Code of Civil Procedure sections 395.5 and 410.10, and Civil Code section

19   1780 subdivision (d).  Plaintiff Stephanie Wedge purchased Crayola products labeled as being NON-

20   TOXIC in Alameda County.  Liability for the false and misleading labeling arose in Alameda County,

21   and a substantial portion of the underlying transactions and events complained of herein occurred in

22   Alameda County.  Attached hereto as Exhibit 29 is a declaration in compliance with Civil. Code

23   section 1780 subdivision (d).

24                                    **THE PARTIES**

25       9.      Plaintiff Stephanie Wedge is a resident of Pleasanton, California.  Ms. Wedge

26   purchased Crayola art products, labeled NON-TOXIC, in Alameda County within the past three years,

27   including Crayola's Washable Markers (Exhibit 7). She specifically purchased the Products, in part,

28   because of the NON-TOXIC claims because she expected the Products to be used by children. When

she purchased the Products, Ms. Wedge was misled to believe that the Products were safe for people, animals (including pets), and the environment because of the NON-TOXIC claims. Had she known that the Products were not NON-TOXIC and could cause harm to people, pets, and/or the environment, this would have affected Ms. Wedge's purchasing decisions in that she would have purchased a lesser quantity of the Products, and/or would have purchased other similar products.

10.    Plaintiff Shawn Wagner is a resident of San Diego County, California. Mr. Wagner purchased Crayola art products, labeled NON-TOXIC, in San Diego and Los Angeles County within the past three years, including Crayola's Classic Markers (Exhibit 1), Crayola Color Change Dual-Ended Markers (Exhibit 4), Inspirational Art Set (Exhibit 7), Imagination Art Set (Exhibit 7), Washable Markers (Exhibit 7), Bold and Bright Washable Markers (Exhibit 7), Clicks Retractable Washable Markers (Exhibit 7), Color Wonder Mess Free Coloring Kits (Exhibit 9), Glitter Glue (Exhibit 12), Washable Paint (Exhibit 20), Sidewalk Chalk (Exhibit 23), and Silly Scents Scented Washable Makers (Exhibit 27). He specifically purchased the Products, in part, because of the NON-TOXIC claims because he expected the Products to be used by children. When he purchased the Products, Mr. Wagner was misled to believe that the Products were safe for people, pets, and the environment because of the NON-TOXIC claims. Had he known that the Products were not NON-TOXIC and could cause harm to people, pets, and the environment, this would have affected Mr. Wagner's purchasing decisions in that he would have purchased a lesser quantity of the Products, and/or would have purchased other similar products.

11.    Plaintiff Robert Mason is a resident of Riverside County, California. Mr. Mason purchased Crayola art products, labeled NON-TOXIC, in Riverside County within the past three years, including Crayola's Washable Markers (Exhibit 7), Super Tips Washable Markers and Silly Scents Smashups (Exhibit 7 and 27), Sidewalk Chalk (Exhibit 23), and Washable Dry Erase Markers (Exhibit 25). He specifically purchased the Products, in part, because of the NON-TOXIC claims because he expected the Products to be used by children and he owns endangered tortoises that could be exposed to the Products. When he purchased the Products, Mr. Mason was misled to believe that the Products were safe for people, pets, and the environment because of the NON-TOXIC claims. Had he known that the Products were not NON-TOXIC and could cause harm to people, pets, and the environment,

1 | this would have affected Mr. Mason's purchasing decisions in that he would have purchased a lesser
2 | quantity of the Products, and/or would have purchased other similar products.

3 |   12.   Crayola, LLC is an entity formed under the laws of Delaware, with a principal address
4 | and mailing address located at 1100 Church Lane, Easton Pennsylvania 18042. This is the location of
5 | its corporate headquarters and one of its production facilities.

6 |   13.   Crayola applied for a limited liability registration with the State of California in 2006
7 | as a foreign limited liability company. The California Secretary of State has assigned it Entity No.
8 | 200635410057. It represented that it is engaged in the manufacture and sale of crayons and other art
9 | products. It has no street address for a California Office. Based on information and belief, it engages
10 | in business and its products are sold in all California counties, including the Products purchased by
11 | Plaintiffs.

12 |   14.   Based on information and belief, Crayola LLC previously operated under the name
13 | Binney and Smith, which sold the first "Crayola" branded crayons in 1903. It was a founding member
14 | of the art industry trade group the Watercolor and Craft Institute founded in 1936, which is today
15 | known as the Art & Creating Materials Institute ("ACMI"). The purpose of ACMI is to promote
16 | product safety to humans in art materials, including through a certification program. ACMI has
17 | "certified" art materials for more than 80 years based on its own requirements. Crayola regularly
18 | represents being approved through ACMI. Based on information and belief ACMI certification is not
19 | legally required under any laws of the United States federally, at the State level, or otherwise.

20 |   15.   Crayola sold its first box of markers in the United States in 1978. It now sells markers
21 | in various types, shapes, and functions, including its classic markers, markers themed in conjunction
22 | with other children's media and products, and even markers that change colors. It also sells a variety
23 | of other art products.

24 |   16.   Crayola markets and sells the Products in stores in California and throughout the United
25 | States, including on the internet. It has been marketing various products as NON-TOXIC[1] and without

26 |

27 | [1] This term has been used in various forms, such as with and without hyphens and various
capitalization, examples include, but are not limited to the terms "Nontoxic," "nontoxic,"
28 | "NONTOXIC," "Non-toxic," "non-toxic." and "NON-TOXIC."

1  qualification, for many years.[2]

2      17.    The true names and capacities, whether individual, corporate, associate, or otherwise,

3  of defendants named herein as DOES 1 through 50, inclusive, are unknown to Plaintiffs, who therefore

4  sue these defendants by such fictitious names. Plaintiffs will amend this Complaint to show the true

5  names and capacities of these defendants when they have been ascertained. Plaintiffs are informed and

6  believe and thereon allege that at all relevant times each fictitiously named defendant is responsible in

7  some manner in law and fact for the events, happenings, occurrences, and obligations alleged herein.

8  Plaintiffs are informed and believe and thereon allege that the fictitiously named defendants' conduct,

9  acts, and or omissions, thereby caused the violations of Plaintiffs' rights, injury to Plaintiffs, harm to

10  Plaintiffs, and or damages to Plaintiffs.

11      18.    As used herein, "Defendant" and "Crayola" means all Defendants, both jointly and

12  severally. References by name to any named Defendant shall include all Defendants, both jointly and

13  severally.

14      19.    Each Defendant is a "person" within the meaning of Business and Professions Code

15  sections 17201 and 17506 and Civil Code section 1761.

16                    **GREEN WASHING IS UNLAWFUL AND ACTIONABLE**

17      20.    The 1969 Santa Barbara Oil spill (cleanup pictured below) is often attributed with

18  sparking the environmental movement in the United States.[3]  Shortly after it, California became a

19  leader in environmental law in the United States and the world.  It continues to be so today.

20

21

22

23

---

24  [2] For example, on Crayola's own website it make available a document titled "Colorful Moments in Time" that identifies and depicts a 1958 Crayola crayon 64 pack box with a NON-TOXIC claim,
25  without clear, prominent, and understandable qualifications. (See https://www.crayola.com/docs/default-source/company-policies/colorful-moments-timeline-
26  2025.pdf?sfvrsn=28b542b6_1, lasted viewed November 26, 2025.)

27  [3] (See https://es.ucsb.edu/santa-barbara-environmental-
declaration#:~:text=In%201969%2C%0a%20massive%20and,the%20haze%20over%20American
28  %20cities, last viewed November 26, 2025.)



21.     Californians have never been afraid of facing corporate interests and industry pressure and concerns about placing profits over the health and welfare of people. Where and when others will not act to avoid harm to people, pets, and the environment, Californians will. This certainly has not hurt Californian's or California's economy, instead enhancing Californian's rights while giving rise to the fourth largest economy in the world.[4]

22.     In the 1980s various industries' malfeasance in the Silicon Valley area came to light regarding the use of toxic chemicals, including trichloroethane and Freon leaching into drinking water.[5] This ultimately led to the discovery of other significant contaminants being released into the Northern California environment. This event had had long-lasting effects. Today, Santa Clara County

---

[4] (See https://www.bbc.com/news/articles/cly80zlk1lyo, last viewed November 26, 2025.)

[5] https://www.sfgate.com/bayarea/article/The-valley-s-toxic-history-IBM-trial-is-latest-2826844.php, last viewed November 26, 2025.

1  while known as the heart of the technology industry is also home to the most Superfund sites of any

2  county in the United States.[6]  Industrial malfeasance and the environmental spread of toxic chemicals

3  were not limited to Northern California but were problematic throughout the state.

4      23.     California's Central Valley is home to one of the largest agricultural industries in the

5  United States.  It supplies one quarter of the nation's fruits, nuts, and other food products on acreage

6  that comprises only 1% of all farmlands in the United States.[7]  In the 1980s, it was discovered that the

7  pesticides used in the agricultural industry, including 1,2-dibromo-3-chloropropane, had significantly

8  contaminated California's Central Valley aquifer, one of the largest aquifer systems in the United

9  States, spanning over 20,000 square miles in a nearly 400 miles long section of California.  This, along

10  with other instances of a lack of corporate environmental stewardship, resulted in Californians having

11  significant public distrust of corporate needs and actions, which continued to be prioritized above

12  public health and welfare of Californians.



Figure 71. The Central Valley aquifer system is located in a large structural trough in central California. The aquifer system is divided into three subregions on the basis of surface-water basins.

EXPLANATION

Central Valley

Redding Basin—Included with Pacific Northwest basin-fill aquifers

Central Valley aquifer system subregions

Sacramento Valley (1)

Sacramento-San Joaquin Delta (2)

San Joaquin Valley (3)

Tulare Basin (3)

Central Valley drainage basin boundary

Williamson and others, 1989

---

[6] https://qz.com/1017181/silicon-valley-pollution-there-are-more-superfund-sites-in-santa-clara-than-any-other-us-county, last viewed November 26, 2025.

[7] https://fruitgrowers.com/how-the-central-valley-feeds-the-nation/, last viewed November 26, 2025.

have failed to provide them with adequate protection, and that these failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs. **The people therefore declare their rights**:

(a) **To protect themselves** and the water they drink against chemicals that cause cancer, birth defects, or other reproductive harm.

(b) **To be informed** about exposures to chemicals that cause cancer, birth defects, or other reproductive harm.

(c) **To secure strict enforcement of the laws** controlling hazardous chemicals and deter actions that threaten public health and safety.

(d) **To shift the cost** of hazardous waste cleanups more **onto offenders and less onto law-abiding taxpayers**.

**The people hereby enact the provisions of this initiative in furtherance of these rights**.[11]

28.     Prop. 65 banned the knowing contamination of ground water with identified chemicals. Importantly, Prop. 65 also sought to avoid harmful chemicals exposures to people through other routes by requiring companies to *inform* people a product contained a cancer-causing chemical *before* purchasing a product. Thus, people could choose to avoid products and companies that did not algin with a person's environmental and health concerns.

29.     Prop. 65 struck a balance between corporate and public interests. Businesses as usual, for most, could continue, but businesses that put products in the stream of commerce in California were faced with either disclosing harmful chemicals in the products, or, to avoid disclosure, to remove the harmful chemicals from their products if sold in California. That is to say, Californians decided that knowing and understanding what was in a product that could cause harm to persons and the environment was a right they had, and that failure to disclose such information would be considered deceptive. This was only the beginning of California's and the Federal Government's game of cat and mouse with corporate interests to avoid deceptive marketing claims, later called environmental marketing claims, that could result in human, animal, and environmental harms in conjunction with the direct and indirect impacts caused by such products offered for sale in California.

30.     Prop. 65 is very particular, addressing only harmful chemicals that cause reproductive harm, cancer, and danger to waterways. However, the entire environment is much broader than

---

[11] Restrictions on Toxic Discharges into Drinking Water; Requirement of Notice of Persons' Exposure to Toxics. Initiative Statute, emphasis added, https://oehha.ca.gov/sites/default/files/media/downloads/proposition-65/general-info/prop65ballot1986.pdf, last viewed November 26, 2025.

24. Under other laws, a slow-moving regulatory process was not curbing the harms Californians were experiencing to themselves and their environment. Corporate interests were significantly impairing timely change in other governmental bodies to address Californian's environmental exposure concerns.[8] This was the backdrop when Californians decided the circumstances were untenable. Change was needed so that environmental exposure of toxins could be avoided, but also so that Californians could make *informed decisions* on whether to promote business that sold products in California that could cause harm to people or the environment.

25. Fortunately for Californians, in California, "[a]ll political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require."[9] Thus, in 1966 California's Constitution was amended to exemplify this power by creating the initiative process, which gave Californians the power to "propose statutes and amendments to the Constitution and to adopt or reject them."[10]

26. This power means that corporate interests cannot control the legislative process merely through the legislature, but when an issue rises to such great importance to the public, these interests must also confront the people directly, or the people will confront them. By the mid-1980s, Californians had enough with exposure to toxins due to corporations prioritizing profits over public health and welfare. Thus, the people used their power.

27. In 1986 Californians passed proposition 65, the Safe Drinking and Toxic Enforcement Act of 1986 (herein "Prop. 65"), through the initiative process. It is a hallmark Californian environmental law. Proposition 65 was overwhelming passed by the people of California, with 62.7% of the more than 7 million votes in favor of it and its purpose expressing their rights. That purpose is as follows:

> SECTION 1. The people of California find that hazardous chemicals pose a serious potential threat to their health and well-being, that state government agencies

---

[8] https://law.stanford.edu/2017/03/10/proposition-65-the-invisible-revolution-in-toxic-chemicals-regulation/, last viewed November 26, 2025.

[9] (Cal Const., art. II, § 1.)

[10] (Cal Const., art. II, § 8.)

waterways. The environment encompasses, among other things, humans, the flora and fauna around them, and the inanimate world in which they live.

31.    As time passed, knowledge grew (as well as the ability to access such knowledge) and people have become more cognizant and concerned about human effects on the greater environment. Issues related to climate change, food security, and stewardship began to be emphasized by the general public.    As the public's environmental concerns grew, so did the opportunity for businesses to capitalize on them.    This resulted in a significant number of marketing claims that products and services were green, safe, environmentally friendly, and did not cause environmental harm.    These types of marketing claims are now specifically known as environmental marketing claims.

32.    Environmental marketing claims are claims made in the marketing of a product or service that indicate, expressly or by implication, that the product or service is not harmful to the environment or that the product is beneficial to the environment.

33.    California's legislature determined that environmental marketing claims about products were important to consumers, recognizing that marketers were improperly taking advantage of consumers' environmental concerns by deceptively conveying a product will cause no risk of harm to people, animals, or the world they live in, by claiming a product is environmentally safe. Such deceptive practices have become known colloquially as "greenwashing." Today, greenwashing has been defined as "a set of deceptive marketing practices in which an entity publicly misrepresents or exaggerates the positive environmental impact or attributes of a product[.]" (*McGinity v. P&G* (9th Cir. 2023) 69 F.4th 1093, 1100.)

34.    Four years after Prop. 65 was passed, California enacted the Environmental Marketing Claims Act ("EMCA") to protect consumers against greenwashing. (See 1990 Cal ALS 1413; 1990 Cal AB 3994; 1990 Cal Stats. ch. 1413.) The EMCA is codified at California's Business and Professions Code sections 17580 through 17581, part of California's False Advertising Law.

35.    Like Prop. 65, one of the purposes of the EMCA was the *disclosure of information to the public* about products they purchase.    Unlike Prop. 65, the disclosure of information is only required if provoked by a marketing claim.

1

2

3

4

> The bill would also require any person who represents that any consumer good which it manufactures or distributes is not harmful to, or is beneficial to, the natural environment, through the use of specified terms, to maintain in written form in its records information and documentation supporting the validity of the representation, as specified. The bill would require this information and documentation to be furnished to any member of the public upon request and to be fully disclosed to the public, within the limits of all applicable laws. [12]

5    This evidences the importance Californians continue to place on people's rights to avoid deception

6    when someone offers a product or service for sale in California.

7        36.    Following suit and recognizing consumers' environmental concerns and businesses'

8    deceptive greenwashing practices, the Federal Government in 1991 sought public comment about its

9    intention to regulate greenwashing through the Federal Trade Commission. (See 57 FR 36363 (1992).)

10   This resulted in public hearings and, in 1992, the promulgation of the FTC's Green Guides. (See *id.*)

11   The Green Guides have been updated on multiple occasions since that time. (See 61 FR 53311 (1996);

12   63 FR 24240 (1998); and 77 FR 62122 (2012).)

13       37.    In explaining the Green Guides, the FTC says:

14

15

16

17

> A growing number of American consumers are looking to buy environmentally friendly, "green" products, from recycled paper to biodegradable trash bags. Companies have responded with "green" marketing touting the environmental benefits of what they're selling. But sometimes what companies think their green claims mean and what consumers really understand are two different things. The Federal Trade Commission's Green Guides are designed to help marketers avoid making environmental claims that mislead consumers. [13]

18   The emphasis is on consumers' understanding so consumers can make informed decisions on what

19   products to buy and whether to support the business of a seller's products.

20       38.    "The FTC guides themselves flow from a task force of state attorneys general that

21   looked into potentially misleading environmental advertising claims growing out of consumers'

22   increased awareness of the environmental impacts of their purchases, and a "'green marketing'"

23   strategy by companies making environmental claims about their products." (*Hill v. Roll Internat. Corp.*

24   (2011) 195 Cal.App.4th 1295, 1301.)

25   _____

26   [12] (See 1990 Cal ALS 1413; 1990 Cal AB 3994; 1990 Cal Stats. ch. 1413.)

27   [13] (*Environmentally Friendly Products: FTC's Green Guides*, FEDERAL TRADE COMMISSION https://www.ftc.gov/news-events/topics/truth-advertising/green-guides, last viewed November 26,

28   2025.)

39.    The Green Guides "apply to claims about the environmental attributes of a product, package, or service in connection with the marketing, offering for sale, or sale of such item or service to individuals." (16 C.F.R. § 260.1 (c).)  This includes "environmental claims in labeling, advertising, promotional materials, and all other forms of marketing in any medium, whether asserted directly or by implication, through words, symbols, logos, depictions, product brand names, or any other means." (*Id.*)

40.    As summarized by the FTC:

> The Green Guides were issued to help marketers ensure that the claims they are making are true and substantiated. The guidance they provide includes:
> 1. general principles that apply to all environmental marketing claims;
> 2. how consumers are likely to interpret particular claims and how marketers can substantiate these claims; and
> 3. how marketers can qualify their claims to avoid deceiving consumers. [14]

41.    The FTC recognizes that "unqualified general environmental benefit claims are difficult to interpret and likely convey a wide range of meanings." (16 C.F.R. § 260.4.)

> In many cases, such claims likely convey that the product, package, or service has specific and far-reaching environmental benefits and may convey that the item or service has no negative environmental impact. Because it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims, marketers should not make unqualified general environmental benefit claims.

(*Id.*)

42.    Thus, it is nearly impossible to make broad and general unqualified environmental marketing claims *without* causing consumer deception.

43.    The FTC has made it clear that a marketer's ignorance will not be rewarded. Environmental marketing claims cannot be thrown into the ether irresponsibly with no basis in fact. If a marketer wants a marketing advantage by making environmental marketing claims about a product or service, there must be a basis for the claim grounded in a factual investigation that substantiates the environmental marketing claims.  The marketer must also clearly communicate to consumers the limits of its claims within what the marketer can substantiate, which is an inherently required act for all environmental marketing claims that is particularly onerous and potentially impossible to substantiate

---

[14] https://www.ftc.gov/legal-library/browse/rules/green-guides, last viewed November 26, 2025.

1 | for an unqualified environmental claim. Otherwise, marketers can simply avoid consumer deception
2 | by not making environmental marketing claims.

3 |     44.    The FTC historically emphasizes that general environmental claims should be qualified
4 | "to prevent deception about the nature of the environmental benefit being asserted." (16 C.F.R. §
5 | 260.4.) The FTC provides guidance to marketers as well:

> To avoid deception, marketers should use clear and prominent qualifying language that
> limits the claim to a specific benefit or benefits. Marketers should not imply that any
> specific benefit is significant if it is, in fact, negligible. If a qualified general claim
> conveys that a product is more environmentally beneficial overall because of the
> particular touted benefit(s), marketers should analyze trade-offs resulting from the
> benefit(s) to determine if they can substantiate this claim.

10 | (*Id.*) Thus, marketers have known for quite some time that environmental marketing claims, which
11 | need not be made and are not required but, once made, require a basis before being made and
12 | qualification to avoid consumer confusion.

13 |     45.    General principles applied to all environmental marketing claims include properly
14 | qualifying claims and distinguishing between benefits of the claim as being related to the product,
15 | package, or service clearly, not overstating environmental attributes, and avoiding confusing or
16 | deceptive comparisons to other products and things. (See 16 C.F.R. § 260.3.) All of these principles
17 | ensure that consumers are not deceived and instead are adequately informed of the nature and extent
18 | of the claim a marketer makes when the marketer voluntarily makes an environmental marketing claim
19 | to obtain a competitive edge in the market they operate.

20 |     46.    Until 2012, claims that a product or service was non-toxic were treated as general
21 | environmental benefit claims by the FTC. (See 77 FR 62122, 62123, fn. 28, (2012).)

22 |     47.    Long before adding a specific section to the Green Guides addressing NON-TOXIC
23 | general environmental marketing claims, the FTC prosecuted actions where a marketer made a claim
24 | that a product was NON-TOXIC. For example, in 1994, the FTC filed a complaint against a lawn care
25 | service, Orkin Exterminating Company, Inc. ("Orkin") for claiming its lawncare pesticides were
26 | "practically nontoxic." The FTC's complaint contended that Orkin's "practically non-toxic"
27 | representation indicated that the pesticides "do not pose any significant risk to human health and the
28 | environment." (See 1994 FTC LEXIS 80, *2.) The FTC further contended that by making this

representation, Orkin was representing, directly or by implication, that it "possessed and relied upon a reasonable basis that substantiated such representations." (*Id.* at *3.) Because Orkin did not possess and rely on a reasonable basis for its "practically non-toxic" claim, the FTC found Orkin's advertising to be false and misleading. (*Id.* at *3-4.) These contentions resulted in a consent order where Orkin agreed to cease and desist from making its non-toxic representations absent "competent and reliable scientific evidence that substantiates the representation," and required Orkin to maintain any information relied upon to substantiate or contradict any representations covered by the consent order, if such representations were to be made by it in the future. (See *id.* at *7-9.)

48.    Thus, of particular importance to the FTC was that if an environmental marketing claim was made, the marketer must have a proper basis for the claim *before* it is made. This concept still holds true today and is axiomatic to the purpose of the FTC Act, avoiding consumer deception and promoting fair competition.[15]

49.    In another important matter of the FTC's fight against consumer deception, in the spring of 1996, the FTC and Safe Brand Corporation entered into a consent order related to the marketing of antifreeze by Safe Brands Corporations and others.[16] The marketing included claims that antifreeze was "Environmentally Safe" and "Essential Non-Toxic" included in a campaign of other environmental claims about its propylene glycol antifreezes.[17] The FTC complaint contended that the marketing campaign, directly, or by implication, indicated to the public that:

> a. Compared to conventional, ethylene glycol-based antifreeze, Sierra antifreeze, and other propylene glycol-based antifreezes, are safer for the environment generally;
>
> b. Sierra antifreeze, and other propylene glycol-based antifreezes, are absolutely safe for the environment after ordinary use; and
>
> c. Because Sierra antifreeze, and other propylene glycol based antifreezes, are

---

[15] https://www.ftc.gov/about-ftc/mission, last viewed November 26, 2025.

[16] (See https://www.ftc.gov/system/files/documents/cases/961126safebrandsdo.pdf, last viewed November 26, 2025.)

[17] (See https://www.ftc.gov/system/files/documents/cases/951128safebrandscmpt.pdf, p. 4. last viewed November 26, 2025.)

biodegradable, they are absolutely safe for the environment after ordinary use.[18]

50.    As part of the consent order Safe Brands agreed to:

forthwith cease and desist from representing, in any manner, directly or by implication, that any such product will not harm the environment, is less harmful to the environment than other products, or offers any environmental benefit, unless at the time of making such representation, respondents possess and rely upon competent and reliable evidence, which when appropriate must be competent and reliable scientific evidence, that substantiates such representation.

Thus, the FTC again recognized both the scope of unqualified environmental marketing claims and the need for a basis supporting the scope of any environmental marketing claims, qualified or unqualified.

51.    In 1996, the FTC updated the Green Guides to add examples of how unqualified "practically non-toxic" and "essentially non-toxic" marketing claims imply that a product or service is "absolutely safe for people, pets, and the environment." (See 61 FR 53311, 53315.) Despite comments from various persons involved in various industries, the FTC maintained that NON-TOXIC claims, "likely convey to consumers that the product does not pose any risk to humans or the environment." (See 61 FR 53311, 53318.)

52.    FTC regulation and enforcement of deceptive greenwashing claims have historically and consistently placed an emphasis on the marketer substantiating and qualifying environmental marketing claims. The concept that the lack of substantiation of an environmental marketing claim made the claim inherently deceptive has been long lived. This concept has not changed since the FTC updated the Green Guides to expressly advise businesses about unqualified NON-TOXIC claims. This has not been well received by art product marketers and industry groups that want to maintain the marketing advantages and consumer goodwill they fostered over nearly a century of claiming certain art products were safe.

53.    The U.S. Environmental Protection Agency's ("EPA") is the federal agency responsible for protecting human health and the environment by setting national standards and enforcing federal environmental laws.

---

[18] (See *id.* at p. 8.)

54.    In 2008, the EPA's Sustainable Products Network commented on the FTC's proposal to update the Green Guides to add a specific non-toxic section.[19]  They expressed the view that consumers interpret non-toxic claims broadly, and that such claims "must be supported by information that addresses a broad range of health and environmental effects and that considers all exposed populations."  They further advised that, "[m]any consumers are likely to interpret a claim of 'non-toxic' as an intrinsic property of the material, and not as simply a statement regarding the safety of the material as it is used in a particular product," explaining that consumers may assume that a "non-toxic" product is not just non-toxic in its final form, but also non-toxic to the workers who manufactured the product, and to environmental species exposed to whatever releases occur during the manufacture, processing, or disposal of the product.  The Sustainable Products Network noted that a company claiming a product is "non-toxic" by virtue of not meeting the higher standard of being "toxic" or "hazardous" as to require a hazard warning "can be highly misleading and at times even dangerous to the consumer."

55.    In 2010, the EPA gave its comments to the FTC's proposal to update the Green Guides to add a specific non-toxic section.[20]  "EPA believes that marketers will rarely, if ever, be able to adequately qualify and substantiate a claim of 'non-toxic' in a manner that will be clearly understood by consumers."

> [A] 'non-toxic' claim conveys that a product is non-toxic for both humans and for the environment generally.  Demonstrating a lack of toxicity in a generic sense involves testing for a broad array of endpoints (e.g. acute toxicity, carcinogenicity and other chronic effects, developmental and reproductive toxicity, neurotoxicity, sensitization, etc.) across a variety of species. It is highly unlikely that the typical consumer product will have been subjected to this degree of testing with a resulting finding of 'no adverse effect' for each of the endpoints evaluated.

This is not surprising as conceptually; there are few products that can cause no harm to every aspect of the world we know.

---

[19] (See https://www.ftc.gov/sites/default/files/documents/public_comments/2008/10/536013-00062.pdf, last viewed November 26, 2025.)

[20] https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00288%C2%A0/00288-57070.pdf, last viewed November 26, 2025.

1    56.    In 2010, the FTC expressed its agreement with the EPA's comments.  (See 75 FR

2  63551, 63580 (2010).)

3    57.    In 2012 the FTC finalized its most recent changes to the Green Guides, including

4  adding a non-toxic section.  (See 77 FR 62122, 62123 (2012).)  It the FTC's Statement of Basis and

5  Purpose ("SBP") for the Green Guides, it explained that:

6       Depending on context, unqualified non-toxic claims may convey broad express and
        implied messages. For example, an unqualified non-toxic claim likely conveys that a
7       product is not toxic to both humans and the environment. However, as EPA explained,
        substantiating this claim by testing for a broad array of endpoints across a variety of
8       species is likely costly and challenging.
                                            ***
9       … given the potential that consumers interpret unqualified claims in this manner, the
        Commission cautions marketers to qualify non-toxic claims carefully, unless they can
10      substantiate all express and implied messages inherent in an unqualified claim.[21]

11    58.    The FTC also addressed trace toxicity in its SBP, clarifying that "there is no allowance

12  for 'de minimis' or 'trace' toxicity."  (Id. at p. 148.)

13    59.    The current version of the Green Guides state that, "[i]t is deceptive to misrepresent,

14  directly or by implication, that a product, package, or service is non-toxic." (16 C.F.R. § 260.10 subd.

15  (a).)

16    60.    "A non-toxic claim likely conveys that a product, package, or service is non-toxic both

17  for humans and for the environment generally." (16 C.F.R. § 260.10 subd. (b).)  Thus, it is incumbent

18  on marketers making such claims to "have competent and reliable scientific evidence that the product,

19  package, or service is non-toxic for humans and for the environment." (Id.)   Alternatively, the

20  marketers "should clearly and prominently qualify their claims to avoid deception."

21    61.    The most recent update to the Greens Guides had little change in the FTC analysis of

22  whether a NON-TOXIC marketing claim was deceptive.  The addition of the NON-TOXIC section to

23  the Green Guides evidences the prominence and frequency that became of the use of the term "non-

24  toxic" in marketing, warranting a specific section of the Green Guides directed to this subset of general

25

26

27  [21] (See https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-
28  guides/greenguidesstatement.pdf, at 146-47, last viewed November 26, 2025.)

1   environmental marketing claims. (Accord 75 FR 63552 (2010), "Periodic review ensures that the
2   Guides keep pace with evolving consumer perceptions and new environmental claims.")

3       62.    As historically demonstrated, substantiation and qualification of marketing claims,
4   including environmental marketing claims, have been and continue to be at the core of FTCs mission
5   of avoiding consumer deception.

6       63.    The Green Guides' substantiation and qualification requirements are applied in all
7   facets of the environmental marking claims it addresses. (See 16 C.F.R. § 260.3.) Such requirements
8   are present or implied and reinforced in the Green Guides not only for NON-TOXIC marketing claims,
9   but also for general environmental marketing claims, compostable marketing claims, degradable
10  marketing claims, free-of marketing claims, recyclable marketing claims, recycled Content marketing
11  claims, renewable Energy marketing claims, and source reduction marketing claims, including those
12  based on reduced toxicity. (See 16 C.F.R. §§ 260.4, 260.7, 260.8, 260.9, 260.10, 260.12, 260.13,
13  260.15, and 260.16.)

14      64.    The FTC has also made clear that a marketer cannot wash their hands of deceptive
15  environmental marketing claims based on third party approvals. The Green Guides expressly advise
16  that use of third-party certifications and seals cannot alleviate marketers of the requirements to
17  substantiate the claims it makes or relieve it of the legal perils associated with unqualified
18  environmental marketing claims. (See 16 C.F.R. § 260.6 subd. (c) through (e).)

19      65.    Indeed, the use of third-party seals may cause deception. Thus "[t]o avoid deception,
20  marketers should use clear and prominent qualifying language that clearly conveys that the
21  certification or seal refers only to specific and limited benefits." (See 16 C.F.R. § 260.6 subd. (e).)

22      66.    Additionally, all qualifications of environmental marketing claims are only acceptable
23  if they are clear and prominent.

> To prevent deceptive claims, qualifications and disclosures should be clear, prominent, and understandable. To make disclosures clear and prominent, marketers should use plain language and sufficiently large type, should place disclosures in close proximity to the qualified claim, and should avoid making inconsistent statements or using distracting elements that could undercut or contradict the disclosure.

27  (16 C.F.R. § 260.3 subd. (a).) The importance of the prominence of qualifications of environmental
28  marketing claims is demonstrated by the FTC's reiteration of such requirements in the Green Guides

1  related to specific and particular environmental marketing claims. (See 16 C.F.R. §§ 260.4 subd. (c),

2  206.7 subd. (c), 260.8 subd. (d), 206.9 subd. (a), 206.12 subd. (b), 260.13 subd. (c), 260.15 subd. (b)

3  and 206.16 subd. (b).) The need to reinforce this concept also speaks to the proclivity of industry

4  interests to avoid prominently qualifying environmental marketing claims.

5      67.    The Green Guides offer examples of improper qualification of environmental

6  marketing claims, including the following example related to NON-TOXIC claims.

7       Example: A marketer advertises a cleaning product as "essentially non-toxic" and
        "practically non-toxic." The advertisement likely conveys that the product does not
8       pose any risk to humans or the environment, including household pets. If the cleaning
        product poses no risk to humans but is toxic to the environment, the claims would be
9       deceptive.

10  (16 C.F.R. § 260.10 subd. (b).)  This example demonstrates the breadth of consumer perception of

11  NON-TOXIC claims as applied by the FTC when interpreting and enforcing the FTCA. It also

12  demonstrates the need for more particularity of a qualification to a NON-TOXIC claim.

13      68.    The Green Guides are used by the FTC to educate marketers on ways to avoid consumer

14  deception, to ensure marketers avoid broad environmental claims, and to promote fair competition.

15  They also have a significant history in California, becoming California law.

16      69.    In 1995, the Green Guides were integrated into California Law through amendments to

17  California's EMCA. (See 1995 Cal ALS 642; 1995 Cal SB 426; 1995 Cal Stats. ch. 642 "This bill

18  would also provide that it is unlawful for a person to make any untruthful, deceptive, or misleading

19  environmental marketing claim, whether explicit or implied.   This bill would provide that

20  'environmental claim' includes any claim contained in the 'Guides for the Use of Environmental

21  Marketing Claims' published by the Federal Trade Commission.")

22      70.    Thus, the Green Guides are not only guidance by the FTC but have the force of law in

23  the State of California for nearly 30 years.

24      71.    California's EMCA, in addition to adopting the Green Guides, also expressly requires

25  that if a marketer seeks a marketing advantage by making an environmental marketing claim about a

26  product, the marketer shall maintain in writing the basis for the claim, including "[t]he reasons the

27  person believes the representation to be true." (Bus. & Prof. Code, § 17580 subd. (a).)

28

72.     California's EMCA further provides that this information and documentation "shall be furnished to any member of the public upon request." (Bus. & Prof. Code, § 17580 subd. (b.).) This is in line with the same rights espoused in the preamble to Prop. 65 and Californians' rights to be informed.

73.     A marketer therefore has the duty to maintain documentation about any environmental marketing claims it makes and to produce that documentation upon being asked for it.

74.     A marketer also has a duty to investigate its marketing claims it makes to ensure the claims are not false.  (See *People v. Forest E. Olson, Inc.* (1982) 137 Cal.App.3d 137, 139.)  This includes a duty of communication among corporate personnel for an entity that is a marketer of a product.  (See *id.* at p. 140.)  Thus, there can be little claim feigned ignorance about the need for substantiation when making environmental marketing claims.

75.     The Green Guides and EMCA also work in conjunction with other California consumer protection laws.  Violations of the Green Guides and California's EMCA may support claims made pursuant to California's Unfair Competition Law (UCL, Bus. & Prof. Code, § 17200 et. seq.), False Advertising Law (FAL, Bus. & Prof. Code, § 17500 et. seq.), and Consumers Legal Remedies Act (CLRA, Civil Code, § 1750 et. seq.).

76.     California Business and Professions Code, section 17200 provides that "unfair competition shall mean and include unlawful, unfair, or fraudulent business practice."

77.     California's UCL functions, among other things, to make violations of other laws actionable by private litigants, even if the violation was not otherwise actionable directly under another federal or state law. (See Bus. & Prof. Code, § 17204; *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949-950.) It also makes conduct not directly violative of another law actionable if the conduct is unfair or fraudulent. (See *id.*)

78.     Section 17203 of the Business and Professions Code provides that "(a)ny person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction." It empowers a Court to "make such orders or judgments…as may be necessary to prevent the use or employment by any person of any practice which constitutes

1  unfair competition." It also permits recovery of any "interest in money or property, real or personal"
2  acquired by a violation of the Unfair Competition Law.

3      79.    Section 17205 of the Business and Professions Code explains that the UCL remedies
4  and penalties are "cumulative to each other and to the remedies or penalties available under all other
5  laws of this state."

6      80.    The CLRA's purpose is to "to protect consumers against unfair and deceptive business
7  practices and to provide efficient and economical procedures to secure such protection." (Civ. Code,
8  § 1760.) It applies to goods "for use primarily for personal, family, or household purposes." (Civ.
9  Code, § 1761(a).)

10     81.    Consumers may bring an action for a violation of the CLRA.  (See Civ. Code, § 1761
11  subd. (d).)  A consumer is defined as "an individual who seeks or acquires, by purchase or lease, any
12  goods or services for personal, family, or household purposes." (*Id.*)

13     82.    Among the enumerated unlawful acts in the CLRA are misrepresentations regarding
14  goods or services.  This includes misrepresentations about a goods' "characteristics, ingredients, uses,
15  [or] benefits." (Civ. Code, § 1770 subd. (a)(5).)  This includes misrepresentations that goods "are of a
16  particular standard, quality, or grade." (Civ. Code, § 1770 subd. (a)(7).)  This includes "[a]dvertising
17  goods or services with intent not to sell them as advertised." (Civ. Code, § 1770 subd. (a)(9).)

18     83.    The CLRA provides remedies that include "[a]n order enjoining the methods, acts, or
19  practices" that violate the CLRA. (See Civ. Code, § 1780 subd. (a)(2).)

20     84.    A violation of the CLRA is also an actionable claim under the UCL.  (See *Gutierrez v.*
21  *Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1266.)

22     85.    The remedies under the CLRA are not exclusive, they are cumulative and may be
23  pursued in conjunction with the remedies provided by the UCL and other laws.  (See *Flores v.*
24  *Southcoast Automotive Liquidators, Inc.* (2017) 17 Cal.App.5th 841, 851-852.)

25     86.    California Business and Professions Code section 17500 provides that it is unlawful for
26  any person "with the intent directly or indirectly to dispose of real or personal property . . . to make or
27  disseminate or cause to be made . . . any statement, concerning that real or personal property . . . which
28

1  is untrue or misleading, and which is known, or which by the exercise of reasonable care should be

2  known, to be untrue or misleading."

3      87.    The FAL addresses false advertising including 20 articles addressing specific subject

4  matter. The FAL includes California's EMCA.

5      88.    Any person may bring any action against any other person for violation of the FAL.

6  (See Bus. & Prof. Code, §17535.)

7      89.    The primary evidence in an FAL claim is the advertisements themselves. (See *Benson*

8  *v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1276.)

9      90.    The FAL does not require proof that a defendant had an intent to deceive. (See *People*

10  *v. Forest E. Olson, Inc.* (1982) 137 Cal.App.3d 137, 139.)

11      91.    Violations of the FAL are expressly adopted as violations of the UCL. (See Bus. &

12  Prof. Code, §17200.)

13      92.    Therefore, if there is a violation of the Green Guides, there is a violation of the EMCA,

14  and these violations are actionable pursuant to the UCL. To the extent the conduct of violating the

15  Green Guides and EMCA also violates the CLRA and FAL, those violations are actionable under the

16  CLRA, FAL, and under the UCL. This is California's law. They are the laws Plaintiffs seek to enforce

17  through this action. These are the laws Crayola wants to avoid.

18  **FACTUAL ALLEGATIONS**

19      93.    This matter is about Crayola's unqualified claims that its Products are NON-TOXIC,

20  representing the products cannot harm humans, animals (including pets), or the environment.

21      94.    There is no legal requirement that Crayola label and market its Products as being NON-

22  TOXIC. The primary purpose of labeling a product as being NON-TOXIC is to gain a marketing

23  advantage over its competitor's products, regardless of whether Crayola's claim is deceptive or not.

24      95.    Many third-party validating sources exist about a product's safety attributes, such as a

25  product not containing chemicals known to cause cancer or other harms. Based on information and

26  belief, no third-party validating sources exist that convey or condone the use of an unqualified NON-

27  TOXIC claim about a product. Indeed, the use of the term NON-TOXIC with third party seals, while

28  once done, appears to have ceased because without proper qualifications it is likely impossible to make

a nondeceptive unqualified NON-TOXIC environmental marketing claim under current laws, as noted by the FTC.

96.    In this case, and as further explained, Crayola should not make unqualified claims that its Products are NON-TOXIC, conveying they cannot cause harm to people, pets, or the environment, as it is false and misleading and Crayola does not have a basis to make the claim.

97.    As noted above, it is nearly impossible to make an unqualified NON-TOXIC claim about a product. It is often not possible to determine the scope or meaning of any such claim without an express explanation of what the marketer means when using the term NON-TOXIC. For example, if a person has asthma and allergic skin reactions, that person may want to protect themselves and their children from chemicals that may be associated with causing or exacerbating such conditions, even though the majority of persons may otherwise be unaffected by such chemicals. As another example, a person that keeps fish as pets may want to avoid the fish being exposed to chemicals that may harm fish even though those same chemicals may not cause any appreciable harm to humans. Thus, people may wholly avoid purchasing and exposure to products when certain information is provided, and very importantly may avoid products that will not otherwise disclose information they seek to know about the product. Conversely, an unqualified NON-TOXIC claim conveys that a product cannot harm people, pets, or the environment, providing relief to a broad and expansive range of worries consumers may have about the health and environmental safety of a product.

98.    In this case, Crayola's products offer no explanation of its use of the term NON-TOXIC on its labels, conveying the broad message that the Products themselves, and in their manufacturing, cannot cause any harm to people, animals (including pets), or the environment.

99.    Consumer sentiment and understanding of NON-TOXIC claims is much broader than particularized non-toxic claims made in more sophisticated and specific contexts, such as in the medical field where it might be limited to human health. Indeed, distinctions in context of the use of terms and the audience to those terms are well recognized as to whether deception is caused to the audience. For example, Nurse Practitioners who have a doctorate of nurse practice cannot present themselves as "Doctor" in clinical settings even where they expressly also qualify that representation

by informing a patient they are a Nurse Practitioner.[22] Thus in the case of the use of a NON-TOXIC claim presented to consumers is much different that same use of the term in the medical field, which is not concerned with harm to animals and the environment. This case is about consumers and that is the context of the use of the NON-TOXIC by Crayola, a use to gain market advantages, similar to the same use some nurses attempted to use the term "doctor."[23]

100.    Consumer understanding is the focus of the FTC's Green Guides and California's EMCA, a subset of California's False Advertising laws. Under these laws, even true statements can be deceptive based on the context the statement is offered.

101.    Just like our understanding of medicine has evolved, so has our understanding of how we interact with products both directly and indirectly. This includes how products may not only affect us, but also animals, whether domesticated or wild, and the environment as a whole.

A.    **NON-TOXIC CLAIMS ABOUT A PRODUCT ARE IMPORTANT TO CONSUMERS**

102.    We live in a time when there is an emphasis on environmental claims related to products, because consumers want to choose to avoid their own hand in causing harm to people, animals, and the environment. It is important to consumers when a product is marketed as being NON-TOXIC, because it is reasonable for consumers to believe such claims mean the product will not cause any harm to people, animals, and the environment.

103.    For example, a survey of Americans from 2014 showed that 75% of those surveyed said it's important to use NON-TOXIC cleaning products.[24]

---

[22] (See *Palmer v. Bonta* (C.D.Cal. Sep. 19, 2025, No. EDCV 23-1047 JGB (SPx)) 2025 U.S.Dist.LEXIS 184724, at *27-48.)[Business and & Profession. Code section 2054's prohibition on persons who are not M.D.'s or D.O.'s from advertising they are "doctor" in a healthcare setting, found to be constitutional regulation of commercial speech.])

[23] "Plaintiff Hanson additionally believes that he will attract more patients if he can call himself "Dr. Hanson" as opposed to not using the title "doctor," because "[i]f patients were given the opportunity to pick between two clinics, one with Dr. Hanson and one with Mr. Hanson written on it, most would gravitate to the former." (*Palmer v. Bonta* (C.D.Cal. Sep. 19, 2025, No. EDCV 23-1047 JGB (SPx)) 2025 U.S.Dist.LEXIS 184724, at *32-33.)

[24]    https://sustainablebrands.com/read/stakeholder-trends-and-insights/survey-60-of-americans-resolving-more-environmentally-responsible-lifestyles-in-2015 ("The survey evidenced Americans' crucial commitment to grassroots efforts to helping the environment. More than 75 percent of respondents said it's important to buy eco-friendly appliances, use non-toxic cleaning products, reduce household use of paper, and properly dispose of batteries, consumer electronics and everyday

104.    Also, an NSF study in 2019 determined 61% of Americans are concerned put in, on, or around their bodies but do not know how to verify related product claims.[25]

105.    As another example, a survey conducted by Crestline Custom Promotional Products, which included over two thousand residents from 25 U.S. cities, revealed that products labeled as NON-TOXIC were the most important among ten other product claims, including claims that a product was organic, non-GMO, Made in America, Fair Trade, locally sourced, had no artificial ingredients, and were hormone free.[26]

106.    Survey results by the National Sanitation Foundation were described by NSF's senior director of its Global Certification as "clearly indicat[ing] that today's consumers are seeking clean beauty products made with organic, toxin-free ingredients."[27] Leading up to the 2016 General Election a survey conducted by Mellman Group[28] and American View Point[29] resulted in a finding that 7-10 persons believe the threat from using chemicals in day to day life is serious.[30]

107.    A survey conducted in February of 2021 revealed that 64% of Americans are willing to pay more for sustainable products but 74% don't know how to identify them.[31] The findings also reveal that 78% of people are more likely to purchase a product that is clearly labeled as

---

household chemicals."), last viewed December 1, 2025.

[25] (See https://www.nsf.org/news/most-americans-are-concerned-about-the-safety-of-many-consumer-products, last viewed December 1, 2025.)

[26] https://crestline.com/c/consumer-guilt-and-buying-dilemmas, last viewed December 1, 2025.

[27] https://www.nsf.org/news/consumers-consider-personal-care-organic-ingredients-important, last viewed December 1, 2025.

[28] https://mellmangroup.com/, last viewed December 1, 2025.

[29] https://www.amview.com/, last viewed December 1, 2025.

[30] Mark Mellman & Linda DiVall, Findings From a National Survey of Likely 2016 General Election Voters (Feb. 2016), https://www.businesswire.com/news/home/20210322005061/en/GreenPrint-Survey-Finds-Consumers-Want-to-Buy-Eco-Friendly-Products-but-Dont-Know-How-to-Identify-Them, last viewed December 1, 2025.

[31] https://www.businesswire.com/news/home/20210322005061/en/GreenPrint-Survey-Finds-Consumers-Want-to-Buy-Eco-Friendly-Products-but-Dont-Know-How-to-Identify-Them, last viewed December 1, 2025.

environmentally friendly and 77% of American are concerned about environmental impacts of the products they buy. The survey also found that for many consumers, trust of a company's statements requires third-party validating sources.

108.    Consumers' desire for environmentally friendly products, including those that will not cause harm to humans, animals, and the environment, are clearly important. Thus, marketing products as environmentally friendly and consumer perceptions related to environmental marketing claims is important to the manufacturers and sellers of products to ensure greater sales of their products.

109.    Indeed, marketer incentives to capture consumer desire for non-toxic products were recognized by NASDAQ after the COVID-19 pandemic. NASDAQ noted a shift towards consumers seeking products that are non-toxic correlated with increased consumer awareness of the non-toxic market, associations with health and wellbeing, increased regulatory support, associations with sustainability and reduction in environmental impacts, and the increase in market growth and profitability for certain products.[32]

110.    It has even been recognized that consumer demand to avoid products that contain toxins expands to the retailers they will shop at, with 84% of health-conscious shoppers being willing to shop at retailers that have taken steps to eliminate toxic chemicals in products they sell.[33]

111.    This should be expected, as consumers naturally prefer to the purchase a product claiming to be safe compared to the same product that is not represented as being safe, even if the "safe" product comes at a cost premium.

## B.    CRAYOLA HEAVILY RELIES ON MARKETING ITS ART PRODUCTS AS NON-TOXIC AND ECOFRIENDLY

112.    Products have been marketed under the Crayola brand name since at least 1903, when Binney & Smith, Crayola's predecessor, first sold Crayola brand crayons marketed to school children. Per Crayola, this was based on Binney & Smith "[n]oticing a need in schools for safe affordable wax

---

[32] (See https://www.nasdaq.com/articles/why-you-should-invest-in-the-growing-non-toxic-product-category, last viewed December 1, 2025.)

[33] (See https://toxicfreefuture.org/blog/survey-results-shoppers-voting-for-safe-and-healthy-products-with-their-wallets/, last viewed September December 1, 2025.)

crayons."[34]  Thus, from Crayola's inception, the safety of its branded products has been a staple of its marketing, as has the focus of its use of its products by children.

113.    While Crayola's art products are primarily marketed to or for use by children, they are also marketed to artists.  Early on Crayola noticed the need for safe art products for people of all ages.  For example, in 1913 Crayola introduced its Rubens drawing crayons "for art students."[35]

114.    Between 1903 and now, Crayola became ubiquitous with art, particularly children's art.  It is an iconic brand, beloved by generations of children and adults. It is one of the most recognizable brands in the world. As contended by Crayola's parent company, "[b]y applying technical innovation, unparalleled quality, consumer satisfaction and product value, Crayola has become the preeminent producer of hands-on products for creative personal development and fun in more than 90 countries."[36]

115.    Crayola has captured an estimated 13.5% of total industry revenue in the United States Art & Office Supply Manufacturing industry.[37]   In 2014 it held a 83.4% share of the "coloring market."[38] It is believed to have nearly an 80% market share of crayon products,[39] which in 2023 had a size of $3.4 billion.[40]   In the washable markers market it has 99% name recognition in the United States.[41]

---

[34] (See https://www.crayola.com/company/about-us, last viewed December 1,, 2025.)

[35] https://www.crayola.com/docs/default-source/company-policies/colorful-moments-timeline-2025.pdf?sfvrsn=28b542b6_1, last viewed December 1,, 2025.

[36] https://corporate.hallmark.com/about/hallmark-cards-company/our-businesses/crayola/#:~:text=As%20the%20third%20largest%20toy,in%20more%20than%2090%20countries, last viewed December 1, 2025.

[37] https://www.ibisworld.com/united-states/company/crayola-llc/412466/, last viewed December 1,, 2025.

[38] https://blog.osum.com/crayola-market-share/, law visited December 1,, 2025.

[39] https://www.linkedin.com/pulse/pricing-strategy-lessons-from-crayola-karan-sood/ , last viewed August 27, 2025; https://nataliedwardsdotcom.wordpress.com/wp-content/uploads/2018/01/edwards-final-plan.pdf, last viewed December 1, 2025.

[40] https://dataintelo.com/report/crayons-market, last viewed December 1, 2025.

[41] https://www.marketsandmarkets.com/Market-Reports/washable-marker-market-169169766.html#:~:text=North%20America%20is%20projected%20to,of%20the%20washable%20

116. In 2024 Crayola's online sales alone amounted to $41 million.[42] It has also branched out into the toy industry, and its parent company contends it is "the third largest toy brand today."[43]

117. Crayola's parent company boast environmental claims not only as to the qualities of Crayola's products, but as to how they are manufactured. As noted by Hallmark Cards, Crayola's parent company, "Crayola invests in 100% renewable energy from solar power for U.S. manufacturing, enough to make over 3 billion crayons and 700 million markers each year. The company is committed to continually improving its sustainability efforts."[44]

118. In 2012, a student petition from a California school brought notoriety to the environmental plastic contamination, including that caused by Crayola related to the plastic in Crayola markers that would ultimately escape "into our oceans and enter into our food chain."[45] More than 90,000 people signed the petition.

119. Crayola reinforced its ecofriendly marketing and image and confronted the problems of plastics contaminating the environment as well as the public relations problems becoming associated therewith by instituting the "Color Cycle" program in 2013 through 2022 in the United States. Crayola partnered with JBI, Inc. (a.k.a Plastic2Oil) to convert used Crayola markers to liquid fuel through a process of melting markers.

120. Crayola marketed the Color Cycle Program as "Crayola and schools across North America are banding together to help kids understand the importance of their role in protecting the

---

markers%20market, last viewed December 1, 2025.

[42] https://ecdb.com/resources/sample-data/retailer/crayola, last viewed December 1, 2025.

[43] https://corporate.hallmark.com/about/hallmark-cards-company/our-businesses/crayola/#:~:text=As%20the%20third%20largest%20toy,in%20more%20than%2090%20countries, last viewed December 1, 2025.

[44] https://corporate.hallmark.com/about/hallmark-cards-company/our-businesses/crayola/, last viewed December 1, 2025.

[45] https://www.youtube.com/watch?v=6eDz6RQlUFQ, last viewed December 1, 2025; https://www.change.org/p/crayola-make-your-mark-set-up-a-marker-recycling-program, last viewed December 1, 2025; https://energyjustice.net/crayola/#:~:text=In%202012%2C%20a%20group%20of,oil%2C%20electricity%20and%20wax.%E2%80%9D, last viewed December 1, 2025.

environment."[46]   The program allowed schools to collect used Crayola markers to then be sent to a conversion facility "where they will be transformed into clean-burning fuel."

121.    Crayola's position when ending the program was that:

> The Color Cycle program started in 2013 and despite the positive intent, it did not meet the intended sustainability goals. The challenges of sustainably collecting and recycling markers were more complicated than anticipated, making the ColorCycle program ineffective.[47]

122.    The reality was that the Color Cycle program was anything but ecofriendly.  Concerns arose that the Color Cycle program was an environmental fraud that chose avoiding one form of environmental contamination (microplastics) for another (burning plastics and releasing carbon and toxic chemicals into the atmosphere).[48]  People began to recognize that the Color Cycle program was merely a marketing and public relations scheme.[49]

123.    Crayola has demonstrated it is well aware of the public's desire to avoid harm to people, animals, and the environment, and that such harm can come from the art products.  This has been part of a long-standing marketing campaign since Crayola's inception that Crayola leverages against its competitors to obtain a greater market share.

## C.    CRAYOLA'S NON-TOXIC CLAIMS ON THE PRODUCTS

124.    Crayola's environmental marketing strategy starts on its labels of its products, where it claims the Products are NON-TOXIC. Crayola's NON-TOXIC claims have significant history.  Like many things, as time passes, knowledge bases grow, and access to the knowledge bases is more freely

---

[46] (See https://web.archive.org/web/20130928001214/http://www.crayola.com/colorcycle, last viewed December 1, 2025; https://web.archive.org/web/20150106085247/www.crayola.com/about-us/company/green-initiatives.aspx, last viewed December 1, 2025.)

[47] (See https://www.crayola.com/about-us/sustainability/colorcycle#:~:text=Recyclers%20have%20strict%20guidelines%20about,%2C%20manufacturing%2C%20and%20distribution%20processes, last viewed December 1, 2025.)

[48] https://energyjustice.net/crayola/#:~:text=In%202012%2C%20a%20group%20of,oil%2C%20electricity%20and%20wax.%E2%80%9D, last viewed December 1, 2025.

[49] https://www.reddit.com/r/environment/comments/83kiey/i_believe_that_crayolas_colorcycle_program_is_a/, last viewed December 1, 2025.

1  provided, and then people discover that past representations once thought to be truthful, actually have
2  no basis to be made or were made on outdated standards and perceptions.

3      125.    Crayola has been marketing art products as being NON-TOXIC, by its own admission,
4  since at least 1958, if not much earlier. [50]

5      126.    The front label of many of its Products, if not all of them, includes the term NON-
6  TOXIC. Based on information and belief, Crayola has done this for the past decades and on all its art
7  products.

8      127.    Depictions of Crayola's labeling of the Products and the NON-TOXIC claims are
9  depicted in Exhibits 1, 4, 7, 9, 12, 14, 16, 18, 20, 22, 23, 25, and 27 attached hereto.

10     128.    The NON-TOXIC claim on the front of the Products' packaging is made without any
11  qualification. It stands alone unfettered by anything else to suggest the claim is qualified. It is not
12  otherwise explained although other companies have explained the limits of a NON-TOXIC claim on
13  markers. For example, Walmart explains that NON-TOXIC markers it offers for sale relate to the
14  claim that the ink is NON-TOXIC.[51]

---

[50] https://www.crayola.com/docs/default-source/company-policies/colorful-moments-timeline-2025.pdf?sfvrsn=28b542b6_1, last viewed December 1, 2025.

[51] https://www.walmart.com/ip/Pen-Gear-Assorted-Colors-Classic-Broad-Line-Markers-10-Count/5089722637, last viewed December 1, 2025.

Pickup or delivery?    ⌄    Search everything at Walmart online and in store
Pittsburgh, 15222 · Carnegie Store

Services ⌄    Get it Fast    New Arrivals    Halloween    Pharmacy    Rollbacks & More    Fall Home    Baby Event

## About this item

Product details

Elevate your creativity with Pen+Gear's 10-Count Classic Broad Line Markers, suitable for ages 3+. This set of assorted colors features non-toxic ink, ensuring safe use for young artists. The conical broad line tips enable you to craft both thick and thin lines, perfect for various artistic pursuits such as drawing, doodling, and dotting. The high-quality pigment ink ensures no bleed-through on paper, enhancing your artwork while maintaining safety for users aged three and above. These markers are ideal for classroom activities, DIY projects, arts and crafts, coloring books, and more. Be sure to explore the complete range of Pen+Gear products to meet all your home, office, and school stationery requirements. Equip your classroom, craft room, or office with a set of Pen+Gear's 10-Count Classic Broad Line Markers, the ultimate tool for artistic expression.

- Pen+Gear Assorted Colors Classic Broad Line Markers, 10 Count
- For kids and adults
- Excellent for lettering and coloring
- 10 bright colors for artistic expression
- Conical tip draws both thick and thin lines
- Non-toxic ink for safe use by ages 3+

ⓘ **We aim to show you accurate product information.** Manufacturers, suppliers and others provide what you see here, and we have not verified it. See our disclaimer

129.    Crayola's NON-TOXIC claims on its Products are generally made on the front label in the lower middle or one of the lower corners of the Products' packaging, but at times is made in another conspicuous area of the front label. The NON-TOXIC claim on the front label is often capitalized. The text may be in various fonts but is colored to highly contrast with the background of the front labeling of Crayola's Products.  The text is often in English, but on certain products may additionally contain text in other languages, such as French and Spanish, in addition to English.  There are no asterisks or symbols associated with the NON-TOXIC claim or other information to suggest there is any qualification of the NON-TOXIC claim on the front label. Below are examples of Crayola's NON-TOXIC claims made on the front labels of some of Crayola's Products, including the 1958 version of its 64 pack of crayons.







130.    Crayola labels the Products with claims they are NON-TOXIC similar to its other art products in form and nature. Based on information and belief, Crayola has made these uniform NON-TOXIC claims across its art product lines to cultivate a belief and expectation by consumers that all Crayola brand art products are NON-TOXIC. Based on information and belief, this has occurred since at least the 1990s, if not much earlier.

131.    Crayola's environmental marketing has paid dividends.    A recent Art and Craft Material Market analysis noted that, "Crayola launched eco-friendly crayons and markers targeting sustainability-conscious parent," and determined that "Crayola dominates with eco-friendly products for children and hobbyists."[52]

---

[52] https://www.futuremarketinsights.com/reports/art-and-craft-material-market-share-analysis, last viewed December 1, 2025.

1    132.    Indeed, Crayola's dominance in marketing products as eco-friendly is evidenced by
2    how they continually reinforce environmental marketing claims. In addition to Crayola's unqualified
3    NON-TOXIC claims on the front label of its art products, Crayola frequently represents on the back
4    labeling of many of its art products, if not all of them, that "All Crayola art materials are nontoxic."
5    This representation is often made alongside other safety representations on the back labeling of the
6    products. Based on information and belief, Crayola has made this representation on the labels of its art
7    products for decades.



13    133.    Crayola also reinforces its unqualified NON-TOXIC claims on the front label of its art
14    products, including the Products at issue in this matter, by making the claims that all its art materials
15    are nontoxic by placing these additional claims directly next to a third-party seal adopted by the Art
16    & Creating Materials Institute. It is questionable whether the additional claim can be distinguished
17    and disassociated from the third-party seal based on its proximity of the NON-TOXIC claim to the
18    seal along with the design and location of area of the label where the third-party seal and additional
19    NON-TOXIC claim are located.

20    134.    ACMI is a non-profit industry association of manufacturers of art, craft, and creative
21    materials. It contends that its primary mission has been to promote safety in art products, most notably
22    through its AP (Approved Product) and CL (Cautionary Label) certification seals. Based on
23    information and belief, ACMI lobbies and interacts with federal agencies to address industry interests.
24    It has been operating since approximately the 1940s and included as a predecessor the art industry
25    trade group the Watercolor and Craft Institute, of which Crayola's predecessor Binney & Smith was
26    a founding member.

27    135.    Today, ACMI represents that it is composed of more than 200 art, craft and material
28

34

**COMPLAINT**

Manufacturers, Retailers and Licensees "that are dedicated to keeping customers safe."[53]  ACMI is not a consumer-based entity, but it is trade association focused on promoting businesses.

136.    ACMI advises parents and teachers to "Look for the seals" as "ACMI's art supply program works to protect students, artists and creatives of all kinds pursuing their passion."[54]

137.    ACMI contends that, "[f]or over 80 years, the ACMI program for children's art materials has certified that these products are non-toxic using the AP Seal."  Thus, the ACMI seals reenforce any non-toxic claim made on the labeling of any product, which contains an ACMI seal.

138.    Today, ACMI provides two distinct seals, its Approved Product seal ("AP seal") and Cautionary Labeling seal ("CL Seal").  The primary difference between the seals, per AMCI, is the nature of toxicity of the product associated with each seal.  According to ACMI, its AP Seal indicates that when the product is used as intended it contains no materials in sufficient quantities to be toxic or injurious to humans.  In contrast the CL seal advises that the product is not hazardous to humans when used as intended.  Examples of the seals are below.





139.    None of Crayola's Products with an ACMI seal qualifies the NON-TOXIC and nontoxic claims or explain whether the NON-TOXIC and

---

[53] (See https://www.acmiart.org/, last viewed December 1, 2025.)

[54] (See https://www.acmiart.org/classroom-art-materials-safety, last viewed December 1, 2025.) Available via https://www.acmiart.org/ under the tab "For Teachers & Parents" and selecting the option K-12 Art Materials Safety.)

1  nontoxic claims are intended to be interpreted consistent with ACMI's explanations.

2      140.    ACMI's AP and CL seals, today, do not state a product is non-toxic.  The AP and CL

3  seals do not, and cannot, certify a product is non-toxic under the Green Guides or California's EMCA.

4  The standard applied in determining whether to apply and use either an AP or CL seal is whether and

5  to what extent a product conforms to the ASTM D-4236 standard, a standard not applicable to

6  determining if a product is non-toxic under the Green Guides or California's EMCA.

7      141.    ASTM D-4236 is a standard that indicates a product does not present a risk of chronic

8  health hazards.  It only addresses issues of the potential for a chronic adverse health effect upon human

9  exposure to a product.  It does not address all harms that a product exposure could cause to a human.

10  It does not address any harms a product exposure could cause to animals.  It does not address any

11  harms a product exposure can cause to the environment.  The ASTM D-4236 standard is not a standard

12  addressing a consumer's understanding of unqualified NON-TOXIC claims.

13      142.    The designation on a product that it "conforms to ASTM D-4236" means all of the

14  potentially known "hazardous" components of the art product have been clearly labeled on the product

15  packaging.[55]

16      143.    Based on information and belief, the general public has no understanding of what the

17  ASTM D-4236 standard is or how it is applied.

18      144.    The University of Vermont explains to its art students how the ASTM D-4236 is

19  applied and cautions them about relying on the standard.

20      The way art products are evaluated relies on the use of averages and assumptions; the
       nature of the process leaves a lot of room for debate about many of the individual
21      factors used. The result is that different opinions may arise as to the relative toxicity of
       a particular art material. These are complex issues and there is validity in more than
22      one opinion.

23      Realize that the toxicological assessment of a product can only rely upon current
       scientific and medical knowledge of existing chemical hazards. Although ASTM D
24      4236 states that "knowledge about chronic health hazards is incomplete," there has
       been a leap made from describing materials as having the "absence of known hazards"
25

26  _____

27  [55] https://outlinesart.com/product-info/what-is-astm-d-
    4236/#:~:text=Brief%20Answer,if%20they%20are%20over%2Dinhaled, last viewed December 1,
28  2025.

1    to declaring that a product is "non-toxic" under the ASTM Standard.[56]

2    145.    Put more bluntly by Hamilton College personnel, "'Conforms to D-4236' on an art

3    material label does **NOT** mean the product is 'non-toxic.'"[57]

4    146.    Importantly, the standard under ASTM D-4236 for what is "hazardous" is not the

5    inverse of the standard to determine if a product is non-toxic under the Green Guides or California's

6    EMCA.

7    147.    While the disclosure that an art product conforms with ASTM D-4236 is required of

8    all art products, the standard does not require the disclosure of all ingredients or components of a

9    product, or what harms those could have on people, animals, or the environment.

10    148.    A product can comply with ASTM D-4236 but still requires a disclosure pursuant to

11    Proposition 65.[58]

12    149.    A product can comply with the ASTM D-4236 standard and still contain an ingredient,

13    component, or chemical that can cause harm to people, animals, or the environment.[59]

14    150.    ACMI is aware of these concepts and thus prohibits products that require a Prop. 65

15    warning from using its seals.    Based on information and belief, ACMI did not have any such

16    requirements related to the use of its seals before the passage of Prop. 65.

17    151.    The ASTM D-4236 standard simply does not address consumer perceptions and

18    marketing, like the Green Guides and California's EMCA.

19    152.    Notably, the ASTM D-4236 standard used by AMCI does not justify the use of the term

20    non-toxic being associated with the standard or ACMI's seals.

21    153.    ACMI at one point used to offer different seals, including its AP NONTOXIC and CP

22    _____

23    [56] https://www.uvm.edu/safety/art-
safety#:~:text=Potentially%20toxic%20chemicals%20are%20likely,way%20to%20use%20these%2

24    0products, last viewed December 1, 2025.

25    [57] https://www.hamilton.edu/documents/art%20hazard%20labeling%20considerations.pdf, last
viewed December 1, 2025.

26    [58] https://www.jacksonsart.com/blog/2021/03/19/explaining-carcinogen-warnings-on-artists-

27    materials/, last viewed December 1, 2025.

28    [59] (See https://greenamerica.org/green-living/toxic-art-supplies, last viewed December 1, 2025.)

1  NONTOXIC seals.

 

ACMI discontinued use of these seals years ago. Based on information and belief, after 2009 ACMI only offered its current AP seal and CL seal to be used by the art business community. Reasons for the discontinuance of the AP NONTOXIC and CP NONTOXIC seals appear to relate to the use of the term NONTOXIC in the seal, and consequently on the packaging of any art products using those seals. Those seals when used on a product label, absent additional qualification, were unqualified non-toxic claims, a claim that conflicts with the very nature of what ACMI contends it seal means, which is that the product has been certified to comply with ASTM D-4236.

154.    It is not surprising that ACMI would stop expressly claiming a product was NONTOXIC in an unqualified manner. When ACMI began to phase out its NONTOXIC seals the FTC had already been interpreting non-toxic claims as general environmental marketing claims for more than a decade.

155.    During that time, some art supplies companies began to see the potential for consumer deception in making non-toxic claims recognizing the need to allow consumers to make an informed decision about the environmental impact of a product. One company, when addressing why it would no longer use the ACMI seals, noted that it would change to a different seal because, "[f]irst, potentially toxic chemicals are likely present at some level regardless of risk assessment; second, it is inappropriate to assume that all possible chronic hazards of chemicals are currently known; and third,

1  personal exposure should be prevented when using the product."[60] These concerns were raised
2  because the company's customer feedback "indicated that reading 'nontoxic' on the label implied the
3  paints could be used for things we did not intend; such as body painting, painting with the fingers or
4  tongue, tattooing, and decorating dishware."[61] Thus the company found it better to qualify its safety
5  claims with a symbol indicating the products while being relatively safe, should be kept out of one's
6  mouth and the company expressly avoided the use of the term non-toxic on its labels. Indeed, when
7  addressing the ASTM D-4263 standard the company noted that toxicological assessments were limited
8  under the ASTM D-4263 standard and that using a standard that incorporated an absence of known
9  hazards did not mean the product could not be hazardous. The company noted how over time the leap
10  from the "'absence of known hazards' to the declaration that a product is 'non-toxic,'" and these
11  phrases did not mean the same thing.

12    156.    As later noted by other producers of art products, the ACMI seals do not provide
13  consumers with much information about a product other than trusting ACMI.[62] Merely complying
14  with ASTM D-4236 standards do not address long term effects of exposure to small quantities of
15  toxins.

16    157.    In 1995, when the FTC sought comment about the Green Guides three years after their
17  promulgation, ACMI provided comments. ACMI complained to the FTC that companies were not
18  making environmental marketing claims because they were too expensive.[63]

19        It may be observed that 'conservative' companies are <u>not</u> making claims that may be
20        justified, since the cost of evaluating such claims in terms of legal, staff, testing and
          other requirements can involve significant expenditures.

21  ACMI recognized the marketing advantages of some companies being willing to make such claims.

22

23  [60] https://justpaint.org/de/label-update-new-health-safety-format/, last viewed December 1, 2025.

24  [61] https://goldenartistcolors.com/resources/health-safety-labeling, last viewed December 1, 2025.

25  [62] (See https://naturalearthpaint.com/blogs/blog/are-non-toxic-art-supplies-truly-toxin-free-kates-
26  story?_pos=3&_sid=dab05047a&_ss=r, last viewed December 1, 2025.)

27  [63] https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-
    marketing-claims-project-no.p954501-00273%C2%A0/00273-57052.pdf, last viewed December 1,
28  2025.

> Less 'conservative' companies in the industry or other industries have probably profited from claims that may not be adequately 'substantiated.' Either they do not realize what 'substantiation' means or may mistakenly think a claim is adequately supported, even if it is not. And there are, at base, some companies that are responsible for misleading and, in some cases, false environmental marketing claims.

ACMI also took the position that:

> Certifying a product to be 'nontoxic' to humans and specifically to children, certainly explicitly and, by implication, states a claim that a product will not 'chemically' injure a child. This is certainly a kind of environmental 'benefit,' but not the kind of environmental benefit normally understood by use of the term in the environmental context.
> ...
> To ACMI' s knowledge, there has never been any known confusion on the part of consumers or public authority purchasers as to the nontoxic mark as implying an environmental benefit, other than the product's nontoxicity to humans.

Thus, ACMI attempted to convince the FTC that general environmental marketing claims made through nontoxic claims should be limited to chemical injuries to humans.

158.    In the face of ACMI's concerns, the FTC did not bend on its interpretation of non-toxic claims that suggest to consumers that a product not only did not cause harm (as opposed to acute chemical injury) to humans, but also to animals and the environment.

> Three new examples have been added to this guide. One illustrates that in some contexts, a 'non-toxic' claim may convey to consumers that a product does not pose any risk to human health or the environment, and that the claim would be deceptive if the product does, in fact, pose a significant risk to either human health or the environment.

(61 FR 53311, 53315 (1996).)

159.    Based on information and belief, ACMI began to phase out its AP NONTOXIC and CP NONTOXIC claims over a ten-year period, beginning in 1999. ACMI understood that public perception about what was non-toxic was not the same as the standards applied under ASTM D-4263, which was what its seal actually certified and addressed for art products.

160.    In addition to consumer, regulatory, and industry changes, AMCI became aware of the issues with the older seals that included express and unqualified non-toxic claims.

161.    In the early 2000s, a legal action by Crayola's predecessor, Binney and Smith, against its insurance company also illustrated the problems with the former AMCI seals.  In that action, Crayola had sought indemnity from its insurance carrier when it settled a class action matter (the

*Schwab* action) for breach of the implied warranty of merchantability, violation of the Illinois' Consumer Fraud Act and Uniform Deceptive Trade Practices Act, and breach of express warranty, all related to Crayola's crayons.  The underlying class action claims were that Crayola's crayons contained asbestos fibers above trace amounts despite Crayola using the ACMI CP NONTOXIC seals and failed to disclose the crayons were made with asbestos, asbestos containing materials, and contained asbestos.  The deceptive claims in the class action case resulted in Crayola agreeing, among other things, to reformulate its crayons to avoid the use of asbestos containing products, namely talc.[64]

162.    The class action matter was filed in June of 2000, resolved six months later, and dismissed a year and half after its filing. About three months after the class action was filed, Crayola's insurance carrier filed an action for declaratory relief seeking a declaration that it neither had a duty to defend nor indemnify Crayola.  Crayola's insurer would lose on both issues in the trial court.

163.    On appeal from the trial court, Crayola's insurer claimed error in that Crayola unreasonably resolved the class action litigation, and it need not indemnify it.  One alleged reason was because Crayola had an absolute defense to the class action claims by complying with the Federal Law requiring the disclosure that the product met the ASTM D-4236 standard.[65]  Crayola had received a letter from the Consumer Protection Safey Commission that its crayons complied with labeling requirements under the Federal Hazardous Substance Act (FHSA), which Crayola's insurance carrier contended was evidence of an absolute defense based on compliance with the FHSA.

164.    In 2009, the appellate court explained why compliance with FHSA was not a defense that Crayola could have raised in the underlying class action litigation that was based on consumer deception based on Crayola's NON-TOXIC claims on the labels of its crayons.

> The CFA and DTPA claims in the Schwab complaint were not based on Binney's use of the statement that 'the crayons conform to ASTM D-4236,' however. Instead, the CFA and DTPA claims were based on Binney's use of the term 'CP NON-TOXIC' and, on some packaging, the term 'Certified Non-Toxic' on its Crayola brand crayon labels. Neither the LHAMA, nor the CPSC agency letter interpreting the LHAMA, 'specifically authorized' Binney to use the terms 'Certified Non-Toxic' or the seal 'CP NON-TOXIC' on its packaging. As our supreme court noted in Price, the 'mere

---

[64] (See *Fed. Ins. Co. v. Binney & Smith, Inc.* (2009) 393 Ill.App. 3d 277, 281.)

[65] (See *Fed. Ins. Co. v. Binney & Smith, Inc.* (2009) 393 Ill.App. 3d 277, 284.)

compliance with the rules applicable to labeling and advertising is not sufficient to trigger the exemption created by section 10b(1).' Price, 219 Ill. 2d at 241. Because Binney was not specifically authorized under the LHAMA to use the terms 'CP NON-TOXIC' or 'Certified Non-Toxic' on its crayon labels, we find section 10b(1) of the CFA and section 4 of the DTPA did not provide an absolute defense to the claims raised in the Schwab action. See Price, 219 Ill. 2d at 241('Conduct is not specifically authorized merely because it has not been specifically prohibited.')[66]

Importantly, this demonstrates that ASTM D-4236 compliance is not the equivalent of a NON-TOXIC claim and compliance with ASTM D-4236 is a very narrow marketing claim that does not include and is distinct from the use of a NON-TOXIC environmental marketing claim.

165.    Crayola's insurance carrier also claimed that Crayola should not be afforded insurance coverage of the class action matter and settlement because the NON-TOXIC claims on the packaging of Crayola's crayons were not a form of advertising intended to be relied upon by the public.  The appellate court dismissed the insurer's argument.

Contrary to Federal's contentions, the Schwab action contained allegations that Binney engaged in the false labeling of its products as 'non-toxic' and 'safe' for use by children, that Binney 'knew or should have known' its products contained asbestos that 'failed to comply with the non-toxic representations on the packaging, and that the members of the class would not have purchased the crayons 'had they known of the risks connected with said purchase.'

We agree with the trial court's findings that Binney's allegedly false labeling could have been considered a form of advertising sufficient to support a claim for coverage arising out of an advertising injury, as defined by the Federal policies. As the trial court noted, the plaintiffs' CFA claims in the Schwab action stemmed from allegedly fraudulent and/or deceptive conduct arising from the form of advertising Binney engaged in. The CFA and DTPA claims did not directly challenge the manufacture or production of the crayons themselves.[67]

166.    By or shortly after the appellate decision, ACMI had phased out the use of NON-TOXIC claims associated with its seals.

167.    ACMI though still desired the use of the term NON-TOXIC with its seal.  In 2010, when the FTC sought comment upon updating the Green Guides.  At the time the FTC had proposed to provide guidance on the use of the term "NON-TOXIC" by marketers, preliminarily to be under a new section of the Green Guides, section 260.9, ACMI commented to the FTC that:

---

[66] (*Id.* at p. 287.)

[67] (*Id.* at p. 287-88.)

1　　ACMI and its members believe that the AP Seal, accompanied by the term "Non-
　　Toxic," and by the legally required statement "conforms to ASTM D4236," meets and
2　　exceeds the FTC's proposed requirement in Section 260.9 of the Green Guides. With a
　　program almost 71 years old and without a single recall of any product certified since
3　　1988 when LHAMA was enacted, we believe the term "Non-Toxic" is non-deceptive
　　and generally understood by consumers not to refer to environmental hazards in the
4　　context of the ACMI program. [68]

5　ACMI also contended that "consumers understand the term to refer to human health effects, not human

6　and environmental effects, based upon its use in the program for 70+ years."

7　　　168.　　The FTC directly addressed ACMI's comment. After issuing the Non-toxic section in

8　the Green Guides, what became section 260.10, the FTC issued its statement of basis and purpose. It

9　referenced ACMI's comment and then explained it would not change its standard as ACMI requested.

10　As noted by the FTC, "an unqualified non-toxic claim likely conveys that a product is not toxic to both

11　humans and the environment" and cautioned marketers "to qualify non-toxic claims carefully, unless

12　they can substantiate all express and implied messages inherent in an unqualified claim."[69]

13　　　169.　　Based on information and belief, ACMI does not use the term NON-TOXIC with its

14　seals today.

15　　　170.　　Based on information and belief, ACMI has never certified a product making a NON-

16　TOXIC claim as complying with the Green Guides by whether the claim was or was not qualified.

17　　　171.　　Based on information and belief, ACMI has never certified a product making a NON-

18　TOXIC claim as complying with the California's EMCA, whether the claim was or was not qualified.

19　　　172.　　ACMI though on its website, not on its seal, advises that "[m]embership in The Art and

20　Creative Materials Institute ensures compliance to the Federal law, as well as the individual state art

21　material labeling laws."[70]　ACMI though only further discuss one law, the Federal Labeling of

22　Hazardous Art Materials Act.

23

24　[68] https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-
25　marketing-claims-project-no.p954501-00273%C2%A0/00273-57051.pdf, last viewed December 1,
　　2025.

26　[69] (See https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-
27　guides/greenguidesstatement.pdf, p. 144-147, last viewed December 1, 2025.)

28　[70] (See https://www.acmiart.org/regulations, last viewed December 1, 2025.)

173.    Other marketers of art materials, after the most recent changes to the Green Guides in 2012 that once marketed their products as NON-TOXIC, no longer use such environmental marketing claims.  For example, Mr. Sketch makes and markets scented markers and crayons.[71]  Mr. Sketch has a specific FAQ directed to NON-TOXIC claims and why it no longer makes such claims about its products.[72]  Under the FAQ "My product no longer says 'Non-toxic.' Is it still safe?" Mr. Sketch advises:

> Our products are still the same and continue to be reviewed by a 3rd party toxicologist to ensure they contain no toxins in sufficient quantities to be toxic or injurious to humans.

> In 2012, the Federal Trade Commission published a new version of the FTC Green Guides, which included new guidance on the use of the phrase "non-toxic" in advertising including packaging. This is why your label may have changed.

174.    Crayola used ACMI's CP NONTOXIC seal on its markers, as identified in Exhibit 30. When using the seal, which uses the term NONTOXIC, Crayola also would independently again restate the term NON-TOXIC next to the seal.



This evidences the importance Crayola places on marketing its product to the public as not causing harm to people, animals, and the environment.

175.    Although ACMI moved away from certifying or making express claims that a product is non-toxic more than 15 years ago, Crayola has been unwilling to give up its NON-TOXIC claims and the association of the AP Seal with NON-TOXIC claims.  It now uses the AP Seal on its art products enclosed in a box, and within that box Crayola also claims that all its products are non-toxic, as identified in Exhibit 31.

---

[71] (See https://www.mrsketch.com/, last viewed December 1, 2025.)

[72] (See https://www.mrsketch.com/Support-Show?cfid=non-toxic-faqs, last viewed December 1, 2025.)

44
**COMPLAINT**



Crayola does so with the Products at issue here, and based on information and belief, with all its art products.

176.    Crayola does not want consumers to be confused that its NON-TOXIC claims are unqualified and applicable to all its art products, even if those products can cause harm to humans, including harms that do not need to be disclosed under ASTM D-4236, and regardless of whether the products can harm animals or the environment, which the ASTM D-4236 standard does not even address.

177.    Based on information and belief, Crayola instead reinforces its NON-TOXIC claims by associating the ACMI seals with Crayola's claims and avoiding any scrutiny of further modifying and qualifying its long-established uniform marketing of its art products that are claimed to be NON-TOXIC without qualification and uniformly applied across its entire art products lines.

178.    It is apparent that Crayola engages in a uniform marketing campaign of its art materials that consistently reinforces its NON-TOXIC environmental marketing claims about all of its art products including the Products at issue in this litigation, which reinforces the nature and extent of the unqualified NON-TOXIC claims it makes on the labels of the Products.

179.    But, when applying the standard of what is NON-TOXIC under the Green Guides and California's EMCA, Crayola's NON-TOXIC claims are deceptive.

## D.    CRAYOLA DOES NOT WANT CALIFORNIANS TO KNOW WHAT IS IN ITS PRODUCTS

180.    Crayola engages in significant marketing to avoid a person questioning its NON-TOXIC claims. It provides fancy logos and language to make it sound as if its products are incapable of causing harm to people, animals, or the environment. The reality though is that there is little transparency in what is in Crayola's products, the standard applied to its "certifications" and standards

applied to evaluating its products to obtain certification that are independently verifiable or having application to the evaluation of marketing claims. Furthermore, despite Californian's having a right to understand the basis for Crayola's NON-TOXIC claims, it will not provide any information on the basis it makes such claims.

       **i.**    **Crayola's ACMI Certification and Compliance with ASTM D-4236 are not Objectively Verifiable, Provided no Substantive Information to Evaluate, and does not Demonstrate or Indicate Compliance with the Green Guides or California's EMCA**

181.    As noted, ACMI is an industry organization, controlled by and acting for the those involved in the Art Industry. To be a member of ACMI one must subscribe to the ACMI's certification program and actively manufacture and sell one or more products that qualify for the certification program.[73] Before applying, ACMI asks applicants to download and read its Manual of Procedure.[74]

182.    ACMI's Manual of Procedures, last updated in December of 2022 (herein "ACMI Manual"), is publicly available.[75]

183.    ACMI represents that a Toxicologist's review covers review of product formulas for only acute or chronic health hazards under the law and regulations administered by the "Consumer Product Safety Commission (CPSC), principally the Labeling of Hazardous Art Materials Act (LHAMA), the Federal Hazardous Substances Act (FHSA) and ASTM D4236."[76]

184.    Additionally, not any toxicologist may evaluate a product for ACMI certification. The toxicologists used to evaluate products seeking ACMI certification must be appointed by ACMI's Board of Directors.[77]

---

[73] (See Join ACMI, https://my.acmiart.org/join-acmi?reload=timezone, last viewed December 1, 2025.)

[74] (See *id.*)

[75] (See Manual of Proc https://members.acmiart.org/docs/MOP_Current.pdf, last viewed December 1, 2025.)

[76] (See *id.* at p. 4.)

[77] (See *id.* at p. 8.)

185.    The ACMI manual advises that its members submit information to a toxicologist, but of the information submitted to a toxicologist, "ACMI does not itself review the formulas or the test results." [78] What occurs is after a toxicologist's review, the ACMI member submits a request to ACMI for authorization to use its seals with an approval form from a toxicologist.  "If the request includes a Toxicologist's Approval (TA) form from one of the Board-certified toxicologists and all other paperwork is in order, ACMI will then authorize the use of the appropriate Seal."[79]

186.    ACMI's manual advises that the toxicologist determines either that there is no acute or and or chronic health hazard determined, then the "product may be described as 'Non-Toxic' when used as intended and qualifies for the AP certification" upon submission of a Toxicologist's approval form. [80]

187.    ACMI is also not privy to any correspondence between its members and toxicologists as absent a "NDA" no copies of communications between its "subscribers" and toxicologists will be sent to ACMI.[81]  Thus, ACMI does not keep information verifying the nature of toxicological work under taken and information provided such as the product formulation, and testing procedures, protocols, actual compliance with protocols and procedures, and results that are provided to and produced by ACMI's chosen toxicologists.

188.    The ACMI certification is simply not objective, relies on trust in its reputation, trust in industry aligned and funded partners and members, and notably has extraordinarily different requirements for determining whether a product is non-toxic from the FTC and California's EMCA.

189.    There simply is no reason for any toxicologist involved with the evaluation of art products as part of the ACMI certification process to consider the FTC or California's understanding, and consumer understanding, of an environmental marketing claim that a product is non-toxic. ACMI's certification simply does not address consumer understanding, marketing claims,

---

[78] (*Id*. at p. 1.)

[79] (*Id*. at p. 2.)

[80] (See *id*. at pp. 4-5.)

[81] (See *id.* at pp. 11, 13, 16, 26.)

1    environmental or otherwise, or include the scope of harms a product exposure may cause to persons,

2    animals, or the environment.

3    190.    The FTC has also considered ACMI's request that its seal and identification of a

4    statement of compliance with ASTM standards should be sufficient to make a non-toxic environmental

5    marketing claim.  The FTC has rejected ACMI's request reiterating warnings that unqualified non-

6    toxic claims were inherently difficult to substantiate, but proper qualification and substantiation of the

7    claims is allowable.[82]

8    191.    Crayola though does not provide any qualification of its NON-TOXIC claims on the

9    front of its products packaging, nor any explanation of what the ACMI seal actually means in the

10   context of making nontoxic environmental marketing claim in connection with the ACMI seal on the

11   Products' labels.

12   **ii.    Crayola's Disclosure of Information Under Duties to Workers only Results in**

13   **What Crayola Chooses to Disclose related to Adult Exposures to Products**

14   192.    Sometimes product manufacturers let the public know what is in a product voluntarily,

15   but often they do not.  Governments though frequently mandate some information about products are

16   provided, particularly for those persons that have no or limited options to avoid chemicals and products

17   as part of their employment.

18   193.    Material Safety Data Sheets and Safety Data Sheets (collectively referred to as an

19   "SDS") are mandated in various countries under various laws.  In the United States the Occupational

20   Safety and Health Act (OSH Act), administered by the Occupational Safety and Health Administration

21   (OSHA), is one of the primary laws that requires SDSs to be provided.  The purpose of the OSH Act

22   is "to assure so far as possible every working man and woman in the Nation safe and healthful working

23   conditions." (29 U.S.C. § 651.)

24   194.    The OSH Act empowers OSHA to promulgate regulations, including those called

25   occupational safety and health standards. (See 29 U.S.C. § 655.) One of these standards is the Hazard

26   Communication Standard, that can be found at 29 C.F.R. § 1910.1200.  This standard requires that

27

28   [82] See footnote 48.

1  SDS are obtained or developed by chemical manufacturers or importers and are maintained in the
2  workplace by employers. (See 29. C.F.R. § 1910.1200(g)(1).)

3      195.    Similar standards have also been developed in parallel by States, including those
4  developed by the State of California.  Under Labor Code § 6390 and 6391 manufacturers must provide
5  SDSs to direct purchasers of their products and disclosure certain information.  State regulations, like
6  federal regulations also require hazard communication in the workplace including the issuance and
7  provision of SDSs. (See Cal. Code Regs., tit. 8, § 5194 (g).)

8      196.    OSHA requires that at least 16 categories are included in SDSs. (See 29. C.F.R. §
9  1910.1200(g)(2) and 29 C.F.R. § 1910.1200 APPENDIX D.) This includes the categories of Hazard
10 Identification, Composition/information on ingredients, First Aid Measures, Fire Fighting Measures,
11 Exposure controls/personal protection, physical chemical properties, physical and chemical properties,
12 toxicological information, and ecological information.    This is also required by regulation in
13 California. (See Cal. Code Regs., tit. 8, § 5194 (g)(2).)

14     197.    Based on information and belief, chemical manufacturers, importers, and employers
15 are primarily concerned about OSHA's SDS requirements as they relate to adults, particularly related
16 to the toxic nature of chemicals, and are not concerned chemical or product exposures to children, as
17 it is adults that primarily make up the workforce.  Indeed, the Fair Labors Standards Act as a general
18 rule sets a minimum of employment at 14 years old and prohibits minors from working that in
19 employment that is declared hazardous.[83]  Thus those who create SDSs are concerned with how each
20 required category that applies to adult humans applies, not babies, infants, or children.

21     198.    Based on information and belief chemical manufacturers, importers, and employers
22 primarily concerned about OSHA's SDS requirements, also have competitive and pecuniary interests
23 to avoid disclosing particular information about their products, and thus are incentivized to offer as
24 little information in SDSs as possible. Legitimate interests in doing so may include avoiding disclosing
25 information subject to trade secret protections, and illegitimate interests in doing so may be to avoid

26 _____

27 [83] (See Age Requirements,
   https://www.dol.gov/general/topic/youthlabor/agerequirements#:~:text=The%20rules%20vary%20d
28 epending%20upon,under%20the%20age%20of%2016, last viewed December 1, 2025.)

the negative consequences of disclosing harmful aspects of the chemical or product. As SDSs often are publicly available, as they must be provided to others such as employers, they can provide insight to consumers about products, but those insights are often limited.

199. SDSs also may be different based on different requirements in various jurisdictions, such that manufacturers and employers that operate in multiple countries that have inconsistent standards regarding what must be included in an SDS and the verification of the information provided.

200. In the United States, SDSs are not preapproved, verified, or updated by anyone other than the manufacturer or importer of a chemical or product. (See 29 C.F.R. § 1910.1200(g)(5), Cal. Code Regs., tit. 8, § 5194(g)(5).) Thus, chemical manufacturers and importers have a legal duty to accurately disclose information as employers will frequently rely on this information when making decisions. (Accord *In re East Palestine Train Derailment* (N.D.Ohio Feb. 21, 2025, No. 4:23-CV-00242) 2025 U.S.Dist.LEXIS 31026, at *18 and *26-27.) There is also a duty to update the SDSs if the manufacturer, importer or employer preparing the SDS becomes aware of newly aware of "significant information" regarding hazards or protection from hazards, to do so within three months and that proper dissemination is made of the new SDSs. (See 29 C.F.R. § 1910.1200(g)(5)-(7), Cal. Code Regs., tit. 8, § 5194(g)(5)-(7).)

201. Contextually, because the SDSs primary use is in the employment context, often any duties that were breached are only realized if an injury is caused in the employment context. OSHA advises that the realities of the circumstances is that "because manufacturers and importers will often have less information about the particular exposures of downstream users, their hazard assessment and communication obligations are imposed only for all normal conditions of use of their chemicals and foreseeable emergencies associated with those chemicals." (See 77 Fed.Reg. 17574, 17601-17602 Mar. 26, 2012.)

202. Furthermore, because children, compared to adults, are rarely employed in contexts where SDSs are relevant to employee safety, it is rare that an employer would ever witness or experience an exposure of a chemical that results in harm to a baby, infant, or child, or evaluate harms in the context of human development. Thus, an exposure to a chemical or product that otherwise may appear innocuous to an adult would not shed light on same harm to a baby, infant, or child or

1  necessarily identify a breach of the SDSs' authors disclosure duties. Nor would an exposure to an

2  adult indicate developmental harms caused by a chemical or product, as adults generally are fully

3  developed, unlike babies, infants, or children.

4      203.    Thus, while SDSs offer some information about a chemical or product, if a

5  manufacturer or importer meets its duties to properly provide disclosures, SDSs can be helpful to better

6  understand potential harms from a product but one is limited to relying on the honesty, accuracy, and

7  fidelity of what the manufacturer or importer discloses, if anything is disclosed.

8      204.    SDSs are also subject to the SDS's author's choice to include, and to not include

9  information in it. This incentivizes authors of SDS's to avoid disclosing information that is beyond

10 the employment context, beyond the effects a product or chemical may have an adult, and otherwise

11 disclosing harms that it may not consider hazardous, even if that harm would be one that would

12 preclude an unqualified non-toxic claim being made in the marketing of the product.

13     205.    Studies have shown that SDSs do not accurately reflect potential harms of Occupational

14 asthma and Occupation dermatitis.[84] As noted in 2002:

15     There are 4 major limitations of MSDSs. First is omission of vital information
       regarding the generic chemical names and formulas of hazardous agents because
16     OSHA permits exclusion of information deemed solely by the manufacturer as not
       hazardous or protected as a trade secret. Second is omission of the listing of potential
17     respiratory and skin sensitizing agents that are known to induce reactions through a
       specific immune response. This is especially true for many high- and low-molecular-
18     weight substances because they are not ordinarily classified as toxic or irritant
       substances and therefore not considered hazardous. Third is failure to update current
19     permissible exposure levels (PELs) for 212 agents that are higher than the PELs set by
       OSHA in 1989.10,15 Finally, failure to require documented clinical information
20     regarding specific occupational lung (ie, OA or hypersensitivity pneumonitis) or
       cutaneous diseases associated with a specific agent is also a major limitation. A survey
21     of MSDSs for toluene diisocyanate revealed lack of factual information that exposure
       could cause OA.19
22
       206.    A 2019 study noted the lack of information in SDSs when comparing SDSs used in the
23
   semiconductor industry to the chemical constituents of photoresist products, which are used to provide
24
   a stencil of or pattern on a silicon wafer later used on the semiconductor, such as to map out circuit
25
   pathways on the silicon wafer. The study noted that the SDSs for the photoresist lacked significant
26

27 [84] (See J. Bernstein, Material safety data sheets: Are they reliable in identifying human hazards?,
28 https://www.jacionline.org/article/S0091-6749(02)00037-4/fulltext, last viewed December 1, 2025.)

1  and important information to determine the potential harm of the products.

2
   According to the review of MSDS data, four carcinogens were included in PR products: cyclohexanone, ethylbenzene, pyridine and 1,4-dioxane. However, toxicological information is not included in their MSDS; thus, it is difficult to make a decision about their harmfulness using the MSDS. Furthermore, four products including cyclohexanone did not have a hazardous identification specified in the MSDS.
3

4

5  …

6
   From the MSDS review, most products did not specify information on impurities, although toxicological information should be indicated for these constituents. In addition, 2-butoxyethanol [ethylene glycol monobutyl ether (EGBE)], classified as a carcinogen 2 by the MOEL, was detected in three products, but no information was specified in the MSDS.
7

8

9  …

10
   Our main findings are as follows: First, PR products contained various chemicals, and some were harmful to humans. Chemical information was not correctly specified in the MSDS; Second, from the analysis results, hazardous chemicals were detected which were not specified in the MSDS. Furthermore, chemical constituents were not matched between MSDS data and analytical results; Third, CMR substances including benzene were released as byproducts at the operating temperature, and formaldehyde and p-cresol were also released from some products containing novolak resin. Therefore, systematic management, and reexamination of chemicals used in fabrication processes and their MSDS data are required. In addition, the risk of exposure to possible by-products should be recognized in the management of the working environment.[85]
11

12

13

14

15

16  207.  A 2023 study advocated for the continued modernization of Chemical Hazard and

17  Safety Data Management Systems. The study identified problems in the current system as including

18  "missing SDS data from vendors [,] non-GHS compliant SDSs [,] SDS data errors [,] manual data

19  entry errors in downstream user databases [,] costs associated with manual entry of data in downstream

20  systems [,] confusion associated with SDSs reproduced by suppliers [,] lack of product-to-SDS

21  association[, and] incorrect reporting due to tracking inefficiencies."[86]

22  208.  As discussed further herein, some of the SDSs for the product at issue in this case

23

24  _____
    [85] (M. Jang, Evaluation of Hazardous Chemicals with Material Safety Data Sheet and By-products of a Photoresist Used in the Semiconductor-Manufacturing Industry, https://www.sciencedirect.com/science/article/pii/S2093791117302366?ref=pdf_download&fr=RR-2&rr=99d7e14c4f44078c, last viewed December 1, 2025.)
25

26

27  [86] (K. Fenton Mitigation of Chemical Reporting Liabilities through Systematic Modernization of Chemical Hazard and Safety Data Management Systems, https://pubs.acs.org/doi/10.1021/acsomega.2c07244, last viewed December 1, 2025.)
28

disclose the potential for harm to children but also are silent on much of the information required to be provided in an SDS.  Importantly, Crayola's statements in the SDSs appear to contradict the Crayola's unqualified NON-TOXIC claims on its products when applying the Green Guides and California's EMCA.

209.    Based on information and belief, Crayola does not publicize the SDSs associated with its products nor make them readily available to consumers and the end users of its products.  Crayola also does not provide sufficient information in the SDSs to evaluate all potential harms to people of all ages and stages of life, pets, and the environment.

### iii.    Crayola Thumbs Its Nose at California's EMCA's Disclosure Requirements and Californian's Rights to Know the Basis of Crayola's NONTOXIC Environmental Marketing Claims.

210.    The Products Plaintiffs purchased are markers, chalk, glue, and color changing coloring books.

211.    The Products are sold in a variety of stores such as art stores, craft stores, general retailers, grocery stores, retail pharmacies, and convenience stores.  They are consumer goods that are an everyday item, widely available for purchase and used by nearly every child that can access them, whether at home, in school, or elsewhere.

212.    The labels affixed to the Products Plaintiffs purchased state the Products are "NON-TOXIC" without qualification.

213.    The labels on the Products Plaintiffs purchased do not include a disclosure of the ingredients in the Products, including those used in all materials making up the Products.

214.    The labeling of the NON-TOXIC claim on the front labels of the Products is not ambiguous.

215.    Based on publicly available information, including SDSs and patents, the Products appear to have the ability to cause harm to humans, animals, and the environment.[87]

---

[87] This is not limited to the products at issue.  As noted recently by the host of the tik tok sensation, nontoxic dad, there are reasons to questions Crayola's products, even their crayons, as causing unnecessary exposure to toxins. (See https://www.tiktok.com/@nontoxicdad/video/7515233733318954282, last viewed December 1,

216.    Based on publicly available information, Crayola frequently contends that the process of creating the Products, including the identity and concentration of ingredients used in the Products, are subject to various protections to avoid the disclosure of the ingredients publicly, including trade secret protections.  This includes stating such in SDS's associated with the products.

217.    Plaintiffs were concerned about the basis for Crayola's NON-TOXIC claims, and, among other things, sought to understand Crayola's basis for making the claims.

218.    On April 29, 2025, Plaintiffs, via a written request sent directly to Crayola, asked that Crayola "[p]ursuant to Cal. Bus. & Prof. Code § 17580(b), provide information and documentation substantiating its claims that the Products are non-toxic." Plaintiffs' request identified and cited to the Green Guides and California's EMCA.  This included citing to the section of the Green Guides adopted in California's EMCA that is specific to NON-TOXIC environmental marketing claims, 16 C.F.R. § 260.10.    This section of the Code of Federal Regulations was cited in the letter to Crayola approximately twenty times.  This regulation includes the statement that, "[a] non-toxic claim likely conveys that a product, package, or service is non-toxic both for humans and for the environment generally."  The regulation is located at Title 16, Chapter I, Subchapter B, and Part 260, which part is entitled "Guides for the Use of Environmental Marketing Claims".

219.    Making a claim on a product label that the product is NON-TOXIC, is an environmental marketing claim.  Thus, Crayola's unqualified text that states NON-TOXIC is an environmental marking claim.

220.    Crayola is, or should be, aware that making a claim on a product label that the product is NON-TOXIC, is an environmental marketing claim.

221.    Crayola is, or should be, aware that the NON-TOXIC claims on the Products' labels are environmental marketing claims.

222.    Crayola is, or should be, aware that the NON-TOXIC claims on the Products' labeling are not ambiguous.

---

2025.) Importantly, as noted in the video, the nature of the ingredients and chemicals in Crayola's products are not publicly disclosed by Crayola, avoiding public scrutiny of its claims that its products do not harm humans, animals, or the environment.

223.    Crayola is, or should be, aware that an unqualified NON-TOXIC claim likely conveys that a product, package, or service is non-toxic for humans, animals, and for the environment generally.

224.    Crayola is, or should be, aware that marketers making NON-TOXIC claims should have competent and reliable scientific evidence that the product, package, or service is non-toxic for humans and for the environment or should clearly and prominently qualify their claims to avoid deception.

225.    Crayola is, or should be, aware that the FTC requires that any environmental marketing claim must be truthful, not misleading, and supported by a "reasonable basis *before* they make the claims."[88]

226.    Crayola is, or should be, aware that FTC has stated that:

> In the context of environmental marketing claims, a reasonable basis often requires competent and reliable scientific evidence. Such evidence consists of tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results. Such evidence should be sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that each of the marketing claims is true.[89]

227.    Crayola is, or should be, aware that the FTC expressly addressed environmental marketing claims based on a claim a product or service was NON-TOXIC before it amended the Green Guides in 2012 and the FTC treated any claims that a product or service were NON-TOXIC as general environmental marketing claims under the Green Guides, which it had done since at least 1994.

228.    Crayola is, or should be, aware that the FTC has advised people making general environmental marketing claim that:

> Unqualified general environmental benefit claims are difficult to interpret and likely convey a wide range of meanings. In many cases, such claims likely convey that the product, package, or service has specific and far-reaching environmental benefits and may convey that the item or service has no negative environmental impact. Because it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims, marketers should not make unqualified general environmental benefit claims. (16 C.F.R. § 260.4(a).)

---

[88] (See 16 C.F.R. § 260.2, emphasis added.)

[89] See footnote 2.

229.    Crayola is, or should be, aware that the FTC's Green Guides have been codified as law in California in a subsection of California's False Advertising law codified at Business and Professions Code sections 17580 and 17580.5 as part of the Environmental Marketing Claims Act.

230.    Crayola is, or should be, aware that Business and Professions Code section 17850 subdivision (a) requires it to maintain a written record of the information and documentation supporting the validity of the representations in advertising or on the label or container of a consumer good that are environmental marketing claims.  This record must include:

- the reasons Crayola believes the representation to be true;
- any significant adverse environmental impacts directly associated with the production, distribution, use, and disposal of the consumer good; and
- any measures that are taken by the person to reduce the environmental impacts directly associated with the production, distribution, and disposal of the consumer good.

231.    Crayola is, or should be, aware that the FTC when promulgating 16 C.F.R. § 260.10 considered and rejected the art trade industry lobby's contention that there is substantial recognition by consumers that use of the term "non-toxic" in conjunction with ACMI's seals relates only to human health effects, not to environmental effects.

232.    With this information and context, on July 3, 2025, through its counsel, Crayola responded to Plaintiffs' April 29, 2025, request for information supporting Crayola's unqualified NON-TOXIC environmental marketing claims on its Products' labels and packaging.  Crayola's response advised that, "Crayola products do not make environmental claims" and that the Plaintiffs' request "invokes the Green Guides and EMCA only through implausible attempts to stretch [the term non-toxic] to cover environmental claims that have no basis."

233.    Crayola's July 3, 2025, response did not otherwise address Plaintiffs' request for documentation supporting the basis for its NON-TOXIC environmental marketing claims made on the Products labels and packing and that Plaintiffs requested from Crayola pursuant to Business and Professions Code section 17580 subdivision (b).

234.    Based on information and belief, Crayola will not voluntarily provide Plaintiffs with any documents or information supporting the basis it had to make its NON-TOXIC claims, as required

1  to be kept by Crayola pursuant to Business and Professions Code section 17580 subdivision (a) and
2  as required to be produced pursuant to Business and Professions Code section 17580 subdivision (b)
3  based on Plaintiffs' April 29, 2025 letter.

4      235.    Crayola simply thumbs its nose at Californian's right to knowledge, specifically their
5  rights to understand the basis for Crayola's environmental marketing claims and to make informed
6  decisions.

7      236.    Crayola will not even acknowledge that making a NON-TOXIC claim on a product is
8  an environmental marketing claim, despite presumably being a large, sophisticated company that leads
9  the art market in many aspects, being a founding member of ACMI's predecessor organization and
10  member of ACMI, which has interacted with the FTC as to its treatment of NON-TOXIC claims and
11  FTC's development and updates to the Green Guides, the express identification in the Green Guides
12  of NON-TOXIC claims being recognized as an environmental marketing claims, California's EMCA,
13  and being provided citations and explanations to relevant material to evaluate its obligation under
14  California's EMCA.

15      237.    Crayola does not want Californian's to be informed about the basis for its NON-TOXIC
16  environmental marketing claims nor to have that basis examined.

17  **E.**    **THE PRODUCTS ARE HARMFUL TO HUMANS, ANIMALS, AND THE**
18      **ENVIRONMENT**

19      238.    It has been recognized that market incentives will drive marketers to make false claims.
20  In 2023, the Ninth Circuit Court of Appeals recognized how widespread greenwashing had become,
21  referencing an influential 2007 study identifying the "Six Sins of Green Washing."[90] The study, among
22  other things, recognized how marketers making environmental marketing claims will not disclose
23  tradeoffs, will not disclose the lack proof of the claims, will make purposefully broad and vague claim,
24  and will even outright lie when making such claims.[91]

25

26  [90] (See *McGinity v. P&G* (9th Cir. 2023) 69 F.4th 1093, 1100 fn 1.)

27  [91] (See "The "Six Sins of Greenwashing" https://perma.cc/7BTD-Z2U7, last viewed December 1,
28  2025.)

239. Crayola is not free of these "sins" when marketing the Products.

240. Crayola advises on its art products that, "[a]ll Crayola art materials are non-toxic" and uniformly without qualification advises on the front label of the Products that the Products are NON-TOXIC.

**A.    Microplastics**

241. Crayola Markers consist of six components: an inklike substance, a nib, a barrel, a filament, an end plug, and a cap.[92] This is true of all the Products that are markers.

242. Crayola's Markers caps and barrels of its markers are made of #5 plastic.

243. Recycling codes are associated with plastics. There are seven codes and generally the higher the number, the more difficult it is to recycle the plastic. Code number 5 is associated with polypropylene plastic.[93]

244. Crayola still represents on its webpage that the marker caps are made of #5 plastic.[94] On its United Kingdom webpage, Crayola previously represented that both the cap and barrels of its markers were made of #5 plastic and particularly #5 polypropylene.[95] The reference to the plastic composition of the marker barrels appears to have been removed after Plaintiffs' request to Crayola for documentation related to the basis for its environmental marketing claims that the Products are NON-TOXIC, which included allegations about the environmental problems associated with polypropylene.

---

[92](See https://www.crayola.com/support/faq/detail/how-are-crayola-markers-made#:~:text=Crayola%C2%AE%20Markers%20are%20made,move%20along%20a%20conveyor%20belt, last viewed September 4, 2025.)

[93] (See https://www.energy.gov/sites/default/files/2021-12/ES_ConsumerGuide_RecyclingCodes.pdf, last visited December 1, 2025; https://dpw.lacounty.gov/epd/SBR/pdfs/TypesOfPlastic.pdf, last viewed December 1, 2025; https://calrecycle.ca.gov/bevcontainer/consumers/, last viewed December 1, 2025.)

[94] (See https://www.crayola.com/support/faq#:~:text=Because%20Crayola%C2%AE%20Marker%20components,14, "Can Crayola Markers be recycled", last viewed December 1, 2025.)

[95] (See https://web.archive.org/web/20210118111110/http://www.crayola.co.uk/faq/environment/can-crayola-markers-be-recycled/, last viewed December 1, 2025.)

1    245.    Approximately 60-80% of the garbage on earth consists of plastics.

2    246.    More than 8 million tons of plastic are estimated to enter the world's oceans annually.

3    247.    Microplastics are a type of plastic debris that is less than five millimeters and in the

4    case of nano-microplastics, less than one micron. As noted by the FDA:

> Limited amounts of plastics are recycled or incinerated, leaving most plastic waste to accumulate in landfills and the environment. Plastic pollution can be found throughout the environment from land to streams and inland waterways to the coast and the ocean. Most plastics do not biodegrade and instead break down from weathering in the environment over time into small particles called microplastics and nanoplastics.[96]

8    248.    The harms associated with microplastics are very real. Due to their small size, they are

9    rapidly spread by wind and water, resulting in their presence in the air, solids, water, and polar ice, in

10   the depths of the sea, and in living organisms. Predominating polluting microplastics include those

11   from polypropylene.

12   249.    A meta-analysis is defined as a method for systematically combining pertinent

13   qualitative and quantitative study data from several selected studies to develop a single conclusion that

14   has greater statistical power.[97]

15   250.    A meta-analysis of the distribution of plastic polymer types in the marine environment

16   was conducted in 2019. It determined that Polypropylene accounts for a significant amount of

17   environmental waste, namely approximately 13% of plastic polluting aquatic environments.

18   251.    A literature review in 2022 microplastics inevitably end up in animals' bodies,

19   including in humans' bodies. Microplastics are now found in human food and water, including in

20   sugar, honey, sale, alcohol, bottled water, tap water and even can be found in inhaled air. Microplastics

21   have been found in human feces, in human placenta, and ovarian follicular fluid.

---

[96] https://www.fda.gov/food/environmental-contaminants-food/microplastics-and-nanoplastics-foods, last visited December 1, 2025.

[97] (See https://guides.himmelfarb.gwu.edu/studydesign101/metaanalysis, last viewed December 1, 2025.)

252. Microplastics have been found to cause negative effects in aquatic and terrestrial animals, including an increase in mortality, a decline in food activity and fertility, and inhibitions in growth and development.[98]





[98] Zolotova N, Kosyreva A, Dzhalilova D, Fokichev N, Makarova O. Harmful effects of the microplastic pollution on animal health: a literature review. PeerJ. 2022 Jun 14;10:e13503. doi: 10.7717, https://pmc.ncbi.nlm.nih.gov/articles/PMC9205308/pdf/peerj-10-13503.pdf, last viewed December 1, 2025. Per google scholar, this article has been cited 178 times.




253.    A recent example of negative effects on humans of microplastics are effects on fertility in both males and female mammals.[99]

254.    Even more recently, links are being found between microplastics and cancer.  This includes polypropylene microplastics promoting breast cancer.[100]

255.    The public's concern about Crayola's markers ending up in landfills was brought to Crayola's attention by children.[101]  After Crayola ignored them, a group of children started an online

---

[99] Zurub RE, Cariaco Y, Wade MG and Bainbridge SA (2024) Microplastics exposure: implications for human fertility, pregnancy and child health. Front. Endocrinol. 14:1330396. doi: 10.3389, https://www.frontiersin.org/journals/endocrinology/articles/10.3389/fendo.2023.1330396/full, last viewed December 1, 2025.

[100] Park, J.H., Hong, S., Kim, OH. *et al.* Polypropylene microplastics promote metastatic features in human breast cancer. *Sci Rep* **13**, 6252 (2023).  https://www.nature.com/articles/s41598-023-33393-8, last viewed December 1, 2025.

[101] (See https://www.sfgate.com/bayarea/article/students-draw-the-line-at-tossing-markers-

petition for Crayola to address their concerns, collecting more than 90,000 signatures and gathering support from other children and schools, celebrities, and politicians. Only after there was national attention of the public's concern about Crayola's marker products effects on the environment did Crayola act to address the public's concerns about what occurred to Crayola markers when they were no longer useable for their intended purposes.

256.    Crayola thus undeniably had knowledge of the environmental problems with plastics leaching into the environment and becoming microplastics for many years. The public outcry on this issue appears to have been the impetus for its Color Cycle public relations campaign that Crayola operated between 2013 and 2022.

257.    Based on information and belief, the Color Cycle campaign was merely a public relations attempt to avoid the attention it was receiving related to the environmental contamination caused by Crayola's markers, with it ultimately burning plastic and contaminating the air with toxins to avoid other methods of recycling or repurposing the markers.[102] Once this was also exposed, the Color Cycle campaign ended.

258.    Crayola later admitted to the difficulties in recycling and repurposing its markers when shelving the Color Cycle campaign.[103] Indeed, to recycle the barrel of the markers requires removal of the ink cartridge and applicator point.[104] This appears to only be an excuse though to avoid Crayola acknowledging the costs to Crayola would incur if it changed its product to be more easily recycled.

259.    Other markers can be easily reused, not even requiring recycling barrels. As an example, Ohuhu sells markers that are refillable.[105] Of note, while Ohuhu includes the ACMI seal on

---

4584841.php, last viewed December 1, 2025.)

[102] (See https://energyjustice.net/crayola/, last visited December 1, 2025.)

[103] https://www.crayola.com/about-us/sustainability/colorcycle#:~:text=Recyclers%20have%20strict%20guidelines%20about,%2C%20manufacturing%2C%20and%20distribution%20processes, last viewed December 1, 2025.

[104] https://recyclenation.com/2015/04/how-to-recycle-markers/, last viewed December 1, 2025.

[105] https://ohuhu.com/pages/ohuhu-brand-story?shpxid=e80636ce-58f0-4e3b-ad2c-82fedf498399, last viewed December 1, 2025.

these products, it does not also assert an unqualified NON-TOXIC claim, or even a qualified NON-TOXIC claim, about them.



260. Crayola's Marker caps and barrels are not NON-TOXIC.

261. Crayola's representation that its markers are NON-TOXIC as currently labeled, is false and misleading.

<u>Classic Markers</u>

262. In addition to all Crayola Markers containing polypropylene, other aspects of Crayola's Classic Markers also make any unqualified NON-TOXIC claim about this product deceptive.

263. Crayola's Classic Markers contain combinations of various chemicals, ingredients, and components in addition to those that make up the markers' caps and barrels. These chemicals, ingredients, and components are harmful to people, pets, and the environment.

264. Based on information and belief, United States Patent with Patent Number 6,160,034 for a "Coloring Composition," attached hereto as Exhibit 3, which is assigned to Binney & Smith,

1    identifies information about Crayola's Class Markers.

2        265.    Based on information and belief the chemicals, ingredients, and components of

3    Crayola's Classic Markers include, but are not limited to, acrylates, tartrazine, 1,2-Benzisothiazolin-

4    3-one, and Premix.

5        266.    Sensitizers are substances that can cause a person to develop an allergic reaction after

6    repeated exposures, leading to heightened sensitivity and potentially severe allergic responses upon

7    subsequent contact.

8        267.    Hazardous chemicals, under OSHA regulations "means any chemical which is

9    classified as a physical hazard or a health hazard, a simple asphyxiant, combustible dust, or hazard not

10   otherwise classified."[106] Sensitizers are included as hazardous chemicals.[107]

11       268.    Acrylates are sensitizers.

12       269.    Tartrazine is a sensitizer. It has been known to trigger urticaria, angioedema, and even

13   worsen asthma.

14       270.    1,2-Benzisothiazolin-3-one is a sensitizer.  It has been banned for use in personal care

15   products in Europe.

16       271.    Based on information and belief, acrylates contain N-methyl-2-pyrrolidone ("NMP").

17       272.    Based on information and belief, Premix contains NMP.

18       273.    NMP is a developmental toxin.  It can also cause irritation of the skin.

19       274.    Crayola has a safety data sheet it associates with it Classic Markers, which is attached

20   hereto as Exhibit 2 ["SDS CRAY-043"].  Its issuance date is identified as January 23, 2024.

21           a.  Section 3 of SDS CRAY-043 under the heading "Composition/information on

22               ingredients"  does not identify any ingredients and instead under the section for

23               "Chemical name" states "Product has been certified as nontoxic by the Art & Creative

24               Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling

25               art materials for acute and chronic adverse health hazards," which is attributable to

26

27   [106] (See 29 C.F.R. § 1910.1200(c).)

28   [107] (See 29. C.F.R. §1910.1200 APPENDIX A, A.4)

1          100% of the chemicals and which are subject to trade secret protections.

2      b.  Section 4 of SDS CRAY-043 advises that for inhalation, eye contact, or skin contact

3          that it is "unlikely that emergency treatment will be required," yet it also advises

4          persons to remove themselves from exposure, to flush their eyes, to wash their skin,

5          and "[g]et medical attention if needed." If the product is ingested, SDS-CRAY-043

6          advises to "[c]all a poison control center or doctor immediately for treatment advice."

7          If a product cannot cause harm, why would any medical attention ever be needed

8          related to a product? Why would a doctor need to be called immediately if the product

9          cannot cause harm to people, pets, or the environment? Crayola's statements in the

10         first aid section in SDS CRAY-043 indicate harm can be caused by the products

11         addressed in SDS CRAY-043.

12     c.  Section 11 of SDS CRAY-043 identifies toxicological information. The categories of

13         information in this section advise that there is "No information on significant adverse

14         effects." However, Crayola's products associated with this SDS require a basis and

15         substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers

16         that the products cannot cause harm to people, pets, or the environment. Thus, the

17         statements in the SDS contradict Crayola's environmental marketing claim.

18     d.  Section 12 of SDS CRAY-043 addresses ecological information. It advises for

19         ecotoxicity that "The environmental impact of this product has not been fully

20         investigated." However, Crayola's products associated with this SDS require a basis

21         and substantiation for Crayola's unqualified NON-TOXIC claim that advises

22         consumers that the products cannot cause harm to people, pets, or the environment.

23         Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

24                          Color Changing Dual Ended Markers

25     275.   In addition to all Crayola Markers containing polypropylene, other aspects of

26  Crayola's Color Change Dual Ended Markers also make any unqualified NON-TOXIC claim about

27  this product deceptive.

28     276.   Crayola's Color Change Dual Ended Markers contain combinations of various

                                    65
                                 COMPLAINT

chemicals, ingredients, and components in addition to those that make up the markers' caps and barrels. These chemicals, ingredients, and components are harmful to humans, animals, and the environment.

277. Based on information and belief, United States Patent Publication No. US 2024/0254355 for a "Color-Change Marking System," attached hereto as Exhibit 6, which is assigned to Crayola LLC, identifies information about Crayola's Color Changing Dual Ended Markers.

278. Based on information and belief the chemicals, ingredients, and components of Crayola's Color Change Dual Ended Markers include C1-C5 alcohols, Cellosize, and Sodium Sulfite.

279. C1 (methanol) alcohols are very harmful to humans, with small amounts causing blindness or death, and C2-C5 alcohols can cause harm of various degrees to adult humans.

280. Cellosize is a sensitizer. Among other things, it affects the skin and respiratory system.

281. Sodium Sulfite is a sensitizer. Among other things, it affects the skin and respiratory system.

282. Crayola has a safety data sheet associated with its Color Change Dual Ended Markers, which is attached hereto as Exhibit 5 ["SDS CRAY-174"]. Its issuance date is identified as January 31, 2024.

    a. Section 3 of SDS CRAY-174 under the heading "Composition/information on ingredients" does not identify any ingredients and instead under the section for "Chemical name" states "Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards," which is attributable to 100% of the chemicals and which are subject to trade secret protections.

    b. Section 4 of SDS CRAY-174 advises that for inhalation, eye contact, or skin contact that it is "unlikely that emergency treatment will be required" yet it also advises person to remove themselves from exposure, to flush their eyes, to wash their skin, and "[g]et medical attention if needed." If the product is ingested, SDS-CRAY-0174 advises to "[c]all a poison control center or doctor immediately for treatment advice." If a product cannot cause harm, why would any medical attention ever be needed related to a

product?  Why would a doctor need to be called immediately if the product cannot cause harm to people, pets, or the environment?  Crayola's statements in the first aid section in SDS CRAY-174 indicate harm can be caused by the products addressed in SDS CRAY-174.

c.  Section 7 of SDS CRAY-174 under the section "[a]dvice on safe handling" advises to "[a]void breather vapor or mist" and to "[a]void contact with eyes, skin, and clothing." It also advises not to eat or drink while using the product and to wear suitable protective gloves and eye/face protection.  These warnings are provided for a product intended to be used by children although the SDS's purpose is to warn adults in an industrial setting.

d.  Section 11 of SDS CRAY-174 identifies toxicological information.  The categories of information in this section advise that there is "No information on significant adverse effects."  However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment.  Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

Section 12 of SDS CRAY-174 addresses ecological information.  It advises for ecotoxicity that "The environmental impact of this product has not been fully investigated.  However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

<u>Washable Markers</u>

283.    Crayola sells markers that are "Washable" including its Super Tips Washable Markers, Bold and Bright Washable Markers, Neon Washable markers, Ultra-Clean Broadline and Fine Line Markers, Clicks Washable Retractable Markers, Pip Squeaks Markers, Washable Dry Erase Chisel Tip Markers, Silly Scents Fine Line Markers, Silly Scents Mash Up Markers, Silly Scents Chisel Tips Markers, and Silly Scents Duel Ended Broad Line Markers (here collectively referred to as "Washable

1  Markers").

2      284.    In addition to all Crayola Markers containing polypropylene, other aspects of Crayola's

3  Washable Markers also make any unqualified NON-TOXIC claim about this product deceptive.

4      285.    The components of Crayola's Washable Markers contain combinations of various

5  chemicals, ingredients, and components in addition to those that make up the markers' caps and

6  barrels.  These chemicals, ingredients, and components are harmful to humans, animals, and the

7  environment, including, but not limited to, dyes, surfactants, and dye blockers.

8      286.    Crayola has a safety data sheet it associates with its Washable Markers, which is

9  attached hereto as Exhibit 8 ["SDS CRAY-041"].  Its issuance date is identified as January 23, 2025.

10          a.  Section 3 of SDS CRAY-041 under the heading "Composition/information on

11              ingredients" does not identify any ingredients and instead under the section for

12              "Chemical name" states "Product has been certified as nontoxic by the Art & Creative

13              Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling

14              art materials for acute and chronic adverse health hazards," which is attributable to

15              100% of the chemicals and which are subject to trade secret protections.

16          b.  Section 4 of SDS CRAY-041 advises that for inhalation, eye contact, or skin contact

17              that it is "unlikely that emergency treatment will be required," yet it also advises person

18              to remove themselves from exposure, to flush their eyes, to wash their skin, and "[g]et

19              medical attention if needed." If the product is ingested, SDS-CRAY-041 advises to

20              "[c]all a poison control center or doctor immediately for treatment advice." If a product

21              cannot cause harm, why would any medical attention ever be needed related to a

22              product?  Why would a doctor need to be called immediately if the product cannot

23              cause harm to people, pets, or the environment?  Crayola's statements in the first aid

24              section in SDS CRAY-041 indicate harm can be caused by the products addressed in

25              SDS CRAY-041.

26          c.  Section 11 of SDS CRAY-041 identifies toxicological information.  The categories of

27              information in this section advise that there is "No information on significant adverse

28              effects."  However, Crayola's products associated with this SDS require a basis and

substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

Section 12 of SDS CRAY-041 addresses ecological information. It advises for ecotoxicity that "The environmental impact of this product has not been fully investigated." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

## Color Wonder Mess Free Coloring Kits

287.    In addition to all Crayola Markers containing polypropylene, other aspects of Crayola's Color Wonder Mess Free Coloring Kits also make any unqualified NON-TOXIC claim about this product deceptive.

288.    Based on information and belief, United States Patent No. 9,790,383 B2 for a "Marking System," attached hereto as Exhibit 11, which is assigned to Crayola LLC, identifies information about Crayola's Color Wonder Mess Free Coloring Kits

289.    The components of Crayola's Color Wonder Mess Free Coloring Kits contain combinations of various chemicals, ingredients, and components in addition to those that make up the markers' caps and barrels. These chemicals, ingredients, and components are harmful to humans, animals, and the environment.

290.    Crayola's Mess Free Coloring kits include a coloring book and markers. The markers are specially made to only color on the particular paper in the coloring book.

291.    Based on information and belief, the chemicals, ingredients, and components of Crayola's Color Wonder Mess Free Coloring kits include Triisopropanolamine and Terigitol NP-9.

292.    Triisopropanolamine is a severe eye irritant, capable of causing corneal burning. It is very harmful to aquatic life.

293.    Terigitol NP-9 may cause serious eye damage and is harmful if swallowed or inhaled. It harmful fish and other aquatic organisms.

294.    Crayola has a safety data sheet it associates with its Color Wonder Mess Free Coloring Kits, which is attached hereto as Exhibit 10 ["SDS CRAY-027"]. Its issuance date is identified as January 23, 2025.

   a. Section 3 of SDS CRAY-027 under the heading "Composition/information on ingredients" does not identify any ingredients and instead under the section for "Chemical name" states "Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards," which is attributable to 100% of the chemicals and which are subject to trade secret protections.

   b. Section 4 of SDS CRAY-027 advises that for inhalation, eye contact, or skin contact that it is "unlikely that emergency treatment will be required" yet it also advises person to remove themselves from exposure, to flush their eyes, to wash their skin, and "[g]et medical attention if needed." If the product is ingested, SDS-CRAY-027 advises to "[c]all a poison control center or doctor immediately for treatment advice." If a product cannot cause harm, why would any medical attention ever be needed related to a product? Why would a doctor need to be called immediately if the product cannot cause harm to people, pets, or the environment? Crayola's statements in the first aid section in SDS CRAY-027 indicate harm can be caused by the products addressed in SDS CRAY-027.

   c. Section 11 of SDS CRAY-027 identifies toxicological information. The categories of information in this section advise that there is "No information on significant adverse effects." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

   d. Section 12 of SDS CRAY-027 addresses ecological information. It advises for ecotoxicity that "The environmental impact of this product has not been fully investigated." However, Crayola's products associated with this SDS require a basis

and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

<div align="center">Glitter Glue</div>

295.   Crayola makes Washable Glitter Glue products in various styles, including "Bold Blazes", "Fiery Flecks", and "Sparkly Colors" (herein collectively "Glitter Glue").

296.   The components of Crayola's Glitter Glue contain combinations of various chemicals, ingredients, and components that are harmful to humans, animals, and the environment.

297.   Crayola's Glitter Glue lists a warning that the Glitter Glue has small parts and may present a choking hazard for children under 3 years old. This is in a different font, color, and disassociated from the NON-TOXIC claim.

298.   Crayola's Glitter Glue on the front and back of its packing, separate, apart and disassociated from Crayola's NON-TOXIC claim advises states "NOT FOR USE ON SKIN". This "NOT FOR USE ON SKIN" statement is also separated and apart from the "Safey Information" panel on the back labeling, which panel advises of the potential choking hazards for young children while also advising that, "[a]ll Crayola art materials are nontoxic."

299.   Crayola has a safety data sheet it associates with its Glitter Glue, which is attached hereto as Exhibit 13 ["SDS CRAY-026"]. Its issuance date is identified as January 23, 2024.

a.   Section 3 of SDS CRAY-026 under the heading "Composition/information on ingredients" does not identify any ingredients and instead under the section for "Chemical name" states "Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards," which is attributable to 100% of the chemicals and which are subject to trade secret protections.

b.   Section 4 of SDS CRAY-026 advises that for inhalation, eye contact, or skin contact that it is "unlikely that emergency treatment will be required," yet it also advises person to remove themselves from exposure, to flush their eyes, to wash their skin, and "[g]et medical attention if needed." If the product is ingested, SDS-CRAY-026 advises to

"[c]all a poison control center or doctor immediately for treatment advice." If a product cannot cause harm, why would any medical attention ever be needed related to a product? Why would a doctor need to be called immediately if the product cannot cause harm to people, pets, or the environment? Crayola's statements in the first aid section in SDS CRAY-026 indicate harm can be caused by the products addressed in SDS CRAY-026.

c. Section 11 of SDS CRAY-026 identifies toxicological information. The categories of information in this section advise that there is "No information on significant adverse effects." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

Section 12 of SDS CRAY-026 addresses ecological information. It advises for ecotoxicity that "The environmental impact of this product has not been fully investigated." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

Washable Glue Stick

300. Crayola makes a Washable Glue Stick.

301. The components of Crayola's Washable Glue Stick contain combinations of various chemicals, ingredients, and components that are harmful to humans, animals, and the environment.

302. The packaging of Crayola's Washable Glue Stick, in addition to making a NON-TOXIC claim in English, also makes such claims in French (Non toxique) and Spanish (No toxico) ensuring not only Algophone, but Franchophone and Hispanophones are aware of Crayola's unqualified NON-TOXIC claims.

303. Crayola has a safety data sheet it associates with its Washable Glue stick. which is attached hereto as Exhibit 15 ["SDS CRAY-051"]. Its issuance date is identified as May 15, 2024.

a. Section 3 of SDS CRAY-051 under the heading "Composition/information on ingredients" does not identify any ingredients and instead under the section for "Chemical name" states "Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards" which is attributable to 100% of the chemicals and which are subject to trade secret protections.

b. Section 4 of SDS CRAY-051 advises that for inhalation, eye contact, or skin contact that it is "unlikely that emergency treatment will be required," yet it also advises person to remove themselves from exposure, to flush their eyes, to wash their skin, and "[g]et medical attention if needed." If the product is ingested, SDS-CRAY-051 advises to "[c]all a poison control center or doctor immediately for treatment advice." If a product cannot cause harm, why would any medical attention ever be needed related to a product? Why would a doctor need to be called immediately if the product cannot cause harm to people, pets, or the environment? Crayola's statements in the first aid section in SDS CRAY-051 indicate harm can be caused by the products addressed in SDS CRAY-051.

c. Section 9 of SDS CRAY-051 identifies physical and chemical properties information. It identifies the pH as having values of 10- 12. Thus, the product has a pH level that can injure a person's eyes[108] and skin.[109]

d. Section 11 of SDS CRAY-051 identifies toxicological information. The categories of information in this section advise that there is "No information on significant adverse effects." However, Crayola's products associated with this SDS require a basis and

---

[108] (See L.Lim, *Common eye drops and their implication for pH measurements in the management of chemical eye injuries*, https://pmc.ncbi.nlm.nih.gov/articles/PMC4270978/pdf/ijo-07-06-1067.pdf, last viewed December 1, 2025.

[109] (See *Hazard Communication Information Sheet reflecting the US OSHA Implementation of the Globally Harmonized System (GHS) of Classification and Labelling of Chemicals*, March 2018, https://www.schc.org/assets/docs/ghs_info_sheets/Skin%20Corrosion%20%20Irritation%20(Final%202018-03).pdf, last viewed December 1, 2025.)

substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

e. Section 12 of SDS CRAY-051 addresses ecological information. It advises for ecotoxicity that "The environmental impact of this product has not been fully investigated." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

### School Glue

304.  Crayola makes a glue product called Washable Liquid School Glue ("School Glue").

305.  The components of Crayola's School Glue contain combinations of various chemicals, ingredients, and components that are harmful to humans, animals, and the environment.

306.  Crayola has a safety data sheet it associates with its School Glue, which is attached hereto as Exhibit 17 ["SDS CRAY-055"]. Its issuance date is identified as January 23, 2024.

a. Section 3 of SDS CRAY-055 under the heading "Composition/information on ingredients" does not identify any ingredients and instead under the section for "Chemical name" states "Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards" which is attributable to 100% of the chemicals and which are subject to trade secret protections.

b. Section 4 of SDS CRAY-055 advises that for inhalation, eye contact, or skin contact that it is "unlikely that emergency treatment will be required," yet it also advises person to remove themselves from exposure, to flush their eyes, to wash their skin, and "[g]et medical attention if needed." If the product is ingested, SDS-CRAY-055 advises to "[c]all a poison control center or doctor immediately for treatment advice." If a product cannot cause harm, why would any medical attention ever be needed related to a product? Why would a doctor need to be called immediately if the product cannot

cause harm to people, pets, or the environment?  Crayola's statements in the first aid section in SDS CRAY-055 indicate harm can be caused by the products addressed in SDS CRAY-055.

c. Section 11 of SDS CRAY-055 identifies toxicological information.  The categories of information in this section advise that there is "No information on significant adverse effects."  However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment.  Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

d. Section 12 of SDS CRAY-055 addresses ecological information.  It advises for ecotoxicity that "The environmental impact of this product has not been fully investigated."  However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

### Paint Sticks

307.    Crayola makes a product called Washable Paint Sticks ("Paint Sticks") that come in packages of various quantities and styles.

308.    The components of Crayola's Paint Sticks contain combinations of various chemicals, ingredients, and components that are harmful to humans, animals, and the environment.

309.    Crayola has a safety data sheet it associates with its Paint Sticks, which is attached hereto as Exhibit 19 ["SDS CRAY-175"].  Its issuance date is identified as January 23, 2024.

a. Section 3 of SDS CRAY-175 under the heading "Composition/information on ingredients" does not identify any ingredients and instead under the section for "Chemical name" states "Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards," which is attributable to 100% of the chemicals and which are subject to trade secret protections.

b. Section 4 of SDS CRAY-175 advises that for inhalation, eye contact, or skin contact that it is "unlikely that emergency treatment will be required," yet it also advises person to remove themselves from exposure, to flush their eyes, to wash their skin, and "[g]et medical attention if needed." If the product is ingested, SDS-CRAY-051 advises to "[c]all a poison control center or doctor immediately for treatment advice." If a product cannot cause harm, why would any medical attention ever be needed related to a product? Why would a doctor need to be called immediately if the product cannot cause harm to people, pets, or the environment? Crayola's statements in the first aid section in SDS CRAY-175 indicate harm can be caused by the products addressed in SDS CRAY-175.

c. Section 11 of SDS CRAY-175 identifies toxicological information. The categories of information in this section advise that there is "No information on significant adverse effects." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

d. Section 12 of SDS CRAY-175 addresses ecological information. It advises for ecotoxicity that "The environmental impact of this product has not been fully investigated." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

### Washable Paint

310. Crayola makes a product called Washable Paint that comes in packages of various quantities and styles.

311. The components of Crayola's Washable Paint contain combinations of various chemicals, ingredients, and components that are harmful to humans, animals, and the environment.

312. Crayola has a safety data sheet it associates with its Washable Paints, which is attached

hereto as Exhibit 21 ["SDS CRAY-034"]. Its issuance date is identified as January 23, 2025.

a. Section 3 of SDS CRAY-034 under the heading "Composition/information on ingredients" does not identify any ingredients and instead under the section for "Chemical name" states "Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards," which is attributable to 100% of the chemicals and which are subject to trade secret protections.

b. Section 4 of SDS CRAY-034 advises that for inhalation, eye contact, or skin contact that it is "unlikely that emergency treatment will be required," yet it also advises person to remove themselves from exposure, to flush their eyes, to wash their skin, and "[g]et medical attention if needed." If the product is ingested, SDS-CRAY-034 advises to "[c]all a poison control center or doctor immediately for treatment advice." If a product cannot cause harm, why would any medical attention ever be needed related to a product? Why would a doctor need to be called immediately if the product cannot cause harm to people, pets, or the environment? Crayola's statements in the first aid section in SDS CRAY-034 indicate harm can be caused by the products addressed in SDS CRAY-034.

c. Section 11 of SDS CRAY-034 identifies toxicological information. The categories of information in this section advise that there is "No information on significant adverse effects." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

d. Section 12 of SDS CRAY-034 addresses ecological information. It advises for ecotoxicity that "The environmental impact of this product has not been fully investigated." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment.

1    Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

2    <u>Chalk</u>

3    313.    Crayola makes Chalk products called Sidewalk Chalk and Anti-Dust ("Chalk") that

4    come in packages of various quantities and styles.

5    314.    Chalks produced by various people have been known to contain heavy metals.[110]

6    315.    Exposure to chalk dust obvious irritant associated with short- and long-term effects

7    such as respiratory disorders, ski, eye, throat, and nose irritation, and symptoms such as coughing and

8    wheezing.[111]

9    316.    A study has illuminated that in anti-dust chalks may expose children to other chemicals

10    that are similar to those causing allegories to cows milk proteins, causing asthma and hay fever

11    (rhinoconjunctivitis).[112]  Thus source the harmful effects of the chalk on a person may be masked by

12    other allergies, yet the effects are still harmful.

13    317.    Crayola describes its chalk as being either Extruded chalk, primarily containing

14    calcium carbonate, or Molded chalk, which does not contain calcium carbonate and contains Plaster

15    of Paris.[113]

16    318.    The components of Crayola's Chalk contain combinations of various chemicals,

17    ingredients, and components that are harmful to humans, animals, and the environment.

18    319.    Crayola has a safety data sheet it associates with its Chalk. which is attached hereto as

19    Exhibit 24 ["SDS CRAY-028"].  Its issuance date is identified as May 23, 2024.

20

21    ─────────────

[110] (See https://www.ourendangeredworld.com/is-sidewalk-chalk-bad-for-the-environment/, last

22    visited December 1, 2025.)

[111] (See S. Mbazima, Release and Health Outcomes of Exposure to Chalk Particles in Classrooms: a

23    Systematic Literature Review, Feb., 4, 2024,

24    https://www.tandfonline.com/doi/full/10.1080/09603123.2024.2311228#abstract, last visited
December 1, 2025.)

25    [112] (See C. Larramedni, *Allergenicity of Casein Containing Chalk in Milk Allergic Schoolchildren*,

26    https://www.sciencedirect.com/science/article/abs/pii/S1081120613001002, last visited December 1,
2025.)

27    [113] (See https://www.crayola.com/faqs/does-crayola-chalk-contain-calcium-carbonate-faq, last

28    visited December 1, 2025.)

a. Section 3 of SDS CRAY-028 under the heading "Composition/information on ingredients" does not identify any ingredients and instead under the section for "Chemical name" states "Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards," which is attributable to 100% of the chemicals and which are subject to trade secret protections.

b. Section 4 of SDS CRAY-028 advises that for inhalation, eye contact, or skin contact that it is "unlikely that emergency treatment will be required," yet it also advises person to remove themselves from exposure, to flush their eyes, to wash their skin, and "[g]et medical attention if needed." If the product is ingested, SDS-CRAY-028 advises to "[c]all a poison control center or doctor immediately for treatment advice." If a product cannot cause harm, why would any medical attention ever be needed related to a product? Why would a doctor need to be called immediately if the product cannot cause harm to people, pets, or the environment? Crayola's statements in the first aid section in SDS CRAY-028 indicate harm can be caused by the products addressed in SDS CRAY-028.

c. Section 11 of SDS CRAY-028 identifies toxicological information. The categories of information in this section advise that there is "No information on significant adverse effects." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim.

d. Section 12 of SDS CRAY-028 addresses ecological information. It advises for ecotoxicity that "The environmental impact of this product has not been fully investigated." However, Crayola's products associated with this SDS require a basis and substantiation for Crayola's unqualified NON-TOXIC claim that advises consumers that the products cannot cause harm to people, pets, or the environment. Thus, the statements in the SDS contradict Crayola's environmental marketing claim

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
("Unlawful," "Unfair," and "Fraudulent" Business Practices in Violation of The UCL,
Bus. & Prof. Code §§ 17200, *et seq.*)

320.    Plaintiff(s) hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

321.    The UCL defines unfair competition to include any "unlawful, unfair or fraudulent" business act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. (*Bus. & Prof. Code*, § 17200.)

322.    A business act or practice is "unlawful" if it is forbidden by law, meaning any violation of a statute, regulation, or rule.

323.    The FTC Act declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" (15 U.S.C. § 45.)

324.    The FTC's Green Guides prohibit misrepresenting, directly or by implication, that a product, package, or service is non-toxic. (See 16 C.F.R. § 260.10 subd. (a).)

325.    A NON-TOXIC claim conveys that a product, package, or service does not pose any risk to humans or the environment, including household pets. (See 16 C.F.R. § 260.10 subd. (b).)

326.    California's EMCA adopts the Green Guides, including 16 C.F.R. § 260.10, as California law. (See Bus. & Prof. Code, § 17580.5 subd. (a).) Furthermore, it requires that upon a request made to the marketer seeking the understanding of the basis the marketer has to make of the environmental claim, the information used by the marketer supporting the basis for the environmental marketing claim "shall be furnished to any member of the public." (See Bus. and Prof. Code, § 17580 subd. (b).)

327.    Crayola's environmental marketing claims about the Products, including stating on the Products label "NON-TOXIC," violated and continue to violate the Green Guides and California's EMCA because the Products have the capability to cause harm to people, pets, and the environment, and hence also violated and continue to violate the "unlawful" prong of the UCL.

328.    California's CLRA declares unlawful enumerated "unfair methods of competition and unfair or deceptive acts or practices . . . undertaken by any person in a transaction intended to result

1 | or that results in the sale or lease of goods or services to any consumer[.]" (See Civ. Code, § 1761
2 | subd. (a).)

3 | 329. California's FAL declares it unlawful for any person to engage in untrue or misleading
4 | advertising. (See Bus. & Prof. Code, § 17500.)

5 | 330. Crayola's NON-TOXIC claims and other environmental marketing claims related to
6 | the Products violated and continue to violate California's CLRA and FAL, as described further below,
7 | and hence also violated and continue to violate the "unlawful" prong of the UCL.

8 | 331. A business act or practice is "fraudulent" under the Unfair Competition Law if it is
9 | likely to deceive members of the public.

10 | 332. Crayola has and continues to violate the "fraudulent" prong of the UCL through its
11 | false and misleading NON-TOXIC claims on the Products' labels. The NON-TOXIC claims are likely
12 | to deceive members of the public into falsely believing that the Products will not harm people, pets,
13 | or the environment.

14 | 333. A business act or practice is also "unfair" under the Unfair Competition Law if the
15 | reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the
16 | harm to the alleged victims.

17 | 334. Crayola has and continues to violate the "unfair" prong of the UCL through its false
18 | and misleading unqualified NON-TOXIC claims on the Products. Crayola's claims are
19 | unaccompanied by any information to evaluate the claim and upon request for its basis to make the
20 | environmental marketing claims, as Crayola is required by California's EMCA to keep in writing,
21 | Crayola will not provide any information it relied upon as the basis to make the environmental
22 | marketing claims. The gravity of the harm resulting from such unfair acts and practices outweighs
23 | any conceivable reasons, justifications and/or motives of Crayola for engaging in such deceptive acts
24 | and practices.

25 | 335. By committing the unfair acts and practices alleged above, Crayola has engaged, and
26 | continues to be engaged, in unlawful, fraudulent, and unfair business practices within the meaning of
27 | California Business and Professions Code §§ 17200, et seq.

28 | 336. As a direct and proximate result of Crayola's unfair business practices in violation of

1 | the UCL, Plaintiff(s) suffered injury in fact and lost money or property as a result of purchasing the
2 | Products.

3 |     337.    Section 17203 of the UCL provides that a Court may enjoin Crayola from engaging in
4 | the unlawful, fraudulent, and unfair business practices alleged herein, in connection with the sale, offer
5 | for sale, manufacturing or distribution of the Products.

6 |     338.    Plaintiff(s) may also seek an order awarding him/her/them restitution of the money
7 | wrongfully acquired from him/her/them by Crayola by means of the unlawful, fraudulent, and unfair
8 | business practices alleged herein.

9 |
10 |

### SECOND CAUSE OF ACTION
#### (Violation of the Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*)

11 |     339.    Plaintiff(s) hereby incorporates all other paragraphs of this Complaint and restate them
12 | as if fully set forth herein.

13 |     340.    This Second Cause of Action is brought pursuant to the Consumers Legal Remedies
14 | Act, California Civil Code §§ 1750, et seq.

15 |     341.    Plaintiffs are "consumers" within the meaning of Civil Code section 1761 subdivision
16 | (d).

17 |     342.    The purchase of the Products by Plaintiffs constituted "transactions" within the
18 | meaning of Civil Code section 1761 subdivision (e), and the Products offered by Crayola constitute
19 | "goods" within the meaning of Civil Code section 1761 subdivision (a).

20 |     343.    Crayola has violated, and continues to violate, Civil Code section 1770 subdivision
21 | (a)(5) by representing that the Products had characteristics (i.e., unable to harm people, pets, and the
22 | environment) that they do not have by stating that the Products are NON-TOXIC.

23 |     344.    Crayola has violated, and continues to violate, Civil Code section 1770 subdivision
24 | (a)(7) by representing that the Products are of a particular standard, quality or grade (i.e., unable to
25 | harm people, pets, and the environment), which they are not.

26 |     345.    Crayola has violated, and continues to violate, Civil Code section 1770 subdivision
27 | (a)(9) by advertising the Products as being NON-TOXIC for people, pets, and the environment with
28 | the intent not to provide what it advertised.

346.    Plaintiffs relied on the NON-TOXIC representations on the Products' labels as a material basis for their decisions to purchase the Products.

347.    Plaintiffs request that this Court enjoin Crayola from continuing to engage in the unlawful and deceptive methods, acts and practices alleged above, pursuant to Civil Code section 1780 subdivision (a)(2).  Unless Crayola is permanently enjoined from continuing to engage in such violations of the CLRA, future consumers of the Products will be harmed by its acts and practices in the same way Plaintiffs have been harmed.

348.    Pursuant to Civil Code section 1782, more than 30 days prior to commencing this action, Plaintiffs Wedge, Wagner, and Mason, through undersigned counsel, notified Crayola of the methods, acts and practices detailed herein that are declared unlawful by section 1780, and did so by certified mail, demanding that Crayola correct, repair and otherwise rectify the Products' NON-TOXIC labeling that violates section 1770.  Crayola failed to correct, repair and otherwise rectify the Products' NON-TOXIC labeling.  Plaintiffs request relief from Crayola as provided for in Civil Code section 1780, including: (a) An order enjoining the methods, acts, or practices that violate the CLRA as allowed under Civil Code section 1780 subdivision (a)(2); (b) Restitution as allowed under Civil Code section 1780 subdivision (a)(3); (c) any other relief which the Court deems proper as allowed under Civil Code section 1780 subdivision (a)(5); and (d) costs and attorney's fees as allowed under Civil Code section 1780(e).

**THIRD CAUSE OF ACTION**
**(Violation of California's False Advertising Law ("FAL")**
**Bus. & Prof. Code §§ 17500, et seq.)**

349.    Plaintiffs hereby incorporate all other paragraphs of this Complaint and restate them as if fully set forth herein.

350.    At all times relevant hereto, Crayola was and is a "person," as defined in Business and Professions Code section 17506.

351.    In marketing, advertising and labeling the Products, Crayola made, and continues to make, false and misleading statements that its Products are NON-TOXIC to induce consumers into purchasing the Products on a false premise.

352.    Crayola is aware that the NON-TOXIC claims it makes about the Products confuse and

1  deceive reasonable consumers.

2      353.    Crayola engaged in the deceptive conduct alleged above to induce the consuming
3  public to purchase the Products.

4      354.    In marketing, advertising, and labeling the Products as NON-TOXIC, Crayola knew or
5  should have known that the NON-TOXIC claims were false and misleading.

6      355.    Crayola's misrepresentation of the material facts detailed above constitutes untrue or
7  misleading advertising as defined by Business and Professions Code section 17500, and false and
8  misleading advertising claims, as defined by Business and Professions Code section 17508.

9      356.    Crayola had reasonably available alternatives to further its legitimate business interests,
10  other than the conduct described herein.

11      357.    All of the conduct alleged herein occurred, and continues to occur, by Crayola while
12  conducting its business.

13      358.    Plaintiffs were misled and, because the misrepresentation was uniform and material,
14  reasonable consumers were misled by Crayola's NON-TOXIC claims as alleged herein.

15      359.    Additionally, Crayola's use of uniform advertising and marketing, as described herein,
16  has deceived and is likely to continue deceiving the consuming public, in violation of California
17  Business and Professions Code sections 17500 and 17508.

18      360.    As a result of Crayola's wrongful conduct, Plaintiffs each suffered an injury in fact and
19  a loss of money or property. Indeed, Plaintiffs purchased the Products because of Crayola's
20  misrepresentations about lack of harm the Products could cause to people, pets, and the environment.
21  Plaintiffs would not have purchased the Products at all, would have purchased a lesser quantity of the
22  Products, or would not have paid a premium for the Products if he/she/they had known that Crayola's
23  NON-TOXIC advertising and representations were false and misleading.

24      361.    Accordingly, Plaintiffs seek an order of this Court enjoining Crayola from engaging in
25  the false advertising alleged herein in connection with the sale of the Products. Additionally, Plaintiffs
26  seek an order awarding restitution of the money wrongfully acquired by Crayola by means of the false
27  and misleading advertising and representations alleged herein.

28

1

**PRAYER FOR RELIEF**

2    WHEREFORE, Plaintiffs pray for relief and judgment against Crayola as follows:

3        A.    A declaration and Order enjoining Crayola from labeling and advertising the Products

4 falsely and misleadingly in violation of California law.

5        B.    Pursuant to Civil Code section 1780 subdivision (a)(2), Plaintiffs seek an order

6 enjoining Crayola from engaging in the unlawful and unfair business practices alleged herein, in

7 connection with the sale, offer for sale, manufacturing or distribution of the Products in California.

8        C.    Pursuant to Civil Code section 1780 subdivision (a)(3), Plaintiffs seek an order

9 awarding them restitution of the money wrongfully acquired from him/her/them by Crayola by means

10 of the unlawful and unfair business practices alleged herein.

11        D.    Pursuant to Business and Professions Code sections 17203 and 17535, an order or

12 judgment the Court deems appropriate as may be necessary to prevent the use or employment by

13 Crayola of any practices which constitute unfair competition or false advertising as described in this

14 Complaint.

15        E.    Restitution in such amount that Plaintiffs paid to purchase Crayola's Products or paid

16 as a premium over alternatives, or restitutionary disgorgement of the profits Crayola obtained from

17 those transactions, for Causes of Action for which they are available.

18        F.    For attorneys' fees, costs, and expenses pursuant to Code of Civil Procedure sections

19 1021.5, pursuant to Civil Code section 1780 subdivision (e), and as otherwise allowed by law.

20        G.    For pre and post judgment interest.

21        H.    For such other and further relief as the Court may deem just and proper.

22 Dated : December 5, 2025            **FEINSTEIN DOYLE PAYNE**

23                      **& KRAVEC, LLC**

24

25                    By:

Wyatt A. Lison

26                      John P. Worgul

27                    ***ATTORNEY FOR PLAINTIFFS***

28

# EXHIBIT 1










100% RENEWABLE ENERGY
Crayola cares about the environment and responsibly makes the products you love.
Bright Bold Colors!
Yellow
Brown
Violet (Purple)
Red
Gray
crayola.com
PROOF OF PURCHASE
71662 07722
QUALITY GUARANTEE
U.S.A. & Canada
Australia
Crayola
SAFETY INFORMATION
AP
WASHING & CARE INFORMATION

US ONLY
PAPER
BOX

how2recycle.info

UK
CA

0-3

ACMI
AP
Conforms to
ASTM D 4236.

H4X13

**3+**    crayola.com    MADE IN INDIA

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F 9 AM-4 PM ET/AEST
**U.S.A. & CANADA (Call/Text):** 1-800-CRAYOLA (800-272-9652)
Text charges may apply.    AUSTRALIA: 1-800-657-353

M-F 9 AM-5 PM LOCAL TIME
**UK:** 0300 389 6238   **ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7178 222   **BENELUX:** +31 (0)38 444 3093
**FRANCE:** +33 (0) 1 41 06 54 54   **GERMANY:** +496103 459180

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.

**Crayola** A smithmark Company   ©2024 Crayola. Easton, PA 18044-0431
Serpentine Design® Ultra-Clean Washable®
Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford,
MK41 7PH, England. Binney & Smith (Europe) Ltd. Via Figina 13, 47122 Forlì (FC), Italy.
Distributed in Australia by Crayola (Australia) Pty Ltd. 10 Caribbean Drive Scoresby Victoria 3179.

WASHING & CARE
**FOR BEST RESULTS:** Crayola Ultra-Clean Washable Markers wash from skin, most washable clothing and most painted walls. Wash promptly in cold or hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.
**STAIN ADVISEMENT:** Keep away from wallpaper, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.

Contents and colors may vary.
Retain packaging for future reference.

Style#: 58-7812    Code#: 58-7812-0-225



0   71662 07812   6

# EXHIBIT 2

# SAFETY DATA SHEET



SDS ID:  CRAY-043
CRAYOLA® REGULAR MARKERS

---

## 1. Identification

**Product identifier**

**Material Name:**             CRAYOLA® REGULAR MARKERS

**Other means of identification**

**Product Code(s)**            CRAY-043

**Synonyms**                 CRAYOLA REGULAR MARKERS; CRAYOLA BROAD LINE MARKERS AND FINE LINE MARKERS (CLASSIC, TROPICAL, BOLD, FLUORESCENT COLORS, PASTELS, ASSORTED, WILDLIFE, BRITE, SUNSPLASHED, ACCESS); EXTREME MARKERS; CRAYOLA MARKERS; CLASS PACKS; COLOR CUBE; ACTIVITES; ART ASSORTMENTS; ADULT COLORING MARKERS; PRODUCT CODE(S): 04-0029; 04-0030; 04-0118; 04-0135; 04-0140; 04-0295; 04-0320; 04-0381; 04-0382; 04-0462; 04-0478; 04-0521; 04-0526; 04-0528; 04-0546; 04-0556; 04-0599; 04-0619; 04-0657; 04-0691; 04-0694; 04-0675; 04-0942; 04-1050; 04-1610; 04-1611; 04-1612; 04-1613; 04-1614; 04-1615; 04-1621; 04-1623; 04-1624; 04-1907; 04-1911; 04-1950; 04-1951; 04-1954; 04-1971, 04-2532; 04-2536; 04-2544; 04-2547; 04-2549; 04-5357; 04-5358; 04-5380, 04-5553; 04-5557; 04-5558; 04-5671; 04-5672; 04-5674; 04-5676; 04-5677, 04-5718; 04-5719, 04-5727, 04-6001; 04-6010; 04-6810; 04-6814; 04-6868; 04-6876, 04-6937; 04-8205; 04-8210; 04-8218; 04-8219; 04-8248; 52-3349; 58-2193; 58-2283; 58-2285; 58-2286; 58-2295; 58-7212; 58-7622; 58-7623; 58-7700; 58-7708; 58-7709; 58-7712; 58-7713; 58-7714; 58-7715; 58-7722; 58-7725 58-7726; 58-7732; 58-7748; 58-7750; 58-7767; 58-7780; 58-7789; 58-7790; 58-7791; 58-7800; 58-7805; 58-7808; 58-7816; 58-7832; 58-7836; 58-8175; 58-8201; 58-8210; 58-9714; 58-9808; 69-6105; 69-6099;

**Recommended use of the chemical and restrictions on use**

**Recommended use**          Arts and Crafts

**Restrictions on use**        None Known

**Details of the supplier of the safety data sheet**

**Supplier Address**
CRAYOLA LLC
1100 Church Lane
Easton, PA 18044
Phone: 1-800-272-9652

**E-mail**                  support@crayola.com

**Emergency telephone number**

**Emergency Telephone**    1-800-535-5053 or call local POISON CONTROL

---

**SDS ID:  CRAY-043**             **Issuing Date**  23-Jan-2024             **Revision Number**  5

**CRAYOLA® REGULAR MARKERS**                                    **Revision date**  23-Jan-2024

---

## 2. Hazard(s) identification

### Classification

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

### Hazards not otherwise classified (HNOC)
Not applicable

### Label elements

### Hazard statements
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

The product contains no substances which at their given concentration, are considered to be hazardous to health.

| **Appearance**  article containing liquid | **Physical state**  liquid | **Odor**  None |
|---|---|---|

### Other information
No information available.

## 3. Composition/information on ingredients

### Substance

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

### Description of first aid measures

| | |
|---|---|
| **Inhalation** | It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed. |
| **Eye contact** | It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention. |
| **Skin contact** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Ingestion** | Call a poison control center or doctor immediately for treatment advice. |

---

**CRAYOLA® REGULAR MARKERS**                                    Revision date  23-Jan-2024

**Most important symptoms and effects, both acute and delayed**

**Symptoms**                      No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**            Treat symptomatically.

## 5. Fire-fighting measures

| | |
|---|---|
| **Suitable Extinguishing Media** | Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
| **Large Fire** | CAUTION: Use of water spray when fighting fire may be inefficient. |
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |

**Explosion data**
**Sensitivity to mechanical impact** None.

**Sensitivity to static discharge**     None.

| | |
|---|---|
| **Special protective equipment and precautions for fire-fighters** | Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment. |

## 6. Accidental release measures

**Personal precautions, protective equipment and emergency procedures**

**Personal precautions**          Wear personal protective clothing and equipment, see Section 8.

**For emergency responders**      Wear protective clothing and equipment suitable for the surrounding fire.

**Methods and material for containment and cleaning up**

**Methods for containment**       Prevent further leakage or spillage if safe to do so.

**Methods for cleaning up**       Pick up and transfer to properly labeled containers.

## 7. Handling and storage

**Precautions for safe handling**

**Advice on safe handling**       Wash thoroughly after handling.

**Conditions for safe storage, including any incompatibilities**

| | |
|---|---|
| **Storage Conditions** | None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances. |

---

**CRAYOLA® REGULAR MARKERS**                                    **Revision date** 23-Jan-2024

## 8. Exposure controls/personal protection

**Control parameters**

**Exposure Limits**          This product, as supplied, does not contain any hazardous materials with occupational
                             exposure limits established by the region specific regulatory bodies.

**Appropriate engineering controls**

**Engineering controls**     Showers
                             Eyewash stations
                             Ventilation systems.

**Individual protection measures, such as personal protective equipment**

**Eye/face protection**      Eye protection not required under normal conditions.

**Hand protection**          Protective gloves are not required under normal conditions.

**Skin and body protection** It is unlikely that emergency treatment will be required. If adverse effects occur, wash with
                             soap or mild detergent and large amounts of water. Get medical attention, if needed.

**Respiratory protection**   No respirator is required under normal conditions of use. Under conditions of frequent use
                             or heavy exposure, respiratory protection may be needed.

**General hygiene considerations** Handle in accordance with good industrial hygiene and safety practice.

## 9. Physical and chemical properties

**Information on basic physical and chemical properties**
**Physical state**          liquid
**Appearance**              article containing liquid
**Color**                   various colors
**Odor**                    None
**Odor threshold**          No information available

| Property | Values | Remarks • Method |
|---|---|---|
| **pH** | 5 - 9 | None known |
| **Melting point / freezing point** | No data available | None known |
| **Initial boiling point and boiling range** | < 100 °C / 212 °F | None known |
| **Flash point** | No data available | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
| Upper flammability or explosive limits | No data available | |
| Lower flammability or explosive limits | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | 1.01 - 1.05 | None known |
| **Water solubility** | Soluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |

---

**CRAYOLA® REGULAR MARKERS**                                    **Revision date** 23-Jan-2024

| | | |
|---|---|---|
| **Kinematic viscosity** | No data available | None known |
| **Dynamic viscosity** | No data available | None known |

**Other information**
| | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | No information available |
| **Bulk density** | No information available |

## 10. Stability and reactivity

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | None reported. |
| **Incompatible materials** | Oxidizing materials. |
| **Hazardous decomposition products** | Oxides of carbon. |

## 11. Toxicological information

**Information on likely routes of exposure**

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

**Symptoms related to the physical, chemical and toxicological characteristics**

**Symptoms**          No information available.

**Acute toxicity**

**Numerical measures of toxicity**
No information available

**Delayed and immediate effects as well as chronic effects from short and long-term exposure**

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |

**CRAYOLA® REGULAR MARKERS**                                      **Revision date**  23-Jan-2024

| | |
|---|---|
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |
| **STOT - single exposure** | No information available. |
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

| | |
|---|---|
| **Ecotoxicity** | The environmental impact of this product has not been fully investigated. |
| **Persistence and degradability** | No information available. |
| **Bioaccumulation** | There is no data for this product. |
| **Other adverse effects** | No information available. |

## 13. Disposal considerations

**Disposal methods**

| | |
|---|---|
| **Waste from residues/unused products** | Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations. |
| **Contaminated packaging** | Do not reuse empty containers. |

## 14. Transport information

**DOT**                          Not regulated

---

**CRAYOLA® REGULAR MARKERS**                                    **Revision date** 23-Jan-2024

## 15. Regulatory information

**International Inventories**

| | |
|---|---|
| **TSCA** | All of the components of this product are listed on the TSCA Inventory. |

| | |
|---|---|
| **DSL/NDSL** | Contact supplier for inventory compliance status. |
| **EINECS/ELINCS** | Contact supplier for inventory compliance status. |
| **ENCS** | Contact supplier for inventory compliance status. |
| **IECSC** | Contact supplier for inventory compliance status. |
| **KECL** | Contact supplier for inventory compliance status. |
| **PICCS** | Contact supplier for inventory compliance status. |
| **AIIC** | Contact supplier for inventory compliance status. |
| **NZIoC** | Contact supplier for inventory compliance status. |

**Legend:**
**TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL** - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS**  - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS**  - Japan Existing and New Chemical Substances
**IECSC**  - China Inventory of Existing Chemical Substances
**KECL**  - Korean Existing and Evaluated Chemical Substances
**PICCS**   - Philippines Inventory of Chemicals and Chemical Substances
**AIIC**  - Australian Inventory of Industrial Chemicals
**NZIoC**  - New Zealand Inventory of Chemicals

**US Federal Regulations**

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA).   This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370,  refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355).   There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

**US State Regulations**

**California Proposition 65**
This product does not require warnings under California Proposition 65.

**U.S. EPA Label Information**

**CRAYOLA® REGULAR MARKERS**                                    Revision date  23-Jan-2024

---

**EPA Pesticide Registration Number** Not applicable

---

## 16. Other information

| **NFPA** | Health hazards  0 | **Flammability**  0 | Instability  0 | Special hazards  - |
|---|---|---|---|---|
| **HMIS** | Health hazards  0 | **Flammability**  0 | Physical hazards  0 | Personal protection  X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**
**Legend  Section 8: Exposure controls/personal protection**

| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
|---|---|---|---|
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

| **Revision date** | 23-Jan-2024 |
|---|---|
| **Revision Note** | No information available. |

**Disclaimer**
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
**End of Safety Data Sheet**

---

# EXHIBIT 3



US006160034A

# United States Patent [19]

## Allison et al.

[11] **Patent Number:** **6,160,034**

[45] **Date of Patent:** **\*Dec. 12, 2000**

| 5,288,160 | 2/1994 | Li et al. ................................. 401/198 |
| 5,462,591 | 10/1995 | Karandikar et al. ................. 106/31.36 |

[54] **COLORING COMPOSITION**

[75] Inventors: **Keith Allison**, Blandon; **Richard Kaiser**, Allentown, both of Pa.

[73] Assignee: **Binney & Smith Inc.**, Easton, Pa.

[ * ] Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

[21] Appl. No.: **09/088,923**

[22] Filed: **Jun. 2, 1998**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/868,180, Jun. 3, 1997, abandoned.

[51] **Int. Cl.⁷** ..................................................... **C09D 11/10**
[52] **U.S. Cl.** ........................... **523/161**; 524/516; 524/522; 524/523; 260/DIG. 38; 401/198; 106/31.01; 106/31.13; 106/31.45
[58] **Field of Search** ................... 523/161; 260/DIG. 38; 401/198; 524/522, 523, 516; 106/31.01, 31.13, 31.25

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

5,116,410   5/1992   Miller .................................... 106/31.58

### FOREIGN PATENT DOCUMENTS

| 466493 | 1/1992 | European Pat. Off. . |
| 466493A1 | 1/1992 | European Pat. Off. ........ C09D 11/00 |
| 550891A1 | 7/1993 | European Pat. Off. ........ C09D 11/16 |
| 0758673A2 | 2/1997 | European Pat. Off. . |
| 758673 | 2/1997 | European Pat. Off. . |

### OTHER PUBLICATIONS

Rohm and Haas Company product literature and Material Safety Data Sheet for "Maincote Fastrack 77 All–Acrylic Emulsion," Jan., 1997.
Dow Chemical Company Material Safety Data Sheet for "Latex DT 211NA," May 23, 1996.

*Primary Examiner*—Terrel Morris
*Assistant Examiner*—John J. Guarriello
*Attorney, Agent, or Firm*—Leydig, Voit & Mayer, Ltd.

[57] **ABSTRACT**

The present invention provides a low-bleed coloring composition incorporating a film-forming agent, an alkali-soluble resin, an aqueous carrier, and a colorant. The coloring composition can optionally include one or more of a humectant, a surfactant, a preservative, a drying agent, a pH regulant, a bittering agent or a fragrance. The present invention further provides a mark upon the surface of a substrate. The present invention furter provides a writing instrument comprising the coloring composition.

**20 Claims, No Drawings**

6,160,034

1

## COLORING COMPOSITION

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation in part of U.S. application Ser. No. 08/868,180, filed on Jun. 3, 1997 now abandon.

### TECHNICAL FIELD OF THE INVENTION

The present invention relates to a coloring composition. More specifically, this invention relates to a coloring composition, such as an ink, suitable for use in children's coloring books.

### BACKGROUND OF THE INVENTION

Coloring compositions generally are mixtures of colorants (pigments, dyes, etc.) dispersed or dissolved in a carrier fluid. Hydrocarbon solvent-based coloring compositions, such as writing and marker inks, have traditionally been permanent inks. However, along with their desirable permanency, they present several undesirable qualities. The solvent systems utilized in these inks typically include such toxic hydrocarbons as toluene and xylene. Such components can lead to both disposal problems and consumer rejection due to a rising appreciation for the dangers of exposure to toxic chemicals and objection to the chemical odor.

Water-based coloring compositions present an attractive alternative to hydrocarbon-based coloring compositions, primarily because aqueous coloring compositions are less toxic and their odor less offensive than hydrocarbon-based coloring compositions. Water-based coloring compositions are generally made by a mixture of water and a colorant (e.g., a water soluble dye or pigment). While some water-based coloring compositions available in the form of marker inks have the desirable quality of good skin and textile fugitivity, they also exhibit the undesirable quality of washing off of the writing surface. Water-based writing and marker inks also tend to smear during application, in part because of long drying time. After being dispensed and dried, such inks are re-wettable and will again smear if later contacted with water. Some of these problems are surmounted by incorporating an acrylic resin, such as an alkali-soluble resin, into the coloring composition.

Coloring compositions are employed to mark on a wide variety of substrates. A commonly employed substrate is paper (or a paper-like material), which is produced in many qualities. In many respects, paper presents a superior writing surface. The surface of paper is generally smooth and even. Moreover, the porosity of paper assists the writing process by drawing the coloring composition into the paper matrix, promoting even application and smooth appearance. However, porous paper is not an ideal writing substrate for all applications. For example, many types of paper (e.g., newsprint, or the highly porous paper commonly employed in children's coloring books) are sufficiently porous to draw a coloring composition through the paper to create a mark on the surface opposite that desired, thereby rendering it difficult to employ both sides of a single sheet of paper. This is commonly referred to as "strike-through" of the ink. Moreover, inks which strike through (or bleed through) paper can actually leave marks on surfaces supporting the paper (such as succeeding sheets of paper in a book, clothing, furniture, and the like). Also, strike-through dulls or reduces the presentation of the color.

2

Efforts aimed at reducing drying time and strike-through of water-based inks have proven largely unsuccessful. Some commercially available inks reduce strike-through by incorporating additives which substantially increase the viscosity of the coloring composition. For example, hyperthermogelling inks incorporating a high amount of surfactants exhibit a phase change due to the evaporation of a given amount of water (e.g., U.S. Pat. No. 5,462,591). While such inks are useful for some applications (e.g., commercial printing presses), they are too viscous for use in common writing instruments, such as capillary markers with porous nibs.

In view of the foregoing problems, there exists a need for a coloring composition that is quick-drying and which exhibits limited or little strike-through when applied to porous papers such as coloring book paper. There is also a need for such compositions that are washable from skin and common fabrics. Furthermore, such compositions are needed which are suitable for use in common ink-based writing instruments (e.g., capillary markers). The present invention meets these needs and provides a low bleed coloring composition suitable for use in common ink-based marking instruments.

### BRIEF SUMMARY OF THE INVENTION

One aspect of the invention is an aqueous coloring composition incorporating a film-forming agent, an alkali-soluble resin, and a colorant. The aqueous coloring composition can optionally include one or more of a humectant, a surfactant, a preservative, a drying agent, a pH regulant, bittering agent or a fragrance. The coloring composition is sufficiently fluid for use in standard writing instruments, yet it minimally permeates highly porous substrates. Moreover, the coloring composition retains superior color stability, remains fluid during prolonged storage, and is readily washed from skin and common fabrics. The viscosity of the coloring composition can be sufficiently low to be compatible with a variety of commonly employed capillary markers.

The coloring composition is useful for forming marks on a variety of surfaces, especially highly porous paper (or paper-like) surfaces. The mark is formed by applying the aqueous coloring composition to the surface such that the film-forming agent forms a hydroresistant film adhering to the surface; the colorant is then entrapped within the matrix of the film. Such marks are quick drying and exhibit minimal strike-through to the opposite surface of a porous substrate (such as paper).

Another aspect of the invention is a writing instrument incorporating the aqueous coloring composition of the invention. In the preferred embodiment, the writing instrument has a nib and a reservoir containing the coloring composition.

The invention can best be understood with reference to the accompanying detailed description of the preferred embodiments.

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

The coloring composition includes a pH-sensitive agent for forming a hydroresistant film following the deposition of the composition upon a substrate. Moieties suitable for use as film-forming agents in the present invention deposit films under high humidity, or even within the fluid emulsion. Generally, such agents have film-forming temperatures in the range of 15–25° C., (e.g., about 20° C.). A preferred film-forming agent includes a polyfunctional amine moiety

6,160,034

3

and a latex having acid functional moieties. In such a system, the latex and the polyfunctional amine can be separate species or the same species (e.g., acid functional moieties and amine finctional moieties can be present within the same polymeric backbone).

The latex is a polymer, generally with an average molecular weight of from about 500 to about 5,000,000 (more typically between about 1,000 to about 1,000,000). The latex can be water soluble, water reducible, or a dispersed polymer (generally having a particle size between about 20 and about 1000 nm). Such latexes are polymerized from monomers commonly included in latex polymers, many of which are disclosed in published European patent application EP 758,673. Preferably, such monomers include acrylic and methacrylic esters and acid functional monomers. Examples of preferred latexes include the following monomers:

1) butyl acrylate and methyl methacrylate,

2) butyl acrylate and styrene,

3) 2-ethyl hexyl acrylate with methyl methacrylate, and

4) 2-ethyl hexyl acrylate with styrene.

The presence of acid finctional monomers permits crosslinking with the polyfunctional amine, thus, the latex preferably contains at least one acid functional monomer (e.g., acrylic acids, methacrylic acids, and combinations thereof). Preferably, the latex has sufficient acid functional groups to have an acid number between 0 and about 390 (e.g., between about 0.8 and about 390), and more preferably between about 0.8 and about 200.

The polyfunctional amine can be polymerized between from about 20% to about 100% (preferably between about 50% and about 100%) from any of several classes of amine-containing monomers. Examples of such monomers include aminoalkyl vinyl esters wherein alkyl groups are straight or branched groups of 2 or 3 carbon atoms; acrylamide or acrylic acid esters; N-acryloxyalkyl-oxazolidines and N-acryloxyalkyltetrahyddro-1,3-oxazines and corresponding components in which the "alkyl" linkage is replaced by alkoxyalkyl and poly(alkoxyalkyl) linkages; and monomers which readily generate amines by hydrolysis. Alternatively, the polyfunctional amine can be a monomer with at least two primary or secondary amino groups (e.g., aliphatic and cycloaliphatic amines each having 2–10 primary or secondary amino groups and from 2 to about 100 carbon atoms). Suitable polymeric and non polymeric polyfunctional amines are disclosed in published European patent application EP 758,673, and other such compounds are known in the art.

Where the film-forming agent includes a latex and a polyfunctional amine, pH sensitivity is effected because the acid functional moieties will crosslink with the amine moieties below a threshold pH, increasing the viscosity of the composition. While different film-forming agents can have different pH thresholds, generally such thresholds are above about 8, and more preferably above about 9. The exact threshold pH can be determined by titrating the composition with an acid, the crosslinking reaction itself (measured by substantial increase in viscosity) serving as an indicator of the threshold. Because the composition preferably is sufficiently fluid for use in a standard marking instrument, as described below, it is especially preferred that the solution chemistry of the composition be such as to impede the film-forming agent from crosslinking during storage or at an otherwise inappropriate time (i.e., a time other than when the composition is applied to the substrate). Thus, to prevent such crosslinking from occurring prematurely, the pH of the coloring composition is maintained at least at about 8 and

4

more typically at least at about 9 (e.g., by the addition of a base to the composition). Typically, the coloring composition will have a maximal pH of about 10 or about 11, although a composition according to the present invention can have a higher pH (e.g., about 12 or higher), if the resulting composition is stable.

Few commercial preparations have sufficient qualities to be useful as a source of a film-forming agent in the composition of the present invention. Those which are available are generally formulated as aqueous emulsions with a relatively high solid content (e.g., about 30% to about 60% solids by weight of the emulsion) and have viscosities in the range of about 30 cps. to about 70 cps. These formulations permit significant control over the ultimate viscosity of the coloring composition, because little of such emulsion needs to be included to supply a suitable amount of film-forming agent. One preferred commercial preparation is an aqueous emulsion of 35–55 wt. % solid matter manufactured by Dow Chemical and marketed under the trade name DT211-NA. Another preferred commercial preparation formulation, having a threshold pH of about 9.2, is marketed by Rohm and Haas as an aqueous emulsion of 50 wt. % solid matter under the trademark MAINCOTE FASTRACK-77™.

Without being bound by any particular theory, it is believed that when the composition is exposed to air (desirably when applied to a substrate (e.g., paper)), some water (and any volatile pH regulant present) evaporates from the composition. Evaporation of volatile components acidifies the composition. At some point, the pH of the composition falls below the threshold, prompting the film-forming agent to crosslink. As mentioned, where the crosslinking occurs within a container, the composition becomes far too viscous for many applications (e.g., as an ink). However, where such crosslinking occurs following application of the composition to a substrate, the crosslinked agent forms a hydroresistant film upon the surface of the substrate. Generally, the hydroresistant film forms before a significant amount of colorant can enter porous substrates (e.g., paper). Because of the extensive crosslinking, the film is not soluble, and is therefore hydroresistant. Moreover, because the film is not water soluble, it sets before the mark otherwise dries; in this respect, the coloring composition is a quick-setting composition. Also, because the hydroresistant film is not soluble, it is permanent in nature, absent any additives promoting removal (e.g., an alkali-soluble resin). Being hydroresistant, the film prevents ffurther permeation of the substrate, effectively confining the colorant to the surface upon which it is applied. However, the other constituents (notably the colorant) associate with the hydroresistant film (e.g., by being trapped within the forming film or incorporated into the hydroresistant film matrix), effectively coupling the colorant to the substrate.

In the usual case, at least about 15% by weight of the total composition film-forming agent must be included in compositions of the present invention to adequately form a hydroresistant film. However, where the coloring composition also includes a surfactant, increased amounts of film-forming agent are usually required to block strike-through of the colorant. The desired viscosity of the coloring composition largely determines the maximum amount of film-forming agent within the coloring composition. For example, where the coloring composition is marker ink, a practical maximum amount of film-forming agent is about 40% by weight of the total composition, as higher concentrations can cause undesirably high viscosity and drying of the coloring composition, resulting in a short "cap-off" time. Of course, the presence of the alkali-soluble resin also

6,160,034

5

affects viscosity; hence, the maximal amount of film-forming agent will depend on the amount of alkali-soluble resin present within the coloring composition. Therefore, the preferred concentration range for most applications is from about 20% to about 30% by weight of the total composition (e.g., about 25 wt. %) film-forming agent.

The coloring composition of the invention also includes an alkali-soluble resin to promote fugitivity from skin and fabrics. The alkali-soluble resin is generally an acrylic resin, i.e., a polymer or copolymer of acrylic or methacrylic esters, including such materials as styrenated acrylic copolymers. Such resins sometimes are referred to as acrylic varnish and lacquer resins or as acrylic film-forming resins. Alkali-soluble acrylic resins are commercially available as substantially pH-neutral emulsions in which the resin is not significantly solubilized. As the pH of an alkali-soluble resin emulsion is increased above neutral, the resin will dissolve.

After application of the coloring composition of the invention to a substrate (e.g., paper), the aqueous carrier begins to evaporate and the pH of the composition drops, as mentioned previously, causing film formation. In contrast with the crosslinking of the film-forming agent, the ability of the alkali-soluble resin to remain in solution depends to a large extent on humidity and solution concentration. Thus, in the context of the present invention, the alkali-soluble resin will not independently form a film as quickly as the film-forming agent. As such, some of the alkali-soluble resin is trapped within the matrix of the hydroresistant film-forming agent film as the film forms.

As discussed herein, the hydroresistant film of the film-forming agent is insoluble in aqueous solutions and is, therefore, permanent. However, the presence of some of the alkali-soluble resin within the matrix of the film effects fugitivity of the film from certain surfaces, as herein described. Basic aqueous solutions can dissolve the alkali-soluble resins, even when trapped within the matrix of the hydroresistant film. When a sufficient amount of alkali-soluble resin is trapped within the matrix, the physical integrity of the film is sufficiently disrupted when the alkali-soluble resin is dissolved. Such disruption significantly weakens the bonds between the film and the substrate onto which it is attached. The weakened film is, therefore, readily removed from the substrate by mechanical agitation. In short, while a hydroresistant film comprising the film-forming agent is not dissolved, it is nonetheless fugitive under basic conditions when a suitable amount of alkali-soluble resin is incorporated into its matrix.

The coloring composition can include any suitable amount of alkali-soluble resin to promote fugitivity. However, in most applications, a minimum amount of alkali-soluble resin equal to about 1% by weight (typically about 5% by weight) of the film-forming agent is required to effect fugitivity. If the composition incorporates too much alkali-soluble resin, the forming film is not suitably hydroresistant to retard the composition from permeating the substrate during application. Furthermore, films incorporating too much alkali-soluble resin are partially disrupted or dissolved during the application of successive layers of the coloring composition (overcoloring), thereby leading to strike-through. Thus, to minimize strike-through of the composition, the amount of alkali-soluble resin typically includes up to about 10% by weight of the film-forming agent; however, the upper limit of the amount of alkali-soluble resin is determined by the capacity of the composition to form a hydroresistant film, as described herein. While the optimal ratio alkali-soluble resin vis-a-vis the film-forming agent depends in large measure on the species of the

6

resins employed, the preferred concentration range of the alkali-soluble resin for most applications is from about 0.5% to about 5% by weight of the total composition (e.g., about 1 wt. % to about 3 wt. %).

Alkali-soluble resins typically have minimum film-forming temperatures between about −15° C. to about −10° C. Many commercially available acrylic resin dispersions are alkali-soluble resins for use in the present invention. Generally, such resins are available as pH-neutral emulsions containing 20% to 50% by weight active resin and have viscosities between 20 cps. and 100 cps. For example, an alkali-soluble acrylic resin emulsion marketed by Union Carbide under the trademark CARBOSET XL19™ is a suitable alkali-soluble resin, as is an acrylic emulsion sold by S. C. Johnson under the trademark JONCRYL 95™. Preferred alkali-soluble resin dispersions are sold by Rohm and Haas under the trademarks ACRYSOL WS 24™, ACRYSOL WS 32™, and ACRYSOL WS 68™.

The coloring composition of the invention also includes a colorant. As used herein, the term "colorant" includes any agent capable of delivering a color to a substrate upon which it is applied. Thus, colorants can be dyes (i.e., soluble colorants), pigments (i.e., insoluble or particulate colorants), or any other suitable agent compatible with the composition components. Colorants are commercially available in suitable preparations, such as aqueous solutions containing dyes, or aqueous dispersions containing pigments.

To promote compatibility with the remaining coloring composition components, pigments used are in the form of aqueous dispersions (e.g., a combination of a pigment, an aqueous carrier, and a surfactant or dispersant system). From the standpoint of convenience, where pigments are used a commercial pigment dispersion is preferred, and many such dispersions are available. However, a pigment dispersion can also be prepared specifically for use in the coloring composition of the invention. Typical commercial dispersions contain about 30% to about 60% by weight active pigment ingredients.

In general, a workable pigment dispersion can have a wide or narrow particle size range depending on the delivery system used for the coloring composition. The lower limit on pigment particle size is determined not by any finctional characteristic of the coloring composition, but by the ability to form a stable dispersion. Similarly, the upper limit on pigment particle size is determined by the type of applicator by which the coloring composition is to be applied or dispensed, since pigment particle size determines the ability of the pigment particles to flow through, for example, the matrix of a marker nib. Indeed, relatively larger pigment particles can restrict coloring composition flow through many types of nibs commonly utilized in writing and marking instruments, ultimately rendering them inoperable. Larger particle sizes can, however, be used where the coloring composition is to be employed in a marker in which the coloring composition is dispensed through a valve assembly (e.g., a paint marker).

The pigment particle size can be adjusted depending on the exact nib type to be utilized in the writing or marking instrument in which the coloring composition will be placed. For example, one preferred form of the coloring composition of the invention can be utilized in a marking instrument having a porous plastic nib on account of the use of an ultrafine pigment dispersion having a particle size range of from about 0.05 μm to about 0.5 μm. Suitable commercial pigment preparations are those incorporating very small (e.g., less than about 0.5 μm) pigment particles. One such preparation is marketed by Hoecht-Celenese under the trade

6,160,034

7

name HOSTAFINE. Another product line of pigment dispersions is manufactured by Heubach and marketed under the trade name HEUCOTECH.

The preferred colorants for use in the composition of the invention are dyes. The color of many dyes is sensitive to pH. Therefore, where a dye is employed as a colorant, preferably it is stable at a pH of greater than about 8, more preferably from about 9 to about 10, without shifting color appreciably at lower pH ranges as the hydroresistant film forms during application. Suitable dyes for use in the coloring composition are polymethine dyes, triphenylmethane dyes, cyanine dyes, methine dyes, and azo dyes which are stable in the presence of a pH of less than about 10. Many such dyes are commercially available and known in the art. Such dyes include the dyes marketed under the trade names BASACRYL X-RL YELLOW® (Basic Yellow 49), marketed by the BASF Corporation, ASTRAZON BLUE FRR® (Basic Blue 69), ASTRAZON BRILLIANT RED 4G® (Basic Red 14), and ASTRAZON PINK FBB® (Basic Red 49) by Bayer; and the dyes marketed under the trade names Acid Green 3 by International Dyestuffs Corporation, Acid Blue 93 and Acid Violet 19 marketed by Spectra Color Corporation, as well as mixtures thereof, Acid Blue 9, Acid Red 1, Acid Yellow 23 (Crompton & Knowles), F.D. & C. Yellow 6, as well as fugitive preparations of dyes, notably those marketed by Milliken, (e.g., Milliken Blue, Milliken Fluorescent Red, Milliken Magenta, Milliken Scarlet, Milliken Orange, Milliken Black, etc.).

The minimum concentration of colorant which will produce a workable coloring composition is governed by the color intensity desired, although as little as 0.1% colorant by weight of the total composition can be sufficient for certain applications. The maximum workable concentration of colorant is determined largely by the ability to maintain a stable composition and the depth of color desired, and it can vary widely depending on the concentration of other components. However, a practical upper limit in the formulation of, for example, a marker ink is about 15% dye or about 10% to 30% pigment by weight of the total composition. The preferred concentration range for most applications is from about 1% to about 6% dye or from about 2% to about 10% active pigment by weight of the total composition. To ensure good coloration, a concentration of from about 1.5% to about 4% dye or from about 5% pigment by weight of the total composition is even more preferred when the coloring composition is to be used as marker ink.

The aqueous carrier used in the coloring composition of the invention is preferably deionized water. The amount of water present in coloring composition is typically from about 10% to about 90% by weight of the total composition, and this amount is in large part determined by the desired end use of the product (e.g., as an ink or a paint) and the amount of other components included in the color composition. To achieve a desirable viscosity when the coloring composition is used in the form of, for example, an ink, water is preferably present in an amount of from about 55% to about 75%, and most preferably from about 60% to about 70% by weight of the total composition. When the coloring composition is used as a paint, of course, the amount of water can be significantly less than these ranges.

In addition to having a film-forming agent, an alkali-soluble resin, and a colorant, the aqueous coloring composition also can include other constituents. Additives are useful to enhance stability, control viscosity, and promote long shelf life. Thus, the coloring composition can include a humectant, a surfactant, a preservative, a drying agent, a fragrance, a bittering agent, or other suitable compatible additive.

8

As mentioned, on exposure to the air, the film-forming agent crosslinks particularly quickly. Hence, the coloring composition can include a humectant when the composition is used in the form of an ink to retard premature drying of the nib of a writing instrument containing the coloring composition. The humectant ensures that the coloring composition does not prematurely crosslink on the surface of a marking system, such as those systems herein described. Typical humectants for inclusion in the coloring compositions of the present invention include polyhydric alcohols such as ethylene glycol, propylene glycol (PPG), hexylene glycol and polyethylene glycol (PEG), hydroxylated starches, and certain surfactants also can function as humectants. The humectant is preferably propylene glycol or glycerin.

The humectant (when included) is generally used in an amount of from about 1% to about 30% by weight of the total composition (e.g., 2 wt. % to about 20 wt. %), though this range is by no means critical. The amount of humectant to be added is determined by the type of nib used in the writing or marking instrument to be employed and the protection time period desired. A preferred composition incorporates propylene glycol as a humectant in an amount of from about 1% to about 10% by weight of the total composition. Another preferred composition includes glycerin as a humectant in an amount of from about 1% to about 2% by weight of the total composition.

For prolonged shelf life, the coloring composition can include a preservative to retard biotic contamination of the coloring composition. The preservative preferably serves as both a bactericide and a fungicide, and is added in any effective amount, although a typical concentration range is from about 0.1% to about 5% by weight of the total composition. The use of preservatives in levels greater than about 5% by weight of the total composition can cause the coloring composition to become toxic or unstable and is, in any event, unnecessary. Should alcohol be added to the composition as a drying agent, that alcohol also will function as a preservative to some extent.

Any conventional preservative compatible with the remaining ingredients is suitable for use in the invention. For example, preservatives manufactured by Hiils Corp., sold under the trade name NUOSEPT 95® (Bicyclic-oxozolidine), by Dow Chemical Co. and sold under the trademarks DOWICIL 75® (1-(3-chloroallyl)-3,5,7-triaza-1-azoniaadamantane chloride) and DOWICIL 200® (3-chlorovinyl-hexamethylene tetrammonium chloride) or a preservative manufactured by Rohm and Haas and sold under the trademark KATHON PFM® (isothiazolinones), or a preservative manufactured by Sutton Labs and sold under the trademark GERMALL II® (imazolidinyl urea), or a preservative manufactured by Merck and sold under the trademark TEKTAMER 38® (1,2 dibromo-2,4-dicyanobutane), are suitable preservatives. Other acceptable preservatives include TROYSAN POLYPHASE P100®, a 3-iodo-2-Propynyl Butyl Carbamate sold by Troy Chemical which is typically mixed with PVP K-30®, a 2-Pyrrolidinone, 1-Ethenyl-, Homopolymer ((C₆MgNO)ₓ solubilizer sold by ISP Technologies Inc. and M-PYROL®, a 1-Methyl-Pyrrolidinone solubilizer sold by ISP Corporation. Many preservatives not stable under basic conditions can degrade at high pH to liberate reagents (e.g., formaldehyde) effecting crosslinking of the film-forming agent. Because film-forming agent is stable at high pH, preferably the preservative does not significantly degrade under alkaline conditions. Two such preferred preservatives are manufactured by Zeneca and sold under the trademarks

6,160,034

**9**

PROXEL GXL™ and PROXEL DL™, and another alkaline-stable preservative is manufactured by Huls and sold under the under the trademark NUOSEPT 495™, each of these preparations uses 1,2-Benzisothiazolin-3-one as the active ingredient.

The coloring composition can also include one or more surfactants. The surfactants can be either ionic or nonionic surfactants. Some surfactants act by reducing the surface tension and energy of solution, thereby affecting a variety of parameters within the coloring composition. The presence of nonionic surfactants promotes the long-term stability of the coloring composition. In particular, some formulations lacking surfactants become progressively more viscous, due to the relatively large amount of solid material in the composition. In extreme cases, these solids can separate from the solution. The presence of a relatively small amount of a nonionic surfactant reduces or substantially eliminates this occurrence.

Additionally, by reducing surface tension, the surfactant reduces the viscosity of the coloring composition, thereby promoting more even flow of the coloring composition through the nib of a pen when the composition is used in the form of an ink. However, too much surfactant promotes strike-through of the coloring composition when applied to some substrates. Additionally, some surfactants (e.g., TAMOL 681) react with materials commonly employed in writing instruments. Hence, the choice of surfactant largely depends on the desired use of the coloring composition.

A suitable nonionic surfactant contemplated herein is SURFYNOL surfactant, sold by Air Products & Chemicals Inc., Allentown, Pennsylvania. Additionally, TAMOL 731, an anionic, polymer-type surfactant sold by Rohm and Haas Company at a concentration of 25% in solvent is a suitable surfactant. A surfactant such as Triton® X-405 (a mixture of 70% octylphenoxypolyethoxyethanol and 30% water), works well in compositions of the invention when used in amounts of 0.1% to about 1% by weight of the total composition (preferably above about 0.4 wt. %).

Other surfactants can act as a dye-blocking agent to promote fugitivity of the colorant. In some formulations of dyes, such as the Milliken dyes mentioned above, the chromophores are coupled to a moiety which is miscible in aqueous carriers, and are thus fugitive in comparison to the acid dyes themselves. However, many of these formulations react with certain resins, especially under basic conditions. Therefore, where acid dyes are used, a surfactant acting as a dye-blocking agent promotes fugitivity of the resulting mark. Such surfactants compete with the chromophores for binding sites on a substrate. Some surfactants suitable for use as dye-blocking agents are disclosed in U.S. Pat. Nos. 5,262,535, 5,507,863, 5,487,778. Other commonly employed surfactants having this dye-blocking ability are various salts of alkylated diphenyl oxide disulfonates. A preferred dye-blocking surfactant is manufactured by Dow Chemical and sold under the trade name DOWFAX 8390™.

While, as mentioned, the film-forming agent solidifies rapidly during application, in some applications an additional drying agent can be added to the coloring composition to effect more rapid film formation and to improve marking characteristics, particularly upon nonporous materials. Drying agents increase the overall volatility, thereby enhancing the evaporation rate of the water and the pH regulant. Any compatible material which performs this function can be used.

The drying agent preferably should be a volatile polar material to ensure compatibility with the primary components of the marker ink. Straight chain $C_2$–$C_4$ alcohols are

**10**

effective, highly volatile drying agents, and, of these, ethanol is preferred because of its relatively low cost, its low toxicity, and because it does not contribute an unpleasant odor to the composition. Alcohols (e.g., conventional denatured alcohols, or preparations) can also provide added benefits, such as reducing surface tension, increasing adherence of the coloring composition to porous surfaces, and providing bactericidal activity when added to the coloring composition.

When utilized, the drying agent preferably is added from about 1% up to about 10% by weight of the total composition, with the most preferred concentration being about 3–8% by weight of the total composition, though these amounts are not critical to the practice of the invention. Indeed, the presence of the drying agent adversely affects stability of the coloring composition and can cause flocculation of the pigment, and significantly reduce cap-off time, unless other stabilizing additives are employed.

As mentioned, the coloring composition is preferably alkaline so that the alkali-soluble acrylic resins remain in solution and to avoid premature crosslinking. While the film-forming agents are available as highly alkaline aqueous emulsions, in some applications a pH regulant may be necessary in the composition to maintain the pH between about 9 and about 10. Any material that is compatible with the other components of the system and that performs this function can be used as a pH regulant. Among the preferred pH regulants for this composition are 2-amino-2-methyl-1-propanol (e.g., available as a 95 wt. % solution with water under the trademark AMP 95 from Angus Chemical Group, Inc.) and ammonium hydroxide. The volatility of the pH regulant affects the stability of the coloring composition during storage, and the use of a highly volatile pH regulant can cause the film-forming agent to crosslink prematurely. Thus, in general, a highly volatile pH regulant is avoided for achieving the objects of the invention. The most preferred pH regulant is AMP 95 because of its moderate to high volatility.

Furthermore, the coloring composition can include additional ingredients, provided the ingredients are compatible with the composition. For example, the coloring composition can include a fragrance. Any suitable fragrance can be employed to impart desired aromas. Many commercial fragrance preparations are compatible with the coloring composition, such as, for example, those marketed by Florasyth, Inc., Technology Fragrances and Flavors, Inc., and Shaw, Mudge, & Co., etc. Additionally, the composition can include a bittering agent, such as those commonly included in coloring compositions, to impart an unpleasant taste to the composition and thereby discourage ingestion of the composition.

The coloring composition is useful for forming a mark upon a substrate. Preferably, the mark is formed by applying the aqueous coloring composition to a first surface, upon which the film-forming agent forms a hydroresistant film. The film preferably includes some of the colorant and some of the alkali-soluble resin.

A preferred substrate has two surfaces (e.g., two opposing surfaces) such as a porous paper sheet (whereby the surfaces oppose each other). As used herein, "paper" includes any grade of paper as well as any paper-like material including, but not limited to, cotton fabric, onionskin, parchment, vellum, papyrus, or other similar material. The hydroresistant film reduces the degree to which the colorant penetrates the substrate, thereby minimizing or substantially preventing the formation of a second mark on the opposing surface (i.e., the film prevents strike-through of the colorant).

6,160,034

**11**

The degree to which strike-through is minimized depends on the nature of the substrate and the viscosity of the composition. For example, on highly porous paper (e.g., coloring book paper or newsprint) some minimal strike-through of a coloring composition having low viscosity can occur despite the presence of the film-forming agent. However, the strike-through mark is generally only about 10% as intense as the mark on the desired surface, and in many applications can be substantially lighter (e.g., about 5% or less).

As mentioned herein, the alkali-soluble resin can be dissolved only in basic solutions. Therefore, a mark made by the coloring composition of the invention is not fugitive upon contact with water unless the pH of the water is elevated to at least a level which would have been sufficient to dissolve the resin in its original state. Thus, ordinary tap water, rain water, atmospheric condensation, or other commonly present liquids, such as spilled beverages and the like, will, of course, have insufficient alkalinity to rewet or dissolve the alkali-soluble resin. As such, the coloring composition of the present invention is of a "permanent" nature compared with most aqueous inks and other coloring compositions. However, tap water combined with a soap, detergent, or bleach is sufficiently alkaline to dissolve the alkali-soluble resin and permit the hydroresistant film to be mechanically removed. Therefore, while permanent, marks made by coloring compositions of the present invention are readily washed from skin and common fabrics using common household reagents.

The coloring composition of the present invention can be applied by any means known for applying fluid to a substrate. For example, the composition can be applied with a paint brush, a split-tip fountain pen, a roller ball (which is analogous to a ball-point pen but has a much larger ball and uses much less viscous coloring composition than a conventional ball-point pen), an aerosol can or other fluid spraying apparatus, an absorbent pad, a paint roller, printing equipment, or other apparatus used for dispensing fluids having the properties of the present coloring composition. Preferably, the composition is suitably fluid for use in such marking instruments. Thus, for use in a such a standard marking instrument, the viscosity of the coloring composition preferably is from about 3 cps. to about 10 cps. (e.g., from about 4 cps. to about 8 cps.), and most preferably from about 5 cps. to about 7 cps. (e.g., about 6 cps.).

A capillary marker is the preferred instrument for applying the coloring composition. A capillary marker has a reservoir and a capillary nib. The reservoir of a typical capillary marker is an absorbent body stored in the handle of the marker. Any suitable reservoir compatible with the coloring composition can be used, such as, for example, an extruded polyester reservoir. The reservoir contains the coloring composition charge of the marker, and is capable of transferring coloring composition to the capillary nib. The nib of a capillary marker has one end in contact with the reservoir and a writing tip for contacting a substrate as its other end. The nib wicks the coloring composition from the reservoir to its writing tip. The writing tip of the nib is drawn across the surface of a substrate to be marked, dispensing the fluid on the surface. The nib can be made of any porous, preferably resilient material. Preferably, a porous plastic nib is used, but other nibs, such as pulltruded hollow nibs, ordinary felt nibs, and bonded fiber nibs, are also suitable.

The nib can have a well-defined, non-wearing writing tip, such as a chisel tip; hence, a capillary marker is the preferred instrument for applying the coloring composition. As is conventional in the capillary marker art, the tip can have

**12**

edges of different dimensions. The same marker can be used to make bolder or lighter lines by drawing with one or another edge of the tip in contact with the writing medium.

While it is believed that one of skill in the art is fully able to practice the invention after reading the foregoing description, the following examples further illustrate some of its features. As these examples are included for purely illustrative purposes, they should not be construed to limit the scope of the invention in any respect.

In particular, these examples present 35 separate coloring compositions of the present invention suitable for use in common writing instruments. Physical properties of the exemplary compositions, notably color and viscosity, were measured, as was pH. It was also noted whether the compositions remained stable over time at ambient (25° C.) and elevated temperatures (60° C.). Each of the coloring compositions was loaded into a variety of different writing instruments (e.g., pens, markers, etc.) to apply marks to surfaces and to determine if the coloring compositions were compatible with various commonly-employed marker nibs. In particular, the strike-through of the marks was determined, as well as the fugitivity of the marks from skin and common fabrics.

EXAMPLE 1

In this example, three coloring compositions were prepared without using surfactants. In formulating the compositions of the present invention, a first premix was formed by mixing an alkali-soluble resin emulsion (ACRYSOL WS-24) with water and adding a pH regulant (ammonium hydroxide) until a pH between about 8.0 and about 10.0 is achieved. At this pH, the resin is dissolved. AMP-95 premix (48% of the commercial emulsion, 48% water, and 4% AMP-95, all by weight of the premix) was then added as a pH regulant to ensure that the final composition is sufficiently alkaline. A second premix was then formed by adding water to the colorant solutions. A third premix included a preservative (Troysan polyphase P100) at 0.2% by weight of the premix, a surfactant (PVP K-30 powder) at 2% by weight of the premix, all in M-Pyrol. These premixes were mixed together with the film-forming agent (MAINCOTE FASTRACK-77) and other ingredients (where included) to form the coloring compositions. The formulae of the compositions are presented in Table 1, along with a measure of viscosity.

The pH of these three coloring compositions varied between 9 and 10. Each of the three coloring compositions exhibited superior washability from common fabrics and skin. Each of them was sufficiently fluid to work in common markers, and in each of the markers tested, they performed well. When applied to porous paper, each of the three exhibited minimal strike-through, and it was observed that the three or more successive applications of the coloring composition over the same area of paper deposited a glossy mark. The three formulations were not stable for prolonged periods either at room temperature or elevated temperatures, either exhibiting signs of dryness or shifting of the color due to interaction of the dyes with the composition.

EXAMPLE 2

In this example, eight additional coloring compositions were prepared. Six of these included a small amount of surfactant (SURFYNOL 72) to decrease dry time. The formulae of the compositions are presented in Table 2, along with a measure of viscosity and pH.

Each of the coloring compositions exhibited superior fugitivity from skin; however, the compositions did not

6,160,034

**13**

wash well from fabrics, especially cotton. Each of them was sufficiently fluid to work in common markers, and in each of the markers tested, they performed well. When applied to porous paper, each exhibited minimal strike-through. The formulations were not stable for prolonged periods either at room temperature or elevated temperatures, either exhibiting signs of dryness or shifting of the color due to interaction of the dyes with the composition.

### EXAMPLE 3

In this example, eight additional coloring compositions were prepared. These coloring compositions incorporate the nonionic surfactant Triton X-405, and include a preservative which is more stable at higher pH (Proxel GXL). Additionally, where Acid blue dye was employed, the coloring compositions incorporated a dye-blocking surfactant (Dowfax 8390) to promote long-term color stability. The formulae of the compositions are presented in Table 3, along with a measure of viscosity and pH.

Each of the eight coloring compositions exhibited superior fugitivity from skin. Each is sufficiently fluid to work in common markers, and in each of the markers tested, they performed well. When applied to porous paper, each exhibited minimal strike-through. The compositions incorporating F.D. & C. yellow dye exhibited some color shifting during prolonged storage. Moreover, some of the dyes thickened or solidified during prolonged storage at 60° C.

### EXAMPLE 4

In this example, eight additional coloring compositions were prepared. These coloring compositions were similar to those in example 3, however an increased amount of Triton X-405 was added to promote solution stability over long storage. Additionally, the use of Milliken Orange dye in place of F.D. & C yellow minimized color shifting. The formulae of the compositions are presented in Table 4, along with a measure of viscosity and pH.

Each of the eight coloring compositions exhibited superior fugitivity. Each of them was sufficiently fluid to work in common markers, and in each of the markers tested, they performed well, without nib drying even up to 90 minutes of "cap off" time in 40% humidity at room temperature. When applied to porous paper, each exhibited minimal strike-through. Moreover, the compositions remained stable at elevated temperatures, neither thickening appreciably nor exhibiting significant color shifting.

### EXAMPLE 5

In this example, eight additional coloring compositions were prepared. These coloring compositions included DT211NA (Dow Chemical Co.) as a source of film-forming agent. The compositions were prepared by first making a premix, similar to that described in Example 1, of the following ingredients in the following proportions by weight:

| Ingredient | Percent by Weight |
|---|---|
| Water | 74.06% |
| PROXEL DL | 1.29% |
| ARYSOL WS-24 | 17.73% |
| TRITON X-405 | 1.14% |

**14**

-continued

| Ingredient | Percent by Weight |
|---|---|
| Glycerine | 4% |
| Fragrance | 0.86% |

This premixture was then combined with other ingredients as indicated in Table 5.

Each of the eight coloring compositions exhibited superior fugitivity. Each of them was sufficiently fluid to work in common markers, and in each of the markers tested, they performed well, without nib drying even up to 90 minutes of "cap off" time in 40% humidity at room temperature. When applied to porous paper, each exhibited minimal strike-through. Moreover, the compositions remained stable at elevated temperatures, neither thickening appreciably nor exhibiting significant color shifting.

All of the references cited herein, including patents, patent applications, and publications, are hereby incorporated in their entireties by reference.

While this invention has been described with an emphasis on preferred embodiments, it will be obvious to those of ordinary skill in the art that variations of the preferred embodiments can be used and that it is intended that the invention can be practiced otherwise than as specifically described herein. Accordingly, this invention includes all modifications encompassed within the spirit and scope of the invention as defined by the following claims.

TABLE 1

| | Composition | | |
|---|---|---|---|
| | 1 | 2 | 3 |
| | | Color | |
| | blue | green | orange |
| Water | 23.6 g | 29.4 g | 33.6 g |
| Preservative Premix | 2.6 g | 2.6 g | 2.6 g |
| NuoSept 95 | 0.3 g | 0.3 g | 0.3 g |
| Glycerin | 1.4 g | 1.4 g | 1.4 g |
| 50 g Acrysol WS-24 | 8.0 g | 8.0 g | 8.0 g |
| AMP-95 | 0.1 g | 0.1 g | 0.1 g |
| Fastrack-77 | 53 g | 53 g | 53 g |
| Acid Yellow 23 | | 0.1 g | |
| F.D. & C. Yellow 6 | | | 4.0 g |
| Milliken Blue | 8.0 g | 8.4 g | |
| Viscosity (cps.) | 6.0 | 6.0 | 6.0 |

6,160,034

15　　　　　　　　　　　　　　　　　　　16

TABLE 2

| Composition | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|
| Color | Orange | Black | Blue | Green | Red | Brown | Violet | Yellow |
| Water | 33.6 g | 23.64 g | 22.86 g | 27.26 g | 29.78 g | 29.46 g | 28.14 g | 34.26 g |
| Preservative Premix | 2.66 g | 2.66 g | 1.8 g | 1.8 g | 1.8 g | 1.8 g | 1.8 g | 1.8 g |
| NuoSept 95 | 0.3 g | 0.3 g | 0.14 g | 0.14 g | 0.14 g | 0.14 g | 0.14 g | 0.14 g |
| Glycerin | 1.4 g | 1.4 g | 1 g | 1 g | | | 1 g | 1 g |
| 5 g Acrysol WS-24 | 8 g | 8 g | 7 g | 6.8 g | 6.8 g | 6.8 g | 6.8 g | 6.8 g |
| AMP-95 | | | | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g |
| Fastrack-77 | 53 g | 53 g | 53 g | 53 g | 53 g | 53 g | 53 g | 53 g |
| SURFYNOL 72 | | | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g |
| Acid Yellow 23 | | | | | 1.2 g | | | 2.6 g |
| F.D. & C. Yellow 6 | 4 g | | | | | 1.2 g | | |
| Milliken Blue | | | 8 g | 8.4 g | | 1 g | 0.72 g | |
| Milliken Flour. Red | | | 6 g | | 1 g | 5.2 g | 1.4 g | |
| Milliken Magenta | | | | | | | 6.6 g | |
| Milliken Scarlet | | | | | 7 g | | | |
| Milliken Black | | 14 g | | | 7 g | | | |
| Viscosity (cps.) | 6.5 | 6.8 | 7.6 | 7.1 | 6.6 | 7.3 | 7.4 | 7.3 |

20

TABLE 3

| Composition | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
|---|---|---|---|---|---|---|---|---|
| Color | orange | yellow | blue | green | red | purple | brown | black |
| Water | 36.1 g | 38.1 g | 28.92 g | 32.54 g | 31.44 g | 29.02 g | 29.66 g | 30.86 g |
| Proxel GXL | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g |
| Glycerin | 1.4 g | 1.4 g | 1.4 g | 1.4 g | 1.4 g | 1.4 g | 1.4 g | 1.4 g |
| 5 g Acrysol WS-24 | 8 g | 8 g | 8 g | 8 g | 8 g | 8 g | 8 g | 8 g |
| Triton X-45 | 0.3 g | 0.3 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g |
| Fastrack-77 | 53 g | 53 g | 53 g | 53 g | 53 g | 53 g | 53 g | 53 g |
| Dowfax 839 | | | 6 g | 6 g | 7 g | 4 g | 4 g | 7 g |
| Acid Blue 9 | | | 1 g | 1 g | | 8 g | 0.14 g | 0.9 g |
| Acid Red 1 | | | | | 1.4 g | | | 0.9 g |
| Acid Yellow 23 | | 2 g | | 0.66 g | | | | |
| F.D. & C. Yellow 6 | 4 g | | | | 0.34 g | | 1.2 g | 0.44 g |
| Milliken Flour. Red | | | 4.28 g | | | 7.5 g | 5.2 g | |
| Viscosity (cps.) | 6.4 | 5.4 | 6.8 | 5.8 | 6.3 | 6.7 | 6.5 | 6.3 |
| pH | 9.4 | 9.3 | 9.4 | 9.5 | 9.5 | 9.4 | 9.4 | 9.5 |

40

TABLE 4

| Composition | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
|---|---|---|---|---|---|---|---|---|
| color | orange | yellow | blue | green | red | purple | brown | black |
| Water | 34 g | 38.3 g | 28.72 g | 31.34 g | 31.24 g | 28.42 g | 27.66 g | 30.55 g |
| Proxel GXL | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g | 0.2 g |
| Glycerin | 1.4 g | 1.4 g | 1.4 g | 1.4 g | 1.4 g | 1.4 g | 1.4 g | 1.4 g |
| 5 g Acrysol WS-24 | 8 g | 8 g | 8 g | 8 g | 8 g | 8 g | 8 g | 8 g |
| Triton X-45 | 0.4 g | 0.4 g | 0.4 g | 0.4 g | 0.4 g | 0.4 g | 0.4 g | 0.4 g |
| Fastrack-77 | 53 g | 53 g | 53 g | 53 g | 53 g | 53 g | 53 g | 53 g |
| Dowfax 839 | | | 6 g | 6 g | 7 g | 4 g | 4 g | 7 g |
| Acid BLue 9 | | | 1 g | 1 g | | 8 g | 0.14 g | 0.85 g |
| Acid Red 1 | | | | | 1.4 g | | | 0.85 g |
| Acid Yellow 23 | | 1.7 g | | 0.66 g | 2 g | | | |
| F.D. & C. Yellow 6 | 2 g | | | | .34 g | | | |
| Milliken Flour. Red | | | 4.28 g | | | 7.5 g | 5.2 g | |
| Milliken orange | 4 g | | | | | | 3 g | 0.75 g |
| Viscosity | 6.0 | 5.2 | 6.9 | 6.2 | 6.6 | 6.8 | 6.6 | 6.4 |
| pH | 9.7 | 9.6 | 9.8 | 9.7 | 9.7 | 9.8 | 9.7 | 9.7 |
| density (g/L) | 1048.52 | 1044.87 | 1047.32 | 1048.52 | 1049.73 | 1043.72 | 1046.12 | 1052.13 |
| s.t. (d/cm) | 38.2 | 36.9 | 40.4 | 37.8 | 35.9 | 4.03 | 38.3 | 37.2 |

65

6,160,034

17                                                                                      18

TABLE 5

| composition | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
|---|---|---|---|---|---|---|---|---|
| color | Marine | Birch | Lavender | Tangerine | Pink | Clover | Banana | Charcoal |
| ACRYSOL Premix | 34.96 % | 34.96 % | 34.96% | 34.96% | 34.96% | 34.96% | 34.96% | 34.96% |
| Water | 0.14% | 0.56% | . | 1.04% | 1.29% | 2.78% | 2.04% | 1.73 |
| DT211NA | 54% | 54% | 54% | 54% | 54% | 54% | 54% | 54% |
| DOWFAX 8390 | 7% | 4% | 4% | 4% | 6% | 7% | 7% | 7% |
| Millikin Orange | | 2.26% | | | | | | |
| Millikin Fl. Red | 3.6% | 4.16% | 7% | 4% | 3% | | | |
| F.D & C. Yellow 6 | | | | 2% | | | | |
| Food Blue 5 | .3% | .06% | .04% | | .75% | .66% | | .4% |
| Acid Red 1 | | | | | | | | 1.11% |
| Acid Yellow 3 | | | | | | | 1.44% | 0.8% |
| Acid Yellow 36 | | | | | | .6% | .56% | |
| Viscosity (cps) | 6.3 | 6 | 6.2 | 6.1 | 5.8 | 5.75 | 6.1 | 5.9 |
| pH | 10.2 | 10 | 10 | 10 | 10 | 10 | 10.1 | 10 |
| density (g/l) | 1047.28 | 1046.08 | 1047.28 | 1053.27 | 1049.67 | 1046.08 | 1055.67 | 1056.86 |
| s.t. (d/cm) | 33.7 | 33.6 | 35.5 | 33.6 | 36.8 | 38.6 | 34.1 | 34.2 |
| Specific Gravity | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.05 | 1.06 | 1.06 |

What is claimed is:

1. A coloring composition comprising:

a) from about 15 wt. % to about 40 wt % pH-sensitive film-forming agent,

b) from about 0.5 wt. % to about 10 wt % alkali-soluble resin,

c) from about 10 wt. % to about 90 wt % aqueous carrier, and

d) a colorant comprising one or more dyes, pigments, or combinations thereof, wherein said dyes represent from about 0 wt % to about 15 wt % and wherein said pigments represent from about 0 wt % to about 30 wt %, wherein said coloring composition has a pH of from about 8 to about 12.

2. The coloring composition of claim 1, having a pH of from about 9 to about 10.

3. The coloring composition of claim 1, having a viscosity of from about 4 cps. to about 8 cps.

4. The coloring composition of claim 1, wherein said film-forming agent represents about 15% to about 30% by weight of said aqueous coloring composition.

5. The coloring composition of claim 1, wherein said film-forming agent comprises a latex and a polyfunctional amine.

6. The coloring composition of claim 5, wherein said latex contains at least one acid functional monomer.

7. The coloring composition of claim 6, wherein said acid functional monomer is acrylic acid or methacrylic acid or a combination thereof.

8. The coloring composition of claim 5, wherein said latex has a weight-average molecular weight of from about 500 to about 5,000,000.

9. The coloring composition of claim 5, wherein said latex is said polyfunctional amine.

10. The coloring composition of claim 1, wherein said alkali-soluble resin is present in an amount of from about 1% to about 5% by weight of said aqueous coloring composition.

11. The coloring composition of claim 1, further comprising a humectant.

12. The coloring composition of claim 1, further comprising a surfactant.

13. The coloring composition of claim 1, further comprising a preservative.

14. The coloring composition of claim 1, flrther comprising a drying agent.

15. The coloring composition of claim 1, further comprising a pH regulant.

16. The coloring composition of claim 1, further comprising a fragrance.

17. The coloring composition of claim 1, further comprising a bittering agent.

18. A mark upon a substrate formed by applying the coloring composition of claim 1 to said substrate, such that said film-forming agent forms a hydroresistant film adhering to said substrate and said colorant binds to said film.

19. A writing instrument comprising the coloring composition of claim 1, wherein said instrument comprises a nib and a reservoir containing said coloring composition.

20. The writing instrument of claim 19, wherein said nib is porous plastic.

*   *   *   *   *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.    :    6,160,034

DATED         :    December 12, 2000

INVENTOR(S)  :    Keith Allison; Richard Kaiser

It is certified that errors appear in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In Column 2, line 32: "instrunents" should read --instruments--

In Column 9, line 2: "Huls" should read --Hüls--

In Column 10, line 34: "film-forning" should read --film-forming--

Signed and Sealed this

First Day of May, 2001

*Attest:*

*Nicholas P. Godici*

NICHOLAS P. GODICI

*Attesting Officer*          *Acting Director of the United States Patent and Trademark Office*

# EXHIBIT 4





## QUALITY GUARANTEE

We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
**U.S.A. & CANADA** (Call/Text):
1-800-CRAYOLA (800-272-9652)
Text charges may apply.
**AUSTRALIA:** 1-800-657-353

M-F, 9 AM-5 PM LOCAL TIME:
**UK:** 0800 389 6238
**ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7178 222
**BENELUX:** +31 (0)104596 580
**FRANCE:** +33 (0) 1 41 06 54 54
**GERMANY:** +496103 459180

**Crayola** A Hallmark Company
©2023 Crayola, Easton, PA 18044-0431. Serpentine Design® **Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England**; Binney & Smith (Europe) Ltd., Via Figline 13, 47122 Forli (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd.10 Caribbean Drive Scoresby Victoria 3179.

**crayola.com**         MADE IN MALAYSIA

Contents and colors may vary.
**3+**     Style#: 58-8316    Code#: 58-8316-0-200



All Crayola art materials are certified AP.

All Crayola art materials are nontoxic.

Conforms to ASTM D 4236.

### WASHING & CARE

**STAIN ADVISEMENT:** Crayola Markers contain colorants that may stain.

Please insert UPC number

0-71662-48316-6

# EXHIBIT 5

# SAFETY DATA SHEET



SDS ID:  CRAY-174
**Color Changing Highlighters**

## 1. Identification

**Product identifier**

**Material Name:**                    Color Changing Highlighters

**Other means of identification**

**Product Code(s)**                   CRAY-174

**Synonyms**                          COLOR CHANGING MARKERS; COLOR CHANGING HIGHLIGHTERS; PRODUCT
                                      CODE(S): 58-6635; 58-8315; 58-8316;

**Recommended use of the chemical and restrictions on use**

**Recommended use**                   Arts and Crafts

**Restrictions on use**               None Known

**Details of the supplier of the safety data sheet**

    **Supplier Address**
    CRAYOLA LLC
    1100 Church Lane
    Easton, PA 18044
    Phone: 1-800-272-9652

**E-mail**                            support@crayola.com

**Emergency telephone number**

**Emergency Telephone**               1-800-535-5053 or call local POISON CONTROL

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

**Label elements**

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

---

**Color Changing Highlighters**                                    **Revision date**  31-Jan-2024

The product contains no substances which at their given concentration, are considered to be hazardous to health.

**Appearance**  multi-color liquid          **Physical state**  liquid          **Odor**  No information available

**Other information**
No information available.

## 3. Composition/information on ingredients

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

| | |
|---|---|
| **Inhalation** | It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed. |
| **Eye contact** | It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention. |
| **Skin contact** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Ingestion** | Call a poison control center or doctor immediately for treatment advice. |

**Most important symptoms and effects, both acute and delayed**

**Symptoms**                    No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**          Treat symptomatically.

## 5. Fire-fighting measures

**Suitable Extinguishing Media**    Use extinguishing measures that are appropriate to local circumstances and the surrounding environment.
   **Large Fire**    CAUTION: Use of water spray when fighting fire may be inefficient.

**Color Changing Highlighters**                                    **Revision date** 31-Jan-2024

| | |
|---|---|
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |

**Explosion data**
**Sensitivity to mechanical impact** None.

    **Sensitivity to static discharge**   None.

| | |
|---|---|
| **Special protective equipment and precautions for fire-fighters** | Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment. |

## 6. Accidental release measures

**Personal precautions, protective equipment and emergency procedures**

| | |
|---|---|
| **Personal precautions** | Wear personal protective clothing and equipment, see Section 8. |

**Methods and material for containment and cleaning up**

| | |
|---|---|
| **Methods for containment** | Prevent further leakage or spillage if safe to do so. |
| **Methods for cleaning up** | Pick up and transfer to properly labeled containers. |

## 7. Handling and storage

**Precautions for safe handling**

| | |
|---|---|
| **Advice on safe handling** | Avoid breathing vapor or mist. Avoid contact with eyes, skin and clothing. Handle all packages and containers carefully to minimize spills. Wash thoroughly after handling. Do not eat, drink or smoke when using this product. Contaminated work clothing must not be allowed out of the workplace. Keep container sealed when not in use. Wear suitable protective gloves and eye/face protection. |

**Conditions for safe storage, including any incompatibilities**

| | |
|---|---|
| **Storage Conditions** | None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances. |

## 8. Exposure controls/personal protection

**Control parameters**

| | |
|---|---|
| **Exposure Limits** | This product, as supplied, does not contain any hazardous materials with occupational exposure limits established by the region specific regulatory bodies. |

**Appropriate engineering controls**

| | |
|---|---|
| **Engineering controls** | Showers |

**Color Changing Highlighters**                                          **Revision date** 31-Jan-2024

Eyewash stations
Ventilation systems.

**Individual protection measures, such as personal protective equipment**

| | |
|---|---|
| **Eye/face protection** | No special protective equipment required. |
| **Hand protection** | Wear appropriate chemical resistant gloves. |
| **Skin and body protection** | If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Respiratory protection** | Under conditions of frequent use or heavy exposure, respiratory protection may be needed. |
| **General hygiene considerations** | Handle in accordance with good industrial hygiene and safety practice. |

---

## 9. Physical and chemical properties

**Information on basic physical and chemical properties**

| | |
|---|---|
| **Physical state** | liquid |
| **Appearance** | multi-color liquid |
| **Color** | multi-color |
| **Odor** | No information available |
| **Odor threshold** | No information available |

| Property | Values | Remarks • Method |
|---|---|---|
| **pH** | 3 - 6.5 | None known |
| **Melting point / freezing point** | No data available | None known |
| **Initial boiling point and boiling range** | No data available | None known |
| **Flash point** | No data available | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
| **Upper flammability or explosive limits** | No data available | |
| **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | 1.01 - 1.05 | None known |
| **Water solubility** | Soluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | No data available | None known |
| **Dynamic viscosity** | < 5 cps | None known |

**Other information**

| | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | No information available |
| **Bulk density** | No information available |

---

## 10. Stability and reactivity

---

**Color Changing Highlighters**                                    **Revision date**  31-Jan-2024

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | Avoid contact with incompatible materials. Keep from direct sunlight and extreme temperatures. |
| **Incompatible materials** | Oxidizing materials. Bases. Acid anhydrides. |
| **Hazardous decomposition products** | None known based on information supplied. |

## 11. Toxicological information

Information on likely routes of exposure

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

Symptoms related to the physical, chemical and toxicological characteristics

**Symptoms**                    No information available.

Acute toxicity

**Numerical measures of toxicity**
No information available


Delayed and immediate effects as well as chronic effects from short and long-term exposure

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |

**Color Changing Highlighters**                                    **Revision date**  31-Jan-2024

| | |
|---|---|
| **STOT - single exposure** | No information available. |
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

| | |
|---|---|
| **Ecotoxicity** | The environmental impact of this product has not been fully investigated. |
| **Persistence and degradability** | No information available. |
| **Bioaccumulation** | There is no data for this product. |
| **Other adverse effects** | No information available. |

## 13. Disposal considerations

**Disposal methods**

| | |
|---|---|
| **Waste from residues/unused products** | Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations. |
| **Contaminated packaging** | Do not reuse empty containers. |

## 14. Transport information

**DOT**                      Not regulated

## 15. Regulatory information

**International Inventories**

| | |
|---|---|
| **TSCA** | All of the components of this product are listed on the TSCA Inventory. |
| **DSL/NDSL** | Contact supplier for inventory compliance status. |

---

| | |
|---|---|
| **EINECS/ELINCS** | Contact supplier for inventory compliance status. |
| **ENCS** | Contact supplier for inventory compliance status. |
| **IECSC** | Contact supplier for inventory compliance status. |
| **KECL** | Contact supplier for inventory compliance status. |
| **PICCS** | Contact supplier for inventory compliance status. |
| **AIIC** | Contact supplier for inventory compliance status. |
| **NZIoC** | Contact supplier for inventory compliance status. |

**Legend:**
 **TSCA** - United States Toxic Substances Control Act Section 8(b) Inventory
 **DSL/NDSL** - Canadian Domestic Substances List/Non-Domestic Substances List
 **EINECS/ELINCS** - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
 **ENCS** - Japan Existing and New Chemical Substances
 **IECSC** - China Inventory of Existing Chemical Substances
 **KECL** - Korean Existing and Evaluated Chemical Substances
 **PICCS** - Philippines Inventory of Chemicals and Chemical Substances
 **AIIC** - Australian Inventory of Industrial Chemicals
 **NZIoC** - New Zealand Inventory of Chemicals

## US Federal Regulations

### SARA 313
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA). This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

### SARA 311/312 Hazard Categories
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370, refer to Section 2 of this SDS for appropriate classifications.

### CWA (Clean Water Act)
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

### CERCLA
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355). There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

## US State Regulations

### California Proposition 65
This product does not require warnings under California Proposition 65.

## U.S. EPA Label Information

**EPA Pesticide Registration Number** Not applicable

## 16. Other information

| | | | | |
|---|---|---|---|---|
| **NFPA** | Health hazards 0 | Flammability 0 | Instability 0 | Special hazards - |
| **HMIS** | Health hazards 0 | Flammability 0 | Physical hazards 0 | Personal protection X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**
Legend Section 8: Exposure controls/personal protection

**Color Changing Highlighters**                                    **Revision date**  31-Jan-2024

| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
|---|---|---|---|
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

**Revision date**              31-Jan-2024
**Revision Note**              No information available.
**Disclaimer**
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
**End of Safety Data Sheet**

# EXHIBIT 6

US 20240254355A1

(19) **United States**
(12) **Patent Application Publication**    (10) Pub. No.: US 2024/0254355 A1
    Allison    (43) Pub. Date:    **Aug. 1, 2024**

(54) **COLOR-CHANGE MARKING SYSTEM**

(71) Applicant: **Crayola LLC**, Easton, PA (US)

(72) Inventor: **Keith John Allison**, Blandon, PA (US)

(73) Assignee: **Crayola LLC**, Easton, PA (US)

(21) Appl. No.: **18/101,880**

(22) Filed: **Jan. 26, 2023**

**Publication Classification**

(51) **Int. Cl.**
   *C09D 11/50*    (2006.01)
   *C09D 11/54*    (2006.01)

(52) **U.S. Cl.**
   CPC .............. *C09D 11/50* (2013.01); *C09D 11/54* (2013.01)

(57) **ABSTRACT**

The marking system includes one or more ink compositions and a color-change agent composition. The ink composition applied to a substrate such that it is a first color, but when a color-change agent is applied, one or more secondary colors appear. The ink compositions each have a respective ink color and include a respective: at least one first dye composition having a respective first color and at least one second dye composition having a respective second color. The first dye composition can react with the color-change agent composition. When the color-change agent composition contacts the ink composition, each respective first dye composition reacts with the color-change agent composition, 10 thereby producing each respective second color. Each respective first color is different from each respective second color, and each respective second color is different from each respective ink color.

US 2024/0254355 A1

1

## COLOR-CHANGE MARKING SYSTEM

### FIELD OF THE INVENTION

[0001]  The present invention relates to coated substrates, and more particularly to a system where a coating on a substrate can be reacted to change from a first color to a second color by applying a color-change agent fluid to the coating.

### BACKGROUND

[0002]  Many craft or art systems are available that are directed to children. One such system is described in U.S. Pat. No. 7,521,112. The following of the '112 patent relies on a thick black opaque coating layer to be applied over printed colored designs on special paper. The black coating is readily removed with water and can undesirably stain users' hands if they are moist. The black coating of the '112 patent is also difficult to produce and also requires a great deal of dye in order to provide opacity.

[0003]  In addition to minimizing these issues and shortcomings, it is important to maintain a pH of any of the components in such marking systems such that the pH is not dangerously high or low, so as not to irritate a user's skin. Therefore a need remains for a color-change system that is not messy to make and use and also provides improved performance and longevity and is not limited to a special paper and that has a pH within a safe range.

### SUMMARY

[0004]  The inventor has discovered a new method that mitigates the aforementioned problems. The present marking system eliminates the need for the messy black topcoat and allows for the use of any type of paper. The present system is a marker-paper image reveal system using printing inks made with different dye combinations to produce several versions of a single, secondary color. Upon marking with the color-change agent marker ink, the different print inks react (change color), from that single starting color to a primary color to reveal a multi-colored, primary pattern in the print ink coating. Accordingly, the ink formulations change color upon contact with the color-change agent composition. According to an embodiment, three black printing ink formulations that each turn a different color upon reaction with a color-change agent marker ink: black-to-cyan, black-to-magenta and black-to-yellow are provided. These three ink formulations are spot-printed on paper in either a repeated pattern or a random pattern or to form an image that is revealed when colored on with the colorless, color-change agent ink. In addition, the pH of the color-change agent composition may be less than 14. Thus, a substrate that is coated with a uniform black (or other color) coating is written on or marked with the colorless color-change agent ink will change to one or more colors other than black.

[0005]  A marking system comprising a) a color-change agent composition and b) one or more ink compositions is provided. The one or more ink compositions each have a respective ink color. These respective ink colors may be the same or different from each other. Preferably, the respective ink colors are initially the same. According to an embodiment, the respective ink colors are all black. Each of the one or more ink compositions comprises a respective i) at least one first dye composition characterized by a respective first

color; and ii) at least one second dye composition characterized by a respective second color. When the a) color-change agent composition contacts the b) one or more ink compositions, each respective i) at least one first dye composition reacts with the a) color-change agent composition, thereby producing each respective second color. Each respective first color is different from each respective second color, and each respective second color is different from each respective ink color. Each respective i) first dye composition is configured to react with the a) color-change agent composition and each respective ii) second dye composition is configured to not react with the a) color-change agent composition.

[0006]  Also provided is a method of marking a substrate with the marking system. The method comprises the following steps.

[0007]  A) Providing the substrate comprising an ink layer formed from the b) one or more ink compositions and having a respective ink color; and

[0008]  B) applying the a) color-change agent composition to at least a portion of the ink layer to react with each respective i) first dye composition to produce the respective second color, different from each respective ink color.

### DETAILED DESCRIPTION

[0009]  The present invention uses color-changing ink compositions as process ink by creating all black inks (or another initial color) that include a mixture of cyan (blue), magenta (red) and yellow dyes. According to an embodiment, each black ink is initially black (or another color) before contacting the color-change agent composition. Importantly, each black ink is a different mixtures of dyes; some of the dyes in the ink composition mixture react with the color-change agent composition to either become colorless or to intensify in color. Others of the dyes in the ink composition do not react with the color-change agent composition. So, for example, the "cyan color change ink" is a mixture of cyan (blue), magenta (red) and yellow dyes that appears black. In this example, the magenta (red) and yellow dyes react with the color-change agent and lose their color, while the cyan (blue) dye does not react with the color-change agent. When the color-change agent composition contacts the initially black ink composition, the red/magenta and yellow used to make it black are rendered colorless, thus leaving the blue/cyan behind. When the eradicating marker is used on the spot where that process ink is printed, the black transforms into cyan/blue. This same principle, with different dyes, is used to prepare ink compositions that all are initially black (for example), but when contacted with the color-change agent, turn red or yellow. When all of these different black inks are spot-printed on a substrate, e.g., paper, the paper appears uniformly black. When the color-change agent composition is applied to the black ink, different colors are revealed depending on the particular dye composition used for each black ink composition.

[0010]  The marking system therefore is a color change system using printing ink compositions made with different dye combinations to produce several versions of a single, secondary color. Upon marking with the color-change agent composition (applied with, for example, a marker containing the color-change agent composition, or applied with a brush, or other method), the different print ink compositions react

2

(change color), from that single starting color to a primary color to produce a multi-colored, primary pattern in the print ink coating

[0011] Thus, a marking system comprising a) a color-change agent composition and b) one or more ink compositions is provided. The one or more ink compositions each have a respective ink color. These respective ink colors may be the same or different from each other. Preferably, the respective ink colors are the same. According to an embodiment, respective ink colors are all black. Each of the one or more ink compositions comprises a respective i) at least one first dye composition characterized by a respective first color; and ii) at least one second dye composition characterized by a respective second color. When the a) color-change agent composition contacts the b) one or more ink compositions, each respective i) at least one first dye composition reacts with the a) color-change agent composition, thereby producing each respective second color. Each respective first color is different from each respective second color, and each respective second color is different from each respective ink color. Each respective i) first dye composition is configured to react with the a) color-change agent composition and each respective ii) second dye composition is configured to not react with the a) color-change agent composition.

a) Color-Change Agent Composition:

[0012] According to an embodiment, the a) color-change agent composition comprises iii) at least one solvent. Non-limiting examples of suitable solvents are water, C1-C5 alcohols, or combinations thereof. According to an embodiment, the a) color-change agent composition is aqueous, i.e., the solvent iii) comprises water. The a) color-change agent composition may comprise from 40 wt % to 95 wt % solvent, based on the total weight of the a) color-change agent composition. The a) color-change agent composition may comprise at least 40, 45, 50, 55, 60, 65, 70, 75, 80, 85 or at least 90 wt % solvent, based on the total weight of the a) color-change agent composition. The color-change agent composition may comprise at most 98, 95, 90, 85, 80, 75, 70, 65, 60, 55, 50 or at most 45 wt % solvent, based on the total weight of the a) color-change agent composition.

[0013] According to another embodiment, the a) color-change agent composition is disposed in an applicator. The applicator may be in the form of a pen, or a marker, or a crayon, for example. The color-change agent may be applied by a brush or a finger, according to other embodiments.

[0014] According to an embodiment, the a) color-change agent composition comprises iv) at least one agent reactive with the i) at least one first dye composition. These agents reactive with the i) at least one first dye composition may be water soluble reducing salts. Non-limiting examples of suitable agents are sodium sulfite, potassium sulfite, sodium bisulfite, potassium bisulfite, sodium metabisulfite, potassium metabisulfite, sodium dithionite, potassium dithionite, sodium hydrosulfite, potassium hydrosulfite, sodium formaldehyde sulfoxylate or zinc formaldehyde sulfoxylate, or combinations thereof. According to an embodiment, suitable reactive agents include sodium sulfite, potassium sulfite, or combinations thereof. The a) color-change agent composition may comprise from 1 wt % to 25 wt % of the reactive agent, based on the total weight of the a) color-change agent composition. The a) color-change agent composition may comprise at least 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 18,

20, or at most 22 wt % of the reactive agent, based on the total weight of the a) color-change agent composition. From a practical standpoint, the limitation of the amount of the reactive agent is limited by its solubility in the solvent, which is preferably water.

[0015] According to another embodiment, the a) color-change agent composition further comprises: v) at least one pH adjuster. Non-limiting examples of suitable pH adjusters are acids, bases, and combinations thereof. Particular examples are sodium hydroxide, potassium hydroxide, calcium hydroxide, lithium hydroxide, citric acid, acetic acid, lactic acid, formic acid, oxalic acid, uric acid, malic acid, tartaric acid, alkyl amines (e.g., C1-C3 amines), pyridine, imidazole, benzimidazole, histidine, guanidine, hydroxides of quaternary ammonium cations, or combinations thereof. According to an embodiment the pH adjuster comprises sodium hydroxide, citric acid, or a combination thereof. Suitable amounts of the pH adjusters are added to adjust the pH of the color-change agent composition to be from 8-14. The pH of the a) color-change agent composition may be at least 8. For example the pH of the a) color-change agent composition may be at least 8, 9, 10, 11, 12, or at least 13. The pH of the color-change agent composition may be at most 10-14. For example, the pH of the color-change agent composition may be at most 14, 13, 12, 11, or at most 10.

[0016] According to an embodiment, the a) color-change agent composition further comprises vi) at least one buffer. Non-limiting examples of suitable buffers include sodium carbonate, potassium carbonate, sodium bicarbonate, potassium bicarbonate, or combinations thereof. According to an embodiment, the vi) at least one buffer comprises sodium carbonate. Suitable amounts of the buffer(s) are added to adjust the pH of the color-change agent composition to be from 8-14, or from 9-14, or from 10-13, or from 10-12. The pH of the a) color-change agent composition may be at least 8, 9, 10, 11, 12, or at least 13. The pH of the color-change agent composition may be at most 14, 13, 12, 11, or at most 10.

[0017] According to an embodiment, a pH of the a) color-change agent composition may be 9 or higher. According to an embodiment, the pH of the a) color-change agent composition may be 10 or more.

[0018] According to an embodiment, the a) color-change agent composition further comprises: vii) at least one wetting agent. Nonlimiting examples of suitable wetting agents include 2,5,8,11-tetramethyl-6-dodecyn-5,8-diol ethoxylate, Dynol™ 604 (Evonik). As is known in the art, the purpose of the wetting agent is to lower interfacial tension of a liquid. The type of wetting agent is not particularly limited. The amount of wetting agent in the a) color-change agent composition may be from 0.2-1.5 wt %, based on the total weight of the a) color-change agent composition. The a) color-change agent composition may comprise at least 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1.0, 1.1, 1.2, 1.3, or at least 1.4 wt % of wetting agent, based on the total weight of the a) color-change agent composition. The a) color-change agent composition may comprise at most 1.5, 1.4, 1.3, 1.2, 1.1, 1.0, 0.9, 0.8, 0.7, 0.6, 0.5, 0.4, or at most 0.3 wt % of wetting agent, based on the total weight of the a) color-change agent composition.

[0019] According to another embodiment, the a) color-change agent composition further comprises viii) at least one surfactant. The surfactant may comprise an aromatic sulfonate anionic surfactant. Non-limiting examples of suit-

able surfactants are Triton™ X-100 surfactant (Dow), Dowfax™ anionic surfactant (Dow), or combinations thereof. The type of surfactant is not particularly limited. The amount of surfactant in the a) color-change agent composition may be from 0.2-1.5 wt %, based on the total weight of the a) color-change agent composition. The a) color-change agent composition may comprise at least 0.2, 0.3, 0.4, 0.5, 0.6, 0.7, 0.8, 0.9, 1.0, 1.1, 1.2, 1.3, or at least 1.4 wt % of surfactant, based on the total weight of the a) color-change agent composition. The a) color-change agent composition may comprise at most 1.5, 1.4, 1.3, 1.2, 1.1, 1.0, 0.9, 0.8, 0.7, 0.6, 0.5, 0.4, or at most 0.3 wt % of surfactant, based on the total weight of the a) color-change agent composition.

[0020] According to some embodiments, the wetting agent and the surfactant may be the same. According to other embodiments, the wetting agent and the surfactant are different.

[0021] According to an embodiment, the a) color-change agent composition further comprises ix) at least one humectant. The humectant serves to prevent the color-change agent composition from drying out too quickly when in use. The humectant also acts as a freeze-thaw stabilizer, to broaden the storage temperature range of the color-change agent composition. Non-limiting examples of suitable humectants are glycerin, ethylene glycol, diethylene glycol, triethylene glycol, propylene glycol, or combinations thereof. The color-change agent composition may comprise from 1-10 wt % of the humectant, based on the total weight of the a) color-change agent composition. The a) color-change agent composition may comprise at least 1, 2, 3, 4, 5, 6, 7, 8, or at least 9 wt % of the humectant, based on the total weight of the a) color-change agent composition. The a) color-change agent composition may comprise at most 10, 9, 8, 7, 6, 5, 4, 3, or at most 2 wt % of the humectant, based on the total weight of the a) color-change agent composition.

b) One or More Ink Compositions

[0022] According to an embodiment of the marking system, the b) one or more ink compositions are disposed on a substrate. Non-limiting examples of suitable substrates are paper, wood, other cellulosic substrates (e.g. cardboard and the like), fabric, glass, plastic, metal, ceramic, cement, etc. Paper or cardboard are preferred.

[0023] According to an embodiment, the marking system comprises two or more ink compositions b), such that each respective ink color of the two or more ink compositions b) is the same, and at least one of more of the respective second colors is different from the other of the respective second colors.

[0024] According to another embodiment of the marking system, the b) one or more ink compositions each comprise from 60% to 95% of the respective i) first dye composition and from 5% to 40% of the respective ii) second dye composition, based on the total weight of the respective i) first dye composition and the respective ii) second dye composition. It is not necessary that each of the respective one or more ink compositions contain the same relative amounts of each respective i) first and ii) second dye compositions.

[0025] According to an embodiment, the b) one or more ink compositions may further comprise at least one binder. Non-limiting examples of suitable binders are emulsified polymers, such as acrylics and copolymers thereof. The b) one or more ink compositions may each comprise up to 50 wt % of the at least one binder, based on the total weight of each b) ink composition, exclusive of any solvent or carrier.

[0026] According to an embodiment the b) one or more ink compositions further comprise at least one thickener. The thickener, if present, is preferably compatible with any binder, if present. Non-limiting examples of suitable thickeners are hydroxyethyl cellulose, associative thickeners such as nonionic polyurethane associative thickeners, anionic associative thickeners and the like, or combinations thereof. The b) one or more ink compositions may each comprise from 1-15, 2-9 wt %, or from 5-10 wt % of the thickener, based on the total weight of each b) ink composition, exclusive of any solvent or carrier.

i) Dye Composition that Reacts with the Color-Change Agent Composition:

[0027] According to an embodiment, the i) at least one first dye composition comprises pyranine 120, acid green 3, acid violet 19, basic blue 93, basic yellow 49, or a combination thereof.

[0028] According to an embodiment, the i) at least one first dye composition comprises a dye that intensifies in color when contacted with the a) color-change agent composition.

[0029] Nonlimiting examples of suitable i) dyes that react with the a) color-change agent composition include triarylmethane dyes, triphenylmethane dyes, cyanine dyes, methine dyes, basic blue 1, basic blue 5, basic violet, basic violet 3, acid violet 17, acid violet 9, acid violet 49, acid green 3, acid green 9, basic red 14, basic red 15, basic red 16, basic orange 21, acid violet 19, acid blue 93, basic yellow 49, basic red 14, basic blue 69, basic green 4, pyranine 120, or combinations therefore.

ii) Dye Composition that does not React with the Color-Change Agent Composition:

[0030] According to an embodiment, the ii) at least one second dye composition comprises acid yellow 23, acid red 18, acid red 87, patent/food blue 5/AB3, or a combination thereof.

[0031] Non-limiting examples of dyes that do not react with the color-change agent composition include patent/food blue 5/AB3, acid blue 9, acid red 1, acid red 18, acid red 87, acid yellow 23, acid yellow 36, FD&C Yellow 6, or combinations thereof.

Other Additives:

[0032] Other additives may also be included in the a) color-change agent composition and/or the b) one or more ink compositions. These include, but are not limited to stabilizers, preservatives, defoamers, or combinations thereof.

[0033] Non-limiting examples of suitable preservatives are Mergal® (Troy), or Reputain® (Lonza).

Methods:

[0034] Also provided is a method of marking a substrate with the marking system. The method comprises the following steps.

   [0035] A) Providing the substrate comprising an ink layer formed from the b) one or more ink compositions and having a respective ink color; and

   [0036] B) applying the a) color-change agent composition to at least a portion of the ink layer to react with

US 2024/0254355 A1

Aug. 1, 2024

4

each respective i) first dye composition to produce the respective second color, different from each respective ink color.

[0037] According to some embodiments, the ink layer may be applied to the substrate using printing methods as are known and used in the art. Non-limiting examples are inkjet printing, color laser printing, screen printing, offset lithography, digital printing, or flexography.

[0038] Certain aspects of the invention may be summarized as follows. (Claims as multiple dependent Aspects when completely finalized.)

### Examples

[0039] The following color-change agent composition and three initially black ink compositions were prepared. In use, the ink compositions 1, 2, and 3 were printed on a paper substrate in a pattern and allowed to dry to form an ink coating. The paper therefore appeared to be uniformly black, prior to application of the color-change agent composition. When the color-change agent composition was applied to the black ink coating, a pattern of red, yellow and blue was revealed.

[0040] In other experiments, the three ink compositions are blended to form other secondary colors such as orange, green and purple when the ink coating is contacted with the color-change agent composition.

| Color-change agent composition (colorless) | |
|---|---|
| Ingredient | wt % |
| Deionized Water | 69.8 |
| Sodium Hydroxide, 25 wt % | 1.8 |
| Sodium Sulfite | 10 |
| Glycerin | 4 |
| Sodium Carbonate | 6 |
| Surfactant Solution (30 wt %) | 3 |
| Citric Acid | 0.4 |
| Stabilizer | 5 |

| Ink compositions | | | | |
|---|---|---|---|---|
| | Ink composition | 1 | 2 | 3 |
| | First color | Black | Black | Black |
| | Second color (after contacting color-change agent composition) | Red | Blue | Yellow |
| | Ingredient | wt % | wt % | wt % |
| | Water | 66.70 | 68.20 | 68.58 |
| First dye composition i) (reacts with color-change agent composition) | Acid Green 3 * | 6.70 | 6.70 | 6.00 |
| | Acid Violet 19 * | 0.50 | 1.76 | 1.76 |
| | Basic Blue 93 * | 1.00 | — | — |
| | Basic Yellow 49 * | 1.00 | 0.38 | — |
| | Pyranine 120 (yellow)** | — | — | 1.50 |
| Second dye composition ii) (does not react with color-change agent composition) | Acid Yellow 23 | — | — | 1.00 |
| | Acid Red 18 | 1.50 | — | — |
| | Acid Red 87 | 1.50 | — | — |
| | Patent/Food Blue 5/AB3 | — | 1.50 | — |
| | preservative | 1.16 | 1.16 | 1.16 |
| thickener | Cellosize ™ (5% in water) | 20.00 | 20.00 | 20.00 |

\* reacts with color-change agent composition and becomes colorless
\*\*reacts with color-change agent composition and intensifies in color

### What is claimed is:

1. A marking system comprising:
   a) a color-change agent composition; and
   b) one or more ink compositions each having a respective ink color, each respective ink composition comprising a respective:
   i) at least one first dye composition characterized by a respective first color, the at least one first dye composition configured to react with the color-change agent composition; and
   ii) at least one second dye composition configured to not react with the color-change agent composition characterized by a respective second color;
   such that when the a) color-change agent composition contacts the b) one or more ink compositions, each respective i) at least one first dye composition reacts with the a) color-change agent composition, thereby producing each respective second color, wherein each respective first color is different from each respective second color, and wherein each respective second color is different from each respective ink color.

2. The marking system of claim 1, wherein the b) one or more ink compositions are disposed on a substrate.

3. The marking system of claim 1, wherein the a) color-change agent composition is aqueous.

4. The marking system of claim 1, wherein the a) color-change agent composition is disposed in an applicator.

5. The marking system of claim 1, comprising two or more ink compositions b), wherein each respective ink color of the two or more ink compositions b) is the same, and wherein at least one of more of the respective second colors is different from the other of the respective second colors.

6. The marking system of claim 1, wherein the b) one or more ink compositions each comprise from 60% to 95% of the respective i) first dye composition and from 5% to 40% of the respective ii) second dye composition, based on the total weight of the respective i) first dye composition and the respective ii) second dye composition.

7. The marking system of claim 1, wherein the b) one or more ink compositions further comprise at least one thickener.

8. The marking system of claim 1, wherein the b) one or more ink compositions further comprise at least one binder.

9. The marking system of claim 1, wherein the a) color-change agent composition comprises:
   iii) at least one solvent;
   iv) at least one reactive agent reactive with the i) at least one first dye composition.

10. The marking system of claim 9, wherein the a) color-change agent composition further comprises:
   v) at least one pH adjuster.

11. The marking system of claim 9, wherein the a) color-change agent composition further comprises:
   vi) at least one buffer.

12. The marking system of claim 9, wherein the a) color-change agent composition further comprises:
   vii) at least one wetting agent.

13. The marking system of claim 9, wherein the a) color-change agent composition further comprises:
   viii) at least one surfactant.

14. The marking system of claim 9, wherein the a) color-change agent composition further comprises:
   ix) at least one humectant.

**15**. The marking system of claim **9**, wherein a pH of the a) color-change agent composition is 8 or higher.

**16**. The marking system of claim **1**, wherein the i) at least one first dye composition comprises triarylmethane dyes, triphenylmethane dyes, cyanine dyes, methine dyes, basic blue 1, basic blue 5, basic violet, basic violet 3, acid violet 17, acid violet 9, acid violet 49, acid green 3, acid green 9, basic red 14, basic red 15, basic red 16, basic orange 21, basic yellow, acid violet 19, acid blue 93, acid green 3, basic yellow 49, basic red 14, basic blue 69, basic green 4, pyranine 120, or a combination thereof.

**17**. The marking system of claim **1**, wherein the ii) at least one second dye composition comprises patent/food blue 5/AB3, acid blue 9, acid red 1, acid red 18, acid red 87, acid yellow 23, acid yellow 36, and FD&C Yellow 6, or a combination thereof.

**18**. The marking system of claim **1**, wherein the i) at least one first dye composition comprises a dye that intensifies in color when contacted with the a) color-change agent composition.

**19**. A method of marking a substrate with the marking system of claim **1** comprising:

  A) providing the substrate comprising an ink layer formed from the b) one or more ink compositions and having a respective ink color; and

  B) applying the a) color-change agent composition to at least a portion of the ink layer to react with each respective i) first dye composition to produce the respective second color, different from each respective ink color.

\* \* \* \* \*

# EXHIBIT 7





**Crayola** A Smucker Company

©2020 Crayola, Easton, PA 18044-0431, Serpentine Design® Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England; Binney & Smith (Europe) Ltd., Via Figlino 13, 47122 Forlì (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd. U.S. Patent 9,321,927.



Conforms to ASTM D 4236.

All Crayola art materials are nontoxic.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
U.S.A. & Canada: 1-800-CRAYOLA (800-272-9652)
Australia: 1-800-657-363

M-F, 9 AM-5 PM LOCAL TIME:
UK: 01702 206170   Italy: +39 (0) 543 720997
Mexico: 01800 71 73 222   Benelux: +31 (0)104596 580
France: +33 (0) 1 41 06 54 54   Germany: +496103 459180

## crayola.com

Style#: 58-7852     Code#: 58-7852-0-202

### WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Ultra-Clean Washable Markers wash from skin, most washable clothing and most painted walls. Wash promptly in cold or hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required. **STAIN ADVISEMENT:** Keep away from wallpaper, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.

# PROOF OF PURCHASE

Please insert UPC
code number
0-71662-07852-2





# 100% RENEWABLE ENERGY

## Crayola cares about the environment and responsibly makes the products you love.



We invest in 100% renewable energy from Solar Power for US manufacturing. Enough to make over 3 Billion crayons and 700 Million markers a year!





**Washes from skin, clothing & walls!**

 Orange

 Yellow

 Brown

Violet (Purple)

 Red

 Blue

 Black

Pink

Gray

Green

 **Our Brightest, Truest Colors Yet!**



MADE IN U.S.A

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M.F.G AM-5 PM ET/AEST
**U.S.A & Canada:** 1-800-CRAYOLA (800-272-9652)
**Australia:** 1 800 657 262

M-F 9 AM-5 PM LOCAL TIME
**UK:** 01702 204142 **Italy:** +39-02-545 721992
**Mexico:** 01500 717 8122 **Benelux:** +31-40-6359-592
**France:** +33-01-1 41 66 54 54 **Germany:** +49-102-849196


Binney & Smith (Europe) Ltd · Bedford Heights,
Manton Lane, Bedford, MK41 7PH, England

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Ultra-Clean Washable Markers wash from skin, most washable clothing and most painted walls. Wash promptly in cold or hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required. **STAIN ADVISEMENT:** Keep away from wallpaper, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.

## SAFETY INFORMATION

Conforms to ASTM D 4236.

**All Crayola art materials are nontoxic.**

**crayola.com**

Contents and colors may vary.

Style# 58-7851    Code# 58-7851-0 202

## PROOF OF PURCHASE

Please insert UPC code number
0-71662-07851-5

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
**U.S.A. & Canada:** 1-800-CRAYOLA (800-272-9652)
**Australia:** 1-800-657-353
M-F, 9 AM-5 PM LOCAL TIME:
**UK:** 01702 208170  **Italy:** +39 (0) 543 720997
**Mexico:** 01800 71 78 222  **Benelux:** +31 (0)104596 580
**France:** +33 (0) 1 41 06 54 54  **Germany:** +496103 459180

**Crayola** A Hallmark Company ©2020 Crayola, Easton, PA 18044-0431.
Serpentine Design® **Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England;** Binney & Smith (Europe) Ltd., Via Figline 13, 47122 Forlì (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd. U.S. Patent 9, 321,927

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Ultra-Clean Washable Markers wash from skin, most washable clothing and most painted walls. Wash promptly in cold or hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required. **STAIN ADVISEMENT:** Keep away from wallpaper, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.



Conforms to ASTM D 4236.

All Crayola art materials are nontoxic.

**crayola.com**
Contents and colors may vary.
Style#: 58-7851    Code#: 58-7851-0-202

## PROOF OF PURCHASE

Please insert UPC
code number
0-71662-07851-5







# Ultra-Clean Washable® Markers

## Wash from...



**Hands!**



**Clothing!**



**Walls!**

Crayola Washable Markers are now ULTRA WASHABLE! Washable from skin, clothing and NOW from painted walls! Washability you can trust from the world's most washable marker!



## Classic Crayola Markers in Our Brightest, Truest Colors Yet!

Crayola is dedicated to helping kids of all ages unleash the power of imagination in colorful ways. That's why we developed ColorMax- a variety of innovations to reinvigorate classic Crayola products with the highest quality colors available today.

**QUALITY GUARANTEE**
We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

U.S.A. & Canada
1-800-CRAYOLA (800-272-9652)
M-F 9 AM-4 PM ET

Australia: 1-800-657-353.
M-F 9 AM-4 PM AEST

France: +33 (0) 1 41 06 54 54.
Germany: +49 6152 71 24 229
UK: 01702 208170
Mexico: 01800 71 78 222
Italy: +39 (0) 549 720997
M-F 9 AM-5 PM local time

**Crayola** A Hallmark Company
©2017 Crayola, Easton PA 18044-0431  Serpentine Design© Distributed in Australia by Crayola (Australia) Pty. Ltd. Imported by Binney & Smith (Europe) Ltd. Bedford Heights, Manton Lane, Bedford, MK41 7PH  Eng and  Patent 5,968,241 and patent pending

**crayola.com**

**WASHING & CARE INFORMATION**
**FOR BEST RESULTS:** Crayola Ultra-Clean Washable Markers wash from skin, most washable clothing and most printed walls. Wash promptly in cold or first wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.
**STAIN ADVISEMENT:** Keep away from wallpaper, unfinished wood, vinyl, carpeting and other materials that cannot be laundered.



Contents to ASTM D 4236.
ALL CRAYOLA ART MATERIALS
ARE NONTOXIC.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.







MADE IN U.S.A.

Contents and colors may vary
Please retain packaging for future reference.

Style# 58-7868    Code# 58-7868-0-200

**PROOF OF PURCHASE**



0  71662 07868  3

**QUALITY GUARANTEE**

We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

**U.S.A. & Canada:**
1-800-CRAYOLA (800-272-9652),
M-F, 9 AM-4 PM ET.

Australia: 1-800-657-353,
M-F, 9 AM-4 PM AEST.

France: +33 (0) 1 41 06 54 54.
Germany: +49 6152 71 24 229.
UK: 01702 208170.
Mexico: 01800 71 78 222.
Italy: +39 (0) 543 720997,
M-F, 9 AM-5 PM local time.

**Crayola** A *Hallmark* Company

©2017 Crayola, Easton, PA 18044-0431. Serpentine Design®. Distributed in Australia by Crayola (Australia) Pty. Ltd. Imported by Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England. Patent 5,968,241 and patent pending.

# crayola.com

**WASHING & CARE INFORMATION**

**FOR BEST RESULTS:** Crayola Ultra-Clean Washable Markers wash from skin, most washable clothing and most painted walls. Wash promptly in cold or hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.
**STAIN ADVISEMENT:** Keep away from wallpaper, unfinished wood, vinyl, carpeting and other materials that cannot be laundered.



Conforms to ASTM D 4236. ALL CRAYOLA ART MATERIALS ARE NONTOXIC.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

  

Contents and colors may vary.
Please retain packaging for future reference.

Style#: 58-7868     Code#: 58-7868-0-200

**PROOF OF PURCHASE**



0   71662 07868   3



K0L20



Conforms to ASTM D 4236.
**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.



0-3

MADE IN VIETNAM

**QUALITY GUARANTEE**
We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
**U.S.A. & Canada (Call/Text):**
1-800-CRAYOLA (800-272-9652)
Text charges may apply.
**Australia:** 1-800-657-353

M-F, 9 AM-5 PM LOCAL TIME:
**UK:** 0800 389 6238
**Italy:** +39 (0) 543 720997
**Mexico:** 800 7178 222
**Benelux:** +31 (0)104596 580
**France:** +33 (0) 1 41 06 54 54
**Germany:** +496103 459180



Contents and colors may vary.
**crayola.com**
Style#: 58-8370    Code#: 58-8370-0-200

8+

**PROOF OF PURCHASE**

0-71662-08370-0

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.
**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.

**Crayola** A Hallmark Company
©2020 Crayola, Easton, PA 18044-0431.
**Binney & Smith (Europe) Ltd.,**
**Bedford Heights, Manton Lane,**
**Bedford, MK41 7PH, England;**
Binney & Smith (Europe) Ltd., Via Figline 13, 47122 Forlì (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd.10 Caribbean Drive Scoresby Victoria 3179.





Crayola

# BOLD & BRIGHT WASHABLE MARKERS

**Crayola Bold & Bright Markers are specially formulated for bold, vibrant colors on light or dark paper! No matter what you draw on, make all your creations pop!**

White    Yellow    Orange    Rose    Magenta

Green    Lime    Sky Blue    Blue    Purple

MADE IN U.S.A. WITH U.S. AND FOREIGN MATERIALS

**crayola.com**
Contents and colors may vary.
Style#: 58-7735    Code#: 58-7735-0-200

3+    UK CA

0-3

0  71662 17735  5

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
**U.S.A. & CANADA** (Call/Text): 1-800-CRAYOLA (800-272-9652)
Text charges may apply.    **AUSTRALIA:** 1-800-657-353
M-F, 9 AM-5 PM LOCAL TIME:
**MEXICO:** 800 7178 222    **BENELUX:** +31 (0)104596 580
**FRANCE:** +33 (0) 1 41 06 54 54    **GERMANY:** +496103 459180

**Crayola** A Hallmark Company
©2023 Crayola, Easton, PA 18044-0431.
Serpentine Design® **Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England;** Binney & Smith (Europe) Ltd., Via Figline 13, 47122 Forli (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd.10 Caribbean Drive Scoresby Victoria 3179.

MADE IN U.S.A. WITH U.S. AND FOREIGN MATERIALS

**crayola.com**
Contents and colors may vary.
Style#: 58-7735    Code#: 58-7735-0-200

**WASHING & CARE**

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required. Keep caps on markers when not in use. **STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.



3+

UK CA



0-3

SAFETY INFORMATION


Conforms to ASTM D 4236.

All Crayola art materials are certified AP.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.



0  71662 17735  5



**Crayola**

# Pip-Squeaks® Washable Markers

Sixteen Pip-Squeaks snuggled in a pack
Teensy Teal, Tiny Plum...Toy Poodle Black
Sixteen shades make the world less duller
Hip, hip hooray! Small size – Big color!

## 16 UNIQUE & BRIGHT COLORS!

- firefly red
- golden nugget
- little lemon
- leprechaun green
- teensy teal
- rain drop blue
- little boy blue
- tiny plum
- sweet violet
- raspberry squirt
- petite rose
- dinky pink
- copper penny
- mini brown
- kitten gray
- toy poodle black

3+

crayola.com

Contents and colors may vary.
Please retain packaging for future reference.    MADE IN CHINA

A **Hallmark** Company

©2015 Crayola, Easton, PA 18044-0431. Serpentine Design®
Distributed in Australia by Crayola (Australia) Pty. Ltd.
Imported by Binney & Smith (Europe) Ltd., Bedford Heights,
Marlton Lane, Bedford, MK41 7PH, England.

Contains to ASTM D 4236.
ALL CRAYOLA ART MATERIALS ARE NONTOXIC.
Markers meet performance standard ANSI Z356 5.
**WARNING!** Not suitable for children
under 36 months due to small parts which
may cause a choking hazard if swallowed.

**WASHING & CARE INFORMATION**
FOR BEST RESULTS: Crayola Washable Markers wash from skin
and most washable clothing. Wash promptly in hot wash cycle.
Do not use prewash or chlorine bleach. Repeat laundering may
be required.
STAIN ADVISEMENT: Keep away from wallpaper, painted walls,
limewash and unfinished wood, vinyl, carpeting and other materials
that cannot be laundered.

**QUALITY GUARANTEE**
We guarantee the quality of all Crayola products. If this
product does not perform properly, please contact us.
In the U.S.A. and Canada, call 1-800-CRAYOLA
(800-272-9652), weekdays 9 AM-4 PM ET.
In Europe, call +33 (0) 1 41 05 54 54, weekdays
9 AM-5 PM local time
In the UK, call 01702 208170, weekdays
9 AM-5 PM local time
In Mexico, call 01800 71 78 222, weekdays
9 AM-5 PM local time.
In Australia, call Crayola AU at 1-800-657-353,
weekdays 9 AM-4 PM AEST.

Style#: 58-8703    Code#: 58-8703-0-200

**PROOF OF PURCHASE**

0  71662 08703  6





Crayola Super Tips Pastel Markers let kids create on the lighter side, with 20 soft and serene colors. The conical tip allows for thin lines from the point and thicker lines when held at an angle. Perfect for springtime decorations, school projects and all-around coloring fun!

Macarons
Salmon
Beige
Melon
Peach
Apricot
Banana Mania
Spring Green
Palm Leaf
Granny Smith Apple

Sea Foam Green
Cool Mint
Turquoise Surf
Powder Blue
Cornflower
Cadet Blue
Periwinkle
Wisteria
Purple Mountains' Majesty
Wild Orchid

crayola.com   3+

0   71662 17516

**WASHING & CARE**

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required. **STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.





**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.



UK CA

US ONLY



Remove From Box

Check Locally

PAPER BOX    PLASTIC TRAY

*Not recycled in all communities*

how2recycle.info

**MADE IN CHINA**

Crayola A Hallmark Company
©2023 Crayola, Easton, PA 18044-0431.
Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England; Binney & Smith (Europe) Ltd., Via Figline 13, 47122 Forlì (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd.10 Caribbean Drive Scoresby Victoria 3179.

**QUALITY GUARANTEE**
We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
**U.S.A. & CANADA** (Call/Text):
1-800-CRAYOLA (800-272-9652)
Text charges may apply.
**AUSTRALIA:** 1-800-657-353

M-F, 9 AM-5 PM LOCAL TIME:
**UK:** 0800 389 6238
**ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7178 222
**BENELUX:** +31 (0)104596 580
**FRANCE:** +33 (0) 1 41 06 54 54
**GERMANY:** +496103 459180

**crayola.com**  **3+**

Contents and colors may vary.

Style#: 58-7516   Code#: 58-7516-0-200



0  71662 17516  0





**Washability You Can Trust!!**

DRAW THIN
DRAW THICK

D5R3O

Crayola Super Tips Markers come in a variety of 10 different colors. The durable conical tip allows for thin lines from the point and thicker lines when held at an angle. Super Tips are great for school projects, doodling and all-around coloring fun!

 Red           Blue

 Orange        Violet

Yellow       Carnation

 Grass Green   Brown

 Green         Black

**3+**

 

Contents bark colors may vary
Please retain packaging for future reference

MADE IN MALAYSIA    **crayola.com**

**QUALITY GUARANTEE**
We guarantee the quality of Crayola products. If any are found defective in performance or workmanship.

In the U.S.A. and Canada, call
**1-800-CRAYOLA (800-272-9652)**
weekdays 9 AM-4 PM E

In Europe call +33 (0) 1 41 06 54 54,
weekdays 9 AM-5 PM local time

In the UK call **01702 208170**
weekday, 9 AM-5 PM local time

In Mexico call **01800 71 78 222**
weekdays 9 AM-5 PM local time

In Australia call Crayola Australia
**1-800-657-353** weekday,
9 AM-4 PM AEST

**WASHING & CARE INFORMATION**
FOR BEST RESULTS: Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.

STAIN ADVISEMENT: Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.


Conforms to
ASTM D 4236
ALL CRAYOLA
ART MATERIALS
ARE NONTOXIC

WARNING! Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

 
A Hallmark Company

© 2015 Crayola, Easton, PA 18044-0431
Distributed in Australia by Crayola.
1A, 1 Dixon Rd, Tec, Imported by Smee, &
Sr 1, 1 Gunnery Ltd., Bedford House,
Manners Lane, Bedford West 7PH, England.

Style# 58-6510   Series 58-8610-0-220

**PROOF OF PURCHASE**


0  71662 08610  7

**3+**



0-3

CE

Contents and colors may vary.
Please retain packaging for future reference.

MADE IN MALAYSIA

**crayola.com**

## QUALITY GUARANTEE

We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

In the U.S.A. and Canada, call 1-800-CRAYOLA (800-272-9652), weekdays 9 AM-4 PM ET.

In Europe, call +33 (0) 1 41 06 54 54, weekdays 9 AM-5 PM local time.

In the UK, call 01702 208170, weekdays 9 AM-5 PM local time.

In Mexico, call 01800 71 78 222, weekdays 9 AM-5 PM local time.

In Australia, call Crayola AU at 1-800-657-353, weekdays 9 AM-4 PM AEST.

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.

## SAFETY INFORMATION



Conforms to ASTM D 4236.

ALL CRAYOLA ART MATERIALS ARE NONTOXIC.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.



A Hallmark Company

©2015 Crayola, Easton, PA 18044-0431. Distributed in Australia by Crayola (Australia) Pty. Ltd. Imported by Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England.

Style#: 58-8610  Code#: 58-8610-0-200

## PROOF OF PURCHASE



0  71662 08610  7





Washability You Can Trust!

# Super Tips
## Washable Markers
DRAW THIN — DRAW THICK





**100 Colors!**



s'more

mint chocolate chip

caramel macchiato

key lime pie

red velvet cake

raspberry macaron

orange dreamsicle

bananas foster

berry smoothie

pb&j sandwich

fluffernutter

coconut cluster

strawberry shortcake

chocolate covered strawberry

orange gingerbread cookie

lemon bar

blueberry cheesecake

plum pudding

root beer float

upside-down cake



**+20 Silly Scents Smashups**



L3L17    cheesecake    pudding    float

3+

Contents and colors may vary.

MADE IN VIETNAM    **crayola.com**

Style#: 58-5121    Code#: 58-5121-0-200

**Crayola** A Hallmark company
©2023 Crayola, Easton, PA 18044-0431. Serpentine Design®
Binney & Smith (Europe) Ltd., Bedford Heights, Manton
Lane, Bedford, MK41 7PH, England. Binney & Smith (Europe)
Ltd., Via Figino 13, 47122 Forli (FC), Italy. Distributed in Australia by
Crayola (Australia) Pty Ltd. 10 Caribbean Drive Scoresby Victoria 3179.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola
products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST.
**U.S.A. & CANADA (Call/Text):** 1-800-CRAYOLA (800-272-9652)
Text charges may apply.    **AUSTRALIA:** 1-800-557-353
M-F, 9 AM-5 PM LOCAL TIME.
**UK:** 0800 389 5238    **ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7176 222    **BENELUX:** +31 (0)104596 580
**FRANCE:** +33 (0) 1 41 06 54 54    **GERMANY:** +496103 459180

**FOR BEST RESULTS:** Crayola
Washable Markers wash from skin and
most washable clothing. Wash promptly
in hot wash cycle. Do not use prewash
or chlorine bleach. Repeat laundering
may be required.
**STAIN ADVISEMENT:** Keep Crayola
Washable Markers away from wallpaper,
painted walls, finished and unfinished
wood, vinyl, carpeting and other
___ be laundered.

ACMI
**AP**
Conforms to
ASTM D 4236.

All Crayola
art materials
are nontoxic.

0    71662 25121    5





**Crayola**

**NEON WASHABLE MARKERS**

Create shockingly bright works
of art with 10 different
Neon Marker colors!
Some even glow under black light!*
Perfect for adding that extra
"WOW" factor to your coloring.

**NEW COLOR VARIETY!**

**3 BRIGHT NEON COLORS!**

Cerise

Sky Blue

Cerulean

**7 COLORS GLOW IN BLACK LIGHT!**

Atomic Tangerine

Purple Pizzazz

Screamin' Green

Shocking Pink

Electric Lime

Laser Lemon

Neon Carrot

crayola.com

0 71662 07847 8

crayola.com

Style# 58-7847 Code# 58-7847-0-200

0 71662 07847 8

MADE IN U.S.A. WITH U.S. AND FOREIGN MATERIALS



how2recycle.info

PAPER BOX

US ONLY

## WASHING & CARE

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required. **STAIN ADVISEMENT:** Keep away from unfinished wood, vinyl, carpeting and wallpaper, painted walls, finished and other materials that cannot be laundered.

Contents and colors may vary. Retain packaging for future reference.

All Crayola art materials are nontoxic and certified AP.



Conforms to ASTM D 4236

Crayola, A *Hallmark* Company

©2024 Crayola, Easton, PA 18044-0431. Serpentine Designs®

**Binney & Smith (Europe) Ltd, Bedford Heights, Manton Lane, Bedford, MK41 7PH, England.** Binney & Smith (Europe) Ltd., via Figino 13, 47122 Forlì (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd, 10 Caribbean Drive Scoresby Victoria 3179.

**QUALITY GUARANTEE:**
We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.
**U.S.A. & CANADA** (Call/Text): 1-800-CRAYOLA (800-272-9652)
Text charges may apply.
**AUSTRALIA:** 1-800-657-353
M-F: 9 AM-5 PM LOCAL TIME:
**UK:** 0800 389 6236 **ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7778 222
**BENELUX:** +31 (0)38 444 3093
**FRANCE:** +33 (0) 1 41 06 54 54
**GERMANY:** +498103 459180





Case • 58 Crayons • 15 Short Colored Pencils • 14 Super Tips Markers • Technique Guide
14 Pip-Squeaks Skinnies Markers • 15 Paper Sheets, 9.8 in x 13.3 in (25 cm x 34 cm)
TIPS & TRICKS
115 Pieces!
+ 3 Texture Plates
Imagination Art Set
Crayola
4+

115 Pieces!
+ Texture Plates
crayola.com
Imagination Art Set
Crayola

# EXHIBIT 8

# SAFETY DATA SHEET



SDS ID:  CRAY-041
CRAYOLA® WASHABLE MARKERS

## 1. Identification

**Product identifier**

**Material Name:**                    CRAYOLA® WASHABLE MARKERS

**Other means of identification**

**Product Code(s)**                   CRAY-041

**Synonyms**                          CRAYOLA® WASHABLE MARKERS; CRAYOLA ULTRA-CLEAN BROAD LINE AND FINELINE MARKERS; CRAYOLA WASHABLE MARKERS BROAD LINE AND FINE LINE; SIGNATURE NEON LIGHT EFFECTS MARKERS; AIRBRUSH MARKERS AND REFILLS; COLORCLICKS; SUPERTIPS; WINDOW F/X MARKERS; COLOR F/X MARKERS; TRICOLOR MIARKERS; RAINBOW CONNECTOR MARKERS; MEGA POSTER MARKERS; DOODLING MARKERS; PIPSQUEAK BROADLINE AND SKINNIES MARKERS; COLORING-BOOK MARKERS; BEGINNINGS MARKERS; FLIP TOP MARKERS; HEADS 'N TAILS MARKERS COLOR TWISTER; TADOODLES; GEL FX; HASSLE FREE 3-IN-1 PAINT; MINI STAMPERS; YOUNG MOM; NO-DRIP PAINT BRUSH PENS; PIP-SQUEAK SKINNIES MARKERS; RECOLORITZ; MY FIRST CRAYOLA; POWERLINES; ART KITS; ART SUPPLIES; ART TUB; ART BUDDY BACKPACK; CLASSPACKS; CREATIVITY TUB; FOR THE CURE; STORY STUDIO; INSPIRATION ART CASE; MARKER MAKER; MARKER MAKER REFILL; PIP-SQUEAKS WASHABLE MARKER KIT PREMIER ART KIT; PROJECTOR LIGHT DESIGNER; SKETCHER PROJECTOR; TELESCOPING TOWER; TUB OF FUN; TRAYOLA; SUPER-TIPS WAHABLE MARKERS KIT ULTIMATE ART SUPPLIES & EASEL; WASHABLE STAMP PAD; WINDOW MARKER & STENCIL KIT; LIGHT DESIGNER; COLOR N ERASE; EMOJI MAKER; COLOR CHEMISTRY; TAKE NOTE WASHABLE GEL MARKERS/PENS; WET ERASE; IMAGINATION ART SET; SKETCH AND COLOR ART CASE; COLORS OF THE WORLD MARKERS; SUPER CLICK RETRACTABLE MARKERS; SCRIBBLE SCRUBBIE MARKERS; SPIN AND SPIRAL ART SET; MARKER AIRBRUSH; MINI MARKER SPRAYER; MARKER MIXER; SCRIBBLE SCRUBBIE DINOSAUR ISLAND; PRODUCT CODE(S): 03-9006; 03-9100; 03-9101;04-0029; 04-0030; 04-0035; 04-0040; 04-0050; 04-0054; 04-0556; 04-0057; 04-0058; 04-0089; 04-5062; 04-5055; 04-0127; 04-0130; 04-0131; 04-0133; 04-0138; 04-0139; 04-0141; 04-0142; 04-0143; 04-0146; 04-0149; 04-0151; 04-0152; 04-0174; 04-0180; 04-0208; 04-0235; 04-0236; 04-0260; 04-0265; 04-0267; 04-0268; 04-0294; 04-0296; 04-0297; 04-0298; 04-0299; 04-0346; 04-0348; 04-0355; 04-0363; 04-0377; 04-0379; 04-0401;04-0436; 04-0437; 04-0438; 04-0439; 04-0400; 04-0404; 04-0440; 04-0455; 04-0504; 04-0506; 04-0517; 04-0521; 04-0524; 04-0530; 04-0533; 04-0546; 04-0557; 04-0559; 04-0561; 04-0563; 04-0564; 04-0573; 04-0574; 04-0575; 04-0576; 04-0577; 04-0578; 04-0580; 04-0581; 04-0583; 04-0594; 04-0595; 04-0596; 04-0597; 04-0599; 04-0598; 04-0600; 04-0601; 04-0604; 04-0610; 04-0611; 04-0612; 04-0619; 04-0629; 04-0630; 04-0633; 04-0635; 04-0636; 04-0637; 04-0638; 04-0639; 04-0641; 04-0648; 04-0649; 04-0650; 04-0657; 04-0661; 04-0702; 04-0703; 04-0781; 04-0901; 04-0910; 04-0911; 04-0912; 04-0918; 04-0919; 04-0920; 04-0923; 04-0928; 04-0937; 04-0944; 04-0945; 04-0981; 04-0982; 04-0983; 04-0984; 04-1024; 04-1025; 04-1040; 04-1042; 04-1050; 04-1051; 04-1052; 04-1053; 04-1054; 04-1089; 04-1900; 04-1096; 04-1234; 04-1235; 04-1257; 04-1906; 04-1910; 04-1911; 04-1912; 04-1913; 04-1914; 04-1917;    04-1918; 04-1921; 04-1923; 04-1955; 04-1970;

**CRAYOLA® WASHABLE MARKERS**                                    Revision date  11-Dec-2024

04-1972; 04-2008; 04-2009; 04-2010; 04-2014; 04-2016; 04-2026; 04-2300; 04-2467;
04-2469; 04-2522; 04-2532; 04-2536; 04-2537; 04-2539; 04-2540; 04-2542; 04-2543;
04-2544; 04-2549; 04-2555; 04-2580; 04-2581; 04-2632; 04-2713; 04-2739; 04-2743;
04-2745; 04-2900;   04-2910; 04-2925; 04-2933; 04-2934; 04-2911; 04-3300; 04-3301;
04-3302; 04-3303; 04-3304; 04-3305; 04-3306; 04-3307; 04-3315; 04-4600; 04-4610;
04-4830; 04-5029; 04-5053; 04-5054; 04-5055; 04-5056; 04-5062; 04-5087; 04-5189;
04-5195; 04-5226; 04-5227; 04-5229; 04-5350; 04-5354; 04-5355; 04-5358; 04-5367;
04-5400; 04-5401;   04-5555; 04-5556; 04-5674; 04-5678; 04-5679; 04-5680; 04-5692;
04-5700; 04-5701; 04-5708; 04-5709; 04-5713; 04-5714; 04-5715; 04-5716; 04-5718;
04-5802; 04-5803; 04-5807; 04-5808; 04-5811; 04-5812; 04-5813; 04-5814; 04-5815;
04-5819; 04-5820; 04-5821; 04-5844; 04-5850; 04-5855; 04-5856; 04-5859; 04-5860;
04-5869; 04-5873; 04-5874; 04-5900; 04-6006; 04-6016; 04-6701; 04-6806; 04-6807;
04-6808; 04-6810; 04-6814; 04-6816; 04-6828; 04-6829; 04-6847; 04-6866; 04-6868;
04-6870; 04-6873; 04-6876; 04-6879; 04-6897; 04-6898; 04-6900; 04-6901; 04-6918;
04-6919; 04-0427; 04-0559; 04-6932; 04-6933; 04-6937; 04-7001; 04-7004; 04-7005;
04-8722; 04-8723; 04-8727; 04-8732; 04-8733; 04-8734; 04-8735; 04-8737; 04-8800;
52-3348; 54-4012; 54-6201; 54-6202; 54-6203; 54-6205; 54-6206; 56-8106. 56-8150;
57-4515; 58-0080; 58-0083; 58-0101; 58-0383; 58-0381; 58-1464; 58-1849; 58-2194;
58-2201; 58-2262; 58-2284; 58-2287; 58-2288; 58-2289; 58-2290; 58-2291; 58-2292;
58-2293; 58-2298; 58-2300; 58-2307; 58-2316; 58-2321; 58-2342; 58-2908; 58-2910;
58-2911; 58-2912; 58-5020; 58-5021; 58-5047; 58-5048; 58-5050; 58-5051; 58-5053;
58-5057; 58-5058; 58-5067; 58-5070; 58-5071; 58-5100; 58-5101; 58-5102; 58-5103;
58-5104; 58-5105; 58-5106; 58-5107; 58-5108; 58-5121; 58-5201; 58-5202; 58-5203;
58-5204; 58-5205; 58-5206; 58-5207; 58-5208; 58-5209; 58-5210; 58-5211; 58-5212;
58-5214; 58-5880; 58-5881; 58-6006; 58-6007; 58-6023; 58-6034; 58-6038; 58-6040;
58-6042; 58-6044; 58-6046; 58-6104; 58-6106; 58-6414; 58-6501; 58-6503; 58-6504;
58-6505; 58-6511; 58-6518; 58-6532; 58-6534; 58-6535; 58-6549; 58-6552; 58-6562;
58-6563; 58-6565; 58-6566; 58-6569; 58-6570; 58-6571;58-6572; 58-6573; 58-6583;
58-6592; 58-6595; 58-6596; 58-6602; 58-6603; 58-6606; 58-6607; 58-6632; 58-6637;
58-6638; 58-6664; 58-6671; 58-6706; 58-7100; 58-7102; 74-7154; 58-7200; 58-7208;
58-7212; 58-7401; 58-7509; 58-7512; 58-7513; 58-7514; 58-7516; 58-7613; 58-7621;
58-7624; 58-7625; 58-7628; 58-7629; 58-7630; 58-7631; 58-7632; 58-7634; 58-7635;
58-7636; 58-7637; 58-7638; 58-7639; 58-7640; 58-7641; 58-7645; 58-7646; 58-7647;
58-7648; 58-7649; 58-7660; 58-7661; 58-7662; 58-7664; 58-7700; 58-7713; 58-7714;
58-7715; 58-7730; 58-7735; 58-7800; 58-7801; 58-7802; 58-7805; 58-7208; 58-7807;
58-7808; 58-7809; 58-7810; 58-7812; 58-7813; 58-7815; 58-7816; 58-7819; 58-7827;
58-7832; 58-7836; 58-7847' 58-7851; 58-7852; 58-7853; 58-7854; 58-7855; 58-7856;
58-7857; 58-7858; 58-7959; 58-7860; 58-7861; 58-7863; 58-7868; 58-7869; 58-7908;
58-7900; 58-7910; 58-8106; 58-8125; 58-8128; 58-8129; 58-8133; 58-8134; 58-8135;
58-8136; 58-8137; 58-8138; 58-8146; 58-8148; 58-8151; 58-8163; 58-8165; 58-8166;
58-8171; 58-8173; 58-8174; 58-8177; 58-8178; 58-8179; 58-8180; 58-8181; 58-8194;
58-8186;    58-8185; 58-8186; 58-8187; 58-8200; 58-8201; 58-8208; 58-8210; 58-8211;
58-8212; 58-8713; 58-8214; 58-8215; 58-8217; 58-8220; 58-8221; 58-8228; 58-8230;
58-8231; 58-8232; 58-3233; 58-8234; 58-8235; 58-8236; 58-8237; 58-8238; 58-8260;
58-8261; 58-8268; 58-8269; 58-8272; 58-8310; 58-8329; 58-8330; 58-8331; 58-8338;
58-8339; 58-8340; 58-8343; 58-8350; 58-8356; 58-8358; 58-8359; 58-8353; 58-8360;
58-8362; 58-8363; 58-8370; 58-8553; 58-8610; 58-8612; 58-8700; 58-8701; 58-8703;
58-8704; 58-8708; 58-8709; 58-8717; 58-8719; 58-8720; 58-8721; 58-8722; 58-8723;
58-8724; 58-8725; 58-8726; 58-8727; 58-8731; 58-8732; 58-8733; 58-8734; 58-8735;
58-8736; 58-8741; 58-8750; 58-8764; 58-8765; 58-8766; 58-9050; 58-8190; 58-8824;
58-8825; 58-8826; 58-8827; 58-9505; 58-9908-P-XXX (1000 PACK BROADLINE
MARKERS): -158 (TROPICAL VIOLET); -161 (ORANGE CIRCUIT); 58-9909-P-XXX (1300
PACK FINELINE U/C MARKERS): -011 (COPPER); -034 (YELLOW); -036 (ORANGE);
-038 (RED); -040 (VIOLET); -041 (PLUM); -042 (BLUE); -044 (GREEN); -045 (PRIMROSE);
-047 (PINK); -051 (BLACK); -054 (BLUE LAGOON); -057 (GOLDEN YELLOW); -063
(KIWI/CITRINE); -066 (TEAL); -086 (RASPBERRY); 74-0232; 74-0237; 74-0238; 74-0239;
74-0245; 74-0293; 74-2444; 74-6080; 74-7059; 74-7147; 74-7150; 74-7202; 74-7210;
74-7413;74-7414; 747415; 74-7270; 74-7245; 74-7246; 74-7248; 74-7249; 74-7252;
74-7253; 74-7254; 74-7255; 74-7260; 74-7262; 74-7264; 74-7265; 74-7267; 74-7268;
74-7269; 74-7283; 74-7284; 74-7285; 74-7286; 74-7287; 74-7288; 74-7289; 74-7295;
74-7296; 74-7298; 74-7304; 74-7310; 74-7311; 74-7312; 74-7321; 74-7322; 74-7324;
74-7325; 74-7326; 74-7327; 74-7328; 74-7329; 74-7330; 74-7331; 74-7332; 74-7333;

**CRAYOLA® WASHABLE MARKERS**                                    **Revision date** 11-Dec-2024

74-7249; 74-7300; 74-7352; 74-7353; 74-7354; 74-7355; 74-7346;74-7356; 74-7357;
74-7358; 74-7359; 74-7360; 74-7362; 74-7363; 74-7364; 74-7365; 74-7366; 74-7367;
74-7368; 74-7369;74- 7370; 74-7371; 74-7372; 74-7373; 74-7374; 74-7406; 74-7407;
74-7409; 74-7411; 74-7412; 74-7417; 74-7419; 74-7422; 74-7426; 74-7427; 74-7428;
74-7438; 74-7439; 74-7441; 74-7442; 74-7445; 74-7447; 74-7450; 74-7457; 74-7460;
74-7469; 74-7470; 74-7471; 74-7479; 74-7481; 74-7483; 74-7485; 74-7488; 74-7489;
74-7506; 74-7507; 74-7611; 74-7612; 74-7613; 74-7621; 74-7622; 74-7626; 74-7627;
74-7635; 74-7656; 74-7663; 74-7666; 74-7667; 74-7669; 74-7672; 81-1150; 81-1324;
81-1365; 81-1459; 81-1466; 81-1491; 81-1493; 81-1494; 81-1503; 81-1548; 81-2007;
81-2013; 81-8109; 81-8123; 81-8326; 81-8128; 81-8324; 81-8325; 82-7251; 82-7275;
95-0291; 99-0064; 99-0066; 99-0067; 99-0068; 99-0075; INT-2061; INT-2062;

**Recommended use of the chemical and restrictions on use**

**Recommended use**          Arts and Crafts

**Restrictions on use**          None Known

**Details of the supplier of the safety data sheet**

**Supplier Address**
CRAYOLA LLC
1100 Church Lane
Easton, PA 18044
Phone: 1-800-272-9652

**E-mail**                        support@crayola.com

**Emergency telephone number**

**Emergency Telephone**          1-800-535-5053 or call local POISON CONTROL

---

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

**Label elements**

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

The product contains no substances which at their given concentration, are considered to be hazardous to health.

| **Appearance** article containing liquid | **Physical state** Liquid | **Odor** No information available |
|---|---|---|

**Other information**
No information available.

---

**CRAYOLA® WASHABLE MARKERS**                                    **Revision date**  11-Dec-2024

| 3. Composition/information on ingredients |
| --- |

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
| --- | --- | --- | --- |
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

| 4. First-aid measures |
| --- |

**Description of first aid measures**

| | |
| --- | --- |
| **Inhalation** | It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed. |
| **Eye contact** | It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention. |
| **Skin contact** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Ingestion** | Call a poison control center or doctor immediately for treatment advice. |

**Most important symptoms and effects, both acute and delayed**

**Symptoms**                    No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**          Treat symptomatically.

| 5. Fire-fighting measures |
| --- |

| | |
| --- | --- |
| **Suitable Extinguishing Media** | Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
| **Large Fire** | CAUTION: Use of water spray when fighting fire may be inefficient. |
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |
| **Explosion data** | |
| **Sensitivity to mechanical impact** | None. |
| **Sensitivity to static discharge** | None. |
| **Special protective equipment and precautions for fire-fighters** | Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment. |

**CRAYOLA® WASHABLE MARKERS**                                          Revision date  11-Dec-2024

## 6. Accidental release measures

<u>Personal precautions, protective equipment and emergency procedures</u>

| | |
|---|---|
| **Personal precautions** | Wear personal protective clothing and equipment, see Section 8. |
| **For emergency responders** | Wear protective clothing and equipment suitable for the surrounding fire. |

<u>Methods and material for containment and cleaning up</u>

| | |
|---|---|
| **Methods for containment** | Prevent further leakage or spillage if safe to do so. |
| **Methods for cleaning up** | Pick up and transfer to properly labeled containers. |

## 7. Handling and storage

<u>Precautions for safe handling</u>

| | |
|---|---|
| **Advice on safe handling** | Wash thoroughly after handling. |

<u>Conditions for safe storage, including any incompatibilities</u>

| | |
|---|---|
| **Storage Conditions** | None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances. |

## 8. Exposure controls/personal protection

<u>Control parameters</u>

| | |
|---|---|
| **Exposure Limits** | This product, as supplied, does not contain any hazardous materials with occupational exposure limits established by the region specific regulatory bodies. |

<u>Appropriate engineering controls</u>

| | |
|---|---|
| **Engineering controls** | Showers<br>Eyewash stations<br>Ventilation systems. |

<u>Individual protection measures, such as personal protective equipment</u>

| | |
|---|---|
| **Eye/face protection** | Eye protection not required under normal conditions. |
| **Hand protection** | Protective gloves are not required under normal conditions. |
| **Skin and body protection** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Respiratory protection** | No respirator is required under normal conditions of use. Under conditions of frequent use or heavy exposure, respiratory protection may be needed. |

**CRAYOLA® WASHABLE MARKERS**    **Revision date**  11-Dec-2024

**General hygiene considerations**    Handle in accordance with good industrial hygiene and safety practice.

## 9. Physical and chemical properties

**Information on basic physical and chemical properties**

| | |
|---|---|
| **Physical state** | Liquid |
| **Appearance** | article containing liquid |
| **Color** | various colors |
| **Odor** | No information available |
| **Odor threshold** | No information available |

| Property | Values | Remarks  • Method |
|---|---|---|
| **pH** | 6  -  9.5 | None known |
| **Melting point / freezing point** | No data available | None known |
| **Initial boiling point and boiling range** | No data available | None known |
| **Flash point** | > 100°C | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
| **Upper flammability or explosive limits** | No data available | |
| **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | 1.06  -  1.12 | None known |
| **Water solubility** | Soluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | No data available | None known |
| **Dynamic viscosity** | 1.06 - 4.2 cps | None known |

**Other information**

| | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | No information available |
| **Bulk density** | No information available |

## 10. Stability and reactivity

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | None reported. |
| **Incompatible materials** | Oxidizing materials. |
| **Hazardous decomposition products** | Oxides of carbon. |

## 11. Toxicological information

**CRAYOLA® WASHABLE MARKERS**                                        **Revision date**  11-Dec-2024

_____

**Information on likely routes of exposure**

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

**Symptoms related to the physical, chemical and toxicological characteristics**

**Symptoms**                    No information available.

**Acute toxicity**

**Numerical measures of toxicity**
No information available

**Delayed and immediate effects as well as chronic effects from short and long-term exposure**

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |
| **STOT - single exposure** | No information available. |
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

**Ecotoxicity**                    The environmental impact of this product has not been fully investigated.

_____

**CRAYOLA® WASHABLE MARKERS**                                    **Revision date** 11-Dec-2024

---

| | |
|---|---|
| **Persistence and degradability** | No information available. |
| **Bioaccumulation** | There is no data for this product. |
| **Other adverse effects** | No information available. |

---

## 13. Disposal considerations

**Disposal methods**

| | |
|---|---|
| **Waste from residues/unused products** | Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations. |
| **Contaminated packaging** | Do not reuse empty containers. |

---

## 14. Transport information

<u>DOT</u>                                    Not regulated

---

## 15. Regulatory information

<u>International Inventories</u>

**TSCA**                                    All of the components of this product are listed on the TSCA Inventory.

| | |
|---|---|
| **DSL/NDSL** | Contact supplier for inventory compliance status. |
| **EINECS/ELINCS** | Contact supplier for inventory compliance status. |
| **ENCS** | Contact supplier for inventory compliance status. |
| **IECSC** | Contact supplier for inventory compliance status. |
| **KECL** | Contact supplier for inventory compliance status. |
| **PICCS** | Contact supplier for inventory compliance status. |
| **AIIC** | Contact supplier for inventory compliance status. |
| **NZIoC** | Contact supplier for inventory compliance status. |

Legend:
**TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL**   - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS**   - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS**  - Japan Existing and New Chemical Substances
**IECSC**  - China Inventory of Existing Chemical Substances
**KECL**  - Korean Existing and Evaluated Chemical Substances
**PICCS**   - Philippines Inventory of Chemicals and Chemical Substances
**AIIC**  - Australian Inventory of Industrial Chemicals

---

**CRAYOLA® WASHABLE MARKERS**                                                  **Revision date** 11-Dec-2024

---

**NZIoC** - New Zealand Inventory of Chemicals

**US Federal Regulations**

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA). This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370, refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355). There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

**US State Regulations**

**California Proposition 65**
This product does not require warnings under California Proposition 65.

**U.S. EPA Label Information**

**EPA Pesticide Registration Number** Not applicable

---

# 16. Other information

| **NFPA** | **Health hazards** 0 | **Flammability** 0 | **Instability** 0 | **Special hazards** - |
|----------|---------------------|--------------------|--------------------|------------------------|
| **HMIS** | **Health hazards** 0 | **Flammability** 0 | **Physical hazards** 0 | **Personal protection** X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**
**Legend** **Section 8: Exposure controls/personal protection**
| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)

---

**SDS ID: CRAY-041**                **Issuing Date** 23-Jan-2025                **Revision Number** 8

**CRAYOLA® WASHABLE MARKERS**                                    Revision date  11-Dec-2024

---

National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

**Revision date**                    11-Dec-2024
**Revision Note**                    No information available.
**Disclaimer**
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
**End of Safety Data Sheet**

---

# EXHIBIT 9







# Works with all Color Wonder Paper!

**crayola.com**



CE ⟨ 3+ ⊘ ®

Please retain package for future reference.
Contents and colors may vary.

**Crayola** A Hallmark Company

©2016 Crayola, Easton, PA 18044-0431.
Serpentine Design® Color Wonder®
Distributed in Australia by Crayola (Australia) Pty
Ltd. Imported by Binney & Smith (Europe) Ltd.,
Bedford Heights, Manton Lane, Bedford, MK41 7PH,
England. U.S. Patent 6,124,377.

Made in China

Style#: 75-2471
Code#: 75-2471-0-300

**QUALITY GUARANTEE**
We guarantee the quality of all Crayola products. If this product
does not perform properly, please contact us.

In the U.S.A. and Canada, call **1-800-CRAYOLA (800-272-9652)**,
weekdays 9 AM-4 PM ET.

In Europe, call **+33 (0) 1 41 06 54 54**,
weekdays 9 AM-5 PM local time.

In the UK, call **01702 208170**, weekdays 9 AM-5 PM local time.

In Mexico, call **01800 71 78 222**,
weekdays 9 AM-5 PM local time.

In Australia, call Crayola AU at **1-800-657-353**,
weekdays 9 AM-4 PM AEST.



Conforms to
ASTM D 4236.

**WARNING!** Not
suitable for children
under 36 months due
to small parts which
may cause a choking
hazard if swallowed.

All Crayola art
materials are nontoxic.

**PROOF OF PURCHASE**



0   71662 22471   4

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Color Wonder products use a colorless system that is invisible on most
household surfaces. After using Color Wonder, remove residue from hands by washing with
soap and water.

**STAIN ADVISEMENT:** Color Wonder products may alter the appearance of some surfaces.
To minimize any change in appearance, wipe Color Wonder products off household surfaces
immediately. Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl,
leather and other materials that cannot be laundered.





BLUEY (word mark and character logos) are trade marks of Ludo Studio Pty Limited and are used under licence. BLUEY logo © Ludo Studio Pty Limited 2018. Licensed by BBC Studios. BBC is a trade mark of the British Broadcasting Corporation and is used under licence. BBC logo © BBC 1996



## Discover Hidden Designs!



US ONLY
how2recycle.info

PAPER
BOX



ACMI
AP
Conforms to
ASTM D 4236.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.

### WASHING & CARE

**FOR BEST RESULTS:** Color Wonder products use a colorless system that is invisible on most household surfaces. After using Color Wonder, remove residue from hands by washing with soap and water.
**STAIN ADVISEMENT:** Color Wonder products may alter the appearance of some surfaces. To minimize any change in appearance, clean Color Wonder products off household surfaces immediately with soap and water. Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, leather and other materials that cannot be laundered. Do not hang finished art directly on porous surfaces like kitchen appliances, countertops, walls, and cabinets.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
**U.S.A. & CANADA** (Call/Text): 1-800-CRAYOLA (800-272-9652)
Text charges may apply.    **AUSTRALIA:** 1-800-657-353
M-F, 9 AM-5 PM LOCAL TIME:
**UK:** 0800 389 6238   **ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7178 222   **BENELUX:** +31 (0)38 444 3093
**FRANCE:** +33 (0) 1 41 06 54 54   **GERMANY:** +496103 459180



**RECYCLED**
Packaging made from recycled material
FSC
www.fsc.org
**FSC® C141185**

UK CA    3+



Crayola — a Hallmark Company
©2024 Crayola, Easton, PA 18044-0431.
Color Wonder® **Binney & Smith (Europe) Ltd.,** Bedford Heights, Manton Lane, Bedford, MK41 7PH, England; Binney & Smith (Europe) Ltd., Via Figline 13, 47122 Forlì (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd. 10 Caribbean Drive Scoresby Victoria 3179. U.S. Patents 9,464,185 and 9,790,383.

**crayola.com**

Contents and colors may vary.
Retain packaging for future reference.

**PRODUCT OF U.S.A. WITH U.S. AND FOREIGN MATERIALS**

Style#: 75-2863    Code#: 75-2863-0-200

0  71662 02863  3











© 2024 MARVEL

**Discover Hidden Designs!**

crayola.com

Contents and colors may vary
Retain packaging for future reference.

PRODUCT OF U.S.A. WITH
U.S. AND FOREIGN MATERIALS

### WASHING & CARE

**FOR BEST RESULTS:** Color Wonder products use a colorless system that is invisible on most household surfaces. After using Color Wonder, remove residue from hands by washing with soap and water.

**STAIN ADVISEMENT:** Color Wonder products may alter the appearance of some surfaces. To minimize any change in appearance, clean Color Wonder products off household surfaces immediately with soap and water. Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, leather and other materials that cannot be laundered. Do not hang finished art directly on porous surfaces like kitchen appliances, countertops, walls, and cabinets.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
**U.S.A. & CANADA** (Call/Text): 1-800-CRAYOLA (800-272-9652)
Text charges may apply.    **AUSTRALIA:** 1-800-657-353

M-F, 9 AM-5 PM LOCAL TIME:
**UK:** 0800 389 6238    **ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7178 222    **BENELUX:** +31 (0)38 444 3093
**FRANCE:** +33 (0) 1 41 05 54 54    **GERMANY:** +496103 459180

All Crayola art materials are nontoxic and certified AP.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.



CE UK CA

Style#: 75-2854
Code#: 75-2854-R-200

**3+**



**Crayola** A Hallmark Company
©2024 Crayola, Easton, PA 18044-0431.
Color Wonder® Binney & Smith
(Europe) Ltd., Bedford Heights,
Manton Lane, Bedford, MK41 7PH,
England; Binney & Smith (Europe) Ltd.,
Via Figline 18, 47122 Forlì (FC), Italy.
Distributed in Australia by Crayola
(Australia) Pty Ltd. 10 Caribbean Drive
Scoresby Victoria 3179. U.S. Patents
9,464,185 and 9,790,383.

**PLEASE
INSERT UPC NUMBER
071662228545**







## Discover Hidden Designs!

© Disney

Contents and colors may vary.
Retain packaging for future reference.



US ONLY
PAPER
BOX

how2recycle.info

ACMI
AP
Conforms to
ASTM D 4236.

All Crayola
art materials
are nontoxic.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST: **U.S.A. & CANADA (Call/Text):** 1-800-CRAYOLA (800-272-9652) Text charges may apply.
**AUSTRALIA:** 1-800-657-353



**Crayola** A Hallmark Company

©2023 Crayola, Easton, PA 18044-0431. Color Wonder®. Distributed in Australia by Crayola (Australia) Pty Ltd.10 Caribbean Drive Scoresby Victoria 3179. Patents 9,464,185 and 9,790,383.

crayola.com

### WASHING & CARE

**FOR BEST RESULTS:** Color Wonder products use a colorless system that is invisible on most household surfaces. After using Color Wonder, remove residue from hands by washing with soap and water. **STAIN ADVISEMENT:** Color Wonder products may alter the appearance of some surfaces. To minimize any change in appearance, clean Color Wonder products off household surfaces immediately with soap and water. Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, leather and other materials that cannot be laundered. Do not hang finished art directly on porous surfaces like kitchen appliances, countertops, walls, and cabinets.



**RECYCLED**
Packaging made from recycled material
FSC www.fsc.org   FSC® C141185

PRODUCT OF U.S.A. WITH U.S. AND FOREIGN MATERIALS

Style#: 75-2853
Code#: 78-2853-R-200

**3+**



0  71662 42853  2

M3L18 09:25:51

# EXHIBIT 10

# SAFETY DATA SHEET



SDS ID:  CRAY-027
CRAYOLA® COLOR WONDER

---

## 1. Identification

**Product identifier**

**Material Name:**                 CRAYOLA® COLOR WONDER

**Other means of identification**

**Product Code(s)**              CRAY-027

**Synonyms**                         CRAYOLA COLOR WONDER MARKERS; COLOR WONDER MINI MARKERS; COLOR
WONDER SPRAY MAGIC; COLOR WONDER SPRAY MAGIC AIR BRUSH SYSTEM;
COLOR WONDER KITS; COLOR WONDER PAPER; COLOR WONDER BRUSH TIP
MARKERS; COLOR WONDER STAMPERS; COLOR WONDER PAINTBRUSH PENS;
PRODUCT CODE(S): 04-0266; 04-0403; 04-1073; 04-1074; 75-0150; 75-0151; 75-0152;
75-0153; 75-0208; 75-0209; 75-0211; 75-0212; 75-0215; 75-0218; 75-0222; 75-0224;
75-0226; 75-0227; 75-0228; 75-0229; 75-0230; 75-0231; 75-0237; 75-0238; 75-0239;
75-0240; 75-0241; 75-0242; 75-0243; 75-0244; 75-0247; 75-0271; 75-0273; 75-0444;
75-0446; 75-0447; 75-0448; 75-0459; 75-1004; 75-1037; 75-1100; 75-1101; 75-1102;
75-1297; 75-1300; 75-1301; 75-1700; 75-1717; 75-1799; 75-1801; 75-1802; 75-1804;
75-1805; 75-1806; 75-1807; 75-1809; 75-1810; 75-1811; 75-1812; 75-1813; 75-1815;
75-1816; 75-1819; 75-1820; 75-1826; 75-1827; 75-1832; 75-1833; 75-1834; 75-1835;
75-1840; 75-1841; 75-1843; 75-1846; 75-1862; 75-1902; 75-1904; 75-1907; 75-1912;
75-1916; 75-1917; 75-1918; 75-1919; 75-1921; 75-1923; 75-1927; 75-1928; 75-1929;
75-1931; 75-1932; 75-1933; 75-1936; 75-1948; 75-1949; 75-2023; 75-2024;
75-2047; 75-2056; 75-2057; 75-2058; 75-2060; 75-2063; 75-2066; 75-2068; 75-2069;
75-2070; 75-2071; 75-2072; 75-2073; 75-2074; 75-2075; 75-2078; 75-2113; 75-2115;
75-2116; 75-2117; 75-2129; 75-2133; 75-2134; 75-2136; 75-2143; 75-2149; 75-2168;
75-2210; 75-2211; 75-2213; 75-2215; 75-2217; 75-2219; 75-2220; 75-2232; 75-2233;
75-2235; 75-2236; 75-2239; 75-2240; 75-2243; 75-2249; 75-2265; 75-2266; 75-2267;
75-2269; 75-2270; 75-2271; 75-2272; 75-2279; 75-2280; 75-2281; 75-2282; 75-2283;
75-2284; 75-2285; 75-2286; 75-2288; 75-2289; 75-2290; 75-2291; 75-2292; 75-2293;
75-2294; 75-2295; 75-2296; 75-2298; 75-2311; 75-2324; 75-2329; 75-2330; 75-2331;
75-2332; 75-2333; 75-2334; 75-2335; 75-2337; 75-2338; 75-2339; 75-2341; 75-2344;
75-2345; 75-2347; 75-2349; 75-2351; 75-2371; 75-2382; 75-2384; 75-2390; 75-2391;
75-2392; 75-2399; 75-2401; 75-2402; 75-2404; 75-2405; 75-2408; 75-2409; 75-2411;
75-2416; 75-2417; 75-2418; 75-2419; 75-2420; 75-2421; 75-2442; 75-2444; 75-2445;
75-2446; 75-2447; 75-2448; 75-2449; 75-2450; 75-2452; 75-2453; 75-2456; 75-2457;
75-2458; 75-2459; 75-2460; 75-2462; 75-2466; 75-2466; 75-2467; 75-2468; 75-2469;
75-2470; 75-2471; 75-2474; 75-2475; 75-2477; 75-2478; 75-2481; 75-2482; 75-2483;
75-2485; 75-2486; 75-2487; 75-2488; 75-2489; 75-2490; 75-2491; 75-2492; 75-2493;
75-2494; 75-2495; 75-2496; 75-2497; 75-2498; 75-2499; 75-2535; 75-2530; 75-2531;
75-2532; 75-2569; 75-2572;75-2573; 75-2575; 75-2579; 75-2399; 75-2580; 75-2399;
75-2585; 75-2595; 75-2596; 75-2701; 75-2707; 75-2708; 75-2709; 75-2711; 75-2712;
75-2714; 75-2715; 75-2716; 75-2717; 75-2720; 75-2722; 75-2723; 75-2724; 75-2725;
75-2726; 75-2727; 75-2728; 75-2774; 75-2780; 75-2784; 75-2786; 75-2788; 75-2800;
75-2801; 75-2802; 75-2803; 75-2804; 75-2805; 75-2824; 75-2826; 75-2827; 75-2836;
75-2838; 75-2839; 75-2852; 75-2853; 75-2858; 75-5100; 75-5101; 75-5107; 75-5849;
75-5851; 75-5852; 75-5853; 75-5854; 75-7000; 75-7001; 75-7002; 75-7003; 75-7004;

---

75-7005; 75-7006; 75-7007; 75-7008; 75-7009; 75-7011; 75-7014; 75-7100; 75-7101;
75-7102; 75-7103; 75-7104; 75-7105; 75-7106; 75-7107; 75-7108; 75-7109; 75-7110;
75-7111; 75-7112; 75-7113; 75-7114; 75-7115; 75-7116; 75-7117; 75-7124; 75-7125;
75-7126; 75-7127; 75-7144; 75-7145; 75-7146; 75-7147; 75-8746; 75-8749; 75-4600;
75-4601; 75-4602; 75-4603; 75-4604; 75-4605; 75-4603; 75-7015; 75-7117; 75-7118;
75-7119; 75-7120; 75-7121; 75-7122; 75-7123; 75-7124; 75-7127; 75-7128; 75-7129;
75-7130; 75-7134; 75-7135; 75-7139; 75-7140; 75-7141; 75-7142; 75-7143; 75-7149;
75-7150; 75-7185; 75-7186; 75-7187; 75-7995; 75-7996; 75-7997; 75-7998; 75-8781;
75-8792; 75-8793; 74-8794; 75-9140; 81-1365;

**Recommended use of the chemical and restrictions on use**

**Recommended use**            Arts and Crafts

**Restrictions on use**         None Known

**Details of the supplier of the safety data sheet**

**Supplier Address**
CRAYOLA LLC
1100 Church Lane
Easton, PA 18044
Phone: 1-800-272-9652

**E-mail**                      support@crayola.com

**Emergency telephone number**

**Emergency Telephone**        1-800-535-5053 or call local POISON CONTROL

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

**Label elements**

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

The product contains no substances which at their given concentration, are considered to be hazardous to health.

| **Appearance** clear straw colored liquid | **Physical state** Liquid | **Odor** No information available |
| --- | --- | --- |

**Other information**
No information available.

## 3. Composition/information on ingredients

**CRAYOLA® COLOR WONDER**                                      **Revision date**  11-Dec-2024

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

**Inhalation**          It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed.

**Eye contact**         It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention.

**Skin contact**        It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed.

**Ingestion**           Call a poison control center or doctor immediately for treatment advice.

**Most important symptoms and effects, both acute and delayed**

**Symptoms**            No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**  Treat symptomatically.

## 5. Fire-fighting measures

**Suitable Extinguishing Media**       Use extinguishing measures that are appropriate to local circumstances and the surrounding environment.

   **Large Fire**                  CAUTION: Use of water spray when fighting fire may be inefficient.

**Unsuitable extinguishing media**      Do not scatter spilled material with high pressure water streams.

**Specific hazards arising from the chemical**       No information available.

**Explosion data**
   **Sensitivity to mechanical impact** None.

   **Sensitivity to static discharge**   None.

**Special protective equipment and precautions for fire-fighters**       Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment.

## 6. Accidental release measures

---

**CRAYOLA® COLOR WONDER**                                          **Revision date** 11-Dec-2024

---

__Personal precautions, protective equipment and emergency procedures__

**Personal precautions**          Wear personal protective clothing and equipment, see Section 8.

**For emergency responders**      Wear protective clothing and equipment suitable for the surrounding fire.

__Methods and material for containment and cleaning up__

**Methods for containment**       Prevent further leakage or spillage if safe to do so.

**Methods for cleaning up**       Pick up and transfer to properly labeled containers.

---

## 7. Handling and storage

__Precautions for safe handling__

**Advice on safe handling**       Wash thoroughly after handling.

__Conditions for safe storage, including any incompatibilities__

**Storage Conditions**            None needed according to classification criteria. Store and handle in accordance with all
                                  current regulations and standards. See original container for storage recommendations.
                                  Keep separated from incompatible substances.

---

## 8. Exposure controls/personal protection

__Control parameters__

**Exposure Limits**               This product, as supplied, does not contain any hazardous materials with occupational
                                  exposure limits established by the region specific regulatory bodies.

__Appropriate engineering controls__

**Engineering controls**          Showers
                                  Eyewash stations
                                  Ventilation systems.

__Individual protection measures, such as personal protective equipment__

**Eye/face protection**           Eye protection not required under normal conditions.

**Hand protection**               Protective gloves are not required under normal conditions.

**Skin and body protection**      It is unlikely that emergency treatment will be required. If adverse effects occur, wash with
                                  soap or mild detergent and large amounts of water. Get medical attention, if needed.

**Respiratory protection**        No respirator is required under normal conditions of use. Under conditions of frequent use
                                  or heavy exposure, respiratory protection may be needed.

**General hygiene considerations**   Handle in accordance with good industrial hygiene and safety practice.

---

**CRAYOLA® COLOR WONDER**                                              **Revision date** 11-Dec-2024

## 9. Physical and chemical properties

**Information on basic physical and chemical properties**

| | |
|---|---|
| **Physical state** | Liquid |
| **Appearance** | clear straw colored liquid |
| **Color** | No information available |
| **Odor** | No information available |
| **Odor threshold** | No information available |

| Property | Values | Remarks • Method |
|---|---|---|
| **pH** | No data available | None known |
| **Melting point / freezing point** | No data available | None known |
| **Initial boiling point and boiling range** | No data available | None known |
| **Flash point** | > 93.3 °C / 199.9 °F | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
| **Upper flammability or explosive limits** | No data available | |
| **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | 0.85 - 0.95 | None known |
| **Water solubility** | Insoluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | 5 - 12 cpi | None known |
| **Dynamic viscosity** | No data available | None known |

| Other information | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | 7.08 - 7.91 lbs/ft3 |
| **Bulk density** | No information available |

## 10. Stability and reactivity

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | None reported. |
| **Incompatible materials** | Oxidizing materials. |
| **Hazardous decomposition products** | Oxides of carbon. |

## 11. Toxicological information

**Information on likely routes of exposure**

**CRAYOLA® COLOR WONDER**                                                      **Revision date** 11-Dec-2024

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

Symptoms related to the physical, chemical and toxicological characteristics

**Symptoms**                    No information available.

**Acute toxicity**

**Numerical measures of toxicity**
No information available

Delayed and immediate effects as well as chronic effects from short and long-term exposure

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |
| **STOT - single exposure** | No information available. |
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

**Ecotoxicity**                    The environmental impact of this product has not been fully investigated.

**Persistence and degradability**    No information available.

**CRAYOLA® COLOR WONDER**                                    **Revision date**  11-Dec-2024

**Bioaccumulation**                 There is no data for this product.

**Other adverse effects**           No information available.

## 13. Disposal considerations

Disposal methods

**Waste from residues/unused**      Dispose of waste in accordance with environmental legislation. Dispose of in accordance
**products**                        with local regulations.

**Contaminated packaging**          Do not reuse empty containers.

## 14. Transport information

DOT                                 Not regulated

## 15. Regulatory information

International Inventories

**TSCA**                            All of the components of this product are listed on the TSCA Inventory.

**DSL/NDSL**                        Contact supplier for inventory compliance status.
**EINECS/ELINCS**                   Contact supplier for inventory compliance status.
**ENCS**                            Contact supplier for inventory compliance status.
**IECSC**                           Contact supplier for inventory compliance status.
**KECL**                            Contact supplier for inventory compliance status.
**PICCS**                           Contact supplier for inventory compliance status.
**AIIC**                            Contact supplier for inventory compliance status.
**NZIoC**                           Contact supplier for inventory compliance status.

 **Legend:**
 **TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
 **DSL/NDSL**   - Canadian Domestic Substances List/Non-Domestic Substances List
 **EINECS/ELINCS**   - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
 **ENCS**  - Japan Existing and New Chemical Substances
 **IECSC**  - China Inventory of Existing Chemical Substances
 **KECL**  - Korean Existing and Evaluated Chemical Substances
 **PICCS**   - Philippines Inventory of Chemicals and Chemical Substances
 **AIIC**  - Australian Inventory of Industrial Chemicals
 **NZIoC**  - New Zealand Inventory of Chemicals

US Federal Regulations

**CRAYOLA® COLOR WONDER**                                    **Revision date** 11-Dec-2024

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA).  This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370,  refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355).  There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

**US State Regulations**

**California Proposition 65**
This product does not require warnings under California Proposition 65.

**U.S. EPA Label Information**

**EPA Pesticide Registration Number** Not applicable

---

# 16. Other information

| **NFPA** | **Health hazards** 0 | **Flammability** 0 | **Instability** 0 | **Special hazards** - |
|----------|----------------------|--------------------|--------------------|-----------------------|
| **HMIS** | **Health hazards** 0 | **Flammability** 0 | **Physical hazards** 0 | **Personal protection** X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**
**Legend  Section 8: Exposure controls/personal protection**

| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
|-----|----------------------------|------|----------------------------------|
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)

---

**CRAYOLA® COLOR WONDER**                                    **Revision date**  11-Dec-2024

---

New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

| | |
|---|---|
| **Revision date** | 11-Dec-2024 |
| **Revision Note** | No information available. |

**Disclaimer**

**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**

**End of Safety Data Sheet**

---

# EXHIBIT 11

US009790383B2

(12) **United States Patent**
Pineiro et al.

(10) Patent No.: **US 9,790,383 B2**
(45) Date of Patent: **Oct. 17, 2017**

(54) **MARKING SYSTEM**

(71) Applicant: **Crayola LLC**, Easton, PA (US)

(72) Inventors: **Luis Rodrigo Pineiro**, Easton, PA (US); **Robert Nicholas Amabile**, Bangor, PA (US)

(73) Assignee: **CRAYOLA LLC**, Easton, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/250,122**

(22) Filed: **Aug. 29, 2016**

(65) **Prior Publication Data**

US 2016/0362571 A1    Dec. 15, 2016

**Related U.S. Application Data**

(62) Division of application No. 14/551,647, filed on Nov. 24, 2014, now Pat. No. 9,464,185.

(60) Provisional application No. 61/908,556, filed on Nov. 25, 2013.

(51) **Int. Cl.**

| | |
|---|---|
| B41M 5/128 | (2006.01) |
| C09D 9/00 | (2006.01) |
| C09D 11/50 | (2014.01) |
| C09D 171/02 | (2006.01) |
| C09D 11/17 | (2014.01) |
| C08K 5/17 | (2006.01) |
| B41M 5/323 | (2006.01) |
| B41M 5/337 | (2006.01) |
| C09D 11/03 | (2014.01) |
| C09D 11/16 | (2014.01) |
| B41M 5/124 | (2006.01) |
| B41M 5/136 | (2006.01) |
| B41M 5/155 | (2006.01) |
| C08K 5/00 | (2006.01) |

(52) **U.S. Cl.**
CPC ............. *C09D 11/17* (2013.01); *B41M 5/128* (2013.01); *B41M 5/1246* (2013.01); *B41M 5/136* (2013.01); *B41M 5/155* (2013.01); *B41M 5/323* (2013.01); *B41M 5/3375* (2013.01); *C08K 5/17* (2013.01); *C09D 9/00* (2013.01); *C09D 11/03* (2013.01); *C09D 11/16* (2013.01); *C09D 11/50* (2013.01); *C09D 171/02* (2013.01); *B41M 2205/04* (2013.01); *B41M 2205/16* (2013.01); *B41M 2205/18* (2013.01); *C08K 5/0091* (2013.01)

(58) **Field of Classification Search**
CPC ..... B41M 5/128; B41M 2205/18; C09D 9/00; C09D 11/50; C09D 171/02
USPC ...................................... 503/205; 106/31.23
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,745,672 | A | 7/1973 | Duskin |
| 3,769,045 | A | 10/1973 | Maierson |
| 3,772,052 | A | 11/1973 | Kimura |
| 3,864,146 | A | 2/1975 | Oda |
| 3,957,495 | A | 5/1976 | Teranishi |
| 4,012,538 | A | 3/1977 | Miyamoto |
| 4,186,243 | A | 1/1980 | Astbury |
| 4,199,618 | A | 4/1980 | Golden |
| 4,244,604 | A | 1/1981 | Fraser |
| 4,245,857 | A | 1/1981 | Satomura |
| 4,263,047 | A | 4/1981 | Myamoto |
| 4,289,332 | A | 9/1981 | Kato |
| 4,339,275 | A | 7/1982 | Tutty |
| 4,372,582 | A | 2/1983 | Geisler |
| 4,374,671 | A | 2/1983 | Hayashi |
| 4,525,214 | A | 6/1985 | Panken |
| 4,571,415 | A | 2/1986 | Jordan |
| 4,576,649 | A | 3/1986 | Oliver |
| 4,601,920 | A | 7/1986 | Mitsuo |
| 4,631,204 | A | 12/1986 | Mitsuo |
| 4,675,706 | A | 6/1987 | Miller |
| 4,748,147 | A | 5/1988 | Sumi-i |
| 4,826,807 | A | 5/1989 | Shimomura |
| 4,833,119 | A | 5/1989 | Umeda |
| 4,835,134 | A | 5/1989 | Umeda |
| 4,840,927 | A | 6/1989 | Sano |
| 4,877,767 | A | 10/1989 | Liang |
| 4,880,766 | A | 11/1989 | Miller |
| 4,960,749 | A | 10/1990 | Miura |
| 4,978,390 | A | 12/1990 | Snedeker |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0017889 | 10/1980 |
| EP | 0610739 | 8/1994 |

(Continued)

OTHER PUBLICATIONS

Great Britain Search Report dated Feb. 13, 2015 for Application No. GB1420866.4, 6 pages.
Fred Omega Garces, "EDTA Titration", Jun. 12, 2012, 25 pages.
Non Final Office Action for U.S. Appl. No. 14/551,647, dated Mar. 21, 2016, 12 pages.
Non Final Office Action for U.S. Appl. No. 14/8551,647, dated Mar. 30, 2016, 8 pages.
Notice of Allowance for U.S. Appl. No. 14/551,647, dated Jun. 28, 2016, 6 pages.

(Continued)

*Primary Examiner* — Bruce H Hess
(74) *Attorney, Agent, or Firm* — RatnerPrestia

(57) **ABSTRACT**

A marking system comprises a substrate having a surface coated with a color-triggering developer and a deactivating ink composition; and a marking composition comprising at least one color precursor. At least one "non-color developing portion" of the surface is coated with both the color-triggering developer and the deactivating ink composition, and at least one "color-developing portion" of the surface is coated with the color-triggering developer and is not coated with the deactivating ink composition. Color development occurs at the color-developing portion(s) and does not occur at the non-color developing portion(s) upon application of the marking composition to the surface of the substrate.

**10 Claims, No Drawings**

**US 9,790,383 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,008,237 | A | 4/1991 | Liang |
| 5,017,546 | A | 5/1991 | Brinkman |
| 5,030,281 | A | 7/1991 | Miller |
| 5,034,370 | A | 7/1991 | Saeki |
| 5,057,154 | A | 10/1991 | Kusakaa |
| 5,084,492 | A | 1/1992 | Pinell |
| 5,116,410 | A | 5/1992 | Miller |
| 5,131,776 | A | 7/1992 | Mott |
| 5,137,797 | A | 8/1992 | Nakamura |
| 5,178,949 | A | 1/1993 | Sakamoto |
| 5,232,494 | A | 8/1993 | Miller |
| 5,276,075 | A | 1/1994 | Santini |
| 5,288,160 | A | 2/1994 | Li |
| 5,290,068 | A | 3/1994 | Gundjian |
| 5,326,388 | A | 7/1994 | Miller |
| 5,326,739 | A | 7/1994 | Tanabe |
| 5,383,954 | A | 1/1995 | Craig |
| 5,388,689 | A | 2/1995 | Kroop |
| 5,389,717 | A | 2/1995 | Santini |
| 5,393,332 | A | 2/1995 | Saito |
| 5,447,901 | A | 9/1995 | Yamaguchi |
| 5,456,743 | A | 10/1995 | Fry |
| 5,460,647 | A | 10/1995 | Snedeker |
| 5,462,597 | A | 10/1995 | Jubran |
| 5,464,470 | A | 11/1995 | Brachman |
| 5,485,792 | A | 1/1996 | Keyse |

| | | | |
|---|---|---|---|
| 5,486,228 | A | 1/1996 | Miller |
| 5,489,331 | A | 2/1996 | Miller |
| 5,492,558 | A | 2/1996 | Miller |
| 5,498,282 | A | 3/1996 | Miller |
| 5,503,665 | A | 4/1996 | Miller |
| 5,647,896 | A | 7/1997 | Nishimura |
| 5,814,579 | A | 9/1998 | Dotson |
| 5,824,715 | A | 10/1998 | Hayashihara |
| 5,846,901 | A | 12/1998 | Jubran |
| 6,124,377 | A | 9/2000 | Kaiser |
| 2003/0054298 | A1 | 3/2003 | Suzuki |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1122598 | 8/2001 |
| EP | 1182501 | 2/2002 |
| EP | 1220033 | 7/2002 |
| GB | 1069661 | 5/1967 |
| GB | 1069991 | 5/1967 |
| GB | 1380092 | 1/1975 |
| GB | 2330556 | 4/1999 |
| JP | 53137710 | 12/1978 |
| JP | 56053089 | 5/1981 |
| JP | 56077188 | 6/1981 |
| JP | 07138517 | 5/1995 |

OTHER PUBLICATIONS

Australian Examination Report for Australian Application No. 2014266438 dated Jun. 19, 2017, 4 pages.

US 9,790,383 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# MARKING SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

This Application is a Divisional Application of U.S. application Ser. No. 14/551,647, filed on Nov. 24, 2014, which claims the benefit of priority of U.S. Provisional Application No. 61/908,556, filed Nov. 25, 2013, the disclosures of which are incorporated herein by reference in their entireties for all purposes.

## FIELD OF THE INVENTION

The present invention relates generally to marking or coloring systems. Particularly, the present invention relates to marking systems that inhibit stray coloring marks from appearing on unintended surfaces, as might be particularly useful for children.

## BACKGROUND

It is well known that artwork is viewed as an important developmental tool for children. For example, marking materials, such as paints and markers, are given to children for drawing, painting, and coloring purposes in order to stimulate their creativity and imagination. Of course, a significant drawback with conventional marking materials is that they tend to become very messy in use. Indeed, parents often limit the use of marking materials by children because of the possibility that household objects, such as carpets and furniture, as well as skin and clothing, would be stained by the marking materials.

Marking systems have been developed that inhibit the formation of inadvertent stains on household objects or other unintended surfaces during use. For example, one commercially-available marking system, which is described in U.S. Pat. No. 6,124,377, provides a marking composition comprising at least one color precursor in the form of a leuco dye, and a substrate provided with a coating comprising at least one color-triggering developer. Upon application of the leuco dye to the substrate, a chromophore, and hence, color, is formed. Application of the leuco dye to the substrate only causes the appearance of color in the areas of the substrate that are coated with the color-triggering developer. One drawback of this marking system is that the user can typically see and/or feel which areas of the substrate are coated, thus it is not surprising which areas will develop color. A second drawback is that artwork for printing the developer coating is typically engraved on an expensive printing cylinder, which is time-consuming and requires a high capital investment. There exists a need for products that are more efficient to manufacture, and that improve upon these marking systems so that the user cannot easily see or feel which areas of the substrate will develop color.

## SUMMARY OF THE INVENTION

An embodiment of the present invention provides a deactivating ink composition suitable for use as a coating on a substrate, the deactivating ink composition comprising a first component that is capable of complexing with a Lewis acid; and a second component that inhibits penetration of a leuco dye intermediate into the substrate. The first component preferably comprises a Lewis base (e.g., triisopropanolamine) and the second component preferably comprises polyethylene glycol (e.g., Carbowax® 1450). Another embodiment of the present invention provides a substrate comprising a surface coated with a color-triggering developer and the deactivating ink composition.

Another embodiment of the present invention provides a marking system comprising (i) a substrate having a surface coated with a color-triggering developer and a deactivating ink composition; and (ii) a marking composition comprising at least one color precursor. At least one "non-color developing portion" of the surface is coated with both the color-triggering developer and the deactivating ink composition, and at least one "color-developing portion" of the surface is coated with the color-triggering developer and is not coated with the deactivating ink composition. Color development occurs at the color-developing portion(s) and does not occur at the non-color developing portion(s) upon application of the marking composition to the surface of the substrate.

Another embodiment of the present invention provides a method of using a marking system comprising applying a marking composition comprising at least one color precursor to a surface of a substrate coated with a color-triggering developer and a deactivating ink composition. The method may comprise using a marking instrument (e.g., a marker, stamp, pen, or paintbrush) to apply the marking composition to the substrate surface.

Another embodiment of the present invention provides a method of making a marking system comprising applying a deactivating ink composition to at least one portion of a substrate surface coated with a color-triggering developer. The method may comprise applying the deactivating ink composition with a flexographic plate imaged with the chosen design. The design can be printed as line art via any traditional printing process, including but not limited to gravure, flexography or lithography.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention relates to marking systems that inhibit the formation of inadvertent stains on household objects or other unintended surfaces during use. In particular, embodiments of the present invention relate to marking systems that provide improvements over commercially-available systems. One such marking system is described in U.S. Pat. No. 6,124,377, which is incorporated by reference herein in its entirety and for all purposes. This type of system provides a marking composition comprising at least one color precursor in the form of a leuco dye intermediate, and a substrate provided with a coating comprising at least one color-triggering developer. The leuco dye intermediate, which is sensitive to oxidation and/or acidic environments, remains colorless until reacted with a color-triggering developer provided in a coating disposed on a substrate. Examples of suitable leuco dyes include, but are not limited to, diarylphthalide dyes, fluoran dyes, indolphthalide dyes, acylluecoazoine dyes, leucoauramine dyes, spiropyrane dyes, rhodaminelactam dyes, triarylmethane dyes and chromene dyes. Preferred leuco dyes include, but are not limited to, spiro(12H-benzo(a)xanthene-12,1'(3'H)-isobenzofuran-3'-one,9-(diethylamino) (such as COPIKEM® 747), 3-[Butyl-2-methylindol-3-yl]-3-(1-octyl-2-methylindol-3-yl)-1(3H) isobenzofuranone (such as COPIKEM® 35 magenta), 2-'phenylamino-3'-methyl-6'-(dibutylamino) spiro[isobenzofuran-1(3H),9'-(9H)-xanthen]-3-one (such as COPIKEM® 34 Black), a substituted phthalide (such as COPIKEM® 14 Orange), such as COPIKEM® 7 Grape, 2'-Di(phenylmethyl)amino-6'-(diethylamino)spiro(isobenzofuran-1(3H),9'-(9H-xanthen))-3-one (such as

US 9,790,383 B2

3 4

COPIKEM® 5 green). Products identified under the COPIKEM® trademarks are commercially available from the Hilton Davis Company, Cincinnati, Ohio.

The color-triggering developer serves as a chemical activator or initiator for the conversion of the color precursor into chromophore containing dyes that display bold and vivid colors. When the color precursor is a leuco dye intermediate, the color-triggering developer is preferably a Lewis acid. The most desirable Lewis acids for use as the color-triggering developer are zinc containing resins. Most preferably, the color-triggering developer is a zincated carboxylic resin that is dispersed in the coating. For example, the zinc acts as a Lewis acid and causes the rearrangement of the dye molecule, thereby resulting in the development of the desired chromophore. Particularly, the development of the color occurs when the color-triggering developer reacts with the leuco dye intermediate to form a highly conjugated compound thereby resulting in a chromophore of intense color. Thus, upon application of the leuco dye intermediate to the substrate, a chromophore, and hence, color, is formed.

Application of the leuco dye intermediate to the substrate only causes the appearance of color in the areas of the substrate that are coated with the color-triggering developer; uncoated areas do not exhibit any color. One drawback of the commercially-available form of this marking system is that the end user can typically see and/or feel which area(s) of the substrate are coated, thus it is not as surprising which area(s) will develop color and which ones will not. A second drawback is that artwork for printing the color-triggering developer is often engraved on an expensive printing cylinder which requires a high capital investment and takes 2-4 weeks to reengrave.

The applicant has developed a marking system which is more cost-effective to manufacture, and which provides a substrate whereby the user cannot easily see or feel which area(s) of the substrate are capable of developing color. According to one embodiment, the substrate, typically paper, is pre-coated with a color-triggering developer (as described above and in U.S. Pat. No. 6,124,377), and flexographic printing plates imaged with the desired artwork (which are more cost-effective than engraved printing cylinders and are usually processed on-site) are used to print individual sheets of the pre-coated paper with an ink that selectively deactivates area(s) of the pre-coated paper where color development is not desired. Without being bound by theory, it is believed that the deactivating ink (also referred to herein as a "deactivating ink composition") acts as a physical and chemical barrier to the development of color.

According to particular embodiments, the deactivating ink contains two components which may work synergistically to prevent color development in the applied marking composition. A first component, preferably a Lewis base, is capable of reacting and/or complexing with the color-triggering developer coated on the substrate (preferably a Lewis acid). For example, when zinc in the color-triggering developer is complexed in this manner, it cannot activate applied leuco dye intermediates. According to particular embodiments, the Lewis base comprises a nitrogen atom and at least one hydrophilic functional group (e.g., hydroxyl, carboxyl, sulfonate, etc.). A preferred Lewis base is triisopropanolamine.

A second component acts as a physical barrier to inhibit or slow down the penetration of the leuco dye intermediate(s) into the substrate. According to particular embodiments, the second component comprises an organic solvent (alcohols, polyethers, glycols, etc.), preferably polyethylene glycol. Application of the marking composition to

paper coated in this fashion affords color development only where the deactivating ink has not been applied. Preferably, the overall look and feel of the final product is such that the end user cannot easily see or feel which areas of the substrate are capable of developing color, so that the marking system is more surprising and entertaining. Stated another way, those areas of the substrate that have the deactivating composition printed onto the color-triggering developer are not visibly discernible from the areas of the substrate that have only the color-triggering developer with no deactivating composition.

An embodiment of the present invention provides a deactivating ink composition suitable for use as a coating on a substrate, the deactivating ink composition comprising a first component that is capable of complexing with a Lewis acid that has been pre-coated on the substrate and a second component that inhibits penetration of a leuco dye intermediate into the substrate. According to preferred embodiments, the substrate is paper. The first component can complex with the Lewis acid to a sufficient extent such that the Lewis acid is no longer capable of activating leuco dye intermediates that are applied to the substrate. The first component preferably comprises a Lewis base, most preferably triisopropanolamine. The composition may comprise the first component in an amount of, for example, about 15 wt % to about 35 wt %, or about 20 wt % to about 30 wt %, or about 22 wt % to about 26 wt %, or about 23 wt % to about 25 wt %. The second component preferably comprises polyethylene glycol (PEG). The PEG preferably has an average molecular weight of greater than about 500 Daltons, greater than about 1,000 Daltons, or greater than about 1,200 Daltons; for example, between about 500 Daltons to about 5,000 Daltons, or between about 1,000 Daltons to about 2,000 Daltons, or between about 1,305 Daltons to about 1,595 Daltons, preferably with an average number of between about 10 and about 50 repeating oxyethylene units, or about 32.5 repeating oxyethylene units (e.g., Carbowax® 1450, also known as PEG-32). The composition may comprise the second component in an amount of, for example, about 20 wt % to about 50 wt %, or about 25 wt % to about 40 wt %, about 30 wt % to about 40 wt %, about 32 wt % to about 35 wt %.

According to particular embodiments, the deactivating ink composition further comprises water. For example, the composition may comprise about 20 wt % to about 50 wt % water, about 25 wt % to about 45 wt % water, or about 30 wt % to about 40 wt % water, or about 35 wt % to about 40 wt % water.

The deactivating ink composition may further comprise at least one additive. Examples of suitable additives include, but are not limited to, wetting agents (e.g., Tergitol® NP-9), defoamers (e.g., Surfynol® 104A), surfactants, pH adjustors (e.g., citric acid), biocides (e.g., Reputain® B30 and/or Kathon® PFM), or a combination thereof. The composition may comprise, for example, about 0.01 wt % to about 10 wt % additives, or about 0.1 wt % to about 10 wt % additives, or about 0.5 wt % to about 10 wt % additives, or about 1 wt % to about 10 wt % additives, or about 0.01 wt % to about 5 wt % additives, or about 0.1 wt % to about 5 wt % additives, or about 0.5 wt % to about 5 wt % additives, or about 1 wt % to about 5 wt % additives, or about 0.01 wt % to about 2 wt % additives, or about 0.1 wt % to about 2 wt % additives, or about 0.5 wt % to about 2 wt % additives, or about 0.01 wt % to about 1 wt % additives, or about 0.1 wt % to about 1 wt % additives.

The deactivating ink composition may further comprise at least one color dye. For example, the dye may have a yellow

US 9,790,383 B2

**5**

color that substantially matches the natural yellow color of the color-triggering developer. The composition may comprise, for example, about 0.01 wt % to about 5 wt % color dye, or about 0.1 wt % to about 5 wt % color dye, or about 0.5 wt % to about 5 wt % color dye, or about 1 wt % to about 5 wt % color dye, or about 0.01 wt % to about 2 wt % color dye, or about 0.1 wt % to about 2 wt % color dye, or about 0.5 wt % to about 2 wt % color dye, or about 0.01 wt % to about 1 wt % color dye, or about 0.1 wt % to about 1 wt % color dye.

According to particular embodiments, the deactivating ink composition comprises, consists essentially of, or consists of water, at least one Lewis base (e.g., triisopropanolamine), polyethylene glycol (e.g., with an average molecular weight between about 1,000 Daltons to about 2,000 Daltons), at least one optional additive, and at least one optional color dye. For example, the deactivating ink composition may comprise, consist essentially of, or consist of about 20 wt % to about 50 wt % water; about 15 wt % to about 35 wt % of the Lewis base; about 20 wt % to about 50 wt % of the polyethylene glycol; about 0.01 wt % to about 5 wt % optional additive(s); and about 0.01 wt % to about 5 wt % optional color dye(s).

Another embodiment of the present invention provides a substrate (preferably paper) coated with a color-triggering developer (as described herein and in U.S. Pat. No. 6,124,377) and a deactivating ink composition of the present invention. According to particular embodiments, only one surface of the substrate (e.g., one side of the paper) is coated with the color-triggering developer and deactivating ink composition, and the opposite side of the substrate is not coated with either the color-triggering developer or the deactivating ink composition. Alternatively, both surfaces of the substrate may be coated with the color-triggering developer and deactivating ink composition.

According to preferred embodiments, an entire surface of the substrate (or substantially an entire surface of the substrate) is coated with the color-triggering developer and at least one portion of the same surface of the substrate is coated with both the color-triggering developer and the deactivating ink; thus, at least one portion of the surface of the substrate is not coated with the deactivating ink. Stated another way, at least one portion of the substrate surface is coated with both the color-triggering developer and the deactivating ink composition, and at least one other portion of the substrate is coated with the color-triggering developer but is not coated with the deactivating ink composition. The portion(s) which do not comprise any of the deactivating ink composition is/are preferably in the shape of one or more designs that develop color upon application of the marking composition described herein and in U.S. Pat. No. 6,124,377. Preferably, the entire surface of the coated substrate surface is substantially flat, such that a user cannot easily see or feel which portion(s) of the substrate comprise both the color-triggering developer and the deactivating ink composition. Thus, the portion(s) of the substrate surface comprising both the color-triggering developer and the deactivating ink composition are not raised any higher off of the substrate than the portion(s) of the substrate surface that comprise no coating or that comprise the color-triggering developer with no deactivating ink composition.

Another embodiment of the present invention provides a marking system comprising (i) a substrate, preferably paper, having a surface coated with a color-triggering developer (as described herein and in U.S. Pat. No. 6,124,377) and (ii) a deactivating ink composition (as described herein); and (ii) a marking composition comprising at least one color pre-

**6**

cursor (as described herein and in U.S. Pat. No. 6,124,377). As described above, at least one "non-color developing portion" of the surface is coated with both the color-triggering developer and the deactivating ink composition, and at least one "color-developing portion" of the surface is coated with the color-triggering developer and is not coated with the deactivating ink composition. Color development occurs at the color-developing portion(s) and does not occur at the non-color developing portion(s) upon application of the marking composition to the surface of the substrate. According to particular embodiments, a majority of the substrate surface, more preferably the entire substrate surface or substantially the entire substrate surface, has been pre-coated with the color-triggering developer, and the deactivating ink composition has subsequently been printed onto one or more portions of the pre-coated substrate applying the deactivating ink composition with a flexographic plate imaged with the chosen design. The design can be printed as line art via any traditional printing process, including but not limited to gravure, flexography or lithography.

According to particular embodiments, the system comprises at least one marking instrument for applying the marking composition to the substrate to form at least one color mark. The marking composition may be contained within the marking instrument; for example, the marking composition may be in the form of an ink that is contained within a marker. Non-limiting examples of marking instruments include markers, pencils, crayons, stamps, stamp pads, pens, paintbrushes, and the like. Alternatively, the marking composition can be in the form of paint, which can be applied with a paintbrush or a person's hands (e.g., "fingerpaint").

According to particular embodiments, a method of using a marking system of the present invention comprises applying a marking composition comprising at least one color precursor to a substrate coated with a color-triggering developer and a deactivating ink composition. The method may further comprise using a marking instrument to apply the marking composition to the substrate.

The following example is provided to describe the invention in greater detail and is intended to illustrate, not limit, the invention.

EXAMPLE

While only one composition is set forth in Table 1 below, alternative compositions will be apparent to those skilled in the art. Such artisans will be able to modify the compositions with an eye toward the desired performance properties and intended use.

TABLE 1

| Deactivating Ink Formula | | |
|---|---|---|
| Component | wt % | Property/Function |
| Deionized Water | 38.7% (20-50%) | vehicle |
| Triisopropanolamine | 24.7% (15-35%) | Lewis base |
| Carbowax ® 1450 (polyethylene glycol) | 33.0% (20-50%) | diluent/synergist |
| Tergitol ® NP-9 | 0.50% (0.01-2%) | Additive (wetting agent) |
| Surfynol ® 104A | 0.05% (0.01-2%) | Additive (defoamer) |
| Reputain ® B30 | 0.12% (0.01-2%) | Additive (biocide) |
| Kathon ® PFM | 0.06% (0.01-2%) | Additive (biocide) |

Although the present invention has been described in connection with specific embodiments, it should be under-

US 9,790,383 B2

7

8

stood that the invention as claimed should not be unduly limited to such specific embodiments. Indeed, various modifications and variations of the described compositions and methods of the invention will be apparent to those of ordinary skill in the art and are intended to be within the scope of the appended claims.

What is claimed is:

1. A deactivating ink composition suitable for use as a coating on a substrate, the deactivating ink composition comprising:
    a Lewis base that is capable of complexing with a Lewis acid that has been coated on the substrate, wherein the Lewis base comprises triisopropanolamine; and
    an organic solvent that inhibits penetration of a leuco dye intermediate into the substrate.

2. The deactivating ink composition of claim 1, wherein the organic solvent comprises polyethylene glycol.

3. The deactivating ink composition of claim 1 further comprising water.

4. The deactivating ink composition of claim 1 further comprising at least one additive selected from the group consisting of surfactants, pH adjustors, biocides, and a combination thereof.

5. The deactivating ink composition of claim 1 further comprising at least one color dye.

6. The deactivating ink composition of claim 1, wherein the composition comprises about 20 wt % to about 50 wt % water.

7. The deactivating ink composition of claim 1, wherein the composition comprises about 15 wt % to about 35 wt % of the Lewis base.

8. The deactivating ink composition of claim 1, wherein the composition comprises about 20 wt % to about 50 wt % of the organic solvent.

9. The deactivating ink composition of claim 1, wherein the composition comprises about 0.01 wt % to about 10 wt % additives.

10. The deactivating ink composition of claim 1, wherein the composition comprises about 30 wt % to about 40 wt % water; about 20 wt % to about 30 wt % of the Lewis base; about 30 wt % to about 40 wt % of the organic solvent; and about 1 wt % to about 5 wt % optional additives.

* * * * *

# EXHIBIT 12



# Crayola Washable Glitter Glue

The Crayola Washable Glitter Glue Bold Blazes™ pack is perfect for adding extra glitz to gifts, dazzle to designs and overall awesomeness to arts and crafts projects! Each tube in this pack contains a blazing bold glitter color – choose the one that shines brightest for you!

• Use as an Adhesive or for Decoration    MFP15



TIP. If nozzle is clogged, insert paper clip to clean.

Try with these Crayola products for even more creative fun!

  

---

Contents and colors may vary. Please retain packaging for future reference

**3+**   

NOT FOR USE ON SKIN

## SAFETY INFORMATION

ACMI AP Conforms to ASTM D 4236.

WARNING! Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.

**Crayola** A Hallmark Company
©2016 Crayola, Easton, PA 18044-0431.
Distributed in Australia by Crayola (Australia) Pty Ltd. Imported by Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England.

crayola.com

## QUALITY GUARANTEE

We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

Made in China

Style#: 69-3522
Code#: 69-3522-0-310

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Washable Glitter Glue washes from most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required on severe stains.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.

In the U.S.A. and Canada, call 1-800-CRAYOLA (800-272-9652), weekdays 9 AM-4 PM ET
In Europe, call +33 (0) 1 41 05 54 54, weekdays 9 AM-5 PM local time.
In the UK, call 01702 208170, weekdays 9 AM-5 PM local time.
In Mexico, call 01800 71 78 222, weekdays 9 AM-5 PM local time.
In Australia, call Crayola AU at 1-800-657-353, weekdays 9 AM-4 PM AEST.

C €

### PROOF OF PURCHASE



0  71662 03522  8





# Crayola

# Washable Glitter Glue

D4P26

The Crayola Washable Glitter Glue Fiery Flecks™ pack collects nine of our most popular glitter glue colors in one large pack! Perfect for adding extra glitz to gifts, dazzle to designs and overall awesomeness to arts and crafts projects!

• Use as an Adhesive or for Decoration

Try with these Crayola products for even more creative fun!

Construction Paper

TIP: If made in dip red, zu it paper clip to clean

crayola.com

QUALITY GUARANTEE

WASHING & CARE INFORMATION

SAFETY INFORMATION

AP

3+

PROOF OF PURCHASE

71662-03527   3



3+

Style#: 69-3527
Code#: 69-3527-0-307

**crayola.com**

NOT FOR USE ON SKIN

Contents and colors may vary.
Please retain packaging for future reference.    Made In China

## QUALITY GUARANTEE

We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

In the U.S.A. and Canada, call **1-800-CRAYOLA (800-272-9652)**, weekdays 9 AM-4 PM ET.

In Europe, call **+33 (0) 1 41 06 54 54**, weekdays 9 AM-5 PM local time.

In the UK, call **01702 208170**, weekdays 9 AM-5 PM local time.

In Mexico, call **01800 71 78 222**, weekdays 9 AM-5 PM local time.

In Australia, call Crayola AU at **1-800-657-353**, weekdays 9 AM-4 PM AEST.

## SAFETY INFORMATION



Conforms to ASTM D 4236.
All Crayola art materials are nontoxic.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Washable Glitter Glue washes from most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required on severe stains.
**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.

 A *Hallmark* Company

©2016 Crayola, Easton, PA 18044-0431. Distributed in Australia by Crayola (Australia) Pty. Ltd. Imported by Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England.

### PROOF OF PURCHASE




0  71662 03527  3





This pack of **Crayola Washable Glitter Glue** is an all-inclusive set of our glitter glue colors in mini-sized tubes. Perfect for adding extra glitz to gifts, dazzle to designs and overall awesomeness to arts and crafts projects!

- Compact Size – Great On-The-Go!
- Use as an Adhesive or for Decoration



16 Sparkly Colors!



TIP: If nozzle is clogged, insert paper clip to clean.

**Try with these Crayola products for even more creative fun!**

  

**3+    crayola.com**

**QUALITY GUARANTEE**

We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

In the U.S.A. and Canada, call 1-800-CRAYOLA (800-272-9652), weekdays 9 AM-4 PM ET.

In Europe, call +33 (0) 1 41 05 54 54, weekdays 9 AM-5 PM local time.

In the UK, call 01702 208170, weekdays 9 AM-5 PM local time.

In Mexico, call 01800 71 78 222, weekdays 9 AM-5 PM local time.

In Australia, call Crayola AU at 1-800-657-353, weekdays 9 AM-4 PM AEST.



**Crayola** A Hallmark Company

©2016 Crayola. Easton, PA 18044-0431. Distributed in Australia by Crayola (Australia) Pty. Ltd. Imported by Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England.

**WASHING & CARE INFORMATION**

**FOR BEST RESULTS:** Crayola Washable Glitter Glue washes from most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required on severe stains.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.

**SAFETY INFORMATION**



Conforms to ASTM D 4236.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.

**NOT FOR USE ON SKIN**

Contents and colors may vary. Please retain packaging for future reference.





Made in China

Style#: 69-4200
Code#: 69-4200-0-306

**PROOF OF PURCHASE**



0  71662 06941  4

# EXHIBIT 13

23838-0059

# SAFETY DATA SHEET



SDS ID:  CRAY-026
CRAYOLA® WASHABLE GLITTER GLUE

## 1. Identification

**Product identifier**

**Material Name:**            CRAYOLA® WASHABLE GLITTER GLUE

**Other means of identification**

**Product Code(s)**          CRAY-026

**Synonyms**                 CRAYOLA PIPSQUEAKS GLITTER GLUE; CRAYOLA ART TUB; CRAYOLA TUB OF FUN; CRAYOLA ART INSPIRATION CASE; PRODUCT CODE(S): 04-0265; 04-0382; 04-0412; 04-0413; 04-0456; 04-0462; 04-0527; 04-0529; 04-0539; 04-0581; 04-0595; 04-0600; 04-0607; 04-0613; 04-0615; 04-0631; 04-0634; 04-0635; 04-0911; 04-0912; 04-0983; 04-1209; 04-1205; 04-1309; 04-1900; 04-1950; 04-1951; 04-2540; 04-2542; 04-2543; 04-2544; 04-2549; 04-2580; 04-2581; 04-4904; 04-5356; 04-5675; 04-5708; 04-5770; 04-6808; 04-6812; 04-6887; 04-7000; 04-7001; 04-7004; 04-8248; 54-2350; 54-2351; 54-2352; 69-0020; 69-0595; 69-1205; 69-2525; 69-3505; 69-3522; 69-3527; 69-4200; 69-4202; 69-7575;

**Recommended use of the chemical and restrictions on use**

**Recommended use**          Arts and Crafts

**Restrictions on use**      None Known

**Details of the supplier of the safety data sheet**

> **Supplier Address**
> CRAYOLA LLC
> 1100 Church Lane
> Easton, PA 18044
> Phone: 1-800-272-9652

**E-mail**                   support@crayola.com

**Emergency telephone number**

**Emergency Telephone**      1-800-535-5053 or call local POISON CONTROL

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**

SDS ID:  CRAY-026                    Issuing Date  23-Jan-2024                    Revision Number  5

**CRAYOLA® WASHABLE GLITTER GLUE**                    Revision date  23-Jan-2024

Not applicable

**Label elements**

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

The product contains no substances which at their given concentration, are considered to be hazardous to health.

| Appearance  Colored Liquid | Physical state  liquid | Odor  glue like |
|---|---|---|

**Other information**
No information available.

## 3. Composition/information on ingredients

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

| | |
|---|---|
| **Inhalation** | It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed. |
| **Eye contact** | It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention. |
| **Skin contact** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Ingestion** | Call a poison control center or doctor immediately for treatment advice. |

**Most important symptoms and effects, both acute and delayed**

**Symptoms**                    No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**          Treat symptomatically.

---

CRAYOLA® WASHABLE GLITTER GLUE

Revision date  23-Jan-2024

## 5. Fire-fighting measures

| | |
|---|---|
| **Suitable Extinguishing Media** | Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
| **Large Fire** | CAUTION: Use of water spray when fighting fire may be inefficient. |
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |

**Explosion data**
| | |
|---|---|
| **Sensitivity to mechanical impact** | None. |
| **Sensitivity to static discharge** | None. |
| **Special protective equipment and precautions for fire-fighters** | Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment. |

## 6. Accidental release measures

**Personal precautions, protective equipment and emergency procedures**

| | |
|---|---|
| **Personal precautions** | Wear personal protective clothing and equipment, see Section 8. |
| **For emergency responders** | Wear protective clothing and equipment suitable for the surrounding fire. |

**Methods and material for containment and cleaning up**

| | |
|---|---|
| **Methods for containment** | Prevent further leakage or spillage if safe to do so. |
| **Methods for cleaning up** | Pick up and transfer to properly labeled containers. |

## 7. Handling and storage

**Precautions for safe handling**

| | |
|---|---|
| **Advice on safe handling** | Wash thoroughly after handling. |

**Conditions for safe storage, including any incompatibilities**

| | |
|---|---|
| **Storage Conditions** | None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances. |

## 8. Exposure controls/personal protection

**Control parameters**

| | |
|---|---|
| **Exposure Limits** | This product, as supplied, does not contain any hazardous materials with occupational exposure limits established by the region specific regulatory bodies. |

**CRAYOLA® WASHABLE GLITTER GLUE**                                    Revision date  23-Jan-2024

**Appropriate engineering controls**

| | |
|---|---|
| **Engineering controls** | Showers<br>Eyewash stations<br>Ventilation systems. |

**Individual protection measures, such as personal protective equipment** `

| | |
|---|---|
| **Eye/face protection** | Eye protection not required under normal conditions. |
| **Hand protection** | Protective gloves are not required under normal conditions. |
| **Skin and body protection** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Respiratory protection** | No respirator is required under normal conditions of use. Under conditions of frequent use or heavy exposure, respiratory protection may be needed. |
| **General hygiene considerations** | Handle in accordance with good industrial hygiene and safety practice. |

---

## 9. Physical and chemical properties

**Information on basic physical and chemical properties**

| | |
|---|---|
| **Physical state** | liquid |
| **Appearance** | Colored Liquid |
| **Color** | various colors |
| **Odor** | glue like |
| **Odor threshold** | No information available |

| Property | Values | Remarks  • Method |
|---|---|---|
| pH | 6.5  -  7.5 | None known |
| Melting point / freezing point | No data available | None known |
| Initial boiling point and boiling range | No data available | None known |
| Flash point | No data available | None known |
| Evaporation rate | No data available | None known |
| Flammability | No data available | None known |
| **Flammability Limit in Air** | | None known |
| Upper flammability or explosive limits | No data available | |
| Lower flammability or explosive limits | No data available | |
| Vapor pressure | No data available | None known |
| Relative vapor density | No data available | None known |
| Relative density | No data available | None known |
| Water solubility | Soluble in water | None known |
| Solubility(ies) | No data available | None known |
| Partition coefficient | No data available | None known |
| Autoignition temperature | No data available | None known |
| Decomposition temperature | | None known |
| Kinematic viscosity | No data available | None known |
| Dynamic viscosity | No data available | None known |

| | |
|---|---|
| **Other information** | |
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | 1 - 1.04  g/cm3 |

---

SDS ID:  CRAY-026                          Issuing Date  23-Jan-2024                    Revision Number  5

**CRAYOLA® WASHABLE GLITTER GLUE**                                      Revision date  23-Jan-2024

| Bulk density | No information available |
|---|---|

## 10. Stability and reactivity

| | |
|---|---|
| Reactivity | No hazard expected. |
| Chemical stability | Stable at normal temperatures and pressure. |
| Possibility of hazardous reactions | None under normal processing. |
| Conditions to avoid | None reported. |
| Incompatible materials | Oxidizing materials. |
| Hazardous decomposition products | Oxides of carbon. |

## 11. Toxicological information

### Information on likely routes of exposure

| | |
|---|---|
| Inhalation | No information on significant adverse effects. |
| Eye contact | No information on significant adverse effects. |
| Skin contact | No information on significant adverse effects. |
| Ingestion | No information on significant adverse effects. |

### Symptoms related to the physical, chemical and toxicological characteristics

| Symptoms | No information available. |
|---|---|

### Acute toxicity

**Numerical measures of toxicity**
No information available

### Delayed and immediate effects as well as chronic effects from short and long-term exposure

| | |
|---|---|
| Skin corrosion/irritation | No information available. |
| Serious eye damage/eye irritation | No information available. |
| Respiratory or skin sensitization | No information available. |
| Germ cell mutagenicity | No information available. |
| Carcinogenicity | No information available. |
| Reproductive toxicity | No information available. |

SDS ID: **CRAY-026**                    **Issuing Date**  23-Jan-2024               **Revision Number**  5

**CRAYOLA® WASHABLE GLITTER GLUE**

**Revision date** 23-Jan-2024

| | |
|---|---|
| **STOT - single exposure** | No information available. |
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

| | |
|---|---|
| **Ecotoxicity** | The environmental impact of this product has not been fully investigated. |
| **Persistence and degradability** | No information available. |
| **Bioaccumulation** | There is no data for this product. |
| **Other adverse effects** | No information available. |

## 13. Disposal considerations

**Disposal methods**

| | |
|---|---|
| **Waste from residues/unused products** | Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations. |
| **Contaminated packaging** | Do not reuse empty containers. |

## 14. Transport information

<u>**DOT**</u>   Not regulated

## 15. Regulatory information

**International Inventories**

**TSCA**   All of the components of this product are listed on the TSCA Inventory.

**SDS ID: CRAY-026**   **Issuing Date** 23-Jan-2024   **Revision Number** 5

**CRAYOLA® WASHABLE GLITTER GLUE**                                   Revision date   23-Jan-2024

| | |
|---|---|
| **DSL/NDSL** | Contact supplier for inventory compliance status. |
| **EINECS/ELINCS** | Contact supplier for inventory compliance status. |
| **ENCS** | Contact supplier for inventory compliance status. |
| **IECSC** | Contact supplier for inventory compliance status. |
| **KECL** | Contact supplier for inventory compliance status. |
| **PICCS** | Contact supplier for inventory compliance status. |
| **AIIC** | Contact supplier for inventory compliance status. |
| **NZIoC** | Contact supplier for inventory compliance status. |

Legend:
**TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL**   - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS**   - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS**   - Japan Existing and New Chemical Substances
**IECSC**  - China Inventory of Existing Chemical Substances
**KECL**   - Korean Existing and Evaluated Chemical Substances
**PICCS**   - Philippines Inventory of Chemicals and Chemical Substances
**AIIC**   - Australian Inventory of Industrial Chemicals
**NZIoC**  - New Zealand Inventory of Chemicals

## US Federal Regulations

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA).   This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370,  refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355).   There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

## US State Regulations

**California Proposition 65**
This product does not require warnings under California Proposition 65.

## U.S. EPA Label Information

**EPA Pesticide Registration Number**  Not applicable

## 16. Other information

| **NFPA** | Health hazards  0 | **Flammability**  0 | Instability  0 | Special hazards  - |
|---|---|---|---|---|
| **HMIS** | Health hazards  0 | **Flammability**  0 | Physical hazards  0 | Personal protection  X |

| | | |
|---|---|---|
| **SDS ID:  CRAY-026** | **Issuing Date**  23-Jan-2024 | **Revision Number**  5 |

**Page  7 / 8**

**CRAYOLA® WASHABLE GLITTER GLUE**

**Revision date** 23-Jan-2024

**Key or legend to abbreviations and acronyms used in the safety data sheet**

**Legend Section 8: Exposure controls/personal protection**

| | | | |
|---|---|---|---|
| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**

Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

| | |
|---|---|
| **Revision date** | 23-Jan-2024 |
| **Revision Note** | No information available. |

**Disclaimer**

The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.

**End of Safety Data Sheet**

SDS ID: CRAY-026

Issuing Date 23-Jan-2024

Revision Number 5

Page 8 / 8

Item Numbers: 23838-0059, 23838-0099, 23838-0169, 23838-0209, 23838-1059, 23838-1259

Page 8 of 8

# EXHIBIT 14







## Washable Glue Sticks
## Bâtons de colle lavable
## Barritas de pegamento lavable

Washable and safe. Pedestal cap holds glue stick upright.

Lavable et sécuritaire. Le bouchon sert de support et tient le bâton de colle debout.

Lavable y seguro. La tapa sirve de pedestal para mantener la barrita de pegamento parada.

H6P30



Crayola a Hallmark Company
©2015 Crayola, Easton, PA 18044-0431.

Made in China
Fabriqué en Chine
Hecho en China

### SAFETY INFORMATION
### RENSEIGNEMENTS SUR LA SÉCURITÉ
### INFORMACIÓN DE SEGURIDAD



Conforms to ASTM D 4236. All Crayola art materials are nontoxic.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

Conforme à la norme ASTM D 4236. Tout le matériel d'artiste Crayola est non toxique.

**AVERTISSEMENT!** Ne convient pas aux enfants de moins de 36 mois; contient de petites pièces pouvant constituer un risque de suffocation si elles sont avalées.

Cumple con la norma ASTM D 4236. Todos los productos de arte Crayola son no tóxicos.

**¡ADVERTENCIA!** No apto para niños menores de 36 meses de edad debido a pequeñas piezas que podrían causar asfixia si se tragan.

**QUESTIONS/COMMENTS**
In the U.S.A. and Canada, call
**1-800-CRAYOLA (800-272-9652),**
weekdays 9 AM-4 PM ET.
In México, call **01800 71 78 222,**
weekdays 9 AM-5 PM local time.

**QUESTIONS/COMMENTAIRES**
Aux É.-U. et au Canada, appelez au
**1-800-CRAYOLA (800-272-9652),**
en semaine, de 9 h à 16 h, HE.
Au Mexique, appelez au **01800 71 78 222,**
en semaine, de 9 h à 17 h, heure locale.

**PREGUNTAS/COMENTARIOS**
En É.U.A. y Canadá, llamar al
**1-800-CRAYOLA (800-272-9652),** Lun.-Vie.,
9 AM-4 PM Hora del Este.
En México, llamar al **01800 71 78 222,**
Lun.-Vie., 9 AM-5 PM Hora Local.

### WASHING & CARE INFORMATION
### RENSEIGNEMENTS SUR LE LAVAGE ET L'ENTRETIEN
### INFORMACIÓN DEL LAVADO Y CUIDADO

**STAIN ADVISEMENT:** Crayola Washable Glue washes from skin and most washable clothing.

**ATTENTION AUX TACHES:** La colle lavable Crayola se lave de la peau et de la plupart des vêtements lavables.

**AVISO SOBRE MANCHAS:** El pegamento lavable de Crayola se lava de la piel y de la mayoría de la ropa lavable.

Contents and colors may vary. Please retain packaging for future reference.

Le contenu et les couleurs peuvent varier. Conserver l'emballage pour référence ultérieure.

El contenido y los colores podrían variar. Conservar el empaque para referencia futura.

crayola.com



3+



Style# / Style n°. / Estilo #: 56-1129
Code# / Code n°. / Código #: 56-1129-0-350

# EXHIBIT 15

# SAFETY DATA SHEET



SDS ID:  CRAY-051
**CRAYOLA® GLUE STICK**

## 1. Identification

**Product identifier**

**Material Name:**                          CRAYOLA® GLUE STICK

**Other means of identification**

**Product Code(s)**                        CRAY-051

**Synonyms**                              CRAYOLA GLUE STICK; GLITTER GLUE STICK; PRODUCT CODE(S): 04-1021; 04-1624; 04-0294; 04-0297; 04-0265; 04-0268; 04-0563; 04-0564; 04-0565; 04-0597; 04-0613; 04-0983; 04-5674; 04-5777; 04-6011; 56-1129; 56-1135; 56-1228; 69-3400; 69-3401; 69-3527; 81-1335; 81-8111;

**Recommended use of the chemical and restrictions on use**

**Recommended use**                    Arts and Crafts

**Restrictions on use**                  None Known

**Details of the supplier of the safety data sheet**

   **Supplier Address**
   CRAYOLA LLC
   1100 Church Lane
   Easton, PA 18044
   Phone: 1-800-272-9652

**E-mail**                                   support@crayola.com

**Emergency telephone number**

**Emergency Telephone**              1-800-535-5053 or call local POISON CONTROL

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

**Label elements**

---

CRAYOLA® GLUE STICK                                                    **Revision date**  15-May-2024

---

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).


The product contains no substances which at their given concentration, are considered to be hazardous to health.

**Appearance**  Blue solid                    **Physical state**  solid                            **Odor**  faint odor

---

**Other information**
No information available.

## 3. Composition/information on ingredients

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

| | |
|---|---|
| **Inhalation** | It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed. |
| **Eye contact** | It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention. |
| **Skin contact** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Ingestion** | Call a poison control center or doctor immediately for treatment advice. |

**Most important symptoms and effects, both acute and delayed**

**Symptoms**                    No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**          Treat symptomatically.

## 5. Fire-fighting measures

**Suitable Extinguishing Media**      Use extinguishing measures that are appropriate to local circumstances and the

---

**CRAYOLA® GLUE STICK**                                        **Revision date**  15-May-2024

|  |  |
|---|---|
| **Large Fire** | surrounding environment.<br>CAUTION: Use of water spray when fighting fire may be inefficient. |
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |

**Explosion data**
  **Sensitivity to mechanical impact** None.

  **Sensitivity to static discharge** None.

| **Special protective equipment and precautions for fire-fighters** | Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment. |
|---|---|

---

## 6. Accidental release measures

**Personal precautions, protective equipment and emergency procedures**

| **Personal precautions** | Wear personal protective clothing and equipment, see Section 8. |
|---|---|
| **For emergency responders** | Wear protective clothing and equipment suitable for the surrounding fire. |

**Methods and material for containment and cleaning up**

| **Methods for containment** | Prevent further leakage or spillage if safe to do so. |
|---|---|
| **Methods for cleaning up** | Pick up and transfer to properly labeled containers. |

---

## 7. Handling and storage

**Precautions for safe handling**

| **Advice on safe handling** | Wash thoroughly after handling. |
|---|---|

**Conditions for safe storage, including any incompatibilities**

| **Storage Conditions** | None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances. |
|---|---|

---

## 8. Exposure controls/personal protection

**Control parameters**

| **Exposure Limits** | This product, as supplied, does not contain any hazardous materials with occupational exposure limits established by the region specific regulatory bodies. |
|---|---|

**Appropriate engineering controls**

| **Engineering controls** | Showers |
|---|---|

---

**CRAYOLA® GLUE STICK**                                          Revision date  15-May-2024

---

Eyewash stations
Ventilation systems.

__Individual protection measures, such as personal protective equipment__

| | |
|---|---|
| **Eye/face protection** | Eye protection not required under normal conditions. |
| **Hand protection** | Protective gloves are not required under normal conditions. |
| **Skin and body protection** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Respiratory protection** | No respirator is required under normal conditions of use. Under conditions of frequent use or heavy exposure, respiratory protection may be needed. |
| **General hygiene considerations** | Handle in accordance with good industrial hygiene and safety practice. |

---

## 9. Physical and chemical properties

__Information on basic physical and chemical properties__

| | |
|---|---|
| **Physical state** | solid |
| **Appearance** | Blue solid |
| **Color** | blue changing to white when exposed to air |
| **Odor** | faint odor |
| **Odor threshold** | No data available |

| **Property** | **Values** | **Remarks • Method** |
|---|---|---|
| **pH** | 10 - 12 | None known |
| **Melting point / freezing point** | No data available | None known |
| **Initial boiling point and boiling range** | 100 °C / 212 °F | None known |
| **Flash point** | > 100°C | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
|   **Upper flammability or explosive limits** | No data available | |
|   **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | 0.95 - 1.1 | None known |
| **Water solubility** | Soluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | No data available | None known |
| **Dynamic viscosity** | No data available | None known |

| **Other information** | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | No information available |
| **Bulk density** | No information available |

---

## 10. Stability and reactivity

---

**CRAYOLA® GLUE STICK**                                    **Revision date** 15-May-2024

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | None reported. |
| **Incompatible materials** | Acid. Oxidizing agents. |
| **Hazardous decomposition products** | None known. |

## 11. Toxicological information

<u>Information on likely routes of exposure</u>

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

<u>Symptoms related to the physical, chemical and toxicological characteristics</u>

**Symptoms**                  No information available.

<u>Acute toxicity</u>

**Numerical measures of toxicity**
No information available

<u>Delayed and immediate effects as well as chronic effects from short and long-term exposure</u>

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |
| **STOT - single exposure** | No information available. |

---

**CRAYOLA® GLUE STICK**    **Revision date**  15-May-2024

| | |
|---|---|
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

| | |
|---|---|
| **Ecotoxicity** | The environmental impact of this product has not been fully investigated. |
| **Persistence and degradability** | No information available. |
| **Bioaccumulation** | There is no data for this product. |
| **Other adverse effects** | No information available. |

## 13. Disposal considerations

**Disposal methods**

| | |
|---|---|
| **Waste from residues/unused products** | Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations. |
| **Contaminated packaging** | Do not reuse empty containers. |

## 14. Transport information

**DOT**    Not regulated

## 15. Regulatory information

**International Inventories**

| | |
|---|---|
| **TSCA** | All of the components of this product are listed on the TSCA Inventory. |
| **DSL/NDSL** | Contact supplier for inventory compliance status. |
| **EINECS/ELINCS** | Contact supplier for inventory compliance status. |

**CRAYOLA® GLUE STICK**                                                    **Revision date** 15-May-2024

| | |
|---|---|
| **ENCS** | Contact supplier for inventory compliance status. |
| **IECSC** | Contact supplier for inventory compliance status. |
| **KECL** | Contact supplier for inventory compliance status. |
| **PICCS** | Contact supplier for inventory compliance status. |
| **AIIC** | Contact supplier for inventory compliance status. |
| **NZIoC** | Contact supplier for inventory compliance status. |

**Legend:**
**TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL**   - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS**   - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS**  - Japan Existing and New Chemical Substances
**IECSC**  - China Inventory of Existing Chemical Substances
**KECL**  - Korean Existing and Evaluated Chemical Substances
**PICCS**   - Philippines Inventory of Chemicals and Chemical Substances
**AIIC**  - Australian Inventory of Industrial Chemicals
**NZIoC**  - New Zealand Inventory of Chemicals

**US Federal Regulations**

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA).  This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370,  refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355).  There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

**US State Regulations**

**California Proposition 65**
This product does not require warnings under California Proposition 65.

**U.S. EPA Label Information**

**EPA Pesticide Registration Number** Not applicable

---

## 16. Other information

| **NFPA** | Health hazards  0 | Flammability  0 | Instability  0 | Special hazards  - |
|---|---|---|---|---|
| **HMIS** | Health hazards  0 | Flammability  0 | Physical hazards  0 | Personal protection  X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**
**Legend  Section 8: Exposure controls/personal protection**

---

**CRAYOLA® GLUE STICK**                                                      **Revision date**  15-May-2024

| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
|-----|----------------------------|------|----------------------------------|
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

**Revision date**                    15-May-2024
**Revision Note**                    No information available.
**Disclaimer**
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
**End of Safety Data Sheet**

# EXHIBIT 16









Style# / Style n° : / Estilo #: 56-1104
Code# / Code n° : / Código #: 56-1104-0-150

**Crayola** A Hallmark Company
Une société Hallmark

©2015 Crayola, Easton, PA 18044-0431. Distributed in
Australia by Crayola (Australia) Pty. Ltd. Imported by
Binney & Smith (Europe) Ltd., Bedford Heights, Manton
Lane, Bedford, MK41 7PH, England.

Distribué en Australie par Crayola (Australia) Pty. Ltd.
Importé par Binney & Smith (Europe) Ltd., Bedford
Heights, Manton Lane, Bedford, MK41 7PH, Angleterre.

Distribuido en Australia por Crayola (Australia) Pty. Ltd.
Importado por Binney & Smith (Europe) Ltd., Bedford
Heights, Manton Lane, Bedford, MK41 7PH, Inglaterra.

**3+**

Made in China
Fabriqué en Chine
Hecho en China

PROOF OF PURCHASE · PREUVE D'ACHAT
PRUEBA DE COMPRA

0 71662 11104 5

# EXHIBIT 17

# SAFETY DATA SHEET



SDS ID:  CRAY-055
CRAYOLA® SCHOOL GLUE

## 1. Identification

**Product identifier**

**Material Name:**                    CRAYOLA® SCHOOL GLUE

**Other means of identification**

**Product Code(s)**                  CRAY-055

**Synonyms**                          CRAYOLA SCHOOL GLUE; COLORED SCHOOL GLUE; PRODUCT CODE(S): 04-0296;
04-0478; 04-0526; 04-0527; 04-0539;04-0581; 04-0614; 04-0631; 04-0634; 04-0635;
04-0638; 04-1624; 04-2547; 04-2580; 04-2581; 04-5672; 04-5674; 04-5678; 04-5718;
04-5770; 04-5777; 04-6011; 04-6932; 04-6933; 56-1104; 56-0300; 56-1228; 69-8100;
69-8101; 69-8150; 69-8199; 69-9100; 69-9101; 69-9102; 69-9103; 69-9104; 69-9105;
69-9106; 69-9107; 69-9108;

**Recommended use of the chemical and restrictions on use**

**Recommended use**                  Arts and Crafts

**Restrictions on use**              None Known

**Details of the supplier of the safety data sheet**

> **Supplier Address**
> CRAYOLA LLC
> 1100 Church Lane
> Easton, PA 18044
> Phone: 1-800-272-9652

**E-mail**                            support@crayola.com

**Emergency telephone number**

**Emergency Telephone**              1-800-535-5053 or call local POISON CONTROL

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

---

**CRAYOLA® SCHOOL GLUE**                                        **Revision date**  23-Jan-2024

**Label elements**

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

The product contains no substances which at their given concentration, are considered to be hazardous to health.

**Appearance**  White liquid          **Physical state**  liquid                                  **Odor**  faint odor

**Other information**
No information available.

## 3. Composition/information on ingredients

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

**Inhalation**            It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed.

**Eye contact**           It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention.

**Skin contact**          It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed.

**Ingestion**             Call a poison control center or doctor immediately for treatment advice.

**Most important symptoms and effects, both acute and delayed**

**Symptoms**              No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**    Treat symptomatically.

## 5. Fire-fighting measures

**CRAYOLA® SCHOOL GLUE**                                    **Revision date**  23-Jan-2024

---

| | |
|---|---|
| **Suitable Extinguishing Media** | Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
| **Large Fire** | CAUTION: Use of water spray when fighting fire may be inefficient. |
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |
| **Explosion data**<br>**Sensitivity to mechanical impact** None. | |
| **Sensitivity to static discharge** | None. |
| **Special protective equipment and precautions for fire-fighters** | Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment. |

## 6. Accidental release measures

**Personal precautions, protective equipment and emergency procedures**

| | |
|---|---|
| **Personal precautions** | Wear personal protective clothing and equipment, see Section 8. |
| **For emergency responders** | Wear protective clothing and equipment suitable for the surrounding fire. |

**Methods and material for containment and cleaning up**

| | |
|---|---|
| **Methods for containment** | Prevent further leakage or spillage if safe to do so. |
| **Methods for cleaning up** | Pick up and transfer to properly labeled containers. |

## 7. Handling and storage

**Precautions for safe handling**

**Advice on safe handling**    Wash thoroughly after handling.

**Conditions for safe storage, including any incompatibilities**

**Storage Conditions**    None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances.

## 8. Exposure controls/personal protection

**Control parameters**

**Exposure Limits**    This product, as supplied, does not contain any hazardous materials with occupational exposure limits established by the region specific regulatory bodies.

**Appropriate engineering controls**

---

**CRAYOLA® SCHOOL GLUE**                                        **Revision date** 23-Jan-2024

| | |
|---|---|
| **Engineering controls** | Showers |
| | Eyewash stations |
| | Ventilation systems. |

**Individual protection measures, such as personal protective equipment**

| | |
|---|---|
| **Eye/face protection** | Eye protection not required under normal conditions. |
| **Hand protection** | Protective gloves are not required under normal conditions. |
| **Skin and body protection** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Respiratory protection** | No respirator is required under normal conditions of use. Under conditions of frequent use or heavy exposure, respiratory protection may be needed. |
| **General hygiene considerations** | Handle in accordance with good industrial hygiene and safety practice. |

## 9. Physical and chemical properties

**Information on basic physical and chemical properties**

| | |
|---|---|
| **Physical state** | liquid |
| **Appearance** | White liquid |
| **Color** | white |
| **Odor** | faint odor |
| **Odor threshold** | No information available |

| Property | Values | Remarks • Method |
|---|---|---|
| **pH** | 4 - 7 | None known |
| **Melting point / freezing point** | No data available | None known |
| **Initial boiling point and boiling range** | 100 °C / 212 °F | None known |
| **Flash point** | No data available | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
| **Upper flammability or explosive limits** | No data available | |
| **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | 1.05 | None known |
| **Water solubility** | Soluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | No data available | None known |
| **Dynamic viscosity** | No data available | None known |

| **Other information** | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | No information available |
| **Bulk density** | No information available |

**CRAYOLA® SCHOOL GLUE**                                                      Revision date  23-Jan-2024

## 10. Stability and reactivity

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | None reported. |
| **Incompatible materials** | Oxidizing agents. |
| **Hazardous decomposition products** | None known. |

## 11. Toxicological information

**Information on likely routes of exposure**

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

**Symptoms related to the physical, chemical and toxicological characteristics**

**Symptoms**                    No information available.

**Acute toxicity**

**Numerical measures of toxicity**
No information available

**Delayed and immediate effects as well as chronic effects from short and long-term exposure**

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |

**CRAYOLA® SCHOOL GLUE**                                           **Revision date**  23-Jan-2024

| | |
|---|---|
| **STOT - single exposure** | No information available. |
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

| | |
|---|---|
| **Ecotoxicity** | The environmental impact of this product has not been fully investigated. |
| **Persistence and degradability** | No information available. |
| **Bioaccumulation** | There is no data for this product. |
| **Other adverse effects** | No information available. |

## 13. Disposal considerations

**Disposal methods**

| | |
|---|---|
| **Waste from residues/unused products** | Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations. |
| **Contaminated packaging** | Do not reuse empty containers. |

## 14. Transport information

**DOT**                              Not regulated

## 15. Regulatory information

**International Inventories**

**TSCA**                             All of the components of this product are listed on the TSCA Inventory.

**CRAYOLA® SCHOOL GLUE**                                          **Revision date** 23-Jan-2024

| | |
|---|---|
| **DSL/NDSL** | Contact supplier for inventory compliance status. |
| **EINECS/ELINCS** | Contact supplier for inventory compliance status. |
| **ENCS** | Contact supplier for inventory compliance status. |
| **IECSC** | Contact supplier for inventory compliance status. |
| **KECL** | Contact supplier for inventory compliance status. |
| **PICCS** | Contact supplier for inventory compliance status. |
| **AIIC** | Contact supplier for inventory compliance status. |
| **NZIoC** | Contact supplier for inventory compliance status. |

**Legend:**
**TSCA** - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL** - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS** - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS** - Japan Existing and New Chemical Substances
**IECSC** - China Inventory of Existing Chemical Substances
**KECL** - Korean Existing and Evaluated Chemical Substances
**PICCS** - Philippines Inventory of Chemicals and Chemical Substances
**AIIC** - Australian Inventory of Industrial Chemicals
**NZIoC** - New Zealand Inventory of Chemicals

**US Federal Regulations**

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA). This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370, refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355). There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

**US State Regulations**

**California Proposition 65**
This product does not require warnings under California Proposition 65.

**U.S. EPA Label Information**

**EPA Pesticide Registration Number** Not applicable

## 16. Other information

| **NFPA** | **Health hazards** 0 | **Flammability** 0 | **Instability** 0 | **Special hazards** - |
|---|---|---|---|---|
| **HMIS** | **Health hazards** 0 | **Flammability** 0 | **Physical hazards** 0 | **Personal protection** X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**

**CRAYOLA® SCHOOL GLUE**                                            **Revision date**  23-Jan-2024

---

**Legend  Section 8: Exposure controls/personal protection**

| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
|---|---|---|---|
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

**Revision date**            23-Jan-2024
**Revision Note**            No information available.
**Disclaimer**
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
**End of Safety Data Sheet**

---

# EXHIBIT 18





الغسل. نصيحة لتجنب البقع: لا تستخدموا المنتج بالقرب من ورق الحائط، والجدران المطلية، والخشب المطلي بطبقة نهائية والخشب غير المطلي، والفينيل، والسجاد وغير ذلك من المواد التي لا يمكن غسلها بالماء. لا يُستخدم كطلاء للجسم/الوجه. قد تختلف المحتويات والألوان.

**crayola.com**

Contents and colours
may vary.

**QUALITY GUARANTEE**
We guarantee the quality of all Crayola
products. If this product does not
perform properly, please contact us.

**M-F, 9 AM-4 PM ET/AEST:**
**U.S.A. & Canada (Call/Text):**
1-800-CRAYOLA (800-272-9652)
Text charges may apply.
**Australia:** 1-800-657-353

**M-F, 9 AM-5 PM LOCAL TIME:**
**UK:** 0800 389 6238
**Italy:** +39 (0) 543 720997
**Mexico:** 800 7178 222
**Benelux:** +31 (0)104596 580
**France:** +33 (0) 1 41 06 54 54
**Germany:** +496103 459180

**Crayola** A Hallmark Company  ©2020 Crayola, Easton, PA 18044-0431.
Serpentine Design® **Binney & Smith (Europe) Ltd., Bedford Heights,**
**Manton Lane, Bedford, MK41 7PH, England**; Binney & Smith (Europe) Ltd.,
Via Figline 13, 47122 Forlì (FC), Italy. Distributed in Australia by Crayola (Australia)
Pty Ltd. 10 Caribbean Drive Scoresby Victoria 3179.



Conforms to
ASTM D 4236.

**WARNING!** Not suitable for
children under 36 months due to
small parts which may cause a
choking hazard if swallowed.

| **WASHING & CARE INFORMATION** |
| --- |

**FOR BEST RESULTS:** Crayola Washable Paint Sticks wash from skin and
most washable clothing. Wash promptly in hot wash cycle. Do not use
prewash or chlorine bleach. Repeat laundering may be required.
**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished
and unfinished wood, vinyl, carpeting and other materials that cannot be
laundered. **Not for use as body/face paint.**

 6+

MADE IN SOUTH KOREA

Style#: 54-1070    Code#: 54-1070-E-301

Please insert UPC
code number
0-71662-21070-0





C2M10

crayola.com



0-3

Contents and colors may vary.

3+

**QUESTIONS? (Call/Text):**
1-800-CRAYOLA (800-272-9652),
M-F, 9 AM-4 PM ET. Text charges may apply.



ACMI
**AP**

Conforms to
ASTM D 4236.

**WARNING!**
Not suitable for children
under 36 months due
to small parts which
may cause a choking
hazard if swallowed.

All Crayola art materials
are nontoxic.

**FOR BEST RESULTS:**
Crayola Washable Paint Sticks
wash from skin and most washable
clothing. Wash promptly in hot
wash cycle. Do not use prewash or
chlorine bleach. Repeat laundering
may be required.

**STAIN ADVISEMENT:**
Keep away from wallpaper,
painted walls, finished and
unfinished wood, vinyl, carpeting
and other materials that cannot
be laundered. **Not for use as
body/face paint.**

**Crayola** A Hallmark Company
©2022 Crayola, Easton, PA 18044-0431. Serpentine Design®

**MADE IN SOUTH KOREA**

Style#: 54-6211    Code#: 54-6211-0-200



0  71662 06211  8

# EXHIBIT 19

# SAFETY DATA SHEET



SDS ID: CRAY-175
CRAYOLA® Paint Sticks

## 1. Identification

**Product identifier**

**Material Name:** CRAYOLA® Paint Sticks

**Other means of identification**

**Product Code(s)** CRAY-175

**Synonyms** CRAYOLA PROJECT PAINT STICKS; WASHABLE PAINT STICKS; QUICK-DRY PAINT STICKS; CRAYOLA CRAFT PAINT STICKS; PRODUCT CODE(S): 04-6941; 54-1070; 54-1071; 54-1072; 54-1073; 54-1075; 54-1085; 54-6207; 54-6211; 54-6213;

**Recommended use of the chemical and restrictions on use**

**Recommended use** Arts and Crafts

**Restrictions on use** None Known

**Details of the supplier of the safety data sheet**

**Supplier Address**
CRAYOLA LLC
1100 Church Lane
Easton, PA 18044
Phone: 1-800-272-9652

**E-mail** support@crayola.com

**Emergency telephone number**

**Emergency Telephone** 1-800-535-5053 or call local POISON CONTROL

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

**Label elements**

**Hazard statements**

---

**CRAYOLA® Paint Sticks**                                         **Revision date** 30-May-2024

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

The product contains no substances which at their given concentration, are considered to be hazardous to health.

| Appearance solid colored stick | Physical state solid | Odor Mild |
|---|---|---|

**Other information**
No information available.

## 3. Composition/information on ingredients

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

**Inhalation**                It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed.

**Eye contact**               It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention.

**Skin contact**              It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed.

**Ingestion**                 Call a poison control center or doctor immediately for treatment advice.

**Most important symptoms and effects, both acute and delayed**

**Symptoms**                  No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**        Treat symptomatically.

## 5. Fire-fighting measures

**Suitable Extinguishing Media**     Use extinguishing measures that are appropriate to local circumstances and the surrounding environment.
   **Large Fire**                     CAUTION: Use of water spray when fighting fire may be inefficient.

**CRAYOLA® Paint Sticks**

**Revision date**  30-May-2024

| | |
|---|---|
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |

**Explosion data**
  **Sensitivity to mechanical impact** None.

  **Sensitivity to static discharge**     None.

| | |
|---|---|
| **Special protective equipment and precautions for fire-fighters** | Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment. |

## 6. Accidental release measures

**Personal precautions, protective equipment and emergency procedures**

| | |
|---|---|
| **Personal precautions** | Wear personal protective clothing and equipment, see Section 8. |
| **For emergency responders** | Wear protective clothing and equipment suitable for the surrounding fire. |

**Methods and material for containment and cleaning up**

| | |
|---|---|
| **Methods for containment** | Prevent further leakage or spillage if safe to do so. |
| **Methods for cleaning up** | Pick up and transfer to properly labeled containers. |

## 7. Handling and storage

**Precautions for safe handling**

**Advice on safe handling**       Wash thoroughly after handling.

**Conditions for safe storage, including any incompatibilities**

| | |
|---|---|
| **Storage Conditions** | None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances. |

## 8. Exposure controls/personal protection

**Control parameters**

| | |
|---|---|
| **Exposure Limits** | This product, as supplied, does not contain any hazardous materials with occupational exposure limits established by the region specific regulatory bodies. |

**Appropriate engineering controls**

| | |
|---|---|
| **Engineering controls** | Showers<br>Eyewash stations<br>Ventilation systems. |

---

**CRAYOLA® Paint Sticks**                                              **Revision date**  30-May-2024

___

**Individual protection measures, such as personal protective equipment**

| | |
|---|---|
| **Eye/face protection** | No special protective equipment required. |
| **Hand protection** | Protective gloves are not required under normal conditions. |
| **Skin and body protection** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Respiratory protection** | No respirator is required under normal conditions of use. Under conditions of frequent use or heavy exposure, respiratory protection may be needed. |
| **General hygiene considerations** | Handle in accordance with good industrial hygiene and safety practice. |

## 9.  Physical and chemical properties

**Information on basic physical and chemical properties**

| | |
|---|---|
| **Physical state** | solid |
| **Appearance** | solid colored stick |
| **Color** | multi-color |
| **Odor** | Mild |
| **Odor threshold** | No information available |

| Property | Values | Remarks  • Method |
|---|---|---|
| **pH** | 8  -  9 | None known |
| **Melting point / freezing point** | 70  °C  /  158  °F | None known |
| **Initial boiling point and boiling range** | No data available | None known |
| **Flash point** | No data available | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
| **Upper flammability or explosive limits** | No data available | |
| **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | 1  -  1.5 | None known |
| **Water solubility** | Soluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | No data available | None known |
| **Dynamic viscosity** | No data available | None known |

| Other information | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | No information available |
| **Bulk density** | No information available |

## 10. Stability and reactivity

___

**CRAYOLA® Paint Sticks**                                    **Revision date** 30-May-2024

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | Avoid heat. |
| **Incompatible materials** | Acids. |
| **Hazardous decomposition products** | None known. |

## 11. Toxicological information

**Information on likely routes of exposure**

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

**Symptoms related to the physical, chemical and toxicological characteristics**

**Symptoms**                    No information available.

**Acute toxicity**

**Numerical measures of toxicity**
No information available

**Delayed and immediate effects as well as chronic effects from short and long-term exposure**

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |
| **STOT - single exposure** | No information available. |

**CRAYOLA® Paint Sticks**                                              **Revision date** 30-May-2024

| | |
|---|---|
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

| | |
|---|---|
| **Ecotoxicity** | The environmental impact of this product has not been fully investigated. |
| **Persistence and degradability** | No information available. |
| **Bioaccumulation** | There is no data for this product. |
| **Other adverse effects** | No information available. |

## 13. Disposal considerations

**Disposal methods**

| | |
|---|---|
| **Waste from residues/unused products** | Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations. |
| **Contaminated packaging** | Do not reuse empty containers. |

## 14. Transport information

**DOT**                         Not regulated

## 15. Regulatory information

**International Inventories**

| | |
|---|---|
| **TSCA** | Contact supplier for inventory compliance status. |
| **DSL/NDSL** | Contact supplier for inventory compliance status. |
| **EINECS/ELINCS** | Contact supplier for inventory compliance status. |
| **ENCS** | Contact supplier for inventory compliance status. |

---

**CRAYOLA® Paint Sticks**                                              **Revision date**  30-May-2024

| | |
|---|---|
| **IECSC** | Contact supplier for inventory compliance status. |
| **KECL** | Contact supplier for inventory compliance status. |
| **PICCS** | Contact supplier for inventory compliance status. |
| **AIIC** | Contact supplier for inventory compliance status. |
| **NZIoC** | Contact supplier for inventory compliance status. |

**Legend:**
**TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL**  - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS**  - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS**  - Japan Existing and New Chemical Substances
**IECSC**  - China Inventory of Existing Chemical Substances
**KECL**  - Korean Existing and Evaluated Chemical Substances
**PICCS**  - Philippines Inventory of Chemicals and Chemical Substances
**AIIC**  - Australian Inventory of Industrial Chemicals
**NZIoC**  - New Zealand Inventory of Chemicals

**US Federal Regulations**

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA).  This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370,  refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355).  There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

**US State Regulations**

**California Proposition 65**
This product does not require warnings under California Proposition 65.

**U.S. EPA Label Information**

**EPA Pesticide Registration Number**  Not applicable

---

# 16. Other information

| **NFPA** | **Health hazards**  0 | **Flammability**  0 | **Instability**  0 | **Special hazards**  - |
|---|---|---|---|---|
| **HMIS** | **Health hazards**  0 | **Flammability**  0 | **Physical hazards**  0 | **Personal protection**  X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**
**Legend  Section 8: Exposure controls/personal protection**

| | | | |
|---|---|---|---|
| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
| Ceiling | Maximum limit value | * | Skin designation |

**CRAYOLA® Paint Sticks**                                             **Revision date**  30-May-2024

---

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

| | |
|---|---|
| **Revision date** | 30-May-2024 |
| **Revision Note** | No information available. |

**Disclaimer**
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
**End of Safety Data Sheet**

---

# EXHIBIT 20





crayola.com

MADE IN U.S.A.

**SAFETY INFORMATION**

Conforms to ASTM D 4236. ALL CRAYOLA ART MATERIALS ARE NONTOXIC.

Crayola • A Hallmark Company

©2014 Crayola, Easton, PA 18044-0431 Serpentine Design© Distributed in Australia by Crayola (Australia) Pty Ltd. Imported by Binney & Smith (Europe) Ltd., Bedford Heights Manton Lane, Bedford MK41 7PH, England

Contents and colors may vary. Please retain packaging for future reference.

**QUALITY GUARANTEE**

We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

In the U.S.A. and Canada, call 1-800-CRAYOLA (1-800-272-9652), weekdays 9 AM-4 PM ET.

In Europe, call +33 (0) 1 41 06 54 54, weekdays 9 AM-5 PM local time.

In the UK, call 01702 206170, weekdays 9 AM-5 PM local time.

In Mexico, call 01800 71 78 222, weekdays 9 AM-5 PM local time.

In Australia, call Crayola AU at 1-800-657-353, weekdays 9 AM-4 PM AEST.

# Style / 55-1311
Code / 55-1311-0-201

**PROOF OF PURCHASE**

0  71662 21311  4

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Washable Fingerpaints wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prevash or chlorine bleach. Repeat laundering may be required.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.





CE (G) UK CA

AP   WARNING:

0-3

**WASHING & CARE INFORMATION**
FOR BEST RESULTS

STAIN ADVISEMENT

**QUALITY GUARANTEE**
| U.S.A. & CANADA | AUSTRALIA | UK | ITALY | MEXICO | BENELUX | GERMANY | FRANCE |

crayola.com

**Crayola**
Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford
MK41 7PH  England

0  71662 21092  2



# Crayola Washable Neon Paint

adds a vibrant, iridescent look to your creative masterpieces. Crayola Washable Paint is a nontoxic water-based paint that's great for art, crafts and school projects. Decorate book covers, signs or posters. Use various brushes, stamps or sponges to create interesting patterns and designs.



Visit crayola.com for fun idea starters!

## 6 Colors Included:

Radical Red

Atomic Tangerine

Unmellow Yellow

Screamin' Green

Blue Attitude

Shocking Pink

**QUALITY GUARANTEE**
We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

**AUSTRALIA**
1-800-657-353
M-F, 9 AM-4 PM AEST

**Crayola** A Hallmark Company
©2022 Crayola, Easton, PA 18044-0431. Distributed in Australia by Crayola (Australia) Pty Ltd. 10 Caribbean Drive Scoresby Victoria 3179.

**crayola.com.au**





CE 0-3

Contents and colors may vary. Please retain packaging for future reference.

Made in Vietnam
Code#: 54-2393

## SAFETY INFORMATION



Conforms to ASTM D 4236. ALL CRAYOLA ART MATERIALS ARE NONTOXIC.
Crayola paints are certified AP.
Meets performance standard ANSI Z356.5.
**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Washable Paints wash from skin and most clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.
**Not for use as body/face paint.**
**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting, and other materials that cannot be laundered.

**PROOF OF PURCHASE**



0 71662 32393 6















Conforms to ASTM D 4236.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.

Do not pour excess paint back into this container. Store in a cool, dry place.

Contents and colors may vary.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
**U.S.A. & CANADA** (Call/Text): 1-800-CRAYOLA (800-272-9652) Text charges may apply.    **AUSTRALIA:** 1-800-657-353

M-F, 9 AM-5 PM LOCAL TIME:
**UK:** 0800 389 6238    **ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7178 222    **BENELUX:** +31 (0)104596 580
**FRANCE:** +33 (0) 1 41 06 54 54    **GERMANY:** +496103 459180

**Crayola** A·Hallmark·Company    ©2022 Crayola, Easton, PA 18044-0431.
**Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England;** Binney & Smith (Europe) Ltd., Via Figline 13, 47122 Forli (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd. 10 Caribbean Drive Scoresby Victoria 3179.

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Washable Project Paint washes from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered. **Not for use as body/face paint.**

MADE IN U.S.A.    **crayola.com**

Style#: 54-2403 Code#: 54-2403-0-200



0  71662 32403  2







QUALITY GUARANTEE:

U.S.A. & CANADA
AUSTRALIA:
UK:  ITALY:
MEXICO:  BENELUX:
FRANCE:  GERMANY:


Binney & Smith (Europe) Ltd., Bedford
Heights, Manton Lane, Bedford, MK41 7PH,
England

MADE IN USA    crayola.com

Style: 54-7315    Order: 54-2315-0-200

 

All Crayola art materials are certified AP

WARNING! Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed

All Crayola art materials are nontoxic

UK CA 



**WASHING & CARE**

FOR BEST RESULTS: Crayola Washable Project Paint washes from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required. STAIN ADVISEMENT: Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered. Not for use as body face paint.



0  71662 22315  1

## SAFETY INFORMATION



**ACMI**
**AP**
ART & CREATIVE MATERIALS INSTITUTE CERTIFIED ®

Conforms to
ASTM D 4236.

All Crayola art materials are certified AP.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.

## WASHING & CARE

**FOR BEST RESULTS:** Crayola Washable Project Paint washes from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required. **STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered. **Not for use as body/face paint.**

Contents and colors may vary

Do not pour excess paint back into container. Store in a cool, dry place.

MADE IN U.S.A.

Style#: 54-2315    Code#: 54-2315



0  71662  2231





**Washable Paint Brush Pens**

**Paint is in the Brush, Just Apply Brush to Paper!**

- Smooth paint flow
- Washes easily from skin and clothes
- No dripping, no spilling

Red　Green
Blue　Violet

Visit Crayola.com/paint for techniques, craft projects and more inspiring ideas!

Try this other neat Crayola Products!

CE　3+　crayola.com

QUALITY GUARANTEE

AP

PROOF OF PURCHASE

0  71662 06201  9

  

Contents and colors may vary.
Please retain packaging for
future reference.

**3+**

Made in China    **crayola.com**



A Hallmark Company

©2015 Crayola, Easton, PA 18044-0431.
Distributed in Australia by Crayola (Australia) Pty. Ltd.
Imported by Binney & Smith (Europe) Ltd., Bedford
Heights, Manton Lane, Bedford, MK41 7PH,
England.

Style#: 54-6201    Code#: 54-6201-0-303

## QUALITY GUARANTEE
We guarantee the quality of all Crayola
products. If this product does not
perform properly, please contact us.

In the U.S.A. and Canada, call
**1-800-CRAYOLA (800-272-9652),**
weekdays 9 AM-4 PM ET.

In Europe, call **+33 (0) 1 41 06 54 54,**
weekdays 9 AM-5 PM local time.

In the UK, call **01702 206170,**
weekdays 9 AM-5 PM local time.

In Mexico, call **01800 71 78 222,**
weekdays 9 AM-5 PM local time.

In Australia, call Crayola AU at
**1-800-657-353,** weekdays
9 AM-4 PM AEST.



Conforms to ASTM D 4236.
All Crayola art materials are nontoxic.

**WARNING!** Not suitable for children
under 36 months due to small parts which
may cause a choking hazard if swallowed.

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Washable Paint Brush Pens wash
from skin and most washable clothing. Wash promptly in hot
wash cycle. Do not use prewash or chlorine bleach. Repeat
laundering may be required.
**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls,
finished and unfinished wood, vinyl, carpeting, and other
materials that cannot be laundered.
Not for use as body/face paint.

K5U08

## PROOF OF PURCHASE



0   71662 06201   9

# EXHIBIT 21

# SAFETY DATA SHEET



SDS ID:  CRAY-034
CRAYOLA® WASHABLE PAINT

---

## 1. Identification

**Product identifier**

**Material Name:** CRAYOLA® WASHABLE PAINT

**Other means of identification**

**Product Code(s)** CRAY-034

**Synonyms** CRAYOLA WASHABLE PAINT; CRAYOLA WASHABLE KIDS' PAINT; CRAYOLA WASHABLE FINGER PAINT; CRAYOLA PAINT MAKER; PAINT & CANVAS KIT; PRODUCT CODE(S): 03-3238; 03-3239; 03-7958; 04-0321; 04-0381; 04-0462; 04-0479; 04-0135; 04-0526; 04-0572; 04-0583; 04-0613; 04-0910; 04-1026; 04-1027; 04-1028; 04-1028; 04-1029; 04-1041; 04-1052; 04-1078; 04-1158; 04-1257; 04-1907; 04-1951; 04-2532; 04-2549; 04-2912; 04-2934; 04-4501; 04-5222; 04-5401; 04-5553; 04-5558; 04-8205; 04-5222; 04-5719; 04-5777; 04-6010; 04-6104; 04-6016; 04-6936; 44-1205-7; 44-2395; 54-0100; 54-0101; 54-0105; 54-0116; 54-0117; 54-0125; 54-0126; 54-0128; 54-0150; 54-0155; 54-0156; 54-0157; 04-0296; 54-1051; 54-1060; 54-1062; 54-1064; 54-1076; 54-1077; 54-1138; 54-1202; 54-1204; 54-1205; 54-1207; 54-1237; 54-1827; 54-1828; 54-1829; 54-1830; 54-1834; 54-1838; 54-1842; 54-1853; 54-208W; 54-2016; 54-2036; 54-2128; 54-2129; 54-2001; 54-2002; 54-2006; 54-2008; 54-2011; 54-2064; 54-2128; 54-2203; 54-2204; 54-2205; 54-2207; 54-2219; 54-2233; 54-2234; 54-2235; 54-2236; 54-2237; 54-2238; 54-2240; 54-2241; 54-2242; 54-2244; 54-2245; 54-2248; 54-2249; 54-2251; 54-2252; 54-2253; 54-2264; 54-2266; 54-2269; 54-2270; 54-2271; 54-2272; 54-2273; 54-2274; 54-2275; 54-2276; 54-2277; 54-2278; 54-2281; 54-2282; 54-2283; 54-2284; 54-2291; 54-2292; 54-2294; 54-2295; 54-2297; 54-2298; 54-2302; 54-2312; 54-2314; 54-2315; 54-2390; 53-2391; 54-2392; 52-2394; 52-2395; 54-2400; 54-2401; 54-2408; 54-2504; 54-2506; 54-2508; 54-2510; 54-2016; 54-2128; 54-2390; 54-2403; 54-2518; 54-2551; 54-2553; 54-4100; 54-5000; 54-6201; 74-7205; 54-7334; 54-7338; 54-7342; 54-7344; 54-7351; 54-7353; 54-7408; 54-9039; 54-9718; 54-9828; 55-0011; 55-0012; 55-1300; 55-0014; 55-0015; 55-0355; 55-1308; 55-1310; 55-1311; 55-1312; 55-1316; 55-1332; 55-1900; 55-1901; 57-0202; 57-0203; 57-0204; 58-6531; 71-1005; 71-1010; 74-7058; 74-7080; 74-7081; 74-7080; 74-7081; 74-7087; 74-7088; 74-7408; 74-7420; 74-7488; 74-7495; 74-7664; 81-1333; 81-1362; 81-1368; 81-1427; 81-1430; 81-1452; 81-1476; 81-1477; 81-1479; 81-1539; 81-8108; 82-0569;

**Recommended use of the chemical and restrictions on use**

**Recommended use** Arts and Crafts

**Restrictions on use** None Known

**Details of the supplier of the safety data sheet**

**Supplier Address**
CRAYOLA LLC
1100 Church Lane
Easton, PA 18044
Phone: 1-800-272-9652

---

**CRAYOLA® WASHABLE PAINT**                                **Revision date**  23-Jan-2025

| | |
|---|---|
| **E-mail** | support@crayola.com |

**Emergency telephone number**

**Emergency Telephone**          1-800-535-5053 or call local POISON CONTROL

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

**Label elements**

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

The product contains no substances which at their given concentration, are considered to be hazardous to health.

| | | |
|---|---|---|
| **Appearance**  multiple colored liquid | **Physical state**  Liquid | **Odor**  faint, floral odor |

**Other information**
No information available.

## 3. Composition/information on ingredients

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

| | |
|---|---|
| **Inhalation** | It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed. |

**CRAYOLA® WASHABLE PAINT**                                          **Revision date** 23-Jan-2025

| | |
|---|---|
| **Eye contact** | It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention. |
| **Skin contact** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Ingestion** | Call a poison control center or doctor immediately for treatment advice. |

**Most important symptoms and effects, both acute and delayed**

**Symptoms**                    No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**          Treat symptomatically.

## 5. Fire-fighting measures

| | |
|---|---|
| **Suitable Extinguishing Media** | Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
| **Large Fire** | CAUTION: Use of water spray when fighting fire may be inefficient. |
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |

**Explosion data**
**Sensitivity to mechanical impact** None.

**Sensitivity to static discharge**    None.

**Special protective equipment and precautions for fire-fighters**    Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment.

## 6. Accidental release measures

**Personal precautions, protective equipment and emergency procedures**

**Personal precautions**        Wear personal protective clothing and equipment, see Section 8.

**For emergency responders**    Wear protective clothing and equipment suitable for the surrounding fire.

**Methods and material for containment and cleaning up**

**Methods for containment**     Prevent further leakage or spillage if safe to do so.

**Methods for cleaning up**     Pick up and transfer to properly labeled containers.

## 7. Handling and storage

**Precautions for safe handling**

**Advice on safe handling**     Wash thoroughly after handling.

**CRAYOLA® WASHABLE PAINT**                                      **Revision date**  23-Jan-2025

__Conditions for safe storage, including any incompatibilities__

**Storage Conditions**            None needed according to classification criteria. Store and handle in accordance with all
                                  current regulations and standards. See original container for storage recommendations.
                                  Keep separated from incompatible substances.

## 8. Exposure controls/personal protection

__Control parameters__

**Exposure Limits**               This product, as supplied, does not contain any hazardous materials with occupational
                                  exposure limits established by the region specific regulatory bodies.

__Appropriate engineering controls__

**Engineering controls**          Showers
                                  Eyewash stations
                                  Ventilation systems.

__Individual protection measures, such as personal protective equipment__

**Eye/face protection**           Eye protection not required under normal conditions.

**Hand protection**               Protective gloves are not required under normal conditions.

**Skin and body protection**      It is unlikely that emergency treatment will be required. If adverse effects occur, wash with
                                  soap or mild detergent and large amounts of water. Get medical attention, if needed.

**Respiratory protection**        No respirator is required under normal conditions of use. Under conditions of frequent use
                                  or heavy exposure, respiratory protection may be needed.

**General hygiene considerations** Handle in accordance with good industrial hygiene and safety practice.

## 9. Physical and chemical properties

__Information on basic physical and chemical properties__
| | | |
|---|---|---|
| **Physical state** | Liquid | |
| **Appearance** | multiple colored liquid | |
| **Color** | No information available | |
| **Odor** | faint, floral odor | |
| **Odor threshold** | No information available | |

| Property | Values | Remarks  • Method |
|---|---|---|
| **pH** | 7.1  -  9.4 | None known |
| **Melting point / freezing point** | No data available | None known |
| **Initial boiling point and boiling range** | No data available | None known |
| **Flash point** | > 100°C | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
| **Upper flammability or explosive limits** | No data available | |
| **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |

**CRAYOLA® WASHABLE PAINT**                                                      **Revision date**  23-Jan-2025

| | | |
|---|---|---|
| **Relative vapor density** | No data available | None known |
| **Relative density** | No data available | None known |
| **Water solubility** | Soluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | 40 - 80 | None known |
| **Dynamic viscosity** | No data available | None known |

**Other information**
| | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | 8.3 - 10.2 |
| **Bulk density** | No information available |

## 10. Stability and reactivity

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | None reported. |
| **Incompatible materials** | Oxidizing materials. |
| **Hazardous decomposition products** | Oxides of carbon. |

## 11. Toxicological information

**Information on likely routes of exposure**

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

**Symptoms related to the physical, chemical and toxicological characteristics**

**Symptoms**          No information available.

**Acute toxicity**

**Numerical measures of toxicity**
No information available

**Delayed and immediate effects as well as chronic effects from short and long-term exposure**

**CRAYOLA® WASHABLE PAINT**                                                      **Revision date**  23-Jan-2025

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |
| **STOT - single exposure** | No information available. |
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

| | |
|---|---|
| **Ecotoxicity** | The environmental impact of this product has not been fully investigated. |
| **Persistence and degradability** | No information available. |
| **Bioaccumulation** | There is no data for this product. |
| **Other adverse effects** | No information available. |

## 13. Disposal considerations

**Disposal methods**

| | |
|---|---|
| **Waste from residues/unused products** | Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations. |
| **Contaminated packaging** | Do not reuse empty containers. |

## 14. Transport information

**CRAYOLA® WASHABLE PAINT**                                         Revision date  23-Jan-2025

<u>DOT</u>                          Not regulated

---

## 15. Regulatory information

<u>International Inventories</u>

**TSCA**                          All of the components of this product are listed on the TSCA Inventory.

**DSL/NDSL**                      Contact supplier for inventory compliance status.
**EINECS/ELINCS**                 Contact supplier for inventory compliance status.
**ENCS**                          Contact supplier for inventory compliance status.
**IECSC**                         Contact supplier for inventory compliance status.
**KECL**                          Contact supplier for inventory compliance status.
**PICCS**                         Contact supplier for inventory compliance status.
**AIIC**                          Contact supplier for inventory compliance status.
**NZIoC**                         Contact supplier for inventory compliance status.

**Legend:**
**TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL**   - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS**   - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS**   - Japan Existing and New Chemical Substances
**IECSC**   - China Inventory of Existing Chemical Substances  .
**KECL**   - Korean Existing and Evaluated Chemical Substances
**PICCS**    - Philippines Inventory of Chemicals and Chemical Substances
**AIIC**   - Australian Inventory of Industrial Chemicals
**NZIoC**  - New Zealand Inventory of Chemicals

<u>US Federal Regulations</u>

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA).  This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370,  refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355).  There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

<u>US State Regulations</u>

---

**CRAYOLA® WASHABLE PAINT**                                      **Revision date**  23-Jan-2025

<u>California Proposition 65</u>
This product does not require warnings under California Proposition 65.

<u>U.S. EPA Label Information</u>

**EPA Pesticide Registration Number**  Not applicable

---

## 16. Other information

| <u>NFPA</u> | **Health hazards** 0 | **Flammability** 0 | **Instability** 0 | **Special hazards** - |
|---|---|---|---|---|
| <u>HMIS</u> | **Health hazards** 0 | **Flammability** 0 | **Physical hazards** 0 | **Personal protection** X |

<u>**Key or legend to abbreviations and acronyms used in the safety data sheet**</u>
**Legend Section 8: Exposure controls/personal protection**

| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
|---|---|---|---|
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

| **Revision date** | 23-Jan-2025 |
|---|---|
| **Revision Note** | No information available. |

<u>Disclaimer</u>
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
**End of Safety Data Sheet**

---

# EXHIBIT 22





For Lesson Plan
Ideas & Tips
Go To **Crayola.com**

Quality, low dust chalkboard
chalk. Bright white for easy
visibility. Makes clean, smooth
lines and erases easily.
Contains calcium carbonate.

A B C
123

**Contents and colors may vary.**
**Please retain package for future reference.**

**Made in Korea**

A Hallmark Company
© 2003 Crayola, Easton, PA 18044-0431
Distributed in Australia by Crayola (Australia) Pty. Ltd.
Imported & Smith (Europe) Ltd, Bedford Heights,
Mission Lane, Bedford, Beds, MK41 7PH, England.

Conforms to ASTM D 4236
Chalk meets performance
standard ANSI Z356.2
ALL CRAYOLA ART MATERIALS
ARE NONTOXIC.

**QUALITY GUARANTEE**
Crayola

12 STICKS EA.  3 x 5/16 IN.  (7.6 x 0.79 cm)

C E

**CODE #: 50-1402-0-205**
**STYLE #: 50-1402**

We guarantee the quality of all
Crayola products. If this product
does not perform properly,
please contact us.

In the U.S.A. and Canada, call
1-800-CRAYOLA, weekdays
9:00 AM-4:00 PM EST

In Europe, call Crayola UK at
01702 208170, weekdays
9:00 AM-5:00 PM local time

In Australia, call Crayola AU at
1-800-657-353, weekdays
9:00 AM-4:00 PM AEST

**www.crayola.com**

**PROOF OF PURCHASE**

0   7 1662 01402   5

M3M09




Crayola chalk—solid, consistent color in a strong stick that resists breaking!

## QUALITY GUARANTEE

We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

In the U.S.A. and Canada, call **1-800-CRAYOLA (800-272-9652),** weekdays 9 AM-4 PM ET.

In Europe, call **+33 (0) 1 41 06 54 54,** weekdays 9 AM-5 PM local time.

In the UK, call **01702 208170,** weekdays 9 AM-5 PM local time.

In Mexico, call **01800 71 78 222,** weekdays 9 AM-5 PM local time.

In Australia, call Crayola AU at **1-800-657-353**, weekdays 9 AM-4 PM AEST.

## crayola.com

MADE IN CHINA 

Contents and colors may vary.

Please retain packaging for future reference.

Code#: 51-0816-0-220
Style#: 51-0816

### WASHING & CARE INFORMATION

**STAIN ADVISEMENT:** Product contains colorants which may stain clothing and other surfaces.



Conforms to ASTM D 4236.

ALL CRAYOLA ART MATERIALS ARE NONTOXIC.



A **Hallmark** Company

©2010 Crayola, Easton, PA 18044-0431. Distributed in Australia by Crayola (Australia) Pty. Ltd. Imported by Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, Beds, MK41 7PH, England.

## PROOF OF PURCHASE



0   71662 00816   1

# EXHIBIT 23





NONTOXIQUE

Contents and colors may vary. Please retain packaging for future reference.

Le contenu et les couleurs peuvent varier. Veuillez conserver l'emballage pour référence future.

crayola.com

## WASHING & CARE ○ LAVAGE ET ENTRETIEN

**FOR BEST RESULTS:** Crayola Sidewalk Chalk is designed for use on concrete or asphalt sidewalks and driveways. To remove, wash surface with water pressure from garden hose. Light brushing with a broom or nylon brush may be necessary. **STAIN ADVISEMENT:** Product contains colorants which may stain clothing and other surfaces. Before use, test on a small inconspicuous area and wash off to make sure product does not stain. **DO NOT USE ON SURFACES LESS THAN 6 MONTHS OLD.**

**POUR DE MEILLEURS RESULTATS :** Les craies de trottoirs Crayola sont conçues pour une utilisation sur les trottoirs et les allées en béton ou en asphalte. Avant utilisation, tester sur une petite surface non visible. Laver pour que la craie ne tache pas la surface. Pour enlever, laver la surface avec un jet d'eau. Il peut être nécessaire de brosser légèrement à l'aide d'un balai ou d'une brosse en nylon. **CONSEILS POUR LES TACHES :** Contient des colorants susceptibles de tacher les vêtements et autres surfaces. **NE PAS UTILISER SUR DES SURFACES DE MOINS DE 6 MOIS.**

USA & CAN
É.-U. et CAN

Flatten Before Recycling
Aplatissez avant de recycler

how2recycle.info

PAPER
PAPIER
BOX
BOÎTE

### QUALITY GUARANTEE
We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST:
**U.S.A. & CANADA** (Call/Text):
1-800-CRAYOLA (800-272-9652)
Text charges may apply
**AUSTRALIA:** 1-800-657-353

M-F, 9 AM-5 PM LOCAL TIME.
**UK:** 0800 389 6238
**ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7178 222
**BENELUX:** +31 (0)38 444 3093
**FRANCE:** +33 (0) 1 41 06 54 54
**GERMANY:** +496103 459180

### GARANTIE DE QUALITÉ
Nous garantissons la qualité de tous les produits Crayola. En cas de mauvais fonctionnement, contactez-nous.

L-V 9 h-16 h HE/AEST :
**É.-U. ET CANADA** (Appelez/Textez) :
1-800-CRAYOLA (800-272-9652) Des frais peuvent s'appliquer aux messages textes
**AUSTRALIE :** 1-800-657-353

L-V 9 h-17 h, heure locale :
**R.U. :** 0800 389 6238
**ITALIE :** +39 (0) 543 720997
**MEXIQUE :** 800 7178 222
**BENELUX :** +31 (0)38 444 3093
**FRANCE :** +33 (0) 1 41 06 54 54
**ALLEMAGNE :** +496103 459180

ACMI
AP
Conforms to
Conforme à la norme
ASTM D 4236

All Crayola art materials are nontoxic.
Tout le matériel d'artiste Crayola est non toxique.





## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Sidewalk Chalk is designed for use on concrete or asphalt sidewalks and driveways. To remove, wash surface with water pressure from garden hose. Light brushing with a broom or nylon brush may be necessary. **STAIN ADVISEMENT:** Product contains colorants which may stain clothing and other surfaces. Before use, test on a small inconspicuous area and wash off to make sure product does not stain.
**DO NOT USE ON SURFACES LESS THAN 6 MONTHS OLD.**





**SAFETY INFORMATION**
Conforms to ASTM D 4236. All Crayola art materials are nontoxic.

MADE IN INDONESIA
**crayola.com**

Contents and colors may vary.
Please retain packaging for future reference

Style#: 51-2048
Code#: 51-2048-0-206

**PROOF OF PURCHASE**

**Crayola** a trademark co....
...2018 Crayola Ertan PA 18044-0431
Superior Designs
**Binney & Smith (Europe) Ltd.,
Bedford Heights, Manton Lane,
Bedford, MK41 7PH, England**
Binney & Smith (Europe) Ltd. Distributed in
U.K 47122 Eol (Italy), Italy. Distributed in
Australia by Crayola Australia Pty Ltd

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.
U.S.A. & Canada 1-800-CRAYOLA (800-272-9652), M-F, 9 AM-4 PM ET
Australia 1-800-657-353, M-F, 9 AM-4 PM AEST
France 0 +33 (0) 1 41 06 54 54  UK. 01702 208170
Germany +49 6152 71 24 229, Mexico  01800 71 78 222,
Italy +39 (0) 543 720997, M-F, 9 AM-5 PM local time



0  7 1662 61248  1



CE







# EXHIBIT 24

# SAFETY DATA SHEET



SDS ID: CRAY-028
CRAYOLA® CHALK

## 1. Identification

**Product identifier**

**Material Name:**                CRAYOLA® CHALK

**Other means of identification**

**Product Code(s)**              CRAY-028

**Synonyms**                     CRAYOLA COLORED CHALK; CRAYOLA DRAWING CHALK; CRAYOLA MOLDED
CHALK; CRAYOLA SIDEWALK CHALK/CRAYONS; CRAYOLA GIANT CHALK; CRAYOLA
3-D CHALK; CRAYOLA GLOW CHALK; CRAYOLA GLITTER CHALK; CRAYOLA TIE
DYED CHALK; CRAYOLA CHALKBOARD CHALK; CRAYOLA ANTI-DUST LOW DUST
CHALK; SOFT CHALK PASTELS; SUPERCHALK; PRODUCT CODE(S): 03-4984;
03-4985; 03-4986; 03-4987; 03-4988; 03-4989; 03-4490; 03-4990; 03-4991; 04-4992;
03-4994; 03-4995; 03-4996; 03-4997; 03-4998; 03-4999; 03-5037; 03-5039; 03-5053;
03-5044; 03-5061; 03-5063; 03-5064; 03-5066; 03-5067; 03-5068; 03-5071; 03-5072;
03-5073; 03-5078; 03-5079; 03-5080; 03-5081; 03-5090; 03-5091; 03-5092; 03-5093;
03-5094; 03-5101; 03-5102; 03-5103; 03-5104; 03-5105; 03-5106; 03-5107; 03-5108;
03-5111; 03-5200; 03-5201; 03-5202; 03-5203; 03-5204; 03-5205; 03-5206; 03-5207;
03-5208; 03-5209; 03-5210; 03-5211; 03-5212; 03-5213; 03-5214; 03-5215; 03-5216;
03-5217; 03-5218; 03-5220; 03-5224; 03-5225; 03-5226; 03-5228; 03-5229; 03-5230;
03-5231; 03-5232; 03-5233; 03-5234; 03-5235; 03-5301; 03-5302; 03-5303; 03-5304;
03-5350; 03-5398; 03-5399; 03-5401; 03-5800; 03-5801; 03-5802; 03-5803; 03-5804;
03-5805; 03-5806; 03-6100; 03-7603; 03-8038; 04-0145; 04-0294; 04-0295; 04-0296;
04-0413; 04-0530; 04-0555; 04-0586; 04-0608; 04-0640; 04-0945;
04-0944;04-0984; 04-1907; 04-1950; 04-1951; 04-2542; 04-5033; 04-5350; 04-5355;
04-5358; 04-5718; 04-5719; 04-5727; 04-5873; 04-6010; 04-6874; 04-6887; 50-1402;
51-0012; 51-0036; 51-2004; 51-0200; 51-0312; 51-0320; 51-0320; 51-0400; 51-0403;
51-0404; 51-0816; 51-0817; 51-1015; 51-1020; 51-1200; 51-1202; 51-1205; 51-1206;
51-1216; 51-1503; 51-1515; 51-1524; 51-1650; 51-1660; 51-1661; 51-1662; 51-1663;
51-1668; 51-2010; 51-2012; 51-2016; 51-2024; 51-2024; 51-2036; 51-2048; 51-2049;
51-2050; 51-2051; 51-2053; 51-2064; 51-2065; 51-2515; 51-3505; 51-3515; 51-3523;
51-4005; 51-4008; 51-4023; 51-4102; 51-4103; 51-4104; 51-4105; 51-4107; 51-4108;
51-4109; 51-4110; 51-4111; 51-5298; 51-5299; 51-7000; 51-8015; 51-8020; 51-8052;
51-8064; 51-8300; 51-8302; 51-8303; 52-3002; 55-4403; 81-1378;

**Recommended use of the chemical and restrictions on use**

**Recommended use**             Arts and Crafts

**Restrictions on use**          None Known

**Details of the supplier of the safety data sheet**

**CRAYOLA® CHALK**                                                      **Revision date**  23-May-2024

___

**Supplier Address**
CRAYOLA LLC
1100 Church Lane
Easton, PA 18044
Phone: 1-800-272-9652

**E-mail**                              support@crayola.com

**Emergency telephone number**

**Emergency Telephone**              1-800-535-5053 or call local POISON CONTROL

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

**Label elements**

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

The product contains no substances which at their given concentration, are considered to be hazardous to health.

| **Appearance** various colors | **Physical state** solid | **Odor** Odorless |

**Other information**
No information available.

## 3. Composition/information on ingredients

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

___

**CRAYOLA® CHALK**                                                    **Revision date** 23-May-2024

| | |
|---|---|
| **Inhalation** | It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed. |
| **Eye contact** | It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention. |
| **Skin contact** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Ingestion** | Call a poison control center or doctor immediately for treatment advice. |

<u>**Most important symptoms and effects, both acute and delayed**</u>

| | |
|---|---|
| **Symptoms** | No information available. |

<u>**Indication of any immediate medical attention and special treatment needed**</u>

| | |
|---|---|
| **Note to physicians** | Treat symptomatically. |

## 5. Fire-fighting measures

| | |
|---|---|
| **Suitable Extinguishing Media** | Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
|    **Large Fire** | CAUTION: Use of water spray when fighting fire may be inefficient. |
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |
| **Explosion data**<br>   **Sensitivity to mechanical impact** | None. |
|    **Sensitivity to static discharge** | None. |
| **Special protective equipment and precautions for fire-fighters** | Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment. |

## 6. Accidental release measures

<u>**Personal precautions, protective equipment and emergency procedures**</u>

| | |
|---|---|
| **Personal precautions** | None. |
| **For emergency responders** | Wear protective clothing and equipment suitable for the surrounding fire. |

<u>**Methods and material for containment and cleaning up**</u>

| | |
|---|---|
| **Methods for containment** | Prevent further leakage or spillage if safe to do so. |
| **Methods for cleaning up** | Pick up and transfer to properly labeled containers. |

## 7. Handling and storage

**CRAYOLA® CHALK**                                                  **Revision date**  23-May-2024

___

**Precautions for safe handling**

**Advice on safe handling**          Wash thoroughly after handling. Use methods to minimize dust.

**Conditions for safe storage, including any incompatibilities**

**Storage Conditions**               None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances.

## 8. Exposure controls/personal protection

**Control parameters**

**Exposure Limits**                  This product, as supplied, does not contain any hazardous materials with occupational exposure limits established by the region specific regulatory bodies.

**Appropriate engineering controls**

**Engineering controls**             Showers
                                     Eyewash stations
                                     Ventilation systems.

**Individual protection measures, such as personal protective equipment**

**Eye/face protection**              Eye protection not required under normal conditions.

**Hand protection**                  Protective gloves are not required under normal conditions.

**Skin and body protection**         It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed.

**Respiratory protection**           No respirator is required under normal conditions of use. Under conditions of frequent use or heavy exposure, respiratory protection may be needed.

**General hygiene considerations**   Handle in accordance with good industrial hygiene and safety practice.

## 9. Physical and chemical properties

**Information on basic physical and chemical properties**
**Physical state**              solid
**Appearance**                  various colors
**Color**                       various colors
**Odor**                        Odorless
**Odor threshold**              No information available

| Property | Values | Remarks • Method |
|---|---|---|
| pH | No data available | None known |
| Melting point / freezing point | No data available | None known |
| Initial boiling point and boiling range | No data available | None known |
| Flash point | No data available | None known |
| Evaporation rate | No data available | None known |
| Flammability | No data available | None known |
| Flammability Limit in Air | | None known |

___

**CRAYOLA® CHALK**                                              **Revision date**  23-May-2024

| | | |
|---|---|---|
| **Upper flammability or explosive limits** | No data available | |
| **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | No data available | None known |
| **Water solubility** | Insoluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | No data available | None known |
| **Dynamic viscosity** | No data available | None known |

**Other information**

| | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | No information available |
| **Bulk density** | No information available |

## 10. Stability and reactivity

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | None reported. |
| **Incompatible materials** | Oxidizing materials. |
| **Hazardous decomposition products** | Oxides of carbon. |

## 11. Toxicological information

**Information on likely routes of exposure**

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

**Symptoms related to the physical, chemical and toxicological characteristics**

**Symptoms**                    No information available.

**Acute toxicity**

**Numerical measures of toxicity**
No information available

**CRAYOLA® CHALK**                                                   Revision date  23-May-2024

**Delayed and immediate effects as well as chronic effects from short and long-term exposure**

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |
| **STOT - single exposure** | No information available. |
| **STOT - repeated exposure** | No information available. |
| **Aspiration hazard** | No information available. |
| **Other adverse effects** | No information available. |
| **Interactive effects** | No information available. |

## 12. Ecological information

| | |
|---|---|
| **Ecotoxicity** | The environmental impact of this product has not been fully investigated. |
| **Persistence and degradability** | No information available. |
| **Bioaccumulation** | There is no data for this product. |
| **Other adverse effects** | No information available. |

## 13. Disposal considerations

**Disposal methods**

| | |
|---|---|
| **Waste from residues/unused products** | Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations. |

**CRAYOLA® CHALK**                                                      **Revision date**  23-May-2024

**Contaminated packaging**            Do not reuse empty containers.

---

## 14. Transport information

**DOT**                                Not regulated

---

## 15. Regulatory information

**International Inventories**

**TSCA**                               All of the components of this product are listed on the TSCA Inventory.

| | |
|---|---|
| **DSL/NDSL** | Contact supplier for inventory compliance status. |
| **EINECS/ELINCS** | Contact supplier for inventory compliance status. |
| **ENCS** | Contact supplier for inventory compliance status. |
| **IECSC** | Contact supplier for inventory compliance status. |
| **KECL** | Contact supplier for inventory compliance status. |
| **PICCS** | Contact supplier for inventory compliance status. |
| **AIIC** | Contact supplier for inventory compliance status. |
| **NZIoC** | Contact supplier for inventory compliance status. |

**Legend:**
**TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL**   - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS**   - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS**  - Japan Existing and New Chemical Substances
**IECSC**  - China Inventory of Existing Chemical Substances
**KECL**  - Korean Existing and Evaluated Chemical Substances
**PICCS**   - Philippines Inventory of Chemicals and Chemical Substances
**AIIC**  - Australian Inventory of Industrial Chemicals
**NZIoC** - New Zealand Inventory of Chemicals

**US Federal Regulations**

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA).   This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370,  refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive

---

**CRAYOLA® CHALK**                                                                 **Revision date**  23-May-2024

Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355).   There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.


**US State Regulations**


**California Proposition 65**
This product does not require warnings under California Proposition 65.



**U.S. EPA Label Information**


**EPA Pesticide Registration Number**  Not applicable


---

## 16. Other information

| **NFPA** | **Health hazards**  0 | **Flammability**  0 | **Instability**  0 | / | **Special hazards**  - |
| **HMIS** | **Health hazards**  0 | **Flammability**  0 | **Physical hazards**  0 | | **Personal protection**  X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**
**Legend  Section 8: Exposure controls/personal protection**

| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

| **Revision date** | 23-May-2024 |
| **Revision Note** | No information available. |

**Disclaimer**
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
                                        **End of Safety Data Sheet**

---

# EXHIBIT 25





MADE IN U.S.A
WITH U.S. AND FOREIGN MATERIALS

**crayola.com**
Contents and colors may vary
Style#: 58 7733
Code#: 58-7733-0-209

B3A14

 **Crayola** A Hallmark Comp.

2023 Crayola, Easton, PA 16044-0431
Corporate Owner Binney & Smith
(Europe) Ltd., Bedford Heights,
Manton Lane, Bedford, MK41 7PH.
England Binney & Smith (Europe) Ltd
2 1 Blvd. 47122 Fort (HFC), U.A.
Corp. and U.K. and by Crayola
Australia Pty Ltd 19 C  1 os  7P  rrs
Sub  by V S    13 79

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST.
**U.S.A. & CANADA** (Call/Text): 1-800 CRAYOLA (800-272-9652)
Text charges may apply.   **AUSTRALIA:** 1-800-657-353
M-F, 9 AM-5 PM LOCAL TIME
**UK:** 0800 399 6238   **ITALY:** +39 (0) 543 720897
**MEXICO:** 800 7178 222   **BENELUX:** +31 (0)10 459 59 9
**FRANCE:** +33 (0) 1 41 C8 54 54   **GERMANY:** +49 3103 459180






Contains to
ASTM D 4236

**WARNING!** Not
suitable for children
under 36 months
due to small parts
which may cause a
choking hazard if
swallowed.

All Crayola
art materials
are nontoxic

UK CA

**WASHING & CARE**

**FOR BEST RESULTS:** Crayola Washable Dry-Erase Markers are designed to wash from skin and most washable clothing. Wash promptly in hot water cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.
**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered. Remove marks from Dry-Erase surfaces with a dry paper towel. Remove hard to erase marks with a wet paper towel.

0  71662 07733  4





C3A07

MADE IN U.S.A.
WITH U.S. AND FOREIGN MATERIALS

 **Crayola** *a Hallmark Company*

©2023 Crayola, Easton, PA 18044-0431.
Serpentine Design® Binney & Smith
(Europe) Ltd., Bedford Heights,
Manton Lane, Bedford, MK41 7PH,
England. Binney & Smith (Europe) Ltd.,
Via Figino 13, 47122 Forli (FC), Italy.
Distributed in Australia by Crayola
(Australia) Pty Ltd 10 Caribbean Drive
Scoresby Victoria 3179.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola
products. If this product does not perform properly, please contact us

M-F, 9 AM-4 PM ET/AEST
**U.S.A. & CANADA** (Call/Text): 1-800-CRAYOLA (800-272-9652)
Text charges may apply　**AUSTRALIA:** 1-800-657-353
M-F, 9 AM-5 PM LOCAL TIME
**UK:** 0800 389 6238　**ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7178 222　**BENELUX:** +31 (0)104596 580
**FRANCE:** +33 (0) 1 41 06 54 54　**GERMANY:** +496103 459180

crayola.com
Contents and colors may vary.
Style#: 58-7734
Code#: 58-7734-0-200

 **AP** Conforms to ASTM D 4236

 UK CA 0-3

**WARNING!** Not
suitable for children
under 36 months due
to small parts which
may cause a choking
hazard if swallowed.

All Crayola
art materials
are nontoxic.

 0 71662 07734 1

**WASHING & CARE**

**FOR BEST RESULTS:** Crayola Washable Dry-Erase Markers are designed to wash from skin and most washable clothing. Wash promptly in hot water cycle.
Do not use prewash or chlorine bleach. Repeat laundering may be required.
**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be
laundered. Remove marks from Dry-Erase surfaces with a dry paper towel. Remove hard to erase marks with a wet paper towel.

# EXHIBIT 26

# SAFETY DATA SHEET



SDS ID:  CRAY-035
CRAYOLA® WASHABLE DRY ERASE MARKERS

## 1. Identification

**Product identifier**

**Material Name:**               CRAYOLA® WASHABLE DRY ERASE MARKERS

**Other means of identification**

**Product Code(s)**              CRAY-035

**Synonyms**                     Color Wipe Offs; Washable Dry Erase; Glow Board; PRODUCT CODE(S): 04-0504;
                                 04-0506; 04-0533; 38-7734; 58-7733; 58-8223; 74-7016; 74-7029; 74-7031; 74-7035;
                                 74-7037; 74-7038; 74-7051; 74-7095; 74-7246;74-7264; 98-1009; 98-2000; 98-5208;
                                 98-5806; 98-5812; 98-5906; 98-5908; 98-5912; 98-8574; 98-8576; 98-8608; 98-8631;
                                 98-8635; 98-8662; 98-8670; 98-8676;

**Recommended use of the chemical and restrictions on use**

**Recommended use**              Arts and Crafts

**Restrictions on use**          None Known

**Details of the supplier of the safety data sheet**

    **Supplier Address**
    CRAYOLA LLC
    1100 Church Lane
    Easton, PA 18044
    Phone: 1-800-272-9652

**E-mail**                       support@crayola.com

**Emergency telephone number**

**Emergency Telephone**          1-800-535-5053 or call local POISON CONTROL

## 2. Hazard(s) identification

**Classification**

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

**Label elements**

---

**CRAYOLA® WASHABLE DRY ERASE MARKERS**                    **Revision date**  31-Jan-2024

---

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).


The product contains no substances which at their given concentration, are considered to be hazardous to health.

| **Appearance**  article containing liquid | **Physical state**  liquid | **Odor**  No information available |

---

**Other information**
No information available.

## 3. Composition/information on ingredients

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

| | |
|---|---|
| **Inhalation** | It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed. |
| **Eye contact** | It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention. |
| **Skin contact** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Ingestion** | Call a poison control center or doctor immediately for treatment advice. |

**Most important symptoms and effects, both acute and delayed**

**Symptoms**                    No information available.

**Indication of any immediate medical attention and special treatment needed**

**Note to physicians**                    Treat symptomatically.

## 5. Fire-fighting measures

**Suitable Extinguishing Media**         Use extinguishing measures that are appropriate to local circumstances and the

---

SDS ID: **CRAY-035**                    **Issuing Date**  31-Jan-2024                    **Revision Number**  5

**CRAYOLA® WASHABLE DRY ERASE MARKERS**                          Revision date  31-Jan-2024

| | |
|---|---|
| **Large Fire** | surrounding environment.<br>CAUTION: Use of water spray when fighting fire may be inefficient. |
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |

**Explosion data**
**Sensitivity to mechanical impact** None.

**Sensitivity to static discharge**      None.

**Special protective equipment and precautions for fire-fighters**    Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment.

## 6. Accidental release measures

Personal precautions, protective equipment and emergency procedures

**Personal precautions**            Wear personal protective clothing and equipment, see Section 8.

**For emergency responders**        Wear protective clothing and equipment suitable for the surrounding fire.

Methods and material for containment and cleaning up

**Methods for containment**         Prevent further leakage or spillage if safe to do so.

**Methods for cleaning up**         Pick up and transfer to properly labeled containers.

## 7. Handling and storage

Precautions for safe handling

**Advice on safe handling**         Wash thoroughly after handling.

Conditions for safe storage, including any incompatibilities

**Storage Conditions**              None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances.

## 8. Exposure controls/personal protection

Control parameters

**Exposure Limits**                 This product, as supplied, does not contain any hazardous materials with occupational exposure limits established by the region specific regulatory bodies.

Appropriate engineering controls

**Engineering controls**            Showers

**CRAYOLA® WASHABLE DRY ERASE MARKERS**                    **Revision date** 31-Jan-2024

Eyewash stations
Ventilation systems.

**Individual protection measures, such as personal protective equipment**

| | |
|---|---|
| **Eye/face protection** | Eye protection not required under normal conditions. |
| **Hand protection** | Protective gloves are not required under normal conditions. |
| **Skin and body protection** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Respiratory protection** | No respirator is required under normal conditions of use. Under conditions of frequent use or heavy exposure, respiratory protection may be needed. |
| **General hygiene considerations** | Handle in accordance with good industrial hygiene and safety practice. |

## 9. Physical and chemical properties

**Information on basic physical and chemical properties**
| | |
|---|---|
| **Physical state** | liquid |
| **Appearance** | article containing liquid |
| **Color** | various colors |
| **Odor** | No information available |
| **Odor threshold** | No information available |

| Property | Values | Remarks • Method |
|---|---|---|
| **pH** | 6.5  -  8.5 | None known |
| **Melting point / freezing point** | No data available | None known |
| **Initial boiling point and boiling range** | No data available | None known |
| **Flash point** | No data available | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
| **Upper flammability or explosive limits** | No data available | |
| **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | 1.04  -  1.06 | None known |
| **Water solubility** | Soluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | 10 cps | None known |
| **Dynamic viscosity** | No data available | None known |

| Other information | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | No information available |
| **Bulk density** | No information available |

## 10. Stability and reactivity

**CRAYOLA® WASHABLE DRY ERASE MARKERS**                              **Revision date** 31-Jan-2024

| | |
|---|---|
| **Reactivity** | No information available. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | None reported. |
| **Incompatible materials** | Oxidizing materials. |
| **Hazardous decomposition products** | Oxides of carbon. |

## 11. Toxicological information

Information on likely routes of exposure

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

Symptoms related to the physical, chemical and toxicological characteristics

**Symptoms**                    No information available.

Acute toxicity

**Numerical measures of toxicity**
No information available

Delayed and immediate effects as well as chronic effects from short and long-term exposure

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |
| **Reproductive toxicity** | No information available. |
| **STOT - single exposure** | No information available. |

**CRAYOLA® WASHABLE DRY ERASE MARKERS**                     **Revision date**  31-Jan-2024

**STOT - repeated exposure**          No information available.

**Aspiration hazard**          No information available.

**Other adverse effects**          No information available.

**Interactive effects**          No information available.

## 12. Ecological information

**Ecotoxicity**          The environmental impact of this product has not been fully investigated.

**Persistence and degradability**          No information available.

**Bioaccumulation**          There is no data for this product.

**Other adverse effects**          No information available.

## 13. Disposal considerations

**Disposal methods**

**Waste from residues/unused products**          Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations.

**Contaminated packaging**          Do not reuse empty containers.

## 14. Transport information

**DOT**          Not regulated

## 15. Regulatory information

**International Inventories**

**TSCA**          All of the components of this product are listed on the TSCA Inventory.

**DSL/NDSL**          Contact supplier for inventory compliance status.
**EINECS/ELINCS**          Contact supplier for inventory compliance status.

**CRAYOLA® WASHABLE DRY ERASE MARKERS**                                   **Revision date**  31-Jan-2024

| | |
|---|---|
| **ENCS** | Contact supplier for inventory compliance status. |
| **IECSC** | Contact supplier for inventory compliance status. |
| **KECL** | Contact supplier for inventory compliance status. |
| **PICCS** | Contact supplier for inventory compliance status. |
| **AIIC** | Contact supplier for inventory compliance status. |
| **NZIoC** | Contact supplier for inventory compliance status. |

**Legend:**
**TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL**   - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS**   - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS**  - Japan Existing and New Chemical Substances
**IECSC**  - China Inventory of Existing Chemical Substances
**KECL**  - Korean Existing and Evaluated Chemical Substances
**PICCS**   - Philippines Inventory of Chemicals and Chemical Substances
**AIIC**  - Australian Inventory of Industrial Chemicals
**NZIoC**  - New Zealand Inventory of Chemicals

**US Federal Regulations**

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA).  This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370,  refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355).  There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

**US State Regulations**

**California Proposition 65**
This product does not require warnings under California Proposition 65.

**U.S. EPA Label Information**

**EPA Pesticide Registration Number**  Not applicable

---

## 16. Other information

| **NFPA** | **Health hazards**  0 | **Flammability**  0 | **Instability**  0 | **Special hazards**  - |
|---|---|---|---|---|
| **HMIS** | **Health hazards**  0 | **Flammability**  0 | **Physical hazards**  0 | **Personal protection**  X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**
**Legend  Section 8: Exposure controls/personal protection**

---

**CRAYOLA® WASHABLE DRY ERASE MARKERS**                    **Revision date** 31-Jan-2024

| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
|---|---|---|---|
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

**Revision date**          31-Jan-2024
**Revision Note**          No information available.
**Disclaimer**
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
**End of Safety Data Sheet**

# EXHIBIT 27





**Crayola Silly Scents "Sweet" Dual-Ended Markers** contain double the sweetness, with 20 colors and fragrant scents in 10 markers! Colors wash off skin and can be easily cleaned from most clothing fabrics.
















3+



crayola.com

MADE IN MALAYSIA

Stylos: 58-8339  Code#: 58-8339-0-702

**PROOF OF PURCHASE**

Insert UPC number

0-71662-08339-7



Contents and colors may vary. Please retain packaging for future reference.

**WASHING & CARE INFORMATION**

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required. **STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.



Conforms to ASTM D 4236.

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.

 a Hallmark Company  ©2019 Crayola, Easton, PA 18044-0431. Serpentine Design®
**Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England;** Binney & Smith (Europe) Ltd., Via Figline 13, 47122 Forlì (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

U.S.A. & Canada: **1-800-CRAYOLA (800-272-9652)**, M-F, 9 AM-4 PM ET.

Australia: **1-800-657-353**, M-F, 9 AM-4 PM AEST.

France: **+33 (0) 1 41 06 54 54**, UK: **01702 208170,**
Germany: **+49 6152 71 24 229**, Mexico: **01800 71 78 222,**
Italy: **+39 (0) 543 720997**, M-F, 9 AM-5 PM local time.

 3+

**crayola.com**

MADE IN CHINA

Style#: 58-8339   Code#: 58-8339-0-200

**PROOF OF PURCHASE**



0 71662 08339 7







**Crayola Silly Scents Washable Slim Markers** are infused with 10 fragrant scents and colors to match!

Colors wash off skin and can be easily cleaned from most clothing fabrics.

 strawberry



 watermelon

cotton candy  

pineapple





mint 

fresh air 

blueberry 

peach 

marshmallow 

root beer

MADE IN MALAYSIA

Crayola ®

©2011 Crayola Easton, PA 18044-0431
Binney & Smith (Europe) Ltd.,
Bedford Heights, Manton Lane,
Bedford, MK41 7PH, England
Binney & Smith (Canada), Lindsay, ON

AUSTRALIA:

**QUALITY GUARANTEE**

U.S.A. & CANADA:
AUSTRALIA:
UK:
ITALY:
MEXICO:
BENELUX:
FRANCE:
GERMANY:



Conforms to
ASTM D 4236

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic.

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting, and other materials that cannot be laundered.

 0-3

Patents and trademarks vary

Style 58-5071   Code: 58 5071-0-255

crayola.com

CE ⓖ UK CA 3+ 

Insert UPC number

**0-71662-65071-1**

B8513

**Crayola** A Hallmark Company
Serpentine Design ® ©2018 Crayola,
Easton, PA 18044-0431. Distributed in
Australia by Crayola (Australia) Pty Ltd.
Imported by Binney & Smith (Europe)
Ltd., Bedford Heights, Manton Lane,
Bedford, MK41 7PH, England.

**QUALITY GUARANTEE**
We guarantee the quality of all Crayola
products. If this product does not
perform properly, please contact us.

U.S.A. & Canada:
1-800-CRAYOLA (800-272-9652),
M-F, 9 AM-4 PM ET.

Australia: 1-800-657-353,
M-F, 9 AM-4 PM AEST.

France: +33 (0) 1 41 66 54 54,
Germany: +49 6152 71 24 229,
UK: 01702 208170,
Mexico: 01800 71 78 222,
Italy: +39 (0) 543 720997,
M-F, 9 AM-5 PM local time.



Conforms to
ASTM D 4236.

**WARNING!** Not
suitable for children
under 36 months due
to small parts which
may cause a choking
hazard if swallowed.

All Crayola art
materials are nontoxic.

**crayola.com**

 

**FOR BEST RESULTS:** Crayola Washable Markers wash
from skin and most washable clothing. Wash promptly in
hot wash cycle. Do not use prewash or chlorine bleach.
Repeat laundering may be required.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted
walls, finished and unfinished wood, vinyl, carpeting, and
other materials that cannot be laundered.

Contents and colors may vary.
Please retain packaging for future reference.

PRODUCT OF CHINA WITH INK FROM U.S.A.

Style# 58-5071   Code# 58-5071-0-202

**PROOF OF PURCHASE**





CE ⌾ 3+

0  71662 65071  1





**Crayola Silly Scents Chisel Tip Markers** are infused with 12 flavorful scents and colors to match! Fuel your imagination with bold colors & the sweet smell of creativity!

 cherry

fruit punch 

orange

lemon



green apple 

fresh air 

blueberry 

grape 

marshmallow 

root beer 

coconut 

cotton candy 

---

**WASHING & CARE INFORMATION**

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, furs, red and unfinished wood, vinyl, carpeting, and other materials that cannot be laundered.

Conforms to ASTM D 4236

**WARNING!** Not suitable for children under 36 months due to small parts which may cause a choking hazard if swallowed.

All Crayola art materials are nontoxic

**QUALITY GUARANTEE:** ...

JSA & Canada 1-800-CRAYOLA (800-272-9652) M-F 9 AM-4 PM ET

Austr lia 1-800-857-353 M-F 9 AM 1 PM AEST

Fr nce +33 (0) 1 41 06 54 54  Jk 01702 208170

Germany +49 6152 71 24 229  M cxoo 01800 71 76 222

UK +38 (0) 543 720997, M-F 9 AM 5 PM local time



**Crayola**

© 2016 Crayola, Easton PA 18044-0431 U Distributed in Australia by Crayola (Australia) Pty Ltd  Imported by Bi ley & Sm th (NZ) L td Lane Bedford Heights, Nortts, Lane Bedford 1 NN41 7PH Engl d

crayola.com

3+



**PROOF OF PURCHASE**

M6515
Made in China

Style 58-8199  Cod # 58-8199-0-20.

0  71662  08199  7

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in not wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, furniture and unfinished wood, vinyl, carpeting, and other materials that cannot be laundered.



**WARNING:** Not suitable for children under 36 months due to small parts which may cause choking hazard if swallowed.

Conforms to ASTM D 4236

All Crayola art materials are non-toxic.





**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

**U.S.A. & Canada:** 1-800-CRAYOLA (800-272-9652), M-F, 9 AM-4 PM ET.

**Australia:** 1-800-807-363, M-F, 9 AM-4 PM AEST.

**France:** +33 (0) 1 61 86 64 54, UK: 81782 288170,

**Germany:** +49 6132 71 24 228, Mexico: 81800 71 76 222,

**Italy:** +39 (0) 543 720897, M-F, 9 AM-5 PM local time.



©2016 Crayola, Easton, PA 18044-0431 Distributed in Australia by Crayola (Australia) Pty Ltd. Imported by Binney & Smith (Europe) Ltd., Bedford Heights, Manton Lane, Bedford, MK41 7PH, England.

3+

M6515
Made in China

Style#: 58-8199  Code#: 58-8199-0-201

**PROOF OF PURCHASE**

**crayola.com**
Contents and colors may vary.
Please retain packaging
for future reference.

0   71662  08199   7





Contents and colors may vary.

Though safe and nontoxic, this product contains
a bittering agent to discourage consumption.

**Crayola** A jinkskuvrk.compan  ©2023 Crayola, Easton, PA 18044-0431.
Serpentine Design®, SB/ Scents® Binney & Smith (Europe) Ltd., Bedford
Heights, Manton Lane, Bedford, MK41 7PH, England; Binney & Smith (Europe) Ltd.,
Via Figino 13, 47122 Forlì (FC), Italy. Distributed in Australia by Crayola (Australia) Pty Ltd. 10
Caribbean Drive Scoresby Victoria 3179.



Conforms to
ASTM D 4236.

All Crayola art
materials
are certified AP.

All Crayola
art materials
are nontoxic.

**crayola.com**

## WASHING & CARE INFORMATION

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most
washable clothing. Wash promptly in hot wash cycle. Do not use prewash or
chlorine bleach. Repeat laundering may be required.

**STAIN ADVISEMENT:** Keep Crayola Washable Markers away from wallpaper,
painted walls, finished and unfinished wood, vinyl, carpeting and other
materials that cannot be laundered.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola
products. If this product does not perform properly, please contact us.

M-F, 9 AM-6 PM ET/AEST.
U.S.A. & CANADA (Call/Text): 1-800-CRAYOLA (800-272-9652)
Text charges may apply.   AUSTRALIA: 1-800-657-353
M-F, 9 AM-5 PM LOCAL TIME:
UK: 0800 389 6238  ITALY: +39 (0) 543 720937
MEXICO: 800 7178 222  BENELUX: +31 (0)104596 580
FRANCE: +33 (0) 1 41 06 54 54  GERMANY: +496103 459180

PACKAGED IN VIETNAM WITH CASE AND
COLORING PAGES MADE IN VIETNAM,
TWISTABLES CRAYONS MADE IN S. KOREA,
SLIM MARKERS MADE IN MALAYSIA, AND
BROAD LINE MARKERS MADE IN U.S.A.

Style#: 04-2935  Code#: 04-2935-0-300



0  71662 12935  4





**Crayola Silly Scents Smash-Ups** blend two sweet scents in each marker—a colorful treat for the eyes and the nose!

Colors wash off skin and can be easily cleaned from most clothing fabrics.

| | |
|---|---|
| red velvet cake | raspberry macaron |
| strawberry shortcake | upside-down cake |
| mint chocolate chip | key lime pie |
| berry smoothie | fluffernutter |
| caramel macchiato | s'more |

MADE IN MALAYSIA

**SAFETY INFORMATION**

Conforms to ASTM D 4236

All Crayola art materials are nontoxic.

crayola.com

A4R16

**WASHING & CARE INFORMATION**

FOR BEST RESULTS: Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.

STAIN ADVISEMENT: Keep away from wall paper, painted walls, finished and unfinished wood, vinyl, carpeting, and other materials that cannot be laundered.

**3+**

Contents and colors may vary.

Style: 58-8275　Code# 58-R215-0 203

0 71662 18275 5





**Crayola Silly Scents Smash-Ups** blend two sweet scents in each marker—a colorful treat for the eyes and the nose!

Colors wash off skin and can be easily cleaned from most clothing fabrics.

red velvet cake

berry smoothie

fluffernutter

pb&j sandwich

orange dreamsicle

caramel macchiato

bananas foster

s'more

mint chocolate chip

coconut cluster

key lime pie

strawberry shortcake

3+
crayola.com

J3R18

0 71662 08279 6



AP
All Crayola
art materials
are nontoxic.

**3+**

**crayola.com**

Contents and colors may vary

**WASHING & CARE INFORMATION**

**FOR BEST RESULTS:** Crayola Washable Markers wash from skin and most washable clothing. Wash promptly in hot wash cycle. Do not use prewash or chlorine bleach. Repeat laundering may be required.

**STAIN ADVISEMENT:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting, and other materials that cannot be laundered.

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST.
**U.S.A. & Canada (Call/Text):** 1-800-CRAYOLA (800-272-9652)
Text charges may apply.  **Australia:** 1-800-657-353
M-F, 9 AM-5 PM LOCAL TIME
**UK:** 0800 389 8236  **Italy:** +39 (0) 543 720997
**Mexico:** 800 7178 222  **Benelux:** +31 (0)104596 580
**France:** +33 (0) 1 41 06 54 54  **Germany:** +496103 459180

MADE IN MALAYSIA

**Crayola** A Hallmark Company
©2022 Crayola. Easton, PA 18044-0431
Serpentine Design™, Silly Scents®
Binney & Smith (Europe) Ltd., Bedford
Heights, Manton Lane, Bedford, MK41
7PH, England. Binney & Smith (Europe)
Ltd., Via Figarse 13, 47122 Forli (FC) Italy.
Distributed in Australia by Crayola
(Australia) Pty Ltd. 10 Caribbean Drive
Scoresby Victoria 3179

H2R26

Style# 58-8279  Code# 58-8279-0-200



0 71662 08279 6





**Washability You Can Trust!**

# Super Tips

DRAW THIN · DRAW THICK

## Washable Markers

## 100 Colors!

| | | | |
|---|---|---|---|
| s'more | mint chocolate chip | caramel macchiato | key lime pie |
| red velvet cake | raspberry macaron | orange dreamsicle | bananas foster |
| berry smoothie | pb&j sandwich | fluffernutter | coconut cluster |
| strawberry shortcake | chocolate covered strawberry | orange gingerbread cookie | lemon bar |
| blueberry cheesecake | plum pudding | root beer float | upside-down cake |



+20 Silly Scents SMASHUPS



L3L17   cheesecake   pudding   float

3+

**Crayola** A Hallmark Company
©2023 Crayola, Easton, PA 18044-0431. Serpentine Design®
Binney & Smith (Europe) Ltd., Bedford Heights, Maxton
Lane, Bedford, NK41 7PH, England; Binney & Smith (Europe)
Ltd., Via Figino 13, 47122 Forli (FC), Italy. Distributed in Australia by
Crayola (Australia) Pty Ltd. 10 Caribbean Drive Scoresby Victoria 3179

**QUALITY GUARANTEE:** We guarantee the quality of all Crayola
products. If this product does not perform properly, please contact us.

M-F, 9 AM-4 PM ET/AEST.
**U.S.A. & CANADA** (Call/Text): 1-800-CRAYOLA (800-272-8652)
Text charges may apply.  **AUSTRALIA:** 1-800-557-353
M-F, 9 AM-5 PM LOCAL TIME:
**UK:** 0800 389 8236  **ITALY:** +39 (0) 543 720997
**MEXICO:** 800 7178 222  **BENELUX:** +31 (0)104596 500
**FRANCE:** +33 (0) 1 41 06 64 54  **GERMANY:** +496103 459180

Contents and colors may vary.
MADE IN VIETNAM    **crayola.com**
Style#: 58-5121   Code#: 58-5121-0-200

0  71662 25121  5

**FOR BEST RESULTS:** Crayola
Washable Markers wash from skin and
most washable clothing. Wash promptly
in hot wash cycle. Do not use prewash
or chlorine bleach. Repeat laundering
may be required.
**STAIN ADVISEMENT:** Keep Crayola
Washable Markers away from wallpaper,
painted walls, finished and unfinished
wood, vinyl, carpeting and other

ACMI
**AP**
Conforms to
ASTM D 4236

All Crayola
art materials
are nontoxic.

# EXHIBIT 28

# SAFETY DATA SHEET



SDS ID: CRAY-044
**CRAYOLA® WASHABLE SCENTED MARKERS**

---

## 1. Identification

**Product identifier**

**Material Name:**      CRAYOLA® WASHABLE SCENTED MARKERS

**Other means of identification**

**Product Code(s)**      CRAY-044

**Synonyms**      CRAYOLA TAKE NOTE SCENTED MARKERS; CRAYOLA SUPERTIPS WASHABLE MARKERS; CRAYOLA DOODLE SCENTS MARKERS; CRAYOLA POWERLINES MARKERS; CRAYOLA SCENTED MARKERS; SCENTED MARKER MAKER; SILLY SCENTS MARKERS; PRODUCT CODE(S): 04-0015; 04-0114; 04-0115; 04-0383; 04-0415; 04-0504; 04-0506; 04-0533; 04-0546; 04-0613; 04-0642; 04-0657; 04-0692; 04-0696; 04-0943; 04-2935; 25-7240; 25-7245; 58-2291; 58-2293; 58-2297; 58-2298; 58-5071; 58-5072; 58-5073; 58-5050; 58-5071; 58-5120; 58-6589; 58-6590; 58-6591; 58-6592; 58-6663; 58-7663; 58-7807; 58-8080; 58-8081; 58-8082; 50-8083; 58-8084; 58-8085; 58-8086; 58-8087; 58-8088; 58-8089; 58-8090; 58-8091; 58-8092; 58-8093; 58-8094; 58-8095; 58-8096; 58-8097; 58-8106; 58-8194; 58-8195; 58-8196; 58-8197; 58-8199; 58-8230; 58-8231; 58-8232; 58-8233; 58-8234; 58-8235; 58-8236; 58-8237; 58-8238; 58-8268; 58-8269; 58-8270; 58-8271; 58-8272; 58-8274; 58-8275; 58-8279; 58-8337; 58-8339; 74-7609; 74-7240; 74-7243; 74-7247; 74-7261; 74-7263; 74-7469; 74-7616;

**Recommended use of the chemical and restrictions on use**

**Recommended use**      Arts and Crafts

**Restrictions on use**      None Known

**Details of the supplier of the safety data sheet**

**Supplier Address**
CRAYOLA LLC
1100 Church Lane
Easton, PA 18044
Phone: 1-800-272-9652

**E-mail**      support@crayola.com

**Emergency telephone number**

**Emergency Telephone**      1-800-535-5053 or call local POISON CONTROL

---

## 2. Hazard(s) identification

**Classification**

---

**CRAYOLA® WASHABLE SCENTED MARKERS**                                      **Revision date** 23-Jan-2024

Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

**Hazards not otherwise classified (HNOC)**
Not applicable

**Label elements**

**Hazard statements**
Not classified as hazardous by the 2012 OSHA Hazard Communication Standard (29 CFR 1910.1200).

The product contains no substances which at their given concentration, are considered to be hazardous to health.

| Appearance article containing liquid | Physical state Liquid | Odor None |

**Other information**
No information available.

## 3. Composition/information on ingredients

**Substance**

| Chemical name | CAS No | Weight-% | Trade secret |
|---|---|---|---|
| Product has been certified as nontoxic by the Art & Creative Materials Institute, Inc. and conforms to ASTM D 4236 standard practice for labeling art materials for acute and chronic adverse health hazards | - | 100 | * |

*The exact percentage (concentration) of composition has been withheld as a trade secret.

## 4. First-aid measures

**Description of first aid measures**

| | |
|---|---|
| **Inhalation** | It is unlikely that emergency treatment will be required. Remove from exposure. Get medical attention, if needed. |
| **Eye contact** | It is unlikely that emergency treatment will be required. Flush eyes with plenty of water for at least 15 minutes. If eye irritation persists, get medical advice/attention. |
| **Skin contact** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Ingestion** | Call a poison control center or doctor immediately for treatment advice. |

**Most important symptoms and effects, both acute and delayed**

**Symptoms**                    No information available.

**Indication of any immediate medical attention and special treatment needed**

**CRAYOLA® WASHABLE SCENTED MARKERS**                        **Revision date**  23-Jan-2024

| | |
|---|---|
| **Note to physicians** | Treat symptomatically. |

## 5. Fire-fighting measures

| | |
|---|---|
| **Suitable Extinguishing Media** | Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
| **Large Fire** | CAUTION: Use of water spray when fighting fire may be inefficient. |
| **Unsuitable extinguishing media** | Do not scatter spilled material with high pressure water streams. |
| **Specific hazards arising from the chemical** | No information available. |

**Explosion data**
**Sensitivity to mechanical impact** None.

**Sensitivity to static discharge**   None.

**Special protective equipment and precautions for fire-fighters**   Firefighters should wear self-contained breathing apparatus and full firefighting turnout gear. Use personal protection equipment.

## 6. Accidental release measures

**Personal precautions, protective equipment and emergency procedures**

| | |
|---|---|
| **Personal precautions** | Wear personal protective clothing and equipment, see Section 8. |
| **For emergency responders** | Wear protective clothing and equipment suitable for the surrounding fire. |

**Methods and material for containment and cleaning up**

| | |
|---|---|
| **Methods for containment** | Prevent further leakage or spillage if safe to do so. |
| **Methods for cleaning up** | Pick up and transfer to properly labeled containers. |

## 7. Handling and storage

**Precautions for safe handling**

| | |
|---|---|
| **Advice on safe handling** | Wash thoroughly after handling. |

**Conditions for safe storage, including any incompatibilities**

| | |
|---|---|
| **Storage Conditions** | None needed according to classification criteria. Store and handle in accordance with all current regulations and standards. See original container for storage recommendations. Keep separated from incompatible substances. |

## 8. Exposure controls/personal protection

**Control parameters**

| | |
|---|---|
| **Exposure Limits** | This product, as supplied, does not contain any hazardous materials with occupational |

---

**CRAYOLA® WASHABLE SCENTED MARKERS**                    **Revision date**  23-Jan-2024

exposure limits established by the region specific regulatory bodies.

**Appropriate engineering controls**

| | |
|---|---|
| **Engineering controls** | Showers<br>Eyewash stations<br>Ventilation systems. |

**Individual protection measures, such as personal protective equipment**

| | |
|---|---|
| **Eye/face protection** | Eye protection not required under normal conditions. |
| **Hand protection** | Protective gloves are not required under normal conditions. |
| **Skin and body protection** | It is unlikely that emergency treatment will be required. If adverse effects occur, wash with soap or mild detergent and large amounts of water. Get medical attention, if needed. |
| **Respiratory protection** | No respirator is required under normal conditions of use. Under conditions of frequent use or heavy exposure, respiratory protection may be needed. |
| **General hygiene considerations** | Handle in accordance with good industrial hygiene and safety practice. |

---

## 9. Physical and chemical properties

**Information on basic physical and chemical properties**

| | |
|---|---|
| **Physical state** | Liquid |
| **Appearance** | article containing liquid |
| **Color** | various colors |
| **Odor** | None |
| **Odor threshold** | No information available |

| Property | Values | Remarks • Method |
|---|---|---|
| **pH** | 6  -  9.5 | None known |
| **Melting point / freezing point** | No data available | None known |
| **Initial boiling point and boiling range** | No data available | None known |
| **Flash point** | No data available | None known |
| **Evaporation rate** | No data available | None known |
| **Flammability** | No data available | None known |
| **Flammability Limit in Air** | | None known |
| **Upper flammability or explosive limits** | No data available | |
| **Lower flammability or explosive limits** | No data available | |
| **Vapor pressure** | No data available | None known |
| **Relative vapor density** | No data available | None known |
| **Relative density** | 1.06  -  1.12 | None known |
| **Water solubility** | Soluble in water | None known |
| **Solubility(ies)** | No data available | None known |
| **Partition coefficient** | No data available | None known |
| **Autoignition temperature** | No data available | None known |
| **Decomposition temperature** | | None known |
| **Kinematic viscosity** | No data available | None known |
| **Dynamic viscosity** | 1.06 - 4.2 cps | None known |

**Other information**

| | |
|---|---|
| **Explosive properties** | No information available |
| **Oxidizing properties** | No information available |

---

**CRAYOLA® WASHABLE SCENTED MARKERS**                    **Revision date**  23-Jan-2024

| | |
|---|---|
| **Softening point** | No information available |
| **Molecular weight** | No information available |
| **VOC Content (%)** | No information available |
| **Liquid Density** | No information available |
| **Bulk density** | No information available |

## 10. Stability and reactivity

| | |
|---|---|
| **Reactivity** | No hazard expected. |
| **Chemical stability** | Stable at normal temperatures and pressure. |
| **Possibility of hazardous reactions** | None under normal processing. |
| **Conditions to avoid** | None reported. |
| **Incompatible materials** | Oxidizing materials. |
| **Hazardous decomposition products** | Oxides of carbon. |

## 11. Toxicological information

**Information on likely routes of exposure**

| | |
|---|---|
| **Inhalation** | No information on significant adverse effects. |
| **Eye contact** | No information on significant adverse effects. |
| **Skin contact** | No information on significant adverse effects. |
| **Ingestion** | No information on significant adverse effects. |

**Symptoms related to the physical, chemical and toxicological characteristics**

**Symptoms**                    No information available.

**Acute toxicity**

**Numerical measures of toxicity**
No information available

**Delayed and immediate effects as well as chronic effects from short and long-term exposure**

| | |
|---|---|
| **Skin corrosion/irritation** | No information available. |
| **Serious eye damage/eye irritation** | No information available. |
| **Respiratory or skin sensitization** | No information available. |
| **Germ cell mutagenicity** | No information available. |
| **Carcinogenicity** | No information available. |

**CRAYOLA® WASHABLE SCENTED MARKERS**                                    **Revision date**  23-Jan-2024

**Reproductive toxicity**              No information available.

**STOT - single exposure**             No information available.

**STOT - repeated exposure**           No information available.

**Aspiration hazard**                  No information available.

**Other adverse effects**              No information available.

**Interactive effects**                No information available.

## 12. Ecological information

**Ecotoxicity**                        The environmental impact of this product has not been fully investigated.

**Persistence and degradability**      No information available.

**Bioaccumulation**                    There is no data for this product.

**Other adverse effects**              No information available.

## 13. Disposal considerations

**Disposal methods**

**Waste from residues/unused products**   Dispose of waste in accordance with environmental legislation. Dispose of in accordance with local regulations.

**Contaminated packaging**             Do not reuse empty containers.

## 14. Transport information

<u>DOT</u>                             Not regulated

## 15. Regulatory information

**CRAYOLA® WASHABLE SCENTED MARKERS**                    **Revision date** 23-Jan-2024

**International Inventories**

**TSCA**                           All of the components of this product are listed on the TSCA Inventory.

**DSL/NDSL**                        Contact supplier for inventory compliance status.
**EINECS/ELINCS**                   Contact supplier for inventory compliance status.
**ENCS**                            Contact supplier for inventory compliance status.
**IECSC**          .                Contact supplier for inventory compliance status.
**KECL**                            Contact supplier for inventory compliance status.
**PICCS**                           Contact supplier for inventory compliance status.
**AIIC**                            Contact supplier for inventory compliance status.
**NZIoC**                           Contact supplier for inventory compliance status.

Legend:
**TSCA**  - United States Toxic Substances Control Act Section 8(b) Inventory
**DSL/NDSL**   - Canadian Domestic Substances List/Non-Domestic Substances List
**EINECS/ELINCS**   - European Inventory of Existing Chemical Substances/European List of Notified Chemical Substances
**ENCS**  - Japan Existing and New Chemical Substances
**IECSC**   - China Inventory of Existing Chemical Substances
**KECL**  - Korean Existing and Evaluated Chemical Substances
**PICCS**  - Philippines Inventory of Chemicals and Chemical Substances
**AIIC**  - Australian Inventory of Industrial Chemicals
**NZIoC**  - New Zealand Inventory of Chemicals

**US Federal Regulations**

**SARA 313**
Section 313 of Title III of the Superfund Amendments and Reauthorization Act of 1986 (SARA).  This product does not contain any chemicals which are subject to the reporting requirements of the Act and Title 40 of the Code of Federal Regulations, Part 372.

**SARA 311/312 Hazard Categories**
Should this product meet EPCRA 311/312 Tier reporting criteria at 40 CFR 370,  refer to Section 2 of this SDS for appropriate classifications.

**CWA (Clean Water Act)**
This product does not contain any substances regulated as pollutants pursuant to the Clean Water Act (40 CFR 122.21 and 40 CFR 122.42).

**CERCLA**
This material, as supplied, does not contain any substances regulated as hazardous substances under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) (40 CFR 302) or the Superfund Amendments and Reauthorization Act (SARA) (40 CFR 355).  There may be specific reporting requirements at the local, regional, or state level pertaining to releases of this material.

**US State Regulations**

**California Proposition 65**
This product does not require warnings under California Proposition 65.

**U.S. EPA Label Information**

**EPA Pesticide Registration Number**  Not applicable

**CRAYOLA® WASHABLE SCENTED MARKERS**                      **Revision date**  23-Jan-2024

| 16. Other information |

| <u>NFPA</u> | **Health hazards**  0 | **Flammability**  0 | **Instability**  0 | **Special hazards**  - |
| <u>HMIS</u> | **Health hazards**  0 | **Flammability**  0 | **Physical hazards**  0 | **Personal protection**  X |

**Key or legend to abbreviations and acronyms used in the safety data sheet**
**Legend  Section 8: Exposure controls/personal protection**

| TWA | TWA (time-weighted average) | STEL | STEL (Short Term Exposure Limit) |
| Ceiling | Maximum limit value | * | Skin designation |

**Key literature references and sources for data used to compile the SDS**
Agency for Toxic Substances and Disease Registry (ATSDR)
U.S. Environmental Protection Agency ChemView Database
European Food Safety Authority (EFSA)
EPA (Environmental Protection Agency)
Acute Exposure Guideline Level(s) (AEGL(s))
U.S. Environmental Protection Agency Federal Insecticide, Fungicide, and Rodenticide Act
U.S. Environmental Protection Agency High Production Volume Chemicals
Food Research Journal
Hazardous Substance Database
International Uniform Chemical Information Database (IUCLID)
National Institute of Technology and Evaluation (NITE)
Australia National Industrial Chemicals Notification and Assessment Scheme (NICNAS)
NIOSH (National Institute for Occupational Safety and Health)
National Library of Medicine's ChemID Plus (NLM CIP)
National Library of Medicine's PubMed database (NLM PUBMED)
National Toxicology Program (NTP)
New Zealand's Chemical Classification and Information Database (CCID)
Organization for Economic Co-operation and Development Environment, Health, and Safety Publications
Organization for Economic Co-operation and Development High Production Volume Chemicals Program
Organization for Economic Co-operation and Development Screening Information Data Set
World Health Organization

**Revision date**             23-Jan-2024
**Revision Note**             No information available.
**Disclaimer**
**The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.**
**End of Safety Data Sheet**

# EXHIBIT 29

**DECLARATION OF STEPHANIE WEDGE PURUSANT TO CALIFORNIA CIVIL CODE § 1780(d)**

I, Stephanie Wedge, declare as follows:

1.    I am a party Plaintiff in this action and a citizen and resident of the County of Alameda, California.

2.    While residing in Alameda County, California in February of 2024, I purchased Crayola crayons and washable markers from stores located in Alameda County, California.

I declare under the penalty of perjury under the laws of the State of California that forgoing is true and correct.

Executed _____12/2/2025_____, at Alameda County, California.

DocuSigned by:

*Stephanie Wedge*
750DF030E557440

Stephanie Wedge

# EXHIBIT 30



# EXHIBIT 31





# EXHIBIT B

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**  Crayola LLC and Does 1 to 50
*(AVISO AL DEMANDADO):*

**YOU ARE BEING SUED BY PLAINTIFF:** Stephanie Wedge, Shawn Wagner and
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*  Robert Mason

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
**12/05/2025**
Chad Finke, Executive Officer / Clerk of the Court
By_____ A. Gospel _____ Deputy

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* | CASE NUMBER:<br>*(Número del Caso):*<br>**25CV157969** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

DATE: 12/05/2025                          Clerk, by _____ , Deputy
*(Fecha)* Chad Finke, Executive Officer / Clerk of the Court *(Secretario)*          A. Gospel          *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

| [SEAL] | **NOTICE TO THE PERSON SERVED:** You are served |
|---|---|

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* CRAYOLA LLC
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)          ☐ CCP 416.90 (authorized person)
   ☒ other *(specify):* CAL. CORP. CODE 17061
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

For your protection and privacy, please press the Clear<br>This Form button after you have printed the form.

[ Print this form ]   [ Save this form ]                  [ Clear this form ]

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Wyatt A. Lison (SBN #316755)<br>Feinstein Doyle Payne & Kravec, LLC<br>429 Fourth Avenue, Law & Finance Building, Suite 1300<br>Pittsburgh, PA 15219<br>TELEPHONE NO.: (412) 281-8400      FAX NO.: (412) 281-1007<br>EMAIL ADDRESS: wlison@fdpklaw.com<br>ATTORNEY FOR *(Name):* Plaintiffs  Stephanie Wedge, Shawn Wager and Robert Mason | **FOR COURT USE ONLY**<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Alameda<br>**12/05/2025 at 01:14:20 PM**<br>By: Andrel Gospel,<br>Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**  Alameda
STREET ADDRESS: 24405 Amador Street
MAILING ADDRESS: 24405 Amador Street
CITY AND ZIP CODE: Hayward CA 94544
BRANCH NAME: Hayward Hall of Justice

CASE NAME: Stephanie Wedge, Shawn Wagner and Robert Mason v.
Crayola LLC, and DOES 1 to 50

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | | CASE NUMBER:<br>25CV157969 |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $35,000) | [ ] Limited<br>(Amount<br>demanded is<br>$35,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>*(Cal. Rules of Court, rule 3.402)* | | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[X] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* 3  1: Cal. Bus. & Prof. Code §§17200 *et seq.;* 2, Cal. Civil Code §§1750, *et seq.;*
5. This case [ ] is  [X] is not  a class action suit.   3. Cal. Bus. & Prof. Code §§17500, *et seq.*
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date:

Wyatt A. Lison
(TYPE OR PRINT NAME)                                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ALAMEDA

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Alameda

12/05/2025

Chad Finke, Executive Officer / Clerk of the Court

By: _A. Gospel_ Deputy

COURTHOUSE ADDRESS:
Rene C. Davidson Courthouse
Administration Building, 1221 Oak Street, Oakland, CA 94612

PLAINTIFF:
Stephanie Wedge et al

DEFENDANT:
Crayola LLC et al

## NOTICE OF CASE MANAGEMENT CONFERENCE

CASE NUMBER:
25CV157969

TO THE PLAINTIFF(S)/ATTORNY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)).

Give notice of this conference to all other parties and file proof of service.

Your Case Management Conference has been scheduled on:

Date: 05/06/2026        Time: 3:00 PM        Dept.: 20

Location: Rene C. Davidson Courthouse
Administration Building, 1221 Oak Street, Oakland, CA 94612

TO DEFENDANT(S)/ATTORNEY(S) FOR DEFENDANT(S) OF RECORD:

The setting of the Case Management Conference does not exempt the defendant from filing a responsive pleading as required by law, you must respond as stated on the summons.

TO ALL PARTIES who have appeared before the date of the conference must:

Pursuant to California Rules of Court, 3.725, a completed Case Management Statement (Judicial Council form CM-110) must be filed and served at least 15 calendar days before the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.

**Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724.

**Post jury fees** as required by Code of Civil Procedure section 631.

If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30. Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

The judge may place a Tentative Case Management Order in your case's on-line register of actions before the conference. This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative case management orders at https://eportal.alameda.courts.ca.gov.

Expedited Jury Trials

If the parties agree, they may try the case in an Expedited Jury Trial. Code of Civ. Proc. § 630.01 et seq. In short, the parties would agree to the following: 8 jurors (6 must agree); 3 peremptory challenges per side; 5-hour time limit per side, unless otherwise agreed and approved; one to two court days for completion, unless otherwise agreed and approved; high/low arrangement option; and limited right to appeal. For additional information, please see the following links:

• EJT-010-INFO* Expedited Jury Trial Information Sheet (ca.gov)
• EJT-008 Agreement of Parties (Mandatory Expedited Jury Trial Procedures) (ca.gov)
• EJT-020 [Proposed] Consent Order for Voluntary Expedited Jury Trial (ca.gov)

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA CIV-100 [Rev. 10/2021]

# NOTICE OF
# CASE MANAGEMENT CONFERENCE

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ALAMEDA

Reserved for Clerk's File Stamp

COURTHOUSE ADDRESS:
Rene C. Davidson Courthouse
1225 Fallon Street, Oakland, CA 94612

**FILED**
Superior Court of California
County of Alameda

12/05/2025

Chad Finke, Executive Officer / Clerk of the Court

By: _____ Deputy
A. Gospel

PLAINTIFF/PETITIONER:
Stephanie Wedge  et al

DEFENDANT/RESPONDENT:
Crayola LLC et al

## CERTIFICATE OF MAILING

CASE NUMBER:
25CV157969

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the attached document upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Wyatt A. Lison
Feinstein Doyle Payne & Kravec LLC
429 Fourth Avenue Suite 1300
Pittsburgh, PA 15219

Chad Finke, Executive Officer / Clerk of the Court

Dated: 12/08/2025                    By:

A. Gospel, Deputy Clerk

## CERTIFICATE OF MAILING

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ALAMEDA

Reserved for Clerk's File Stamp

COURTHOUSE ADDRESS:

Rene C. Davidson Courthouse

Administration Building, 1221 Oak Street, Oakland, CA 94612

**FILED**
Superior Court of California
County of Alameda

12/05/2025

Clad Flike , Executive Officer / Clerk of the Court

By: _____ Deputy

A. Gospel

PLAINTIFF(S):

Stephanie Wedge  et al

DEFENDANT(S):

Crayola LLC et al

## NOTICE OF CASE ASSIGNMENT

CASE NUMBER:

25CV157969

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the Local Rules of the Superior Court of California, County of Alameda, this action is hereby assigned by the Presiding Judge for all purposes to:

| | |
|---|---|
| ASSIGNED JUDGE: | Karin Schwartz |
| DEPARTMENT: | 20 |
| LOCATION: | Rene C. Davidson Courthouse |
| | Administration Building, 1221 Oak Street, Oakland, CA 94612 |
| PHONE NUMBER: | (510) 267-6936 |
| FAX NUMBER: | |
| EMAIL ADDRESS: | Dept20@alameda.courts.ca.gov |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

Please note: In this case, any challenge pursuant to Code of Civil Procedures section 170.6 must be exercised within the time period by law. (See Code of Civ. Proc. §§ 170.6, subd. (a.)(2) and 1013)

NOTICE OF NONAVAILABILITY OF COURT REPORTERS: Effective June 4, 2012, the court will not provide a court reporter for civil law and motion hearings, any other hearing or trial in civil departments, or any afternoon hearing in Department 201 (probate).  Parties may arrange and pay for the attendance of a certified shorthand reporter.  In limited jurisdiction cases, parties may request electronic recording. Amended Local Rule 3.95 states: "Except as otherwise required by law, in general civil case and probate departments, the services of an official court reporter are not normally available.  For civil trials, each party must serve and file a statement before the trial date indicating whether the party requests the presence of an official court reporter."

GENERAL PROCEDURES

Following assignment of a civil case to a specific department, all pleadings, papers, forms, documents and writings can be submitted for filing at either Civil Clerk's Office, located at the Rene C. Davidson Courthouse, Room 109, 1225 Fallon Street, Oakland, California, 94612, and the Hayward Hall of Justice, 24405 Amador Street, Hayward, California, 94544 and through Civil e-filing.  Information regarding Civil e-filing can be found on the courts website. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

**NOTICE OF CASE ASSIGNMENT**

**ASSIGNED FOR ALL PURPOSES TO**
JUDGE Karin Schwartz
DEPARTMENT 20

All parties are expected to know and comply with the Local Rules of this Court, which are available on the court's website at http://www.alameda.courts.ca.gov/Pages.aspx/Local-Rules(1) and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processed (ADR) prior to the Initial Case Management Conference. The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days." The court's website contains this form and other ADR information. If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

COURT RESERVATIONS

The use of the Court Reservation System (CRS) is now mandated in many civil courtrooms within the Alameda County Superior Court. Instead of calling or emailing the courtroom to make a reservation, parties with a case assigned to a courtroom using CRS are directed to utilize CRS to make and manage their own reservations, within parameters set by the courtrooms. CRS is available 24 hours a day, seven days a week and reservations can be made from a computer or smart phone. Please note, you are prohibited from reserving more than one hearing date for the same motion.

Prior to scheduling any motion on CRS, including any Applications for Orders for Appearance and Examination, or continuing any motion, please review the online information (if any) for the courtroom in which you are reserving. There may be specific and important conditions associated with certain motions and proceedings. Information is available on the court's eCourt Public Portal at www.eportal.alameda.courts.ca.gov.

Chad Finke, Executive Officer / Clerk of the Court

By

A. Gospel, Deputy Clerk

**NOTICE OF CASE ASSIGNMENT**

1  Wyatt A. Lison (SBN – 316775)
   John P. Worgul (SBN – 259150)
2  **FEINSTEIN DOYLE PAYNE**
   **& KRAVEC, LLC**
3  429 Fourth Avenue
   Law & Finance Building, Suite 1300
4  Pittsburgh, PA 15219
   Tel.: 412-281-8400
5  Fax: 412-281-1007
   Email: wlison@fdpklaw.com
6  Email: jworgul@fdpklaw.com

7  *Attorneys for Plaintiffs*

ELECTRONICALLY FILED
Superior Court of California
County of Alameda
12/18/2025
Chad Finke, Executive Officer / Clerk of the Court
By: _____ N. Douglas _____ Deputy

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                      **FOR THE COUNTY OF ALAMEDA**
9

10  **STEPHANIE WEDGE, SHAWN WAGNER**
    **AND ROBERT MASON,**
11

12                              **Plaintiffs,**

13          **v.**

14  **CRAYOLA LLC, and DOES 1 to 50**

15

16

17  **Defendants.**

18

19  _____

| | |
|---|---|
| Case No.:  **25CV157969** | |
| *Assigned for All Purposes to* | |
| *Hon. Karin Schwartz* | |
| | |
| **PROOF OF SERVICE** | |
| | |
| Dept. :  20 | |
| Hearing Date :  May 26, 2025 | |
| Time :  3:00 PM | |

20

21

22

23

24

25

26

27

28

| Attorney or Party without Attorney: | | For Court Use Only |
|---|---|---|
| WYATT A. LISON ESQ., Bar #316775<br>FEINSTEIN DOYLE PAYNE & KRAVEC, LLC<br>429 4th AVE, SUITE 1300<br>LAW & FINANCE BLDG.<br>PITTSBURGH, PA  15219<br>Telephone No: 412-281-8400          FAX No: 412-281-1007 | | |
| Attorney for: Plaintiff | Ref. No. or File No.:<br>WEDGE, ET AL V. CRAYOLA | |
| Insert name of Court, and Judicial District and Branch Court:<br>ALAMEDA COUNTY SUPERIOR COURT-HAYWARD BRANCH | | |
| Plaintiff: STEPHANIE WEDGE; ET AL | | |
| Defendant: CRAYOLA LLC; ET AL | | |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date:<br>Tue, May. 26, 2026 | Time:<br>3:00PM | Dept/Div:<br>20 | Case Number:<br>25CV157969 |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; NOTICE OF CASE MANAGEMENT CONFERENCE; NOTICE OF CONFIRMATION OF ELECTRONIC FILING

3.   a. *Party served:*                         CRAYOLA LLC C/O CT CORPORATION SYSTEM
    b. *Person served:*                        JACQUELINE MEJIA, INTAKE SPECIALIST

4. *Address where the party was served:*        330 N. BRAND BLVD., STE. 700<br>                                               GLENDALE, CA  91203

5. *I served the party:*
    a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Mon., Dec. 15, 2025 (2) at: 12:40PM

6. *The "Notice to the Person Served" (on the Summons) was completed as follows:*
    *on behalf of:* CRAYOLA LLC
    *Other:* CAL. CORP. CODE 17061

7. *Person Who Served Papers:*                               Recoverable Cost Per CCP 1033.5(a)(4)(B)
    a. DOUGLAS  FORREST                 d.  *The Fee for Service was:*
    **b. A & A LEGAL SERVICE, Inc.**        e.  I am: (3)  registered California process server
       880 MITTEN ROAD, SUITE 102            (i)   Employee
       BURLINGAME, CA  94010               (ii) *Registration No.:*    5141
    c. (650) 697-9431, FAX (650) 697-4640       (iii) *County:*           Los Angeles

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

   *Date:* **Wed, Dec. 17, 2025**

| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | PROOF OF SERVICE<br>SUMMONS | (DOUGLAS  FORREST) | wylis.148527 |
|---|---|---|---|

# EXHIBIT C

1 DAVIS WRIGHT TREMAINE LLP
  James H. Moon (SBN 268215)
2   jamesmoon@dwt.com
3 350 South Grand Avenue, 27th Floor
  Los Angeles, CA 90071
4 Telephone: (213) 633-6800
  Fax: (213) 633-6899
5
6 *Attorneys for Defendant*
  *Crayola LLC*
7

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                     FOR THE COUNTY OF ALAMEDA
10

| | |
|---|---|
| 11 STEPHANIE WEDGE, SHAWN WAGNER AND ROBERT MASON, | Case No. 25CV157969 |
| 12 | UNLIMITED JURISDICTION |
| 13 Plaintiffs, | **NOTICE OF FILING OF NOTICE OF REMOVAL** |
| 14 v. | |
| 15 CRAYOLA LLC, et al., | |
| 16 Defendants. | |

17 TO:     CLERK OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
18         COUNTY OF ALAMEDA

19         Please take notice that pursuant to the provisions of 28 U.S.C. §§ 1332, 1441, and 1446,

20 Defendant Crayola LLC, filed a Notice of Removal in the above-entitled action, a copy of which is

21 attached as Exhibit 1, in the office of the Clerk of the United States District Court for the Northern

22 District of California, on January 14, 2026.

23

24 Dated: January 14, 2026                    DAVIS WRIGHT TREMAINE LLP

25                                              /s/ James H. Moon

26                                            ATTORNEYS FOR DEFENDANT
27                                            CRAYOLA LLC

28